No. 24-1590

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

CROSSPOINT CHURCH,

*Plaintiff-Appellant,*

v.

A. PENDER MAKIN, IN HER OFFICIAL CAPACITY AS COMMISSIONER OF THE MAINE DEPARTMENT OF EDUCATION, ET AL.,

*Defendants-Appellees.*

On Appeal from the United States District Court for the District of Maine, No. 1:23-cv-00146 (Woodcock, J.)

## OPENING BRIEF OF APPELLANT CROSSPOINT CHURCH

Kelly J. Shackelford
David J. Hacker
Jeremiah G. Dys
First Liberty Institute
2001 W. Plano Parkway, Ste. 1600
Plano, TX 75075
(972) 941-4444
kshackelford@firstliberty.org

Camille P. Varone
First Liberty Institute
1331 Pennsylvania Ave. NW, Ste. 1410
Washington, DC 20004
(202) 921-4105
cvarone@firstliberty.org

September 3, 2024

Patrick Strawbridge
Consovoy McCarthy PLLC
10 Post Office Sq.
8th Flr. S. PMB #706
Boston, MA 02109
(617) 227-0548
patrick@consovoymccarthy.com

Tiffany H. Bates
Consovoy McCarthy PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tiffany@consovoymccarthy.com

*Counsel for Appellant*

# TABLE OF CONTENTS

Table of Authorities ..................................................................................................ii

Reasons Why Oral Argument Should Be Heard .............................................1

Introduction ...........................................................................................................1

Jurisdictional Statement .......................................................................................3

Statement of the Issues........................................................................................3

Statement of the Case ..........................................................................................3

    I.    Crosspoint Church and Bangor Christian School ..........................3

    II.    Maine's Tuitioning Program and the Sectarian Exclusion ............5

    III.    *Carson v. Makin* Invalidated the Sectarian Exclusion .........................6

    IV.    The Maine Legislature Adds a Poison Pill to the Tuitioning Program ..........7

    V.    Procedural History.................................................................................9

Summary of Argument ...................................................................................... 13

Standard of Review ............................................................................................ 15

Argument ............................................................................................................. 15

    I.    Section 4602 violates the Free Exercise Clause. ........................... 15

        A.    Section 4602 targets Crosspoint's religious exercise and triggers strict scrutiny.................................................................... 18

        B.    Section 4602 cannot satisfy strict scrutiny. ........................... 23

    II.    Applying the MHRA to prohibit Crosspoint from employing only co-religionists violates the Establishment and Free Exercise Clauses. .............. 26

    III.    Section 4602 violates the Free Speech Clause................................. 31

Conclusion........................................................................................................... 35

Certificate of Compliance.................................................................................. 36

Certificate of Service .......................................................................................... 37

# TABLE OF AUTHORITIES

## CASES

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
  570 U.S. 205 (2013) ................................................................................... 16

*Burwell v. Hobby Lobby Stores, Inc.*,
  573 U.S. 682 (2014) ................................................................................... 16

*Carson v. Makin*,
  401 F. Supp. 3d 207 (D. Me. 2019) ..................................................7, 20, 34

*Carson v. Makin*,
  596 U.S. 767 (2022) .................................................. 1, 5, 6, 7, 17, 23, 24, 25

*Carson v. Makin*,
  979 F.3d 21 (1st Cir. 2020) ....................................................... 6, 7, 8, 19, 26

*Church of the Lukumi Babalu Aye, Inc. v. Hialeah*,
  508 U.S. 520 (1993) ...................................................... 19, 22, 23, 25

*Darren Patterson Christian Acad. v. Roy*,
  699 F. Supp. 3d 1163 (D. Colo. 2023) .................................................24, 29

*Emp't Div., Dep't of Hum. Res. of Ore. v. Smith*,
  494 U.S. 872 (1990) ................................................................................... 19

*Fulton v. City of Philadelphia*,
  593 U.S. 522 (2021) ...............................................................................23, 24

*Gonzales v. O Centro Espírita Beneficente União*,
  546 U.S. 418 ( 2006) .................................................................................. 23

*Good News Club v. Milford Cent. Sch.*,
  533 U.S. 98 (2001) ..................................................................................... 24

*Hosanna-Tabor Evangelical Church & Sch. v. EEOC*,
  565 U.S. 171 (2012) ...............................................................................29, 30

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, Inc.*,
  515 U.S. 557 (1995) ................................................................. 34

*Kennedy v. Bremerton Sch. Dist.*,
  597 U.S. 507 (2022) ..............................................14, 15, 18, 22, 24

*Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*,
  584 U.S. 617 (2018) ................................................................. 22

*McDaniel v. Paty*,
  435 U.S. 618 (1978) ............................................................. 16, 30

*Miami Herald Publishing Co. v. Tornillo*,
  418 U.S. 241 (1974) ................................................................. 34

*Naser Jewelers, Inc. v. City of Concord*,
  513 F.3d 27 (1st Cir. 2008) ..................................................... 15

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
  591 U.S. 732 (2020) ................................................................. 28

*Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal.*,
  475 U.S. 1 (1986)..................................................................... 34

*Perry v. Sindermann*,
  408 U.S. 593 (1972) ................................................................. 30

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ................................................................. 31

*Rideout v. Gardner*,
  838 F.3d 65 (1st Cir. 2016) ..................................................... 32

*Roberts v. U.S. Jaycees*,
  468 U.S. 609 (1984) ................................................................. 32

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
  592 U.S. 14 (2020) ................................................................... 22

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995) ............................................................. 31, 32

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.,*
547 U.S. 47 (2006) ................................................................ 32, 33, 34, 35

*St. Dominic Acad. v. Makin,*
2024 No. 2:23-cv-00246-JAW (D. Me. Aug. 8, 2024)....................... 18, 21

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
582 U.S. 449 (2017) ............................................................... 7, 16, 30

*Turner Broad. Sys., Inc. v. FCC,*
512 U.S. 622 (1994) ..................................................................... 32

*Ward v. Rock Against Racism,*
491 U.S. 781 (1989) ..................................................................... 31

*Widmar v. Vincent,*
454 U.S. 263 (1981) ..................................................................... 25

## STATUTES

5 M.R.S.A. §4553 ........................................................................ 27

5 M.R.S.A. §4572 .....................................................15, 26, 27, 30, 35

5 M.R.S.A. §4573 ........................................................................ 27

5 M.R.S.A. §4602 ........................................... 1, 8, 13, 15, 16, 19, 35

20-A M.R.S.A. §2 ..........................................................................5

20-A M.R.S.A. §2951 ....................................................................5

20-A M.R.S.A. §5204 ....................................................................5

28 U.S.C. § 1331 ..........................................................................3

Me. P.L. § 2021 ................................................................8, 15, 19

P.L. 2023, ch. 188, §1, 2023 Me. Laws 370 .................................. 11

**OTHER AUTHORITIES**

Aaron Tang, *There's a Way to Outmaneuver the Supreme Court, and Maine Has Found It*,
    N.Y. Times (June 23, 2022)......................................................................... 21

**REASONS WHY ORAL ARGUMENT SHOULD BE HEARD**

This is a constitutional challenge to Maine's continued attempt to unconstitutionally exclude Crosspoint Church from participating in the state's school choice program because of its religious beliefs. As the district court acknowledged, this case "presents novel constitutional questions in the wake of the Supreme Court's decision in *Carson v. Makin*" that are ripe for this Court's review. ADD3. Crosspoint believes that oral argument will assist this Court in resolving this case.

**INTRODUCTION**

After forty years of religious discrimination in Maine's school choice program, the state continues to unconstitutionally exclude certain religious schools from participating in the state's school choice program because of their religious beliefs. In Maine, local school administrative units (SAUs) that do not operate their own secondary schools may pay tuition for resident students to attend either a private secondary school or another SAU's secondary school. For its first 100 years, the program permitted participation by private religious schools, but from 1980 until the Supreme Court's decision in *Carson v. Makin*, 596 U.S. 767 (2022), the state excluded these schools from the tuition program, limiting participation only to non-sectarian schools.

Until recently, the state also exempted religious schools from certain nondiscrimination provisions to accommodate their religious beliefs. Anticipating the Supreme Court's decision in *Carson*, however, the Maine legislature narrowed the religious exemption in 5 M.R.S.A. §4602. The exemption previously covered all religious schools,

1

but the amendment narrowed it to protect only religious schools that do not participate in the tuitioning program. Without the exemption, religious schools are subject to administrative investigations, complaints, and financial penalties of thousands of dollars if they offer instruction or make hiring decisions consistent with their sincerely held religious beliefs.

This "poison pill" is designed to deter religious schools from participating and thus perpetuates the religious discrimination at the heart of the state's prior sectarian exclusion. From the start, Maine's Attorney General and the then-Speaker of the House of Representatives admitted this scheme was intentional. The legislature crafted the poison pill explicitly to circumvent the Supreme Court's decision in *Carson*. The poison pill also specifically targeted Crosspoint, who operates the school that two of the *Carson* plaintiffs attended.

Crosspoint brought this suit, alleging that the states' discriminatory application of the Maine Human Rights Act to exclude Crosspoint, who operates an otherwise qualified school, from the tuition program violates the Free Exercise, Establishment, and Free Speech Clauses of the U.S. Constitution. Although the district court held that this scheme burdens Crosspoint's religious expression and acknowledged that Crosspoint faces a credible threat of enforcement, it declined to grant Crosspoint its desired relief. At this point, after Crosspoint's "hard-fought and significant victory" at the Supreme Court in *Carson*, "the Maine Legislature and the Maine Attorney General

have largely deprived Crosspoint and similar religious schools of the fruit of their victory." ADD47. This Court should not allow the state to continue to do so.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction because Crosspoint alleges violations of the First Amendment of the United States Constitution. 28 U.S.C. §1331. This Court has jurisdiction because Crosspoint appeals from a final judgment disposing of all claims. *Id.* §1291. On June 4, 2024, the district court granted the parties' joint motion to convert the order on a preliminary injunction into an order on a permanent injunction. ADD49-56. On June 5, 2024, the court entered judgment. ADD57. Crosspoint timely appealed on June 21, 2024. JA11.

## STATEMENT OF THE ISSUES

I.  Does §4602 of the Maine Human Rights Act violate the Free Exercise Clause of the First Amendment?

II. Does §4572 of the Maine Humans Rights Act violate the Establishment and Free Exercise Clauses of the First Amendment?

III. Does §4602 of the Maine Human Rights Act violate the Free Speech Clause of the First Amendment?

## STATEMENT OF THE CASE

### I.  Crosspoint Church and Bangor Christian School

Appellant Crosspoint Church, a Christian church located in Bangor, Maine, runs Bangor Christian School (BCS), a preschool-12 religious school. BCS is a ministry of Crosspoint Church founded in 1970 "to assist families in educating the whole child by encouraging spiritual maturity and academic excellence in a supportive environment." JA83. Crosspoint runs BCS in accordance with its Statement of Faith, and its religious

beliefs are central to BCS's educational mission. JA85-88. Crosspoint considers prospective students' spiritual fit in determining admissions, and parents agree when they join BCS that they support and will cooperate with the school's religious mission and educational philosophy. JA89-90. Because they serve as Christian role models to the students and are responsible for inculcating BCS's religious beliefs and values, Crosspoint employees must be co-religionists—that is, they must agree with the school's Statement of Faith and educational objectives. JA127-34.

As explained in BCS's Statement of Faith, Crosspoint believes the Bible is inerrant and the "final authority in all matters." JA83, 86-87. It believes that the only method of salvation is by grace, through repentance and faith in Jesus Christ. JA85. Crosspoint believes that marriage is defined by God to join one man and one woman in a covenantal union and that sexual activity is not to occur outside of marriage. JA86-87. And it also believes that a person's "gender is both sacred and established by God's design." JA89. Accordingly, BCS's code of conduct prohibits students from, among other things, engaging in sexual activity outside of marriage (as defined in the Statement of Faith) or identifying as a gender other than their sex at birth. JA89. A student who persistently and unrepentantly counter-witnesses—that is, advocates beliefs contrary to BCS's Statement of Faith—is considered not to agree and cooperate with BCS's mission and is subject to removal from the school. JA90.

4

## II.    Maine's Tuitioning Program and the Sectarian Exclusion

The Maine legislature guarantees every school-aged child residing within the state "an opportunity to receive the benefits of a free public education." 20-A M.R.S.A. §2(1). It vests authority to fulfill this guarantee in local administrative units. Maine's tuitioning program is a school choice program for families residing in SAUs that do not maintain a secondary school. 20-A M.R.S.A. §5204(4). Families residing in tuitioning SAUs may send their child to the public or approved private school of their choice at the SAU's expense, up to the state tuition cap. 20-A M.R.S.A. §5204.

Until 1981, religious schools were eligible to participate in the tuition program. *See Carson*, 596 U.S. at 774-75. But after the Maine Attorney General issued an opinion concluding that allowing religious schools to participate violated the First Amendment's Establishment Clause, the Maine legislature amended the tuitioning law to require that private schools be "nonsectarian" to participate. *Id.*; 20-A M.R.S.A. §2951(2). Because of this sectarian exclusion, BCS was no longer eligible to participate in the tuitioning program, and eligible families could no longer use their tuition benefit at BCS. *See Carson*, 596 U.S. at 775-76.

But the state did not enforce the sectarian exclusion to exclude *all* religious schools. Instead, the Education Commissioner administered the sectarian exclusion to exclude only *certain* religious schools, depending on their religious beliefs. As the Education Commissioner explained, the Education Department

> consider[ed] a sectarian school to be one that is associated with a particular faith or belief system and which, in addition to teaching academic subjects, promotes the faith or belief system with which it is associated and/or presents the material taught through the lens of this faith. While affiliation or association with a church or religious institution is one potential indicator of a sectarian school, it is not dispositive. The Department's focus [was] on what the school teaches through its curriculum and related activities, and how the material is presented.

*Carson v. Makin*, 979 F.3d 21, 38 (1st Cir. 2020) (quoting interrogatory response of the Maine Education Commissioner); JA260. In practice, the Education Department treated schools operated by religious organizations as sufficiently nonsectarian when they taught what the Department considered "universal moral and spiritual values." JA265; *see* Transcript of Oral Argument at 63-65, *Carson v. Makin*, 596 U.S. 767 (2022) (No. 20-1088). And it excluded schools holding so-called "discriminatory" beliefs, such as those teaching a particular religion as true or employing only co-religionists. JA259-60 (Interrog. Resp. of Educ. Comm'r); JA233-55 (H. Legis. R., 1st Regul. Sess., at 582-89 (Me. 2003)). Thus, the sectarian exclusion allowed religious schools to participate in the tuitioning program if, and only if, the state was persuaded that the school's religious beliefs were satisfactorily "universal" and not "discriminatory."

III.   *Carson v. Makin* **Invalidated the Sectarian Exclusion**

In 2018, three families—including two families whose children attended BCS—challenged the sectarian exclusion. In 2022, the Supreme Court of the United States ruled in their favor, holding that the sectarian exclusion violated the Free Exercise Clause because it "operate[d] to identify and exclude otherwise eligible schools on the basis of their religious exercise" in violation of the First Amendment's Free Exercise

Clause. *Carson*, 596 U.S. at 789. The Court held that the Free Exercise Clause of the First Amendment protects against "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." *Id.* at 778. And it concluded that "BCS … [is] disqualified from this generally available benefit 'solely because of [its] religious character,'" and "[b]y 'conditioning the availability of benefits in that manner,' Maine's tuition assistance program … 'effectively penalizes the free exercise' of religion." *Id.* at 780 (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017)). The Court also found the Education Department's practice of "scrutinizing whether and how a religious school pursues its educational mission" particularly troubling because of the potential for "state entanglement with religion and denominational favoritism." *Id.* at 787. As a result of that decision, the sectarian exclusion is unenforceable.

## IV.  The Maine Legislature Adds a Poison Pill to the Tuitioning Program

Throughout the *Carson* litigation, Commissioner Makin strove to deter BCS from agreeing to participate in the tuitioning program if its students' suit succeeded. To undermine the *Carson* plaintiffs' standing, Commissioner Makin contended that if the state approved BCS for the tuition program, provisions of the Maine Human Rights Act (MHRA) would require BCS to hire employees that do not share its religious beliefs. *See* Def.'s Mot. for Summ. J. at 7-8, 13-14, *Carson v. Makin*, 401 F. Supp. 3d 207 (D. Me. 2019) (No. 1:18-cv-327-DBH), ECF No. 29; Br. for Appellee at 22-23, *Carson v. Makin*, 979 F.3d 21 (1st Cir. 2020) (No. 19-1746). This Court ultimately rejected the Commissioner's standing argument, and it reserved the question of how the MHRA applies to

BCS because of constitutional and statutory exemptions available to religious organizations. *See Carson*, 979 F.3d at 28, 31.

While the *Carson* petition for certiorari was pending before the Supreme Court, the Maine legislature passed a new law designed to undermine the *Carson* plaintiffs' standing. The law created a poison pill in the tuitioning program designed to deter disfavored religious schools, including BCS, from participating if the Court invalidated the sectarian exclusion. "An Act to Improve Consistency in Terminology and within the Maine Human Rights Act," P.L. 2021, Ch. 366, §19, amended the MHRA's educational discrimination provision (5 M.R.S.A. §4602) in two relevant ways: 1) it narrowed the preexisting religious exemption for the sexual orientation and gender identity provisions to protect only religious schools that do not participate in the tuitioning program, and 2) it added religion as a protected class and prohibited discrimination against students' religious expression without providing an exemption for religious schools. JA43-54; P.L. 2021, Ch. 366, §19, *codified at* 5 M.R.S.A. §4602(5)(C), (D). As a result, if the state approved BCS for participation in the tuitioning program, the poison pill would prohibit BCS from teaching from its religious perspective, requiring parents and students to agree with BCS's religious beliefs and religious educational mission, and requiring students to adhere to a code of conduct consistent with BCS's religious beliefs. Violations of the MHRA carry thousands of dollars in civil penalties and attorney's fees liability. *See* 5 M.R.S.A. §§4613(2)(B)(7), 4614.

8

## V.    Procedural History

A. On March 27, 2023, Crosspoint filed a three-count complaint against the Commissioner of the Maine Department of Education and the Commissioners of the Maine Human Rights Commission, alleging that §4602 and §4572 of the MHRA effectively excluded it from the state's tuitioning program in violation the Free Exercise, Establishment, and Free Speech Clauses of the U.S. Constitution. JA15-42. The same day, Crosspoint filed a motion for preliminary injunction to enjoin Defendants from enforcing those provisions.

B. On February 27, 2024, the district court denied Crosspoint's motion for a preliminary injunction. ADD2-28. First, the district court held that Crosspoint's claims were ripe for review. It concluded that there is no "serious dispute" that "if BCS received state funding," its policies would "conflict directly with the MHRA's prohibition against discrimination on the basis of sexual orientation or gender identity." ADD23. And the "only way for Crosspoint to avoid liability" is for it to "refrain[] from acting." ADD24. "Once Crosspoint is approved for tuitioning," the court explained, "a member of a protected class could apply at any time, forcing Crosspoint to either violate the statute or compromise its religious beliefs." *Id.* Thus, Crosspoint is forced to "do nothing" or "give up control over concerns for legal liability." *Id.*

The court also concluded that Crosspoint's fear of enforcement is "eminently reasonable," especially considering "the timing of the amendments," the then-Speaker of the House's statement that the law was designed to undermine the Supreme Court's

9

decision in *Carson*, and the Maine Attorney General's statements indicating he would enforce the MHRA against religious schools that apply to receive public funds. ADD26-27. Such statements by the state's chief law enforcement officer "reasonably" caused Crosspoint "to conclude that he would pursue [them] for asserted violations of the MHRA's antidiscrimination provisions." ADD26-27. Indeed, the court continued, it is a "short step" from Crosspoint accepting tuition funds to the Attorney General's enforcement of the MHRA "with its potential of civil and other penalties." ADD24.

C. On the merits, the district court denied a preliminary injunction "primarily" because it concluded that Crosspoint was "unlikely to succeed" on its constitutional claims. ADD2. The court concluded that the MHRA's antidiscrimination provisions did, in fact, "burden Crosspoint's religious exercise." ADD33. "The statute plainly would prohibit Crosspoint—if it joins the tuitioning program—from denying admission to or otherwise excluding applicants based on their sexual orientation, gender identity, or religion," the court explained. ADD30. And because Crosspoint requires its students to comply with its Statement of Faith, "the MHRA effectively prohibits Crosspoint from enforcing some tenets of those policies." ADD33.

Even so, the court declined to apply strict scrutiny, concluding that the educational antidiscrimination provisions were "neutral, generally applicable, and rationally related to a legitimate government interest." ADD2, 27. When this suit was filed, §4602 categorically exempted single-sex schools (for example, traditional all-boys or girls Catholic schools) from nearly all educational nondiscrimination provisions, including

those relating to religion, sexual orientation, and gender identity. After this case was fully briefed, the Maine legislature eliminated that exemption. *See* P.L. 2023, ch. 188, §1, 2023 Me. Laws 370. The court thus concluded that Crosspoint's "argument on general applicability appears to have been mooted" and held that §4602 is generally applicable. ADD34.

The court also held that §4602 is "neutral." ADD34-36. The court stated that it did not find "significant evidence" that the legislature's "objective was 'to impede or constrain religion' as opposed to ensuring uniformity in a legislative scheme that already prohibited these types of discrimination by organizations receiving public funds in the housing and employment contexts." ADD36. The court "acknowledge[d]," however, that Attorney General Frey's "immediate negative response to *Carson* and then-Speaker Fecteau's opinion about the purpose of the legislation len[t] credence to Crosspoint's argument." ADD38. But the court ultimately discounted those statements, holding that "Maine has a legitimate interest in preventing discrimination in education," and the MHRA's challenged provisions were "rationally related to that interest." ADD41.

As to the employment discrimination claim, the district court concluded that there was no "case or controversy between the parties." ADD43. In the court's view, "[b]oth Crosspoint and the state" agree that Crosspoint is exempt from §4572's prohibition on employment discrimination and thus the state "disclaimed" future enforcement of the statute "in a manner that would appear to plainly violate the statute's own text." ADD42-43.

11

And as to the free speech claim, the district court held that §4602 of the MHRA did not infringe on Crosspoint's expression. "At least in this pre-enforcement context," the court explained, the challenged provisions "regulate conduct, not speech." ADD43.

Finally, the district court held that the remaining preliminary injunction factors favored the state. The court explained that it did "not discount Crosspoint's hardship related to not participating in the tuitioning program for fear of MHRA enforcement." ADD46. But it concluded that this hardship did not "outweigh" the "potential hardship the state would face from being unable to fully enforce its educational antidiscrimination laws" and the public interest in "the state being able to effectively combat discrimination." *Id.*

D. On March 28, 2024, the parties jointly moved to convert the order on preliminary injunction into an order on a permanent injunction and enter final judgment. The same day, the parties submitted joint stipulated facts for the purpose or resolving that motion. The parties and the district court then conferred, resulting in the parties submitting a joint motion in response to the court's order on April 24, 2024. The district court then granted the parties' joint motion to covert the order on the preliminary injunction into an order on a permanent injunction and enter final judgment on June 4, 2024. Crosspoint timely filed its notice of appeal. JA11.

## SUMMARY OF ARGUMENT

After the Supreme Court invalidated the sectarian exclusion, BCS is eligible to participate in the state's tuitioning program. But the liability the Maine Human Rights Act now imposes on BCS—thanks to revisions the state made in anticipation of *Carson*—prevents BCS from doing so without relinquishing its religious identity. Until those amendments, the state exempted religious schools from certain nondiscrimination provisions to accommodate their religious beliefs. But now the Maine legislature has narrowed the religious exemption in 5 M.R.S.A. §4602 to effectively prohibit schools from participating in the tuition program without facing the prospect of state investigations, complaints, and large fines—merely for offering instruction consistent with their sincerely held religious beliefs.

Section 4602 was plainly designed to exclude BCS from the state's tuitioning program. In the Maine Attorney General's words, BCS's specific religious beliefs are "inimical to a public education" and "promote discrimination, intolerance, and bigotry." JA275. The law thus acts as a poison pill, effectively deterring religious schools from participating. This perpetuates the religious discrimination at the heart of the sectarian exclusion. The Free Exercise Clause prohibits government from burdening a plaintiff's "sincere religious practice pursuant to a policy that is not neutral or generally applicable … unless the government can satisfy strict scrutiny by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that

interest." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022) (cleaned up). Defendants cannot meet that burden.

Before the Maine legislature adopted §4602, Commissioner Makin declared that if BCS became approved for tuition purposes, it would be subject to §4572(1)(A), which prohibits employers from failing or refusing to hire or otherwise discriminating against any applicant "because of race or color, sex, sexual orientation or gender identity, physical or mental disability, religion, age, ancestry, national origin or familial status." *See* Defs.' Mot. for Summ. J. (D. Me.), *supra*, at 7-8, 13-14; Br. of Appellee (CA1), *supra*, at 22-23. So even though BSC is now eligible to participate in the tuitioning program, it faces a credible threat of Defendants enforcing §4572(1)(A) to prohibit BCS's practice of hiring only co-religionists if it participates. Applying the MHRA's employment discrimination provision to prohibit Crosspoint from hiring only co-religionists violates the text of Establishment and Free Exercise Clauses.

Section 4602 also restricts Crosspoint's speech based on content and viewpoint. It is designed to coerce BCS into abandoning its religious-based perspectives as a condition of participating in the tuition program. Maine now forces BCS to choose either to forgo publicly funded tuition payments or to face the imminent prospect of thousands of dollars in liability. Suppressing BCS's religious perspective is the avowed purpose of §4602. This provision violates the Free Speech Clause.

At bottom, Crosspoint is "stuck between 'the Scylla of intentionally flouting state law and the Charybdis of forgoing what [it] believe[s] to be constitutionally protected

activity.'" ADD27. In that contest, the Constitution wins. The Court should vacate the district court's judgment and remand the case with instructions to permanently enjoin the states from enforcing 5 M.R.S.A. §4572 and 5 M.R.S.A. §4602 against Crosspoint.

## STANDARD OF REVIEW

This Court reviews First Amendment claims de novo. *Naser Jewelers, Inc. v. City of Concord*, 513 F.3d 27, 32 (1st Cir. 2008).

## ARGUMENT

Sections 4602 and 4572 of the Maine Human Rights Act effectively exclude Crosspoint from the state's tuitioning program in violation the Free Exercise, Establishment, and Free Speech Clauses of the U.S. Constitution. The district court erred in holding otherwise.

### I.    Section 4602 violates the Free Exercise Clause.

Section 4602 is a poison pill that violates the Free Exercise Clause. *See* P.L. 2021, Ch. 366, §19, codified at 5 M.R.S.A. §4602(5)(C), (D). The Free Exercise Clause prohibits government from burdening a plaintiff's "sincere religious practice pursuant to a policy that is not neutral or generally applicable … unless the government can satisfy strict scrutiny by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Kennedy*, 597 U.S. at 525 (cleaned up).

The poison pill substantially "burden[s] Crosspoint's religious exercise." ADD33. After *Carson*, Crosspoint is now eligible to participate in the tuitioning program, but if it does so, the poison pill will prohibit it from operating as a religious

school. As the district court correctly concluded, the statute "plainly would prohibit Crosspoint—if it joins the tuitioning program—from denying admission to or otherwise excluding applicants based on their sexual orientation, gender identity, or religion." ADD30. Indeed, if Crosspoint participates in the program, the MHRA will "effectively prohibit[]" Crosspoint from "enforcing several of its religiously motivated policies"— policies that are critical to carrying out the schools' religious mission. ADD33. Putting Crosspoint to the choice of participating in a generally available benefit program or surrendering its constitutionally protected religious exercise penalizes its religious exercise and constitutes a substantial burden. *Trinity Lutheran*, 582 U.S. at 462 ("[W]hen the State conditions a benefit in this way, … the State has punished the free exercise of religion: 'To condition the availability of benefits … upon [a recipient's] willingness to … surrender[ ] his religiously impelled [status] effectively penalizes the free exercise of his constitutional liberties.'") (quoting *McDaniel v. Paty*, 435 U.S. 618, 626 (1978) (plurality opinion); *see Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 217-19 (2013) (holding that government may not condition benefits on the recipient relinquishing constitutional rights). Violations of MHRA carry substantial monetary penalties and potential attorney's fees liability, 5 M.R.S.A. §§4613(2)(B)(7), 4614, which also constitute a substantial burden, *see Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 691 (2014).

Crosspoint also reasonably fears enforcement: the Education Commissioner's briefing to the Supreme Court in *Carson* threatened to enforce 5 M.R.S.A. §4602 against BCS if it participated in the tuitioning program, and Attorney General Frey's June 21,

2022 press release specifically identified BCS as an enforcement target. *See* Br. for Resp't at 54, *Carson v.* Makin, 596 U.S. 767 (2022) (No. 20-1088); JA274-75 (Statement of Maine Attorney General Aaron Frey on Supreme Court Decision in *Carson v. Makin*).

Despite holding that the MHRA burdens BCS's religious expression and acknowledging that BCS "reasonably" believes that it faces a credible threat of enforcement, the district court nevertheless concluded that §4602 was generally applicable, neutral, and need only be justified by a rational basis. ADD26-27, 41. The court stated that it did not find "significant evidence" that the legislature's "objective was 'to impede or constrain religion' as opposed to ensuring uniformity in a legislative scheme that already prohibited these types of discrimination by organizations receiving public funds in the housing and employment contexts." ADD36. The court "acknowledge[d]," however, that Attorney General Frey's "immediate negative response to *Carson* and then-Speaker Fecteau's opinion about the purpose of the legislation len[t] credence to Crosspoint's argument." ADD38. But the court ultimately discounted those statements, holding that "Maine has a legitimate interest in preventing discrimination in education," and the MHRA's challenged provisions were "rationally related to that interest." ADD41. This analysis applied the wrong constitutional test and misread the purpose and reach of the statute.

### A.    Section 4602 targets Crosspoint's religious exercise and triggers strict scrutiny.

Contrary to the district court's conclusion, §4602 is not generally applicable. When this suit was filed, §4602 categorically exempted single-sex schools (for example, traditional all-boys' or girls' Catholic schools) from nearly all educational nondiscrimination provisions, including those relating to religion, sexual orientation, and gender identity. After this case was fully briefed, the Maine legislature eliminated that exemption. But even without that exemption, §4602 still fails the test for general applicability. Just last month, the same district court assigned to this case held that §4602 is not generally applicable because is "does not apply to private postsecondary institutions or to schools located outside of Maine" that participate in the tuition program. *See St. Dominic Acad. v. Makin*, No. 2:23-cv-00246-JAW (D. Me. Aug. 8, 2024), Doc. 50 at 51; *see id.* ("It appears that these schools could adopt any of St. Dominic's policies or practices that allegedly violate the MHRA without fear of enforcement actions or risk of losing access to public funds from Maine. In other words, Chapter 366 is 'underinclusive,' and therefore not generally applicable, because it 'fail[s] to prohibit nonreligious conduct that endangers [Maine's] interests in a similar or greater degree than' St. Dominic's conduct.").

Nor is the law "neutral." ADD41. A law "will not qualify as neutral if it is 'specifically directed at … religious practice,'" such as "if it 'discriminate[s] on its face,' or if a religious exercise is otherwise its 'object.'" *Kennedy*, 597 U.S. at 526 (quoting *Emp't*

*Div., Dep't of Hum. Res. of Ore. v. Smith*, 494 U.S. 872, 877 (1990); *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 533 (1993)). Failing either neutrality or general applicability triggers strict scrutiny. *Id.* Moreover, "[a] plaintiff may also prove a free exercise violation by showing that 'official expressions of hostility' to religion accompany laws or policies burdening religious exercise"; in such cases the Supreme Court has "set aside such policies without further inquiry." *Id.* at 2422 n.1 (quotation omitted).

Section 4602 targets Crosspoint's religious exercise. It was expressly designed to exclude Crosspoint from the tuitioning program, because—in the Maine Attorney General's own words—Crosspoint's specific religious beliefs are "inimical to a public education" and "promote discrimination, intolerance, and bigotry." JA275. Although §4602 has ramifications for many religious schools, its timing and structure show that its purpose was to preemptively exclude BCS and other schools with similar beliefs from the tuitioning program to moot *Carson*. In *Carson*, Commissioner Makin identified particular requirements that would prompt BCS to decline to participate in the tuitioning program. *See* Defs.' Mot. for Summ. J. (D. Me.), *supra*, at 7-8, 13-14; Br. of Appellee (CA1), *supra*, at 22-23. The legislature then imposed those very same requirements after the Commissioner's attempt to craft a poison pill from existing law failed in this Court. *See* Br. for Resp't (SCOTUS), *supra*, at 54; *Carson*, 979 F.3d at 28, 31; P.L. 2021, Ch. 366, §19; 5 M.R.S.A. §4602(5)(C).

19

This result is intentional and specifically targets BCS's sincere religious beliefs. As Attorney General Frey explained in his press release the day the Supreme Court decided *Carson*:

> The education provided by the schools at issue here is inimical to a public education. They promote a single religion to the exclusion of all others, refuse to admit gay and transgender children, and openly discriminate in hiring teachers and staff. One school teaches children that the husband is to be the leader of the household. While parents have the right to send their children to such schools, it is disturbing that the Supreme Court found that parents also have the right to force the public to pay for an education that is fundamentally at odds with values we hold dear. I intend to explore with Governor Mills' administration and members of the Legislature statutory amendments to address the Court's decision and ensure that public money is not used to promote discrimination, intolerance, and bigotry.
>
> While the Court's decision paves the way for religious schools to apply to receive public funds, it is not clear whether any religious schools will do so. Educational facilities that accept public funds must comply with anti-discrimination provisions of the Maine Human Rights Act, and this would require some religious schools to eliminate their current discriminatory practices.

JA275.

The school General Frey is talking about is BCS. *See* Joint Stipulated Facts, *Carson*, 401 F. Supp. 3d 207 (D. Me. 2019) (No. 1:18-cv-327-DBH), ECF No. 25 ¶79 ("BCS believes that God has ordained distinct and separate spiritual functions for men and women, and the husband is to be leader of the home and men are to be the leaders of the church."); *id.* ¶ 102 ("BCS teaches children that the husband is the leader of the household."). On top of that, the then-Speaker of the Maine House of Representatives

boasted days after the Supreme Court decided *Carson* that the Maine legislature intentionally designed the poison pill to evade the Court's decision:



JA280. Scholars who followed this debate also observed that this was the legislature's motivation in the days following the *Carson* decision. In the New York Times, U.C. Davis Law Professor Aaron Tang wrote: "Anticipating this week's decision [in *Carson*], Maine lawmakers enacted a crucial amendment to the state's antidiscrimination law last year in order to counteract the expected ruling." Aaron Tang, *There's a Way to Outmaneuver the Supreme Court, and Maine Has Found It*, N.Y. Times (June 23, 2022), shorturl.at/KZsqU; *see St. Dominic Acad.*, No. 2:23-cv-00246-JAW, Doc. 50, at 13-14. He opined that this "legislative fix" by the Maine legislature "offers a model for lawmakers elsewhere who are alarmed by the court's aggressive swing to the right." *Id.* Indeed, he concluded that "Maine's example shows that those on the losing end of a case can often outmaneuver the court and avoid the consequences of a ruling." *Id.*

General Frey's press release, which disparages BCS's religious beliefs and vows to exclude them using the MHRA, is smoking-gun evidence—rare in its candor—of

the state's disregard of BCS's constitutional rights. And it leaves no doubt that the legislature specifically crafted the poison pill to target BCS's religious beliefs. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 16-17 (2020) ("[S]tatements made in connection with the challenged rules can be viewed as targeting the ultra-Orthodox [Jewish] community.") (quotation omitted); *Lukumi*, 508 U.S. at 540-42 (considering city council members' hostile statements towards religious group in finding ordinance not neutral); *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 584 U.S. 617, 635 (2018) (noting that civil rights commissioner's disparagement of plaintiff's religious beliefs as bigoted "is inappropriate"); *Kennedy*, 597 U.S. at 525 n. 1.

Between the Attorney General's statements indicating "he would pursue Crosspoint for asserted violations of the MHRA's antidiscrimination provisions" if it participated in the tuitioning program, the then-Speaker of the House's "frank statement" that the law was designed to undermine the Supreme Court's decision in *Carson*, and the "the timing of the amendments," the district court concluded that Crosspoint's fear of enforcement is "eminently reasonable." ADD26-27. Such statements by the state's chief law enforcement officer "reasonably" caused Crosspoint "to conclude that he would pursue [them] for asserted violations of the MHRA's antidiscrimination provisions." *Id.* Indeed, the court continued, it is a "short step" from Crosspoint accepting tuition funds to the Attorney General's enforcement of the MHRA "with its potential of civil and other penalties." ADD24.

Excluding BCS from the tuitioning program is the feature of the amended statute, not a bug. *See Lukumi*, 508 U.S. at 540-41. A law enacted "because of, not merely in spite of," its exclusion of religious schools simply cannot be neutral. *Id.* at 540; *see id.* at 533; *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021) ("Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature."). And although the poison pill failed to stop the Supreme Court from deciding *Carson*, it now excludes religious schools that teach from a particular religious perspective and whose admissions requirements reflect their religious mission from participating in the tuition program. As a result, it perpetuates the religious discrimination at the heart of the sectarian exclusion. *See* JA259-60. As the Supreme Court explained in *Carson*, the Education Commissioner's practice of enforcing the sectarian exclusion by "scrutinizing whether and how a religious school pursues its educational mission" is particularly troubling because of the potential for "state entanglement with religion and denominational favoritism." 596 U.S. at 787. The poison pill suffers from the same problem. Strict scrutiny therefore applies.

**B.    Section 4602 cannot satisfy strict scrutiny.**

Strict scrutiny under the Free Exercise Clause requires a "precise analysis." *Fulton*, 593 U.S. at 541. "Rather than rely on 'broadly formulated interests,' courts must 'scrutinize[ ] the asserted harm of granting specific exemptions to particular religious claimants.'" *Id.* (quoting *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 431 (2006)). This means that to survive strict scrutiny analysis, Defendants cannot

merely assert a general interest in nondiscrimination; they must show that they have a *compelling* interest in denying BCS an exemption. *Id.* Attempting to avoid an adverse Supreme Court decision is not a compelling interest.

Defendant can identify no compelling interest here. After *Carson*, at least one court has concluded that asserted state interests in "eliminating discrimination in hiring as well as in educational access" are not interests "'of the highest order' such that the anti-discrimination rules can survive." *Darren Patterson Christian Acad. v. Roy*, 699 F. Supp. 3d 1163, 1186 (D. Colo. 2023) (granting preliminary injunction to private Christian pre-school against Colorado's anti-discrimination provisions). Such "broadly formulated interests" simply do not suffice. *Fulton*, 593 U.S. at 541.

Nor can perceived fears about violating the Establishment Clause create a compelling interest. If there is "no valid Establishment Clause interest," the Establishment Clause cannot justify such discrimination. *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 113-14 (2001); *see also Kennedy*, 597 U.S. at 543 ("[I]n no world may a government entity's concerns about phantom constitutional violations justify actual violations of … First Amendment rights"). Withholding tuition funding from schools whose religious beliefs are considered "inimical to a public education," JA275, simply strives to maintain stricter separation than the Establishment Clause requires. But the Supreme Court has repeatedly explained that "an interest in separating church and state more fiercely than the Federal Constitution … cannot qualify as compelling in the face of the infringement of free exercise." *Carson*, 596 U.S. at 781 (internal quotation marks

24

omitted); *see Widmar v. Vincent*, 454 U.S. 263, 276 (1981). Indeed, the Education Commissioner made, and the Supreme Court rejected, that argument again in *Carson*. Relatedly, avoiding state endorsement of a particular school's teaching or policies also fails to demonstrate a compelling interest under *Carson*, because tuition funds only flow to tuitioning schools because of the independent choices of the tuition beneficiaries—the families that choose to use the benefit at their preferred school. *Carson*, 596 U.S. 781.

Finally, Defendants cannot demonstrate that the poison pill is narrowly tailored. A law is not narrowly tailored where "[t]he proffered objectives are not pursued with respect to analogous non-religious conduct, and those interests could be achieved by narrower ordinances that burdened religion to a far lesser degree." *Lukumi*, 508 U.S. at 546. Section 4602's exemption allowing participating private post-secondary and out-of-state schools to discriminate on the basis of any protected class other than disability demonstrates that the law is "underinclusive in substantial respects," *see id.*, and that the state could still achieve its interests by providing a religious exemption as well. The religious exemption that the §4602 repealed also demonstrates a more narrowly tailored option—exempting religious schools from the provisions that burden their religious beliefs while leaving the other provisions (that is, those relating to race, color, sex, ancestry, national origin, and disability) in place. Thus, §4602 is not narrowly tailored to achieve a compelling government interest and cannot survive strict scrutiny.

## II.   Applying the MHRA to prohibit Crosspoint from employing only co-religionists violates the Establishment and Free Exercise Clauses.

Applying the MHRA's employment discrimination provision, 5 M.R.S.A. §4572(1)(A), to prohibit Crosspoint from hiring only co-religionists violates the Establishment and Free Exercise Clauses. Before the Maine legislature adopted the poison pill, Commissioner Makin attempted to craft another poison pill from existing provisions of MHRA, contending that if BCS became approved for tuition purposes, it would be subject to §4572(1)(A), which prohibits employers from failing or refusing to hire or otherwise discriminating against any applicant "because of race or color, sex, sexual orientation or gender identity, physical or mental disability, religion, age, ancestry, national origin or familial status." *See* Defs.' Mot. for Summ. J. (D. Me.), *supra*, at 7-8, 13-14; Br. of Appellee (CA1), *supra*, at 22-23. Although this Court rejected this argument as to the *Carson* plaintiffs' standing, *Carson*, 979 F.3d at 28, 31, BCS faces a credible threat of Defendants enforcing §4572(1)(A) to prohibit BCS's practice of hiring only co-religionists if it participates in the tuitioning program. *See* JA274-45, 277.

The district court "decline[d] to issue an injunction" as to this provision, concluding that "there is no case or controversy between the parties." ADD43. In the district court's view, the state "interpret[s] §4573-A(2) to exempt Crosspoint" from the prohibition on employment discrimination based on religion and "disclaimed" any "future enforcement" "in a manner" that would contradict Crosspoint's ability to hire only co-religionists. ADD42-43. BCS respectfully disagrees with that characterization, and it

fears Defendants will enforce the MHRA against it in violation of the MHRA's text and the First Amendment.

### A. The plain text of the MHRA protects BCS's employment autonomy even when it accepts public funds.

The MHRA's plain language protects BCS's right to hire only co-religionists, even if it participates in the tuitioning program. 5 M.R.S.A. §4572(1)(A) prohibits "employers" from engaging in "unlawful employment discrimination." But 5 M.R.S.A. §4553(4) explains that the term "'Employer' does not include a religious or fraternal organization or association … with respect to employment of its members of the same religion." Similarly, a religious organization requiring "that all applicants and employees conform to the religious tents of the organization" is statutorily defined as "not unlawful employment discrimination." 5 M.R.S.A. §4573-A(2). Thus, BCS is not an "employer" engaging in "unlawful employment discrimination" when it requires its employees to affirm the Statement of Faith.

In *Carson*, Commissioner Makin argued that the exemption for religious employers in §4553(4) is conditional on refusal to accept public funds under §4553(10)(G). *See* Defs.' Mot. for Summ. J. (D. Me.), *supra*, at 7-8, 13-14; Br. of Appellee (CA1), *supra*, at 22-23. This interpretation is strained at best, and, in any event, §4573-A(2)'s clarification that religious organizations may lawfully give hiring preferences to co-religionists is not conditional on refusing to accept public funds. And Defendants' argument here fares no better. In its brief before the district court, Defendants asserted that BCS is "free to

limit employment to persons who share Plaintiff's religion and who conform to its religious tenets." ADD42; Defs.' Opp'n at 18 (Doc. 14). But those religious tenets apparently may not include belief in "the biblical definition of marriage, sexuality and moral conduct, and the clear biblical teaching that gender is both sacred and established by God's design." JA89. Defendants clearly do not "disclaim" enforcing the challenged provision against BCS if were to reject an applicant on that basis. *See* Defs.' Opp'n at 18 & n.18 ("If, for example, a homosexual person applies to work at BCS, is rejected, and files a claim or lawsuit, the MHRC and/or a court can decide whether the person was lawfully rejected for not conforming to Plaintiff's religious tenets."). Thus enforcing §4572(1)(A) against BCS for hiring only co-religionists violates the MHRA.

**B. If Defendants enforce the MHRA to impose liability on BCS for hiring only co-religionists, it violates the Establishment and Free Exercise Clauses.**

Enforcing §4572(1)(A) against BCS for hiring only co-religionists also violates the First Amendment's religion clauses. The Free Exercise and Establishment Clauses work in tandem to "foreclose certain employment discrimination claims brought against religious organizations." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 747 (2020). Religious organizations have "autonomy with respect to internal management decisions that are essential to the institution's central mission. And a component of this autonomy is the selection of the individuals who play certain key roles." *Id.* at 746. This ministerial exception, grounded in the First Amendment, forbids a government from "[r]equiring a church to accept or retain an unwanted minister, or punishing a church

28

for failing to do so." *Hosanna-Tabor Evangelical Church & Sch. v. EEOC*, 565 U.S. 171, 188 (2012). The Supreme Court has made clear that teachers or other employees who "play[] a vital part in carrying out the mission of the church" are covered by the ministerial exception. *Our Lady of Guadalupe Sch.*, 565 U.S. at 757.

Crosspoint's hiring practices for its ministries, including BCS, are protected by the ministerial exception. BCS employees are responsible for teaching and modeling the Statement of Faith and accomplishing the school's educational objectives. JA85-88. They serve as Christian role models to the students, both in and out of school, and are required to both agree with the statement of faith and engage in particular religious practices. JA127-34. BCS teachers and staff educate students in Crosspoint Church's faith, inculcate its teaching, participate with students in religious activities, and train students to live out their faith: "responsibilities that lie at the very core of the mission of a private religious school." *Our Lady of Guadalupe Sch.*, 565 U.S. at 753-54. Employing BCS teachers and staff who agree with and practice its Statement of Faith is necessary to accomplishing BCS's religious purpose, and the ministerial exemption protects this fundamental religious exercise. *See id.*; *Hosanna-Tabor*, 565 U.S. at 188-89; *see also Darren Patterson Christian Acad.*, 699 F. Supp. 3d at 1184 ("Plaintiff explicitly bases its hiring decisions on religious criteria and cannot put aside those criteria without abandoning its religious beliefs. Requiring the school to hire its teachers or other ministers without discriminating on the basis of religion, therefore, would likely violate Plaintiff's free exercise of religion, as protected by the ministerial exception.").

29

Threatening to enforce 5 M.R.S.A. §4572(1)(A) against BCS if it participates in the tuitioning program unconstitutionally conditions participation on BCS relinquishing its First Amendment right to select its ministers. BCS has a "right to participate in government benefit program[s] without having to disavow its religious character," *Trinity Lutheran*, 582 U.S. at 463, and maintaining autonomy in the selection of its ministers is necessary to retaining its religious character, *see Hosanna-Tabor*, 565 U.S. at 188 ("[D]epriving the church of control over the selection of those who will personify its beliefs" infringes its right under the Free Exercise Clause to "shape its own faith and mission."). Forcing BCS to choose between participating in a generally available benefit or preserving its religious mission "would allow the government to 'produce a result which [it] could not command directly.'" *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). "Such interference with constitutional rights is impermissible," *id.*, and "effectively penalizes the free exercise of [its] constitutional liberties," *Trinity Lutheran*, 582 U.S. at 459 (*quoting McDaniel*, 435 U.S. at 626). This is especially true where enforcing the MHRA in this manner is contrary to MHRA's text, which protects religious organizations' right to hire only co-religionists whether they accept public funding or not.

Because Defendants have plainly not "disclaimed" future enforcement of the MHRA against BCS, and the parties disagree about the contours of the exception, a "case or controversy" is present. And this Court should hold that applying the MHRA to prohibit Crosspoint from employing only co-religionists violates the Establishment and Free Exercise Clauses.

### III.    Section 4602 violates the Free Speech Clause.

Finally, §4602 violates the First Amendment's Free Speech Clause. Content-based laws, or laws that regulate speech "because of the topic discussed or the idea or message expressed," are presumptively unconstitutional unless they satisfy strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Even facially content-neutral laws "will be considered content-based regulations of speech" if they "cannot be 'justified without reference to the content of the regulated speech,' or that were adopted by the government 'because of disagreement with the message [the speech] conveys.'" *Id.* at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). Viewpoint discrimination, "an egregious form of content discrimination," occurs "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

Section 4602 restricts Crosspoint's speech based on content and viewpoint, because it is designed to force BCS to stop educating its students from its religious perspective as a condition of participating in the tuition program. *See id.* at 831. Educating students from a religious perspective is a form of speech and expression protected under the Free Speech Clause. "Religion may be a vast area of inquiry, but it also provides … a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered." *Id.*; *see Kennedy*, 597 U.S. Ct. at 523-24 ("Where the Free Exercise Clause protects religious exercises, whether communicative or not, the Free Speech Clause provides overlapping protection for expressive religious activities. That

the First Amendment doubly protects religious speech is no accident. It is a natural outgrowth of the framers' distrust of government attempts to regulate religion and suppress dissent." (citations omitted)). And the First Amendment protects the rights of individuals and institutions to "associate for the purpose of engaging in those activities protected by the First Amendment" including "speech" and "the exercise of religion." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984).

Yet under Maine's law, if BCS teaches from its religious perspective, it must either forgo accepting publicly funded tuition payments or face thousands of dollars in liability. *See* 5 M.R.S.A. §§4613(2)(B)(7); 4614. And suppressing BCS's religious perspective is §4602's avowed purpose. *See Rideout v. Gardner*, 838 F.3d 65, 71 (1st Cir. 2016) ("The government's purpose is the controlling consideration" in determining whether a law is content-based.); *see supra* 19-23. Maine cannot "suppress unpopular ideas or information or manipulate the public debate through coercion," *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994), and it "offends the First Amendment [to] impose[] financial burdens on certain speakers based on the content of their expression," *Rosenberger*, 515 U.S. at 828-29. Imposing financial burdens because BCS's teaching reflects its religious perspective is unconstitutional under the Free Speech Clause.

Despite all this, the district court held that, "[a]t least in this pre-enforcement context," the challenged provisions "regulate conduct, not speech." ADD43. To support this classification, the district court relied on *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006) (*FAIR*). There, the Supreme Court upheld a

32

federal law denying funds to law schools that prohibited military recruiters on campus. The Court held that the law did not violate the First Amendment because it "affects what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*." *Id.* at 60 (emphasis in original). But *FAIR* involved Congress's "broad and sweeping" power over the military. *Id.* at 58. And "nothing about the statute" there "affect[ed] the composition" of the law school. *Id.* at 70. Indeed, the recruiters were "not part of the law school." *Id.* at 69. The Supreme Court emphasized that "[r]ecruiters are, by definition, outsiders who come onto campus for the limited purpose of trying to hire students—not to become members of the school's expressive association." *Id.* That distinction is "critical," since any students admitted to BCS would undoubtedly become part of the school's "expressive association." *Id.*

In any event, the district court's conclusion that the MHRA only regulates conduct is mistaken. In the district court's view, these provisions do not forbid participating religious schools from "'teach[ing] from [their] religious perspective.'" ADD44. Instead, they may merely "affect their conduct" such as by "impeding" the schools "ability to enforce certain religiously motivated policies." *Id.* But BCS's religiously motivated policies and their enforcement cannot be separated from the messages BCS intends to convey. For example, §4602 would require BCS to affirm a student's gender identity

and sexual orientation, contrary to its statement of faith.[1] JA20-21(¶¶28-29). That would clearly undermine BCS's ability to convey its belief in the biblical definition of "sexuality and moral conduct, and the clear biblical teaching that gender is both sacred and established by God's design." JA89. Section 4602(5)(D) would also require BCS to permit student religious expression contrary to its statement of faith. Allowing such expression would interfere with BCS's speech about the nature of salvation. JA85.

The Supreme Court has "in a number of instances" restricted "the government's ability to force one speaker to host or accommodate another speaker's message." *FAIR*, 547 U.S. at 63.; *see Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 566 (1995); *Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal.*, 475 U.S. 1, 20-21 (1986) (plurality opinion); *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 258 (1974). In those cases, the First Amendment violation "resulted from the fact that the complaining speaker's own message was affected by the speech it was forced to accommodate." *FAIR*, 547 U.S. at 63. In *Hurley,* for example, the Court concluded that because "every participating unit affects the message conveyed by the [parade's] private organizers," a law "dictating that a particular group must be included in the parade

---

[1] BCS's 30(b)(6) representatives testified in their *Carson* depositions that it violates BCS's statement of faith to admit a student or allow a student to remain enrolled who violates BCS's statement of faith by presenting as a gender not consistent with his or her biological sex or by professing the "entrenched" belief that a homosexual sexual orientation is "who [the student is] and [the student] think[s] that is right and good." Defs.' Opp'n, Ex. 4, at 29-30; Stipulated Record, *Carson*, 401 F. Supp. 3d 207 (D. Me. 2019) (No. 1:18-cv-327-DBH), ECF No. 24-16 (Boone Dep. at 23-25).

'alter[s] the expressive content of th[e] parade.'" *Id.* That is the case here. Section 4602

"interfere[s] with" BCS' "own message." *Id.* at 64. To accomplish its mission, BCS must

be free to express its Christian message without interference by the state. Maine may

not condition the receipt of state tuition funds on the forfeiture of its ability to control

the religious messages conveyed throughout its own school.

## CONCLUSION

The Court should vacate the district court's judgment and remand the case with

instructions to permanently enjoin the states from enforcing 5 M.R.S.A. §4572 and 5

M.R.S.A. §4602 against Crosspoint.

Respectfully submitted,

*/s/ Patrick Strawbridge*

Kelly J. Shackelford
David J. Hacker
Jeremiah G. Dys
First Liberty Institute
2001 W. Plano Parkway, Ste. 1600
Plano, TX 75075
(972) 941-4444
kshackelford@firstliberty.org

Camille P. Varone
First Liberty Institute
1331 Pennsylvania Ave. NW, Ste. 1410
Washington, DC 20004
(202) 921-4105
cvarone@firstliberty.org

Patrick Strawbridge
Consovoy McCarthy PLLC
10 Post Office Sq.
8th Flr. S. PMB #706
Boston, MA 02109
(617) 227-0548
patrick@consovoymccarthy.com

Tiffany H. Bates
Consovoy McCarthy PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tiffany@consovoymccarthy.com

September 3, 2024

*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with Rule 32(a)(7) because it contains 8,577 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it is prepared in a proportionally spaced face using Microsoft Word in 14-point Garamond font.

Dated: September 3, 2024                    */s/ Patrick Strawbridge*

## CERTIFICATE OF SERVICE

I filed this brief on the Court's electronic filing system, which will email everyone

requiring notice.

Dated: September 3, 2024                              _/s/ Patrick Strawbridge_____

**ADDENDUM**

| **Document** | **Page #** |
|---|---|
| Order Denying Preliminary Injunction | ADD2 |
| Order Granting Joint Motion to Convert Order on Preliminary Injunction into an Order on Permanent Injunction and Enter Final Judgment | ADD49 |
| Judgment | ADD57 |

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| CROSSPOINT CHURCH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-00146-JAW |
| | ) | |
| A. PENDER MAKIN, in her | ) | |
| official capacity as Commissioner of | ) | |
| the Maine Department of Education, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

A church that operates a religious school sues Maine's Education Commissioner and Human Rights Commissioners to preclude enforcement of the state's educational and employment antidiscrimination laws, arguing that they violate the Free Exercise, Establishment, and Free Speech Clauses of the U.S. Constitution. The Court denies the injunction, primarily because it concludes that the plaintiff is unlikely to succeed on the merits. The Court determines that the educational antidiscrimination provisions do not violate the Free Exercise Clause because they are neutral, generally applicable, and rationally related to a legitimate government interest. The Court concludes further that the educational provisions do not violate the Free Speech Clause because they regulate conduct, not speech. Finally, the Court concludes that the employment provisions do not proscribe any constitutionally protected conduct.

Recognizing that this case presents novel constitutional questions in the wake of the Supreme Court's decision in *Carson v. Makin*, the Court has framed its opinion as a prelude to a challenge to the Court of Appeals for the First Circuit for a more authoritative ruling.

## I.  PROCEDURAL HISTORY

On March 27, 2023, Crosspoint Church filed a three-count complaint against A. Pender Makin, in her official capacity as Commissioner of the Maine Department of Education, and Jefferson Ashby, Edward David, Julie Ann O'Brien, Mark Walker, and Thomas Douglas, in their official capacities as Commissioners of the Maine Human Rights Commission (MHRC Commissioners), alleging that certain provisions of the Maine Human Rights Act (MHRA) effectively excluded it from approval for Maine's school tuitioning program in violation the Free Exercise, Establishment, and Free Speech Clauses of the U.S. Constitution.[1]  *Compl.* (ECF No. 1).  That same day, Crosspoint filed a motion for preliminary injunction to enjoin the Defendants from enforcing the provisions in Maine law that allegedly exclude it from the tuitioning program.  *Pl.'s Mot. for Prelim. Inj.* (ECF No. 5) (*Pl.'s Mot.*).

On April 28, 2023, the Defendants opposed Crosspoint's motion.  *Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj.* (ECF No. 14) (*Defs.' Opp'n*), and on May 2, 2023, the American Civil Liberties Union of Maine (in conjunction with its national

---

[1]      Specifically, Crosspoint alleged that "[o]n its face and as applied to Plaintiff[], 5 M.R.S. §§ 4602(1), (5)(C), [and] (5)(D) violate[] the Free Exercise Clause of the First Amendment to the U.S. Constitution," *Compl.* ¶ 113, that "[a]s applied to Plaintiff, 5 M.R.S. § 4572(1)(A) violates the Free Exercise Clause and the Establishment Clause of the U.S. Constitution," *id.* ¶ 131, and that "[a]s applied to Plaintiff, 5 M.R.S. § 4602 violates the Free Speech Clause of the U.S. Constitution."  *Id.* ¶ 144.

organization) filed an amici curiae brief in support of the Defendants' opposition. *Br. of Amici Curiae the American Civil Liberties Union and American Civil Liberties Union of Maine in Supp. of Defs.* (ECF No. 20). On May 12, 2023, Crosspoint filed a reply in support of its motion. *Pl.'s Reply in Supp. of Mot. for Prelim. Inj.* (ECF No. 21) (*Pl.'s Reply*). Also on May 12, 2023, the Defendants answered the complaint. *Defs.' Answer to Pl.'s Compl.* (ECF No. 23) (*Answer*).

On June 20, 2023, after this motion was taken under advisement, the Defendants filed correspondence with the Court regarding a bill recently passed by the Maine Legislature that amended the MHRA's definition of educational institution. *Notice/Correspondence Re: Enactment of Maine Pub. L. 2023, ch. 188* (ECF No. 28) (*Defs.' June 20 Correspondence*). On June 27, 2023, Crosspoint filed its own correspondence regarding the bill. *Notice/Correspondence Re: Enactment of Maine Pub. L. 2023, ch. 188* (ECF No. 29) (*Pl.'s June 27 Correspondence*).

## II.    FACTUAL BACKGROUND

### A.    The Parties

Crosspoint is a Christian church incorporated as a nonprofit corporation under Maine law and located in Bangor, Maine. *Compl.* ¶ 7. Bangor Christian Schools (BCS), a private, Christian school educating students from K4 to 12th grade, is an integrated auxiliary of Crosspoint. *Id.* ¶ 8. A. Pender Makin is the Commissioner of the Maine Department of Education, an agency of the state of Maine created and empowered under 20-A M.R.S. § 201, to "[s]upervise, guide and plan for a coordinated system of public education for all citizens of the State." *Id.* ¶ 9 (quoting 20-A M.R.S. § 201(1)).

Mr. Ashby, Mr. David, Ms. O'Brien, Mr. Walker, and Mr. Douglas are Commissioners of the Maine Human Rights Commission, an agency of the state of Maine, created and empowered under 5 M.R.S. § 4566 to "investigat[e] all forms of invidious discrimination, whether carried out legally or illegally, and whether by public agencies or private persons." *Id.* ¶ 12; 5 M.R.S. § 4566. Commissioner Makin and the MHRC Commissioners have joint rule-making authority to effectuate the subchapter of the MHRA prohibiting discrimination with respect to educational opportunity. *Compl.* ¶ 13; *Answer* ¶ 13.

## B. Maine's School Tuitioning Program

### 1. The Pre-*Carson* Regime

Maine law provides that "[i]t is the intent of the Legislature that every person within the age limitations prescribed by state statutes shall be provided an opportunity to receive the benefits of a free public education." 20-A M.R.S. § 2(1). The "control and management of the public schools" is "vested in the legislative and governing bodies of local school administrative units [SAUs], as long as those units are in compliance with appropriate state statutes," *id.* § 2(2), and "[a] school administrative unit that neither maintains a secondary school nor contracts for secondary school privileges . . . shall pay the tuition . . . at the public school or the approved private school of the parent's choice at which the student is accepted." *Id.* § 5204(4). A similar provision exists for elementary schools. *Id.* § 5203(4). The upshot is that Maine's tuitioning program permits SAUs—some of which are sparsely populated—to pay the tuition for students to attend other approved public or private schools, in lieu of maintaining their own.

When a SAU opts to pay students' tuition rather than maintain its own school(s), parents are solely responsible for selecting the school their children attend. *Compl.* ¶ 47. To receive the tuitioning benefit, however, the parents must select an "approved" school satisfying certain statutory criteria. *Id.* ¶ 46. Section 2951 of title 20-A of the Maine statutes, entitled "Approval for tuition purposes," provides in pertinent part:

> A private school may be approved for the receipt of public funds for tuition purposes only if it:
>
> **2. Nonsectarian.** Is a nonsectarian school in accordance with the First Amendment of the United States Constitution.

20-A M.R.S. § 2951(2).

## 2.  The *Carson* Litigation

In 2018, three families, including two families whose children attended BCS, sued Maine's Education Commissioner to challenge 20-A M.R.S. § 2951(2), the "sectarian exclusion," claiming that it violated the First Amendment's Free Exercise Clause. *See Carson v. Makin*, 979 F.3d 21, 26-27 (1st Cir. 2020); *Carson v. Makin*, 142 S. Ct. 1987, 1994-95 (2022). On June 21, 2022, the United States Supreme Court held that Maine's sectarian exclusion violates the Free Exercise Clause because it "operates to identify and exclude otherwise eligible schools on the basis of their religious exercise." *Id.* at 2002. Specifically, the Supreme Court held that "BCS . . . [is] disqualified from this generally available benefit 'solely because of [its] religious character.'" *Id.* at 1997 (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 (2017)). The Court continued, "[b]y 'condition[ing] the availability of benefits' in that manner, Maine's tuition assistance program . . .

'effectively penalizes the free exercise' of religion." *Id.* at 1997 (first alteration in original) (quoting *Trinity Lutheran*, 137 S. Ct. at 2022). As a result of the Supreme Court's decision in *Carson*, the sectarian exclusion is unenforceable.[2] *Compl.* ¶ 71.

### C.    The Maine Human Rights Act's Antidiscrimination Provisions

While *Carson* was pending, the Maine Legislature enacted several amendments to the MHRA. *See* P.L. 2021, ch. 366, § 19 ("An Act to Improve Consistency in Terminology and within the Maine Human Rights Act"), 2021 Me. Laws 766-67 (Chapter 366).

Prior to the 2021 amendments, the MHRA's educational discrimination provisions did not include gender identity, religion, ancestry, or color as protected classes and stated that "[t]he provisions in this subsection [prohibiting discrimination on the basis of] sexual orientation do not apply to any education facility owned,

---

[2]      Paragraph 71 of Crosspoint's Complaint states: "As a result of the Supreme Court's decision in *Carson*, the sectarian exclusion is unenforceable." In their Answer, the Defendants admit only that "as a result of the Supreme Court's decision in *Carson*, sectarian schools are eligible to participate in the tuitioning program and otherwise deny the allegations made in this paragraph." *Answer* ¶ 71.
         The Court is unclear how the Defendants could deny in good faith the proposition that the "sectarian exclusion is unenforceable." Upon remand, this Court asked the parties, including Commissioner Makin, to submit proposed final judgments. *See Carson v. Makin*, No. 1:18-cv-00327-JAW, 2023 U.S. Dist. LEXIS 60496, at *29-30 (D. Me. Apr. 6, 2023). Although the Plaintiffs' and Commissioner Makin's proposed judgments differed in some respects, the Plaintiffs and Commissioner Makin each proposed an order permanently enjoining the state from enforcing 20-A M.R.S. § 2951(2). *See Carson v. Makin*, No. 1:18-cv-00327-JAW, *Letter from Michael Bindas, Senior Att'y, Inst. for Just., to Judge Woodcock* (Apr. 13, 2023), Attachs. 1 & 2 (ECF No. 95). *Compare id.*, Attach. 1, *[Proposed] Order Granting Pls. Declaratory and Permanent Inj. Relief* at 2 ("Defendant is hereby permanently **ENJOINED** as follows: 1. Defendant shall not enforce 20-A M.R.S. § 2951(2)"), *with id.*, Attach. 2, *[Proposed] Order Granting Pls. Declaratory and Permanent Inj. Relief* at 1 ("Defendant is hereby permanently **ENJOINED** from enforcing 20-A M.R.S. sec. 2951(2)"). On April 18, 2023, this Court adopted Commissioner Makin's proposed enjoining language. *J.* at 2 (ECF No. 96) ("Defendant is hereby permanently **ENJOINED** from enforcing 20-A M.R.S. section 2951(2)"). As this Court permanently enjoined enforcement of 20-A M.R.S. § 2951(2) based on language supplied by the Commissioner, the Court is perplexed as to how the Defendants in this case, including Commissioner Makin, could deny that the sectarian exclusion is unenforceable, since the Court has permanently enjoined its enforcement, and its judgment on this issue is final. The Court declines to accept the Defendants' denial of paragraph 71 to the extent they deny the terms of this Court's June 29, 2023 permanent injunction in *Carson v. Makin*.

controlled or operated by a bona fide religious corporation, association or society." *Compl.* ¶¶ 75-76; P.L. 2005, ch. 10, § 21 ("An Act to Extend Civil Rights Protections to All People Regardless of Sexual Orientation").

Chapter 366, which took effect on October 18, 2021, added gender identity, religion, ancestry, and color as protected classes under the statute and narrowed the religious exception to state that "[n]othing in this section . . . requires a religious corporation, association or society *that does not receive public funding* to comply with this section as it relates to sexual orientation or gender identity." *Compl.* ¶¶ 77, 81; P.L. 2021, ch. 366, § 19, 2021 Me. Laws 767; 5 M.R.S. § 4602(5)(C) (emphasis in *Compl.*). Chapter 366 provides no exemptions from the prohibition against discrimination on the basis of religion in education and further requires that "to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing." P.L. 2021, ch. 366, § 19, 2021 Me. Laws 767; 5 M.R.S. § 4602(5)(D). MHRA violations, including violations of 5 M.R.S. § 4602, carry civil monetary penalties of up to $20,000 for a first violation, up to $50,000 for a second violation, and up to $100,000 for subsequent violations, as well as attorney's fees in certain circumstances. 5 M.R.S. §§ 4613(2)(B)(7), 4614. The Maine Superior Court is also empowered to issue a cease-and-desist order, *id.* § 4613(2)(B)(1), to order reinstatement of a victim of unlawful employment discrimination with or without back pay, *id.* § 4613(2)(B)(2), and to award both compensatory and punitive damages, *Id.* § 4613(2)(B)(8).

When Crosspoint filed its complaint, the MHRA exempted single-sex schools, even those participating in the tuitioning program, from its prohibition on discriminating on the basis of race, color, ancestry, national origin, sex, religion, sexual orientation, and gender identity. *Compl.* ¶ 79; *Defs.' Opp'n* at 14 (acknowledging the exception but asserting it was unintentional). On June 15, 2023, the Governor of Maine signed Maine Public Law 2023, Chapter 188 (Chapter 188), which amended the MHRA to remove the exclusion of single-sex schools from the Act's definition of "educational institution." P.L. 2023, ch. 188, § 1 ("An Act to Amend the Definition of 'Educational Institution' Under the Maine Human Rights Act to Include Single-Sex Education Institutions"), 2023 Me. Laws 370; *Defs.' June 20 Correspondence* at 1.

Crosspoint believes that Chapter 366 is a "poison pill . . . designed to operate as an end-run around *Carson* to exclude Plaintiff from the tuitioning program." *Compl.* ¶ 87. As evidence of this connection, Crosspoint points to a press release from Maine's Attorney General issued on the day the Supreme Court decided *Carson*, in which the Attorney General stated:

> The education provided by the schools at issue here is inimical to a public education. They promote a single religion to the exclusion of all others, refuse to admit gay and transgender children, and openly discriminate in hiring teachers and staff. One school teaches children that the husband is to be the leader of the household. While parents have the right to send their children to such schools, it is disturbing that the Supreme Court found that parents also have the right to force the public to pay for an education that is fundamentally at odds with values we hold dear. I intend to explore with Governor Mills' administration and members of the Legislature statutory amendments to address the Court's decision and ensure that public money is not used to promote discrimination, intolerance, and bigotry.

> While the Court's decision paves the way for religious schools to apply to receive public funds, it is not clear whether any religious schools will do so. Educational facilities that accept public funds must comply with anti-discrimination provisions of the Maine Human Rights Act, and this would require some religious schools to eliminate their current discriminatory practices.

*Id.* ¶ 84. Crosspoint also cites a June 26, 2022 tweet by then-Speaker of the Maine House of Representatives Ryan Fecteau. *Id.* ¶ 87. An individual tweeted, "You know how SCOTUS said Maine couldn't exclude religious schools from their voucher program? Maine just changed the guidelines to exclude schools that discriminate against LGBTQ+ students." *Id.* Speaker Fecteau responded, "Sure did. Anticipated the ludicrous decision from the far-right SCOTUS." *Id.*

## D. Bangor Christian Schools' Tuitioning Eligibility and Policies

### 1. Tuitioning Eligibility

BCS is accredited by the New England Association of Schools and Colleges, annually maintains basic school approval under 20-A M.R.S. § 2901(2)(A), meets the requirements for reporting and release of student records, and is willing to comply with the remaining applicable requirements for tuitioning schools—aside from the disputed MHRA provisions. *Compl.* ¶¶ 49-51.

BCS's total high-school enrollment for the 2022-23 school year is 92 students, 28 of whom live in tuitioning SAUs: Bradford, Glenburn, Levant, Orrington, and Veazie. *Id.* ¶¶ 52-53. Crosspoint Church pays 95% of tuition for the children of Crosspoint Church employees, including BCS staff, to attend BCS. *Id.* ¶ 54. For the 2023-24 school year, eight BCS high-school students are children of Crosspoint Church employees and live in Glenburn, Maine—a tuitioning SAU. *Id.* ¶ 55. If the

state approved BCS for tuition purposes, BCS would charge the tuition for these eight students to Glenburn, resulting in an annual savings of approximately $47,120. *Id.* ¶ 56. If the state approved BCS for tuition purposes, the BCS high-school students residing in tuitioning SAUs would be eligible to participate in the tuitioning program instead of paying BCS tuition out of pocket. *Id.* ¶ 57. BCS has not applied for the tuitioning program but avers that it would apply if exempted from Chapter 366's penalties for discriminating on the basis of religion, sexual orientation, and gender identity. *Id.* ¶¶ 96, 100.

### 2. School Policies

Crosspoint's objective is "full obedience to the will of the Lord Jesus Christ who is the Founder and Head of the Church." *Id.* ¶ 19. BCS's vision "is to help students discover God's plan for their lives and to equip them to be successful on whatever path He is leading them," and its mission "is to assist families in educating the whole child by encouraging spiritual maturity and academic excellence in a supportive environment. Our final authority in all matters is the Word of God." *Id.* ¶¶ 25-26.

BCS operates in accordance with its Statement of Faith, which provides, in relevant part that: (1) the term marriage has only one legitimate meaning—a covenantal union between one man and one woman; and (2) all "sexual activity, identity or expression" that lies outside this definition of marriage "are sinful perversions of and contradictory to God's natural design and . . . will not be accepted." *Id.* ¶ 28. Its admissions policy provides:

> Bangor Christian Schools adheres to and supports the historical truth claims and moral foundations of Christianity. This includes, but is not limited to, the biblical definition of marriage, sexuality and moral

conduct, and the clear biblical teaching that gender is both sacred and
established by God's design. Parents or the legal guardians, who choose
to enroll their children at our school, are agreeing to support these and
other basic biblical values derived from historical Christianity and the
relevant Christian positions embraced by Crosspoint Church. Parents
understand and agree that Bangor Christian Schools will teach these
principles and biblical values.

Bangor Christian Schools does not discriminate in its practices against
any person because of race, color, national or ethnic origin, gender, age,
or disability.

*Id.* ¶ 29.  Two criteria BCS uses for admissions are whether the student "is in
agreement with school policies" and whether the parents "are willing to have their
children trained in accordance with this philosophy." *Id.* ¶ 30. Finally, the
admissions policy provides that BCS "will consider admission for students from any
family who, despite their religious background or beliefs, is willing to support our
philosophy of Christian education, student conduct requirements, and the above-
stated positions and . . . [c]ontinued enrollment at Bangor Christian Schools is
contingent upon this same understanding and support." *Id.* ¶ 31.

Any student who "persistently and unrepentantly engages in . . . advocating
beliefs contrary to BCS's statement of faith" would be "subject to removal from the
school." *Id.* ¶ 35. BCS's code of conduct "prohibits students from . . . engaging in
immoral conduct, including sexual activity outside of marriage as defined in the
Statement of Faith, or identifying as a gender other than their biological sex." *Id.*
¶ 37.

Crosspoint Church employees, including BCS staff, "must be co-religionists—
that is, they must be in agreement with Crosspoint's Statement of Faith and engage

in religious practice consistent with Crosspoint Church's spiritual standards." *Id.* ¶ 39. BCS teachers "must agree to both BCS's Statement of Faith and the Educational Philosophy and Objectives and be committed to upholding them," including by adhering to the policies "relating to sexual behavior." *Id.* ¶¶ 40-41.

## III.   THE PARTIES' POSITIONS

### A.   Crosspoint Church's Motion for Preliminary Injunction

Crosspoint argues that it is entitled to a preliminary injunction because: (1) Chapter 366, as applied to religious institutions, violates the First Amendment's Free Exercise Clause; (2) applying the MHRA to prohibit Crosspoint from employing only co-religionists violates the First Amendment's Free Exercise and Establishment Clauses; (3) Chapter 366 violates the First Amendment's Free Speech Clause; (4) Crosspoint will suffer irreparable harm in the absence of an injunction; and (5) the balance of equities and public interest favor an injunction. *Pl.'s Mot.* at 1-20.

Beginning with the Free Exercise Clause, Crosspoint submits that "[t]he Free Exercise Clause prohibits government from burdening a plaintiff's 'sincere religious practice pursuant to a policy that is not neutral or generally applicable . . . unless the government can satisfy strict scrutiny by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest.'" *Id.* at 7 (alteration in original) (quoting *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421-22 (2022)). It asserts that Chapter 366 "substantially burdens Plaintiff's sincere religious exercise." *Id.* Furthermore, Crosspoint contends that Chapter 366 is not

neutral because "[a]lthough the poison pill[3] has ramifications for many religious schools, its timing and structure show that its purpose was to preemptively exclude Plaintiff from the tuitioning program in order to moot *Carson* . . . [t]his result is intentional and specifically targets Plaintiff's religious beliefs." *Id.* at 9. Assuming that Chapter 366 is not neutral, Crosspoint asserts that the Court should apply strict scrutiny. *Id.* at 11. Alternatively, Crosspoint offers that the Court should apply strict scrutiny on the theory that Chapter 366 is not generally applicable—specifically, because it exempts single-sex schools from the antidiscrimination provisions. *Id.* Crosspoint asserts that Chapter 366 cannot survive strict scrutiny because it is not narrowly tailored to achieve a compelling government interest. *Id.* at 12-14.

Next, Crosspoint argues that applying the MHRA "to prohibit Plaintiff from hiring only co-religionists violates the Establishment and Free Exercise Clauses." *Id.* at 14. It points to the MHRA's provision prohibiting employers from discriminating against applicants because of, inter alia, religion and submits that "Plaintiff faces a credible threat of Defendants enforcing § 4572(1)(A) to prohibit BCS's practice of hiring only co-religionists if BCS participates in the tuitioning program." *Id.* at 14-15. Yet such enforcement would be unconstitutional, Crosspoint contends, because the "MHRA's plain language protects Plaintiff's right to hire only co-religionists" and "Plaintiff's hiring practices for its ministries, including BCS, are protected by the ministerial exception." *Id.* at 15-16. Crosspoint maintains that "[t]hreatening to

---

[3]    Crosspoint refers to the disputed MHRA educational antidiscrimination provisions as a "poison pill" while Defendants refer to them as "Chapter 366." The Court adopts the neutral framing of Chapter 366.

enforce 5 M.R.S. § 4572(1)(A) against Plaintiff if it participates in the tuitioning program unconstitutionally conditions participation on Plaintiff relinquishing its First Amendment right to select its ministers." *Id.* at 17.

Crosspoint then contends that Chapter 366 "violates the U.S. Constitution's Free Speech Clause." *Id.* at 18. In its view, Chapter 366 "restricts Plaintiff's speech based on content and viewpoint, because it is designed to force Plaintiff to stop educating its students from its religious perspective as a condition of participating in the tuition program." *Id.* Crosspoint submits that "[i]mposing financial burdens because Plaintiff's teaching reflects its religious perspective is unconstitutional under the Free Speech Clause." *Id.* at 19.

Finally, Crosspoint asserts that it will suffer irreparable harm in the absence of an injunction and that the balance of equities and public interest also favor an injunction. *Id.* at 19-20. It concludes that the Court should grant a preliminary injunction enjoining the Defendants from enforcing the religion, sexual orientation, and gender identity provisions of 5 M.R.S. § 4602 against Crosspoint and from enforcing 5 M.R.S. § 4572(1)(A) to prohibit Crosspoint from hiring co-religionists. *Id.* at 20.

**B.    The Defendants' Opposition**

The Defendants argue first that Crosspoint's claim is not ripe because it is predicated on a "list of hypothetical events"—including Crosspoint applying for funding, being accepted, denying admission to a person in a protected class, and then facing a MHRC discrimination charge—and thus "there is no imminent threat of enforcement and Plaintiff's lawsuit . . . should be dismissed." *Defs.' Opp'n* at 1-2.

The Defendants go on to assert that, if ripe, "Plaintiff is not entitled to a preliminary injunction based on well-established precedent because it is not likely to prevail on the merits and none of the other relevant factors supports an injunction." *Id.* at 2. They submit that "[a]dmitting students belonging to these protected classes will in no way burden Plaintiff's religious practices," as "BCS would still be free to teach and say whatever it wishes – it simply would not be allowed to prevent willing students from receiving whatever education BCS chooses to deliver." *Id.*

The Defendants add that "even if the prohibitions against discrimination did interfere with Plaintiff's religious practices, they are permissible because they are neutral and generally applicable." *Id.* Moreover, they offer that, in any event, "the prohibitions against unlawful discrimination satisfy strict scrutiny because, as the Supreme Court has recognized, states have a compelling interest in ending discrimination, and this outweighs any interest schools may have in discriminatory policies, even when such policies are based on sincerely held religious beliefs." *Id.*

Turning to the employment issue, the Defendants observe that "the MHRA expressly permits Plaintiff to hire only members of its religion and to require all employees to conform to Plaintiff's religious tenets" and "[t]he so-called 'ministerial exception' recognized by the Supreme Court may provide Plaintiff with further protection by barring application of the MHRA to some employment positions." *Id.* In their view, however, "[t]he extent to which the exception applies cannot be decided in the abstract in this facial challenge and must instead await an actual controversy." *Id.* at 2-3.

ADD16

Finally, regarding Crosspoint's free speech claim, the Defendants submit that "the prohibitions against discrimination do not violate Plaintiff's First Amendment right to free speech because they regulate conduct, not speech" and "Plaintiff is free to say whatever it wishes; it just cannot exclude willing listeners for discriminatory reasons." *Id.* at 3.

### C.    Crosspoint's Reply

In reply, Crosspoint first submits that "Defendants' Response at least concedes (at 18) that the ministerial exception restricts the application of 5 M.R.S. § 4572(1)(A) to BCS's employment practices with respect to a significant portion of its employees" and "[a]t a minimum, then, a preliminary injunction to that effect is appropriate." *Pl.'s Reply* at 1.

Crosspoint also reiterates that "the Defendants' ongoing First Amendment violations justify the full injunction Plaintiff seeks." *Id.* Addressing the Defendants' ripeness argument, Crosspoint submits that "BCS need not risk the MHRA's substantial legal penalties to seek relief." *Id.* Crosspoint contends that its claim is ripe for pre-enforcement review because it is eligible for and would participate in the tuitioning program, but for the challenged provisions. *Id.* at 2. It says that it reasonably fears enforcement and thus "the poison pill forces BCS to either relinquish its religious identity or forego participation in the tuitioning program for which it is otherwise eligible." *Id.* at 2-3.

Next, Crosspoint contends that "Section 4602 burdens Plaintiff's religious exercise" because "BCS's religious exercise encompasses all aspects of operating BCS according to its religious beliefs" and "BCS's requiring students to behave

consistently with BCS's statement of faith is an exercise of BCS's religious beliefs and is necessary to its religious educational mission." *Id.* at 3-4. Thus, in its view, "Section 4602 burdens BCS's religious exercise not just in its admissions, as Defendants claim, but also in BCS's daily internal operations" by requiring BCS to "permit student religious expression contrary to its statement of faith" and "also requir[ing] BCS to affirm a student's gender identity and sexual orientation, contrary to its statement of faith." *Id.* at 4.

Crosspoint also reiterates that Chapter 366 violates the Free Exercise Clause because it "is not neutral and generally applicable," triggering strict scrutiny, and it cannot survive strict scrutiny because "Defendants assert . . . only a general interest in nondiscrimination" that is insufficiently compelling. *Id.* at 5-8.

### D. The Parties' Correspondence Regarding Recent Legislation

While this motion was under advisement, each party filed correspondence with the Court regarding the passage of Chapter 188, which amended the MHRA to remove the exclusion of single-sex schools from the Act's definition of "educational institution." *See Defs.' June 20 Correspondence*; *Pl.'s June 27 Correspondence*. After the Defendants notified the Court that the bill had been enacted, Crosspoint responded that "[a]lthough this amendment removed one of the constitutional flaws with the existing statutory scheme, it does not resolve Plaintiff's other challenges" and "[t]his challenge remains ripe for review" because "Plaintiff will suffer irreparable harm absent an injunction." *Pl.'s June 27 Correspondence* (citations omitted).

## IV.    LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012) (quoting *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011)).   A judge should use the authority to grant such injunctive relief "sparingly." *Mass. Coal. of Citizens with Disabilities v. Civil Def. Agency & Off. of Emergency Preparedness*, 649 F.2d 71, 76 n.7 (1st Cir. 1981).

To determine whether to issue a preliminary injunction a court must analyze four factors:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 17-18 (1st Cir. 2006) (alteration in original) (quoting *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004)).

"The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor." *Id.* at 18.   Ultimately, "trial courts have wide discretion in making judgments regarding the appropriateness of such relief." *Francisco Sánchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2009).

## V.    DISCUSSION

### A.    Likelihood of Success on the Merits

"The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his

quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002); *see also Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 7 (1st Cir. 2012) (confirming that this factor is "the most important part of the preliminary injunction assessment" (quoting *Jean v. Mass. State Police*, 492 F.3d 24, 27 (1st Cir. 2007))). The Court analyzes the merits of Crosspoint's challenges to the MHRA and concludes that the religion, sexual orientation, and gender identity provisions of 5 M.R.S. § 4602 do not violate the Free Exercise, Establishment, or Free Speech Clauses of the U.S. Constitution. The Court also concludes that Crosspoint is not entitled to a preliminary injunction on its challenge to 5 M.R.S. § 4572(1)(A) because the parties agree that Crosspoint is exempt from this provision.

### 1.   Ripeness

As a threshold matter, the Court considers the Defendants' claim that Crosspoint's suit is not yet ripe for review. The Court concludes that it is ripe.

"If standing is a question of who, then ripeness—which shares standing's constitutional and prudential pedigree—is a question of when." *R.I. Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d 26, 33 (1st Cir. 1999) (citation omitted). The United States Supreme Court explained that the basic function of ripeness is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967). "While the doctrine has a prudential flavor, a test for ripeness is also mandated by the constitutional requirement that federal jurisdiction extends only to actual cases or controversies." *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 535 (1st

Cir. 1995) (citing U.S. CONST. art. III, § 2; *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 242-45 (1952)).

"To determine whether a case is ripe for review, a federal court must evaluate the fitness of the issue presented and the hardship that withholding immediate judicial consideration will work." *Whitehouse*, 199 F.3d at 33. "To establish ripeness in a pre-enforcement context, a party must have concrete plans to engage immediately (or nearly so) in an arguably proscribed activity," and "[a] showing that the challenged statute, fairly read, thwarts implementation of the plan adds the element of hardship." *Id.* Crosspoint submits that both requirements are met because: (1) "BCS is eligible for the tuitioning program and would participate if the challenged MHRA provisions did not impose liability because of BCS's religious exercise"; and (2) the "Defendants also agree that BCS 'would be required to comply' with the challenged MHRA provisions if BCS participates in the tuitioning program." *Pl.'s' Reply* at 2.

The Court finds *Whitehouse* instructive and agrees with Crosspoint. In *Whitehouse*, the First Circuit considered a First Amendment challenge to a law prohibiting the use of certain public records for commercial solicitation. 199 F.3d at 28-29. The plaintiff association obtained protected records to use for commercial solicitations but feared prosecution under the law, despite no person having been criminally charged in its 20-year existence. *Id.* at 28. "Reluctant either to execute or to abandon its [plan], and seeing no other way of resolving the issue, the Association sued" to have the law enjoined as unconstitutional. *Id.* at 29. The state's Attorney

General contended that the complaint "showed neither a sufficiently definite plan to engage in conduct that would transgress [the challenged law] nor a sufficiently imminent threat of prosecution." *Id.*

The *Whitehouse* Court sided with the plaintiff. Regarding fitness, the First Circuit observed that:

> This is not a case of statutory ambiguity but, rather, one that presents a single, purely legal question: Does Rhode Island's prohibition on using public records for commercial solicitation unconstitutionally restrain free expression? The Association has described a concrete plan to recruit new members—an activity plainly proscribed by the text of section 38–2–6—and no one has suggested any valid reason why resolution of the apparent conflict should await further factual development. Since the controversy was well-defined and amenable to complete and final resolution, it was fit for judicial review.

*Id.* at 34.

Crosspoint's case is fit for similar reasons. As in *Whitehouse*, this is not "a case of statutory ambiguity" but rather "a single, purely legal question." *Id.* Here, there is no ambiguity as to whether the MHRA, as amended by Chapter 366, proscribes Crosspoint's desired conduct. Crosspoint desires to apply for Maine's tuitioning program, a benefit the Supreme Court recently ruled the state could not deny to sectarian institutions, such as Crosspoint. While the Supreme Court was considering *Carson*, Maine's Legislature amended the MHRA to prohibit educational institutions that accept state funding—including religious institutions—from discriminating on the basis of "sexual orientation or gender identity." 5 M.R.S. § 4602(1). On the day the Supreme Court decided *Carson*, Maine's Attorney General stated that "[t]he education provided by the schools at issue here," including BCS, "is inimical to a

public education.  They promote a single religion to the exclusion of all others, refuse to admit gay and transgender children, and openly discriminate in hiring teachers and staff."  *Compl.* ¶ 84.  He added further that "[e]ducational facilities that accept public funds must comply with anti-discrimination provisions of the Maine Human Rights Act, and this would require some religious schools to eliminate their current discriminatory practices."  *Id.*

In the Court's view, there is no statutory ambiguity here.  There is no serious dispute that, if BCS received state funding, its stated policies would conflict directly with the MHRA's prohibition against discrimination on the basis of sexual orientation or gender identity.  *See, e.g., id.* ¶¶ 37-38 (BCS's code of conduct prohibits students from "identifying as a gender other than their biological sex" and BCS's dress code requires students to "wear clothing consistent with their biological sex"); *Defs.' Opp'n* at 9 ("BCS apparently does not discriminate based on any class *other than* sexual orientation or gender identity" (emphasis added)).

The Defendants posit that Crosspoint's claim is unripe because it is based on a pyramid of hypotheticals, with its fear of sanction under the MHRA first dependent on applying for tuitioning, being approved, denying admission to a protected person, and then being charged and punished by the MHRC.  *Defs.' Opp'n* at 9-10.  In essence, the Defendants attempt to avoid *Whitehouse* by characterizing Crosspoint's claim as "rest[ing] upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Id.* at 8 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).  Under this logic, *Whitehouse* is distinguishable because there, the plaintiff

association could have faced legal liability as soon as it started soliciting new members, whereas Crosspoint must wait for a member of a protected class to apply, and presumably be rejected. But the only way for Crosspoint to avoid liability is by refraining from acting. Once Crosspoint is approved for tuitioning, a member of a protected class could apply at any time, forcing Crosspoint to either violate the statute or compromise its religious beliefs. Therefore, Crosspoint is in the same position as the *Whitehouse* plaintiff: do nothing or give up control over concerns for legal liability. To accept the Defendants' chain of hypotheticals would be to confine *Whitehouse* to the type of statute at issue in that case. The Defendants have provided no support for such a limited reading of *Whitehouse*, and the Court sees none.

The Defendants do not suggest that Crosspoint is insincere in its stated desire to apply for tuitioning or that its policies are not motivated by religious conviction. The Defendants do not offer any reason why, but for its religious convictions, Crosspoint/BCS would not be approved for tuitioning if it applied,[4] and it is equally clear that Crosspoint's policies violate the MHRA's antidiscrimination provisions. Based on the statements of the Maine Attorney General, it is a short step from Crosspoint/BCS's acceptance of tuition from the state to the Attorney General's enforcement of the unlawful educational discrimination provisions of Maine law with its potential of civil and other penalties. *See* 5 M.R.S. § 4613.[5]

---

[4]     The Defendants' chain of hypotheticals assumes Crosspoint would be approved for tuitioning, and the Defendants themselves admit as much. *See Defs.' Opp'n* at 14 n.5 ("Discriminatory schools are free to participate in the tuitioning program regardless of whether they comply with the MHRA").
[5]     If Crosspoint violates the MHRA, it could be subject to civil penalties not in excess of $20,000 in the case of the first order under the Act, and escalating civil penalties thereafter, not in excess of $100,000 for a third or subsequent order. 5 M.R.S. § 4613(2)(B)(7). The MHRA also provides for an order to cease and desist. *Id.* § 4613(B)(1).

In short, the record does not reveal why "resolution of the apparent conflict should await further factual development." *Whitehouse*, 199 F.3d at 34. In terms of fitness for review, Crosspoint's claim primarily offers a "purely legal question," *id.*, of whether, after *Carson*, the state may require religious institutions with faith-motivated policies that discriminate on the basis of sexual orientation or gender identity to comply with the MHRA's antidiscrimination provisions as a condition of participating in the tuitioning program. Because this "controversy [is] well-defined and amenable to complete and final resolution," it is fit for judicial review. *Id.* at 34; *see also Sullivan v. City of Augusta*, 511 F.3d 16, 31-32 (1st Cir. 2007) (constitutional challenge to parade permit ordinance containing thirty-day advance notice requirement was ripe even though plaintiff had not applied for a permit less than thirty days before a planned march); *Project Veritas Action Fund v. Rollins*, 982 F.3d 813, 830 (1st Cir. 2020) ("So long as th[e] uncertainty [inherent to pre-enforcement suits] does not undermine the credible threat of prosecution or the ability of the court to evaluate the merits of the plaintiff's claim in a preenforcement posture, there is no reason to doubt standing" (alteration in original) (quoting *Am. C.L. Union of Ill. v. Alvarez*, 679 F.3d 583, 594 (7th Cir. 2012))).

Turning to the hardship prong of ripeness, *Whitehouse* is again instructive. In *Whitehouse*, the plaintiff "refrained from carrying forward its plan because it reasonably feared prosecution" under the challenged statute (even though the state had never pursued criminal charges under that statute). 199 F.3d at 32, 34. The First Circuit observed that the plaintiff "thus faced the direct and immediate

dilemma of choosing between the Scylla of intentionally flouting state law and the Charybdis of forgoing what [it] believe[d] to be constitutionally protected activity" and that "[b]ecause lost opportunities for expression cannot be retrieved, delaying or denying resolution of the issue would have worked a substantial hardship." *Id.* at 34 (internal citations and quotations omitted).

The Court reaches the same conclusion here. In *Carson,* the Supreme Court struck down the sectarian exclusion, holding that "BCS . . . [is] disqualified from this generally available benefit 'solely because of [its] religious character,'" 142 S. Ct. at 1997 (quoting *Trinity Lutheran*, 137 S. Ct. at 2021), and "[b]y 'condition[ing] the availability of benefits' in that manner, Maine's tuition assistance program . . . 'effectively penalizes the free exercise' of religion.'" *Id.* (quoting *Trinity Lutheran*, 137 S. Ct. at 2022). Crosspoint now seeks to avail itself of that program and avers that "[b]ut for the poison pill's penalization of Plaintiff's religious exercise" and the "credible threat of enforcement" it "would apply to become approved for tuition purposes." *Compl.* ¶¶ 100-01.

Setting aside—for the moment—the constitutionality of the challenged provisions, Crosspoint's fear of MHRA enforcement is eminently reasonable, especially given the timing of the amendments and the then-Speaker of the House's frank statement of his understanding of legislative intent. Moreover, the Maine Attorney General is the "chief law officer of the State," *Withee v. Lane & Libby Fisheries Co.*, 120 Me. 121, 123, 113 A. 22 (1921), and his statement on the day of the

*Carson* decision would cause Crosspoint reasonably to conclude that he would pursue Crosspoint for asserted violations of the MHRA's antidiscrimination provisions.

In sum, Crosspoint may apply for tuitioning, but its policies plainly run afoul of the MHRA's antidiscrimination provisions. Crosspoint is thus fairly stuck between "the Scylla of intentionally flouting state law and the Charybdis of forgoing what [it] believe[s] to be constitutionally protected activity." *Whitehouse*, 199 F.3d at 34 (quoting *Steffel v. Thompson*, 415 U.S. 452, 462 (1974)); *see also Trinity Lutheran*, 582 U.S. at 462 ("To condition the availability of benefits . . . upon [a recipient's] willingness to . . . surrender[ ] his religiously impelled [status] effectively penalizes the free exercise of his constitutional liberties" (alterations in original) (quoting *McDaniel v. Paty*, 435 U.S. 618, 626 (1978))). Crosspoint has satisfied both the fitness and hardship prongs, and its claims are ripe for judicial review.

### 2. Crosspoint's Free Exercise Claims

Crosspoint brings two Free Exercise claims, alleging that the MHRA's educational discrimination provisions—codified at 5 M.R.S. § 4602—and employment discrimination provisions—§ 4752(1)(A)—each violate its First Amendment rights. *Pl.'s Mot.* at 7-17. The Court concludes that neither claim is likely to succeed on the merits. The educational discrimination claim is unavailing because the challenged provisions are neutral, generally applicable, and rationally related to a legitimate government interest. The employment discrimination claim fails because Crosspoint has not identified any constitutionally protected conduct infringed by the statute.

The Free Exercise Clause prohibits the government from burdening a plaintiff's "sincere religious practice pursuant to a policy that is not neutral or

generally applicable . . . unless the government can satisfy strict scrutiny by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Id.* at 2421-22 (citations and internal quotations omitted). The Supreme Court clarified that "the Free Exercise Clause protects against 'indirect coercion or penalties on the free exercise of religion, not just outright prohibitions.'" *Trinity Lutheran*, 137 S. Ct. at 2022 (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988)). "[I]t is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." *Id.* (quoting *Sherbert v. Verner*, 374 U.S. 398, 404 (1963)). "To condition the availability of benefits . . . upon [a recipient's] willingness to . . . surrender[] his religiously impelled [status] effectively penalizes the free exercise of his constitutional liberties." *Id.* at 2022 (alterations in original) (quoting *McDaniel*, 435 U.S. at 626). In *Carson*, the Supreme Court held explicitly that Maine's "nonsectarian" requirement violated the Free Exercise Clause because "the program operates to identify and exclude otherwise eligible schools on the basis of their religious exercise." 142 S. Ct. at 2002.

The Supreme Court has also provided that "a plaintiff bears certain burdens to demonstrate an infringement of his rights under the Free Exercise and Free Speech Clauses. If the plaintiff carries these burdens, the focus then shifts to the defendant to show that its actions were nonetheless justified and tailored consistent with the demands of our case law." *Kennedy*, 142 S. Ct. at 2421.

a.       **The Educational Discrimination Claim**

The gravamen of Crosspoint's suit is that Chapter 366 impermissibly burdens

religious exercise by forcing Crosspoint to compromise its religious beliefs to

participate in the tuitioning program.  *See, e.g., Compl.* ¶ 80 (alleging that § 4602

"operates to deter religious schools from participating in the tuitioning program if

they hold disfavored religious beliefs, including . . . operating in accordance with

traditional beliefs about the nature of marriage and sexuality").  Crosspoint asserts

that *Carson* prohibited the state from excluding sectarian institutions from the

tuitioning program, but Chapter 366 would now improperly force them to compromise

their religious beliefs to access that benefit.  *Pl.'s Mot.* at 7.  The Defendants counter

that "[a]dmitting students belonging to these protected classes will in no way burden

Plaintiff's religious practices" and "BCS would still be free to teach and say whatever

it wishes – it simply would not be allowed to prevent willing students from receiving

whatever education BCS chooses to deliver."  *Defs' Opp'n* at 2.

Whether the MHRA burdens Crosspoint's religious exercise presents a close

call, at least in this pre-enforcement context.  The MHRA provides:

> It is unlawful educational discrimination in violation of this Act, on the
> basis of sex, sexual orientation or gender identity, physical or mental
> disability, ancestry, national origin, race, color or religion, to:
>
> A. Exclude a person from participation in, deny a person the benefits of,
> or subject a person to, discrimination in any academic, extracurricular,
> research, occupational training or other program or activity;
>
> B. Deny a person equal opportunity in athletic programs;
>
> C. Apply any rule concerning the actual or potential familial status or
> marital status of a person or to exclude any person from any program or

activity because of pregnancy or related conditions or because of sex or sexual orientation or gender identity;

D. Deny a person admission to the institution or program or to fail to provide equal access to and information about an institution or program through recruitment; or

E. Deny a person financial assistance availability and opportunity.

5 M.R.S. § 4602(1). These provisions are subject to the qualification that "[n]othing in this section . . . [r]equires a religious corporation, association or society that does not receive public funding to comply with this section as it relates to sexual orientation or gender identity." *Id.* § 4602(5). The MHRA further provides that "'Discriminate' includes, without limitation, segregate, separate or subject to harassment." *Id.* § 4553(2).

The statute plainly would prohibit Crosspoint—if it joins the tuitioning program—from denying admission to or otherwise excluding applicants based on their sexual orientation, gender identity, or religion. It does not, on its face, appear to directly limit the content of Crosspoint's religious expression or teaching—e.g., Crosspoint could not reject applicants for being homosexual, but it could still teach that homosexuality is a sin. *See Compl.* ¶ 28 (characterizing sexual conduct outside the Bible's definition of marriage as "sinful perversions of and contradictory to God's natural design and purpose for sexual activity").

Crosspoint responds, however, that "BCS's requiring students to behave consistently with BCS's statement of faith is an exercise of BCS's religious beliefs and is necessary to its religious educational mission" and "[a]ccordingly, applicants for admission at BCS must agree to cooperate with BCS's statement of faith and code of

conduct, and a student who persistently advocates beliefs contrary to BCS's statement of faith is subject to expulsion for failure to cooperate with BCS's religious purpose and code of conduct." *Pl.'s Reply* at 4. It adds further that "[t]o say that § 4602 does not burden BCS's religious practice because BCS may still express—but not enforce—its religious beliefs is absurd." *Id.* at 5.

Essentially, as noted earlier, Crosspoint is saying that the state's law requires it to admit students only to expel them. If Crosspoint admitted students with sexual orientations, gender identities, or religious views inconsistent with its central religious tenets, the students would be required under Crosspoint policy to adhere to religious beliefs inimical to their own sexual orientations, gender identities, and religious beliefs on pain of "removal from the school." *Compl.* ¶ 35.

Crosspoint's reasoning fits within recent Supreme Court precedent. In *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021), the Supreme Court considered the case of Catholic Social Services (CSS), a private agency that had contracted with the city to provide foster care services but refused to certify same-sex couples because it considered "the certification of prospective foster families to be an endorsement of their relationships." *Id.* at 1875. The city stated that it would not enter a future foster care contract with CSS "unless the agency agreed to certify same-sex couples," and CSS sued to enjoin the city from enforcing that directive. *Id.* at 1875-76. The Supreme Court sided with CSS, stating:

> As an initial matter, it is plain that the City's actions have burdened CSS's religious exercise by putting it to the choice of curtailing its mission or approving relationships inconsistent with its beliefs. The City disagrees. In its view, certification reflects only that foster parents

satisfy the statutory criteria, not that the agency endorses their relationships. But CSS believes that certification is tantamount to endorsement. And "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Review Bd. of Ind. Employment Security Div.*, 450 U.S. 707, 714 (1981). Our task is to decide whether the burden the City has placed on the religious exercise of CSS is constitutionally permissible.

*Id.* The Court went on to find that the city's policies triggered strict scrutiny because they were not generally applicable and concluded that:

CSS seeks only an accommodation that will allow it to continue serving the children of Philadelphia in a manner consistent with its religious beliefs; it does not seek to impose those beliefs on anyone else. The refusal of Philadelphia to contract with CSS for the provision of foster care services unless it agrees to certify same-sex couples as foster parents cannot survive strict scrutiny, and violates the First Amendment.

*Id.* at 1881-82.

*Fulton* is helpful on the issue of burden. In *Fulton*, the government burdened an organization's religious exercise "by putting it to the choice of curtailing its mission or approving relationships inconsistent with its beliefs" through requiring it to—in the organization's view—"endorse" homosexual relationships to which it objected. *Id.* at 1875-76. Here, Crosspoint avers that requiring students to behave consistently with its statement of faith is an exercise of its religious beliefs and noncompliant students are subject to expulsion. Its policies prohibit "students from, among other things, engaging in immoral conduct, including sexual activity outside of marriage as defined in the Statement of Faith, or identifying as a gender other than their biological sex" and the school's "dress code requires students to wear clothing consistent with their biological sex." *Compl.* ¶¶ 37-38. To the extent that Crosspoint

requires all students to comply with its statement of faith, the MHRA effectively prohibits Crosspoint from enforcing some tenets of those policies (for example, it likely could not permissibly discipline a student for identifying as transgender[6] or entering a non-heterosexual relationship). As such, the challenged provisions of the MHRA burden Crosspoint's religious exercise.

As the Supreme Court observed in *Fulton*, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." 141 S. Ct. at 1876 (quoting *Thomas,* 450 U.S. at 714). Taking Crosspoint at its word, the challenged provisions of the MHRA "put[] it to the choice of curtailing its mission or approving [conduct] inconsistent with its beliefs." *Id.* at 1876. Against the backdrop of *Fulton*, the Court concludes that the MHRA's antidiscrimination provisions—which would effectively prohibit Crosspoint from enforcing several of its religiously motivated policies relating to sexual orientation and gender identity—burden Crosspoint's religious exercise.

Burdensome, however, does not mean impermissible, as "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Parker v. Hurley*, 514 F.3d 87, 95 (1st Cir. 2008) (quoting *Church of the*

---

[6]      *See, e.g., Doe v. Reg'l Sch. Unit 26*, 2014 ME 11, ¶ 24, 86 A.3d 600, 607 (holding that "denying access to the appropriate bathroom [consistent with a student's gender identity] constitutes sexual orientation discrimination in violation of the MHRA"); *see also Pl.'s Reply* at 4 n.7 (reiterating its representatives' prior testimony that "it violates BCS's statement of faith to admit a student or allow a student to remain enrolled who violates BCS's statement of faith by presenting as a gender not consistent with his or her biological sex or by professing the entrenched belief that a homosexual sexual orientation is who [the student is] and [the student] think[s] that is right and good" (citation and internal quotation marks omitted)).

*Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993)).  Crosspoint
contends that § 4602 triggers strict scrutiny because it is neither neutral nor
generally applicable.

Crosspoint's argument on general applicability appears to have been mooted.
It initially asserted that "5 M.R.S. § 4602 is not generally applicable, because it
categorically exempts single-sex schools from nearly all educational
nondiscrimination provisions, including those relating to religion, sexual orientation,
and gender identity." *Pl.'s Mot.* at 11.  When this suit was filed, single-sex schools
were indeed exempt.  However, as each party acknowledges, on June 15, 2023, the
Governor of Maine signed Maine Public Law 2023, Chapter 188, which eliminated
the exemption for single-sex educational institutions.  *See* P.L. 2023, ch. 188, § 1, 2023
Me. Laws 370; *Defs.' June 20 Correspondence*; *Pl.'s June 27 Correspondence*.
Crosspoint, presumably referring to its general applicability claim, stated that
"[a]lthough this amendment removed one of the constitutional flaws with the existing
statutory scheme, it does not resolve Plaintiff's other challenges." *Pl.'s June 27
Correspondence* at 1.  Because Crosspoint has not raised any other reason to suggest
that the challenged provisions are not generally applicable, the Court concludes that
the law is generally applicable and moves on to neutrality.

To qualify as neutral, a policy must not target religious beliefs or practices
"because of their religious nature" and the "[g]overnment fails to act neutrally when
it proceeds in a manner intolerant of religious beliefs or restricts practices because of
their religious nature." *Fulton*, 141 S. Ct. at 1877.  "If the policy's objective is to

impede or constrain religion, the policy is not neutral." *Swartz v. Sylvester*, 53 F.4th 693, 700 (1st Cir. 2022) (citing *Lukumi*, 508 U.S. at 533). The First Circuit has noted that "[w]e are mindful that the Free Exercise Clause forbids subtle departures from neutrality and covert suppression of particular religious beliefs" and "[w]hen assessing neutrality, a court must survey meticulously the totality of the evidence, both direct and circumstantial . . .. This includes the series of events leading to the conduct, as well as the historical background." *Id.* at 701 (citations and internal quotation marks omitted).

Crosspoint asserts that Chapter 366 is not neutral because "its timing and structure show that its purpose was to preemptively exclude Plaintiff from the tuitioning program in order to moot *Carson*," meaning that "[e]xcluding Plaintiff from the tuitioning program is a feature, not a bug." *Pl.'s Mot.* at 9-11. It cites Attorney General Frey's press release on the day *Carson* was decided and Speaker Fecteau's tweet about the legislative response to *Carson* as evidence that there is "no doubt that the Legislature specifically crafted the poison pill to target Plaintiff's religious beliefs." *Id.* at 10. The Defendants respond that Attorney General Frey issued the contested press release a year after the challenged law was passed and that the Court cannot divine the legislature's intent from a single tweet by then-Speaker Fecteau. *Defs.' Opp'n* at 13, 14 n.15. Furthermore, they offer that:

> even if [Chapter 366] was introduced and enacted in anticipation of an adverse Supreme Court ruling, it was not a "poison pill." Until then, religious schools were not eligible to receive public funds because they were excluded from the tuitioning program. There was thus no need to differentiate between religious schools receiving public funds and those that were not. If the Legislature anticipated that Maine might soon be

> prohibited from excluding religious schools from the tuitioning program, it would have been entirely appropriate for them to then draw the same distinction that already existed when it came to employment and housing discrimination – religious educational institutions not receiving public funds could discriminate based on sexual orientation or gender identity, while those receiving public funds were prohibited from doing so.

*Id.* at 13-14.

After weighing the parties' claims in light of the totality of the evidence and historical background, the Court concludes that Chapter 366 is neutral. Even accepting Crosspoint's assumption that the Maine Legislature passed Chapter 366 in anticipation of the Supreme Court striking down the sectarian exclusion, the Court does not find significant evidence that this legislation's objective was "to impede or constrain religion" as opposed to ensuring uniformity in a legislative scheme that already prohibited these types of discrimination by organizations receiving public funds in the housing and employment contexts. *Swartz*, 53 F.4th at 700 (citing *Lukumi*, 508 U.S. at 533).

The MHRA's history provides useful context for the recent amendments to its educational discrimination provisions. When the MHRA was enacted in 1971, it prohibited unlawful discrimination in employment, housing, and public accommodations—but not education. P.L. 1971, ch. 501. It also did not initially prohibit discrimination based on sex, sexual orientation, or gender identity. *Id.* Later, the Legislature expanded the MHRA to prohibit discrimination in education (initially only prohibiting sex discrimination). P.L. 1987 ch. 578, § 3. Between 1987 and 1991, the Legislature continued to expand the educational discrimination

provisions to prohibit discrimination on the basis of disability, race, and national origin.  *See* P.L. 1987, ch. 478; P.L. 1989, ch. 725; P.L. 1991, ch. 100.

Then, in 2005, the Legislature again expanded the MHRA to prohibit discrimination on the basis of sexual orientation in all areas covered by the Act (employment, housing, public accommodations, and education).  P.L. 2005, ch. 10 ("An Act to Extend Civil Rights Protections to All People Regardless of Sexual Orientation").  At the time, sexual orientation was defined to also include gender identity.  *Id.* ("'Sexual orientation' means a person's actual or perceived heterosexuality, bisexuality, homosexuality or gender identity or expression").  Religious organizations that did not receive public funds were exempted from the provision on sexual orientation discrimination in employment, housing, and education.  *Id.* (prohibiting "[d]iscrimination in employment, housing, public accommodation, credit and educational opportunity on the basis of sexual orientation, except that a religious corporation, association or organization that does not receive public funds is exempt from this provision").  Education facilities "owned, controlled or operated by a bona fide religious corporation, association, or society" were fully exempted.  *Id.*

In other words, since 2005 the MHRA has prohibited sexual orientation/gender identity discrimination in employment, housing, and education but has also generally exempted religious organizations that do not receive public funds.  From 2005 to 2021, its educational discrimination subsection—5 M.R.S. § 4602—exempted religious organizations, without distinguishing whether they received public funds,

and, in 2021, Chapter 366 narrowed this exclusion to exempt only religious institutions that do not receive public funds. *Compare* P.L. 2005, ch. 10, *with* P.L. 2021, ch. 366, § 19; *see also* 5 M.R.S. § 4602(5).

Crosspoint submits that this change was made to target its purportedly disfavored religious exercise and subvert the Supreme Court's *Carson* decision. The Court acknowledges that Attorney General Frey's immediate negative response to *Carson* and then-Speaker Fecteau's opinion about the purpose of the legislation lend credence to Crosspoint's argument. But Attorney General Frey was not a member of the Maine Legislature when it enacted Chapter 366, and there is no evidence that he had a hand in proposing the legislation to a legislator. Regarding Speaker Fecteau, the United States Supreme Court has repeatedly cautioned against relying on the statements of one legislator to ascribe motivations to the entire legislative body. *See United States v. O'Brien*, 391 U.S. 367, 383-84 (1968) ("Inquiries into congressional motives or purposes are a hazardous matter" and courts should not rely on statements made by individual legislators since "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it"); *Lukumi*, 508 U.S. at 558 (Scalia, J., concurring) (subjective motivation of lawmakers is irrelevant when conducting analysis under the First Amendment, and "it is virtually impossible to determine the singular 'motive' of a collective legislative body").

The historical background provides significantly more support for the Defendants' explanation that the Maine Legislature fashioned Chapter 366 to keep

the MHRA's provisions on education discrimination in line with its broader scheme for exempting only religious organizations that do not receive public funding from certain antidiscrimination provisions. The tuitioning program's sectarian exclusion prohibited sectarian educational institutions from receiving public funding from 1981 up until its invalidation by *Carson* in 2022. 142 S. Ct. at 1994, 2002. The MHRA has, since 2005, generally exempted only religious organizations that do not receive public funds from its sexual orientation/gender identity provisions. *See* P.L. 2005, ch. 10. While religious organizations were exempted from those provisions from 2005 until 2022—regardless of whether they received public funding—there would have been no reason to include such a distinction. Because the sectarian exclusion blocked tuitioning funding for sectarian educational institutions, distinguishing between sectarian institutions that did or did not receive public funding would have been unnecessary and redundant.

Once the sectarian exclusion was struck down, however, the public funds distinction was no longer be mere surplusage. After the constitutionality of the sectarian exclusion was challenged during the *Carson* litigation, the Legislature in 2021 passed Chapter 366, which—among other things—added the public funding distinction to the religious exception for educational discrimination. The current exemption, enacted in 2021, is consistent with the text and purpose of the Legislature's 2005 Act, which broadly proscribed sexual orientation and gender identity discrimination "in employment, housing, public accommodation, credit and educational opportunity . . . except that a religious corporation, association or

organization *that does not receive public funds* is exempt from this provision." P.L. 2005, ch. 10 (emphasis added).

The First Circuit has directed that "[w]hen assessing neutrality, a court must survey meticulously the totality of the evidence, both direct and circumstantial . . .. This includes the series of events leading to the conduct, as well as the historical background." *Swartz,* 53 F.4th at 701 (citations and internal quotation marks omitted). Against this neutral explanation, Crosspoint insists that Chapter 366 instead targets its religious beliefs and was designed to prevent it from participating in the tuitioning program, relying on the Act's temporal relationship to the *Carson* litigation, then-Speaker Fecteau's tweet, and Attorney General Frey's press release— issued nearly a full year after Chapter 366 was enacted. Even if some members of the Maine Legislature enacted Chapter 366 with the *Carson* litigation in mind and even if Chapter 366 causes some religious institutions not to apply for tuition funding, the law itself may still be neutral. Given the historical and circumstantial backdrop, the Court does not find sufficient evidence to suggest that Chapter 366 "proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature."[7] *Fulton*, 141 S. Ct. at 1877.

---

[7]     Though the parties focus primarily on the MHRA's sexual orientation and gender identity provisions, Crosspoint also contends that the statute violates its free exercise rights by "requir[ing] BCS to permit student religious expression contrary to its statement of faith." *Pl.'s Reply* at 4; 5 M.R.S. § 4602(5)(D) (providing that "to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing").
        These issues are not fleshed out in the parties' briefings nearly as thoroughly as the sexual orientation/gender identity issues. *See Defs.' Opp'n* at 2, 10; *Pl.'s Reply* at 4. Section 4602(5)(D) appears to primarily protect students' rights to religious expression. Even assuming that it would burden Crosspoint's religious exercise to prevent it from prohibiting disfavored religious expression, it

The Court concludes that Chapter 366 is neutral and generally applicable. "When a religiously neutral and generally applicable law incidentally burdens free exercise rights, we will sustain the law against constitutional challenge if it is rationally related to a legitimate governmental interest." *Does 1-6 v. Mills*, 16 F.4th 20, 29 (1st Cir. 2021) (citing *Fulton*, 141 S. Ct. at 1876). Maine has a legitimate interest in preventing discrimination in education, and the Court finds that the MHRA's challenged antidiscrimination provisions are rationally related to that interest. Crosspoint has failed to demonstrate a likelihood of success on the merits on its free exercise claim as it pertains to educational discrimination.

### b.     The Employment Discrimination Claim

Crosspoint's employment discrimination claim is similarly unavailing. Crosspoint asserts that "applying MHRA's employment discrimination provision, 5 M.R.S. § 4572(1)(A), to prohibit Plaintiff from hiring only co-religionists violates the Establishment and Free Exercise Clauses." *Pl.'s Mot.* at 14. In Crosspoint's view, "Plaintiff faces a credible threat of Defendants enforcing § 4572(1)(A) to prohibit BCS's practice of hiring only co-religionists if BCS participates in the tuitioning program . . .. Such enforcement violates both MHRA's plain text and the First Amendment." *Id.* at 15.

Section 4572 prohibits employers from discriminating on the basis of religion. As Crosspoint notes, however, 5 M.R.S. § 4573-A states plainly that:

is unclear to the Court in which context(s) this would arise and to what extent § 4602(5)(D) would infringe Crosspoint's desired behavior.
        For the purposes of this motion, the Court concludes that Crosspoint has not carried its "burden of proving a free exercise violation." *See Kennedy*, 142 S. Ct. at 2421-22.

> This subchapter does not prohibit a religious corporation, association, educational institution or society from giving preference in employment to individuals of its same religion to perform work connected with the carrying on by the corporation, association, educational institution or society of its activities. Under this subchapter, a religious organization may require that all applicants and employees conform to the religious tenets of that organization.

*Id.*; *Pl.'s Mot.* at 15 ("The plain text of the MHRA protects Plaintiff's employment autonomy even when Plaintiff accepts public funds"). The Defendants agree, offering that "[a]ll religious organizations (regardless of whether they receive public funds) are allowed to give employment preference to individuals of the same religion and may require all applicants and employees to conform to the organization's religious tenets" and "Plaintiff is thus free to limit employment to persons who share Plaintiff's religion and who conform to its religious tenets." *Defs.' Opp'n* at 18 (emphasis omitted) (citing 5 M.R.S. § 4573-A(2)). In reply, Crosspoint submits only that "Defendants' Response at least concedes (at 18) that the ministerial exception restricts the application of 5 M.R.S. § 4572(1)(A) to BCS's employment practices with respect to a significant portion of its employees" and "[a]t a minimum, then, a preliminary injunction to that effect is appropriate." *Pl.'s Reply* at 1.

The Court respectfully disagrees. Both Crosspoint and the state interpret § 4573-A(2) to exempt Crosspoint, as a religious institution, from § 4572(1)(A)'s prohibition on employment discrimination based on religion. The Court's own reading of the statute's operation confirms this interpretation.[8] Crosspoint offers no

---

[8]    Although not mentioned by the parties, Maine's Constitution contains a direct reference to the right of religious societies to employ "public teachers" of their choosing. Article I, § 3 is entitled,

legitimate justification for the Court to enjoin the hypothetical future enforcement of a statute (disclaimed by the state) in a manner that would appear to plainly violate the statute's own text.   In essence, on this narrow issue, the Court declines to issue an injunction because there is no case or controversy between the parties.   U.S. CONST. art. I, § 2.

### 3.    Crosspoint's Free Speech Claim

Crosspoint argues that Chapter 366 also violates the Constitution's Free Speech Clause, asserting that it "restricts Plaintiff's speech based on content and viewpoint, because it is designed to force Plaintiff to stop educating its students from its religious perspective as a condition of participating in the tuition program." *Pl.'s Mot.* at 17.   Under its interpretation of the law, "[i]f Plaintiff teaches from its religious perspective, it must either forgo accepting publicly funded tuition payments or face thousands of dollars in liability . . . [a]nd suppressing Plaintiff's religious perspective is the poison pill's avowed purpose." *Id.* at 18-19.

The Court is not convinced.   At least in this pre-enforcement context, the plain text of the challenged provisions of the MHRA regulate conduct, not speech.   The Court found that the MHRA's antidiscrimination provisions could burden

"Religious Freedom; Sects Equal; Religious Tests Prohibited; Religious Teachers," and provides in part:

> [A]ll religious societies in this State, whether incorporate or unincorporate, shall at all times have the exclusive right of electing their public teachers, and contracting with them for their support and maintenance.

ME. CONST. art. 1, § 3.   The parties' unified position that the Maine statutes exempt Crosspoint as a religious institution from the provisions of Maine law that prohibit discrimination based on religion seems consistent with this specific provision of the Maine Constitution.

Crosspoint's religious exercise by impeding its ability to enforce certain religiously motivated policies. But on its face, the MHRA does not limit Crosspoint's ability to "teach[] from its religious perspective." *Id.* Prohibiting participating religious schools from discriminating on the basis of sexual orientation or gender identity may ultimately affect their conduct, but the Court has yet to see a persuasive argument that it infringes on their expression. *See Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1598 (2022) (Alito, J., concurring) ("'Speech,' as that term is used in our First Amendment jurisprudence, refers to expressive activity that is 'intended to be communicative' and, 'in context, would reasonably be understood . . . to be communicative'" (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984)).

In *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006), the Supreme Court held that a law denying certain federal funds to law schools that prohibited military recruiters did not violate the First Amendment because it "neither limits what law schools may say nor requires them to say anything" and the "schools remain free under the statute to express whatever views they may have on the military's congressionally mandated employment policy, all the while retaining eligibility for federal funds." *Id.* at 51, 60, 70. The Supreme Court emphasized that "[a]s a general matter, the [challenged law] regulates conduct, not speech. It affects what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*." *Id.* at 60 (emphasis in original).

The Court concludes the same here: the challenged MHRA provisions limit conduct, not speech, and therefore do not infringe on Crosspoint's right to free expression. Crosspoint has not shown a likelihood of success on any of its claims.

## B.    Irreparable Harm to Crosspoint

Having concluded that Crosspoint is not likely to succeed on the merits, the Court next considers the second prong of the preliminary injunction analysis. Irreparable harm is "an injury that cannot adequately be compensated for either by a later-issued . . . injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). To show irreparable harm, a plaintiff must "demonstrate that irreparable injury is *likely* in the absence of an injunction," not merely that it is a possibility. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original); *see also Canadian Nat'l Ry. Co. v. Montreal, Me. & Atl. Ry., Inc.*, 786 F. Supp. 2d 398, 432 (D. Me. 2011) ("[P]roof of a mere possibility of injury is insufficient to justify an injunction").

Courts "measure irreparable harm on 'a sliding scale, working in conjunction with a moving party's likelihood of success on the merits.'" *Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 42-43 (1st Cir. 2010) (quoting *Vaquería Tres Monjitas, Inc. v. Irizarry,* 587 F.3d 464, 485 (1st Cir. 2009)). Thus, "[t]he strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown," however, "at least some positive showing of irreparable harm must still be made." *Id.* at 43 (internal quotations omitted) (alteration in original); *see also Gately v. Commonwealth of Massachusetts*, 2 F.3d 1221, 1232 (1st

Cir. 1993) ("[A] federal court cannot dispense with the irreparable harm requirement in affording injunctive relief").

In other words, as the First Circuit has recently put it, "[i]f the movant fails to demonstrate a likelihood of success on the merits, the remaining elements are of little consequence." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 92 (1st Cir. 2020). The Court does not doubt that, if Crosspoint's constitutional claims were meritorious, it would suffer irreparable injury by refraining from applying for the tuitioning program. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). Crosspoint, however, has not shown a likelihood of success on the merits, and Chapter 366 is thus unlikely to cause a deprivation of its constitutional rights.

## C.    Balance of the Equities and the Public Interest

The Court must also weigh the balance of the hardships on the parties and the public interest. The Court does not discount Crosspoint's hardship related to not participating in the tuitioning program for fear of MHRA enforcement, but it also does not find that hardship to outweigh the potential hardship the state would face from being unable to fully enforce its educational antidiscrimination laws. The public also has a strong interest in the state being able to effectively combat discrimination. Buttressed by the Court's conclusion about Crosspoint's likelihood of success on the merits, the balance of these factors favors the Defendants.

### D.    Summary

The Court concludes that Crosspoint is not entitled to a preliminary injunction. With this said, the Court acknowledges that Crosspoint is raising important legal questions.  Despite the plaintiffs' hard-fought and significant victory at the United States Supreme Court in *Carson*, the Maine Legislature and the Maine Attorney General have largely deprived Crosspoint and similar religious schools of the fruit of their victory.  Crosspoint essentially argues that the Maine Legislature's enactment of statutes that prohibit discrimination on the basis of sexual orientation and gender identity is a form of state-enforced, secular religion.  Yet, the Maine Legislature has the authority to define protected classes under its antidiscrimination laws.  The rub comes when the Maine Legislature's view of the categories of people meriting protected status conflicts with sincerely held beliefs of members of religious communities.  This is a tension as old as the nation itself.  Although it has done its best to set out, analyze, and decide these difficult constitutional issues, the Court also recognizes that this case poses novel constitutional questions and has attempted to frame its opinion as a prelude to a challenge to the Court of Appeals for the First Circuit for a more authoritative ruling.  *See Carson v. Makin*, 401 F. Supp. 3d 207, 212 (D. Me. 2019) ("It has always been apparent that, whatever my decision, this case is destined to go to the First Circuit on appeal, maybe even to the Supreme Court").

## VI.    CONCLUSION

The Court DENIES Crosspoint Church's Motion for Preliminary Injunction (ECF No. 5).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 27th day of February, 2024

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| CROSSPOINT CHURCH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-00146-JAW |
| | ) | |
| A. PENDER MAKIN, in her | ) | |
| official capacity as Commissioner of | ) | |
| the Maine Department of Education, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON JOINT MOTION TO CONVERT ORDER ON PRELIMINARY INJUNCTION INTO ORDER ON PERMANENT INJUNCTION AND ENTER FINAL JUDGMENT**

Determining that the small amount of additional evidence submitted by the parties does not alter the reasoning behind the Court's denial of the plaintiff's motion for preliminary injunction, the Court grants the parties' joint motion to convert the order on preliminary injunction into an order on permanent injunction and enters final judgment in favor of the defendants.

## I. PROCEDURAL BACKGROUND

On March 27, 2023, Crosspoint Church filed a three-count complaint against A. Pender Makin, in her official capacity as Commissioner of the Maine Department of Education, and Jefferson Ashby, Edward David, Julie Ann O'Brien, Mark Walker, and Thomas Douglas, in their official capacities as Commissioners of the Maine Human Rights Commission, alleging that certain provisions of the Maine Human Rights Act (MHRA) effectively exclude it from approval for Maine's school tuitioning

program in violation of the Free Exercise, Establishment, and Free Speech Clauses of the U.S. Constitution. *Compl.* (ECF No. 1). That same day, Crosspoint filed a motion for preliminary injunction to enjoin the Defendants from enforcing the provisions of Maine law that allegedly exclude it from the tuitioning program. *Pl.'s Mot. for Prelim. Inj.* (ECF No. 5).

On February 27, 2024, the Court denied Crosspoint's motion for preliminary injunction in a forty-seven-page order. *Order on Pl.'s Mot. for Prelim. Inj.* (ECF No. 41) (*Order on Prelim. Inj.*). Despite denying Crosspoint's motion, the Court acknowledged that Crosspoint "is raising important legal questions." *Id.* at 46. In recognition of these "novel constitutional questions," the Court "attempted to frame its opinion as a prelude to a challenge to the Court of Appeals for the First Circuit for a more authoritative ruling." *Id.*

On March 28, 2024, the parties filed a joint motion asking the Court to "convert its Order on Plaintiff's Motion for Preliminary Injunction into an Order on Permanent Injunction and enter final judgment to facilitate prompt and efficient appellate review." *Jt. Mot. to Convert Order on Prelim. Inj. Into Order on Permanent Inj. and Enter Final J.* (ECF No. 43) (*Jt. Mot. for Order on Permanent Inj.*). That same day, the parties submitted a joint stipulation of facts, with thirteen attachments, to be included as part of the record for appellate review. *Jt. Stipulated Facts* (ECF No. 44).

On April 1, 2024, the Court issued an order on the parties' joint motion, in which the Court expressed concern that new materials not previously before the Court were included in the parties' joint stipulation of facts. *Order on Jt. Mot. to*

*Convert Order on Prelim. Inj. Into Order on Permanent Inj. and Enter Final J.* at 2 (ECF No. 45) (*Order on Jt. Mot.*).  The Court further explained that it did not believe it could convert its order on preliminary injunction into an order on permanent injunction without referring to the new record and considering the new evidence offered by the parties.  *Id.* at 2-3.  To resolve this issue, the Court sought counsels' advice on how to proceed.  *Id.* at 3.

To this end, on April 22, 2024, the Court held a telephonic conference of counsel.  *Min. Entry* (ECF No. 47).  During this conference, the Court instructed the parties to file a motion explaining why they added new materials to the joint stipulation of facts and whether they believed this additional evidence would impact the reasoning in the Court's order on preliminary injunction.

On April 24, 2024, the parties submitted a motion responding to the Court's queries.  *Jt. Mot. in Resp. to Ct.'s Order on Jt. Mot. to Convert Order on Prelim. Inj. Into Order on Permanent Inj. and Enter Final J.* (ECF No. 48) (*Jt. Mot. in Resp. to Ct.'s Order*).  In this motion, the parties acknowledged that some evidence in the joint stipulation of facts was not before the Court when it issued its order on Crosspoint's motion for preliminary injunction, but they represented this evidence was part of the record in *Carson v. Makin*.  *Id.* at 1.  The parties described the new evidence as "background information that will not materially impact the Court's thorough legal analysis or its ruling on the preliminary injunction motion."  *Id.*  The parties further clarified they were seeking "to ensure that all potentially relevant evidence is

included in the record" "to ensure full appellate review and avoid possible remand."
*Id.* at 2.

## II.  DISCUSSION

### A.  The Newly Stipulated Evidence

In its previous order, the Court referenced three attachments to the parties'
joint stipulation of facts that were not before the Court when it was considering
Crosspoint's motion for preliminary injunction: 1) Bangor Christian Schools' (BCS)
application for admission, *Jt. Stipulated Facts*, Attach. 2; 2) the interrogatory
answers of Robert G. Hasson, Jr., former Commissioner of the Maine Department of
Education, *id.*, Attach. 9; and 3) correspondence between the Maine Department of
Education and Cardigan Mountain School.  *Id.*, Attach. 10.  Having analyzed each
newly filed attachment, the Court determines they do not alter the reasoning in its
order on Crosspoint's motion for preliminary injunction.

### 1.  Bangor Christian Schools' Application for Admission

BCS's application for admission does not affect the Court's reasoning because
the Court's order on Crosspoint's motion for preliminary injunction accounted for
BCS's admissions policy and criteria.  *See Order on Prelim. Inj.* at 10-11.  The
application primarily seeks demographic information about the prospective enrollee
and their family, including religious affiliation.  *Jt. Stipulated Facts*, Attach. 2, *BCS
Admission Application*.  Additionally, both the prospective student and a parent or
guardian must affirm they "have read and understand the entire contents of the
Student/Parent Handbook, and [] are willing to abide by all of the principles stated

therein . . . [and] understand that the school may request withdrawal at any time, if in the opinion of the school, [the] child does not fit into the spirit of the institution." *Id.*

In its order on Crosspoint's motion for preliminary injunction, the Court, in concluding the challenged provisions of the MHRA burdened Crosspoint's religious exercise, discussed BCS's requirement that students comply with its statement of faith. *Order on Prelim. Inj.* at 29-32. As the relevant portions of BCS's application for admission merely provide cumulative evidence on this point, the Court concludes the application does not alter its previous order.

### 2.    The Hasson Interrogatory Answers

The Hasson interrogatory answers likewise do not affect the reasoning behind the Court's denial of preliminary injunction because they primarily relate to 20-A M.R.S. § 2951(2), the "sectarian exclusion" invalidated by the United States Supreme Court in *Carson v. Makin*, 142 S. Ct. 1987 (2022). Specifically, the interrogatory answers discuss how the Maine Department of Education applied 20-A M.R.S. § 2951(2) and the interests purportedly advanced by it. *Jt. Stipulated Facts*, Attach. 9, *Def. Robert G. Hasson, Jr.'s Resps. to Pls.' First Set of Interrogs.* As 20-A M.R.S. § 2951(2) is not at issue in this case, the Court agrees with the parties that the Hasson interrogatory answers constitute "background information" that does not alter the reasoning in the Court's order on preliminary injunction. *See Jt. Mot. in Resp. to Ct.'s Order* at 1-2.

### 3.    The Cardigan Mountain School Correspondence

As the Cardigan Mountain School correspondence also concerns tuitioning approval under 20-A M.R.S. § 2951(2), it similarly does not change the analysis in the Court's prior order.  This correspondence, from the summer and fall of 2015, is comprised of several emails between officials at Cardigan Mountain School and the Maine Department of Education.  *Jt. Stipulated Facts*, Attach. 10, *Cardigan Mountain School Correspondence*.  In conjunction with Cardigan Mountain School's application to participate in Maine's tuitioning program, the officials discuss the school's mandatory chapel services.  *Id.*  The correspondence ends with Maine Department of Education officials recommending the approval of Cardigan Mountain School for tuitioning purposes.  *Id.*

In the Court's view, this correspondence, now nearly nine years old, primarily relates to 20-A M.R.S. § 2951(2).  Whether students are required to attend chapel services appears to concern Cardigan Mountain School's potential status as a "sectarian" institution as opposed to its compliance with the challenged antidiscrimination provisions of the MHRA.  Accordingly, the Court determines that the Cardigan Mountain School correspondence does not affect the reasoning in the Court's order on preliminary injunction.

### B.    The Parties' Motion to Convert the Court's Order on Preliminary Injunction Into an Order on Permanent Injunction

Having determined that the newly submitted evidence does not alter the reasoning in the order on preliminary injunction, the Court turns to the parties' request to convert that order into an order on permanent injunction and enter final

judgment. "A district court can convert a preliminary injunction order into a permanent injunction order and may do so without an evidentiary hearing where, as here, the parties agree that no hearing is necessary and where a hearing would serve little purpose." *Me. Republican Party v. Dunlap*, No. 1:18-cv-00179-JDL, 2018 U.S. Dist. LEXIS 130446, at *2 (D. Me. Aug. 3, 2018) (citing *Shell Co. (P.R.) Ltd. v. Los Frailes Serv. Station, Inc.*, 605 F.3d 10, 19 n.4 (1st Cir. 2010)). "Where a plaintiff seeks permanent injunctive relief, the test is the same [as the preliminary injunction standard], except that the movant must show actual success on the merits of the claim, rather than a mere likelihood of success." *Id.* (alteration in original) (quoting *Caroline T. v. Hudson Sch. Dist.*, 915 F.2d 752, 755 (1st Cir. 1990)).

In its order on Crosspoint's motion for preliminary injunction, the Court concluded that Crosspoint "is unlikely to succeed on the merits." *Order on Prelim. Inj.* at 1. Specifically, the Court determined that "the religion, sexual orientation, and gender identity provisions of 5 M.R.S. § 4602 do not violate the Free Exercise, Establishment, or Free Speech Clauses of the U.S. Constitution" and that "Crosspoint is not entitled to a preliminary injunction on its challenge to 5 M.R.S. § 4572(1)(A) because the parties agree that Crosspoint is exempt from this provision." *Id.* at 19. Because the small amount of additional evidence submitted by the parties does not change the Court's reasoning, Crosspoint cannot now show actual success on the merits where it previously failed to show a likelihood of success.

Accordingly, since the Court agrees with the parties that there are no material factual disputes and that an evidentiary hearing is unnecessary, *see Jt. Mot. for Order*

*on Permanent Inj.* at 2, the Court adopts and restates all of the legal conclusions contained in its February 27, 2024 Order on Plaintiff's Motion for Preliminary Injunction. The Court further converts its denial of preliminary injunction into a denial of permanent injunction and enters final judgment for the Defendants.

## III. CONCLUSION

The Court GRANTS the Joint Motion in Response to Court's Order on Joint Motion to Convert Order on Preliminary Injunction Into Order on Permanent Injunction and Enter Final Judgment (ECF No. 48), considers the additional evidence submitted in the joint motion to convert order, and determines that the additional exhibits do not affect the merits of the Court's February 27, 2024 Order on Plaintiff's Motion for Preliminary Injunction (ECF No. 41) or the propriety of converting the order on preliminary injunction into an order on permanent injunction and appealable judgment. The Court further GRANTS the Joint Motion to Convert Order on Preliminary Injunction Into Order on Permanent Injunction and Enter Final Judgment (ECF No. 43). The Court further CONVERTS its February 27, 2024 Order on Plaintiff's Motion for Preliminary Injunction (ECF No. 41) into an Order on Permanent Injunction and ORDERS the Clerk to enter final judgment for the Defendants.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 4th day of June, 2024

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| CROSSPOINT CHURCH | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL NO. 1:23-cv-00146-JAW |
| | ) | |
| A. PENDER MAKIN, et al. | ) | |
| | ) | |
| Defendants. | ) | |

<u>JUDGMENT</u>

In accordance with the Order on Joint Motion to Convert Order on Preliminary

Injunction into Order on Permanent Injunction and Enter Final Judgment entered by U.S.

District Judge John A. Woodcock, Jr. on June 4, 2024,

JUDGMENT is hereby entered for all Defendants and against Plaintiff,

Crosspoint Church.

CHRISTA K. BERRY
CLERK

By:  /s/ Joanne McCue
Deputy Clerk

Dated: June 5, 2024