# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

CROSSPOINT CHURCH,

*Plaintiff-Appellant,*

v.

A. PENDER MAKIN, IN HER OFFICIAL CAPACITY AS COMMISSIONER
OF THE MAINE DEPARTMENT OF EDUCATION, ET AL.,

*Defendants-Appellees.*

On Appeal from the United States District Court for the
District of Maine, No. 1:23-cv-00146 (Woodcock, J.)

## JOINT APPENDIX

David J. Hacker
First Liberty Institute
2001 W. Plano Parkway, Ste. 1600
Plano, TX 75075
(972) 941-4444
dhacker@firstliberty.org

Camille P. Varone
First Liberty Institute
1331 Pennsylvania Ave. NW, Ste. 1410
Washington, DC 20004
(202) 921-4105
cvarone@firstliberty.org

Patrick Strawbridge
Consovoy McCarthy PLLC
10 Post Office Sq.
8th Flr. S. PMB #706
Boston, MA 02109
(617) 227-0548
patrick@consovoymccarthy.com

Tiffany H. Bates
Consovoy McCarthy PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tiffany@consovoymccarthy.com

September 3, 2024

*Counsel for Appellant*

# TABLE OF CONTENTS

Docket Sheet ................................................................................................JA1

Notice of Appeal (Doc. 51) ........................................................................JA11

Complaint (Doc. 1) ..................................................................................... JA15

An Act To Improve Consistency within the Maine Human Rights Act
(Doc. 14-2) ...................................................................................................JA43

Joint Stipulation of Facts (Doc. 44) ........................................................... JA55

MHRC's then-Executive Director in support of LD 1688 (Doc. 44-1) .................. JA64

BCS' Application for Admission (Doc. 44-2) ............................................. JA71

BCS' Student Handbook (Doc. 44-3) ........................................................ JA76

BCS' Faculty Contract (Doc. 44-4) ......................................................... JA127

BCS' Teacher Contract (Doc. 44-5) ........................................................ JA131

Deposition of Jeffrey Benjamin, part of the stipulated record in
*Carson v. Makin*, No. 1:18-cv-00327, Doc. 24-8 (Doc. 44-6) ................................. JA135

Deposition of Martha Boone, part of the stipulated record in
*Carson v. Makin*, No. 1:18-cv-00327, Doc. 24-16 (Doc. 44-7) ................................JA196

Legislative History of L.D. 182 (Doc. 44-8) .............................................. JA232

Interrogatory Responses from Education Commissioner
Robert Hasson, Jr. (Doc. 44-9) ................................................................. JA256

Correspondence Regarding the Cardigan Mountain School (Doc. 44-10)............ JA264

Statement of Maine Attorney General Aaron Frey on the Supreme Court
Decision in *Carson v. Makin* (June 21, 2022) (Doc. 44-11) ...................... JA273

Statement of Attorney General Aaron Frey on the *Carson v. Makin*
Oral Argument (Dec. 8, 2021) (Doc. 44-12) ............................................. JA276

Tweet of Speaker of the House Ryan Fecteau on the Amendments to
5 M.R.S.A. §4602 (June 26, 2022) (Doc. 44-13) ...................................... JA279

APPEAL,CLOSED,STANDARD

# U.S. District Court
## District of Maine (Bangor)
## CIVIL DOCKET FOR CASE #: 1:23-cv-00146-JAW

CROSSPOINT CHURCH v. MAKIN et al
Assigned to: JUDGE JOHN A. WOODCOCK, JR
Referred to: MAGISTRATE JUDGE KAREN FRINK WOLF
related Cases:  1:18-cv-00327-JAW
              2:23-cv-00246-JAW
Case in other court:  First Circuit Court of Appeals, 24-01590
Cause: 28:1983 Civil Rights

Date Filed: 03/27/2023
Date Terminated: 06/05/2024
Jury Demand: None
Nature of Suit: 950 Constitutional - State Statute
Jurisdiction: Federal Question

**Plaintiff**

**CROSSPOINT CHURCH**                    represented by    **DAVID J. HACKER**
FIRST LIBERTY INSTITUTE
2001 W. PLANO PARKWAY
SUITE 1600
PLANO, TX 75075
972-941-4444
Email: dhacker@firstliberty.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JEFFREY C. MATEER**
FIRST LIBERTY INSTITUTE
2001 W. PLANO PARKWAY
SUITE 1600
PLANO, TX 75075
972-941-4444
Email: jmateer@firstliberty.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**LEA E. PATTERSON**
BUTTERFIELD & PATTERSON PLLC
P.O. BOX 941681
PLANO, TX 75094
945-284-0702
Email: lea@butterfieldpatterson.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**PATRICK N. STRAWBRIDGE**
CONSOVOY MCCARTHY PLLC

JA1

TEN POST OFFICE SQUARE
8TH FLOOR SOUTH PMB 706
BOSTON, MA 02109
617-227-0548
Email: patrick@consovoymccarthy.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**TIFFANY H. BATES**
CONSOVOY MCCARTHY PLLC
1600 WILSON BLVD
SUITE 700
ARLINGTON, VA 22209
703-243-9423
Email: tiffany@consovoymccarthy.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**COURTNEY A. JONES**
FIRST LIBERTY INSTITUTE
2001 W. PLANO PARKWAY
SUITE 1600
PLANO, TX 75075
972-941-4000
Email: cjones@firstliberty.org
*TERMINATED: 05/31/2023*
*PRO HAC VICE*

**KEISHA T. RUSSELL**
FIRST LIBERTY INSTITUTE
2001 W. PLANO PARKWAY
SUITE 1600
PLANO, TX 75075
972-941-4444
Fax: 972-941-4457
Email: krussell@firstliberty.org
*TERMINATED: 08/08/2023*
*PRO HAC VICE*

V.

**Defendant**

**A PENDER MAKIN**
*In her official capacity as Commissioner of
the Maine Department of Education*

represented by **CHRISTOPHER C. TAUB**
OFFICE OF THE ATTORNEY GENERAL
STATE HOUSE STATION 6
AUGUSTA, ME 04333-0006
207-626-8800
Email: Christopher.C.Taub@maine.gov
*ATTORNEY TO BE NOTICED*

**SARAH A. FORSTER**
OFFICE OF THE ATTORNEY GENERAL
SIX STATE HOUSE STATION

JA2

AUGUSTA, ME 04333-0006
207-626-8866
Email: sarah.forster@maine.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**JEFFERSON ASHBY**
*In his official capacity as Commissioner of
the Maine Human Rights Commission*

represented by **CHRISTOPHER C. TAUB**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SARAH A. FORSTER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**EDWARD DAVID**
*In his official capacity as Commissioner of
the Maine Human Rights Commission*

represented by **CHRISTOPHER C. TAUB**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SARAH A. FORSTER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**JULIE ANN O'BRIEN**
*In his official capacity as Commissioner of
the Maine Human Rights Commission*

represented by **CHRISTOPHER C. TAUB**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SARAH A. FORSTER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MARK WALKER**
*In his official capacity as Commissioner of
the Maine Human Rights Commission*

represented by **CHRISTOPHER C. TAUB**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SARAH A. FORSTER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**THOMAS DOUGLAS**
*In his official capacity as Commissioner of
the Maine Human Rights Commission*

represented by **CHRISTOPHER C. TAUB**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SARAH A. FORSTER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**AMERICAN CIVIL LIBERTIES UNION
OF MAINE**

represented by **ANAHITA SOTOOHI**
AMERICAN CIVIL LIBERTIES UNION

JA3

8/29/24, 1:43 PM                    District of Maine (NextGen)

OF MAINE
P.O. BOX 7860
PORTLAND, ME 04112
860-302-2427
Email: asotoohi@aclumaine.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**CAROL GARVAN**
AMERICAN CIVIL LIBERTIES UNION
OF MAINE
PO BOX 7860
PORTLAND, ME 04112
207-619-8687
Email: cgarvan@aclumaine.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**DANIEL MACH**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION DC
915 15TH ST NW STE 600
WASHINGTON, DC 20005
202-675-2330
Email: dmach@aclu.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**HEATHER L. WEAVER**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION DC
915 15TH ST NW STE 600
WASHINGTON, DC 20005
202-675-2330
Email: hweaver@aclu.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**ZACHARY L. HEIDEN**
AMERICAN CIVIL LIBERTIES UNION
OF MAINE
PO BOX 7860
PORTLAND, ME 04112
207-774-5444
Fax: 207-774-1103
Email: zheiden@aclumaine.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**AMERICAN CIVIL LIBERTIES UNION**        represented by **ANAHITA SOTOOHI**
                                          (See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**CAROL GARVAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**DANIEL MACH**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**HEATHER L. WEAVER**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**ZACHARY L. HEIDEN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/27/2023 | 1 | COMPLAINT against JEFFERSON ASHBY, EDWARD DAVID, THOMAS DOUGLAS, A PENDER MAKIN, JULIE ANN O'BRIEN, MARK WALKER **PAYMENT OF FILING FEE DUE WITHIN 48 HOURS. IF FILING FEE IS BEING PAID WITH A CREDIT CARD COUNSEL ARE INSTRUCTED TO LOGIN TO CMECF AND DOCKET** *Case Opening Filing Fee Paid* **FOUND IN THE** *Complaints and Other Initiating Documents* **CATEGORY. CHECK PAYMENTS DUE WITHIN 48 HOURS.**, filed by CROSSPOINT CHURCH. (Service of Process Deadline 6/26/2023) Fee due by 3/29/2023. (jgd) (Entered: 03/27/2023) |
| 03/27/2023 | 2 | CIVIL COVER SHEET. (jgd) (Entered: 03/27/2023) |
| 03/27/2023 | 3 | CORPORATE DISCLOSURE STATEMENT by CROSSPOINT CHURCH. (jgd) (Entered: 03/27/2023) |
| 03/27/2023 | 4 | Summons Issued as to JEFFERSON ASHBY, EDWARD DAVID, THOMAS DOUGLAS, A PENDER MAKIN, JULIE ANN O'BRIEN, MARK WALKER. **Counsel shall print the embossed summons and effect service in the manner in accordance with Fed.R.Civ.P.4.** **Note-If you are using Version 6 of Adobe Acrobat, be sure the PRINT WHAT field is set to DOCUMENTS AND COMMENTS (Click File, then Print to check this setting).** (Attachments: # 1 Summons- Jefferson Ashby, # 2 Summons- Edward David, # 3 Summons- Julie Ann O'Brien, # 4 Summons- Mark Walker, # 5 Summons- Thomas Douglas) (jgd) (Entered: 03/27/2023) |
| 03/27/2023 | 5 | MOTION for Preliminary Injunction by CROSSPOINT CHURCH Responses due by 4/17/2023. (Attachments: # 1 Exhibit Ex. A - BCS Handbook, # 2 Exhibit Ex. B - BCS |

| | | Teacher Contract, # 3 Exhibit Ex. C - BCS Staff Contract)(STRAWBRIDGE, PATRICK) (Entered: 03/27/2023) |
|---|---|---|
| 03/27/2023 | 6 | CERTIFICATION for Admission Pro Hac Vice of Tiffany H. Bates filed by PATRICK N. STRAWBRIDGE on behalf of CROSSPOINT CHURCH (Total admission fee $ 100 receipt number AMEDC-2778375.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (STRAWBRIDGE, PATRICK) (Entered: 03/27/2023) |
| 03/27/2023 | 7 | CERTIFICATION for Admission Pro Hac Vice of Jeffrey C. Mateer filed by PATRICK N. STRAWBRIDGE on behalf of CROSSPOINT CHURCH (Total admission fee $ 100 receipt number AMEDC-2778381.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (Attachments: # 1 Appendix Addendum- Other Admissions)(STRAWBRIDGE, PATRICK) (Entered: 03/27/2023) |
| 03/27/2023 | 8 | CERTIFICATION for Admission Pro Hac Vice of David J. Hacker filed by PATRICK N. STRAWBRIDGE on behalf of CROSSPOINT CHURCH (Total admission fee $ 100 receipt number AMEDC-2778384.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (Attachments: # 1 Appendix Addendum- Other Admissions)(STRAWBRIDGE, PATRICK) (Entered: 03/27/2023) |
| 03/27/2023 | 9 | CERTIFICATION for Admission Pro Hac Vice of Lea E. Patterson filed by PATRICK N. STRAWBRIDGE on behalf of CROSSPOINT CHURCH (Total admission fee $ 100 receipt number AMEDC-2778387.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (Attachments: # 1 Appendix Addendum- Other Admissions)(STRAWBRIDGE, PATRICK) (Entered: 03/27/2023) |
| 03/27/2023 | 10 | CERTIFICATION for Admission Pro Hac Vice of Keisha T. Russell filed by PATRICK N. STRAWBRIDGE on behalf of CROSSPOINT CHURCH (Total admission fee $ 100 receipt number AMEDC-2778388.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (Attachments: # 1 Appendix Addendum- Other Admissions)(STRAWBRIDGE, PATRICK) (Entered: 03/27/2023) |
| 03/27/2023 | 11 | CERTIFICATION for Admission Pro Hac Vice of Courtney A. Jones filed by PATRICK N. STRAWBRIDGE on behalf of CROSSPOINT CHURCH (Total admission fee $ 100 receipt number AMEDC-2778389.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (STRAWBRIDGE, PATRICK) (Entered: 03/27/2023) |
| 03/30/2023 | | Filing Fee Paid via Credit Card ( Filing fee $ 402 receipt number AMEDC-2779683.), filed by CROSSPOINT CHURCH.(STRAWBRIDGE, PATRICK) (Entered: 03/30/2023) |
| 04/05/2023 | 12 | Consent MOTION to Extend Time *to April 28, 2023 to respond to Preliminary Injunction motion*, Consent MOTION to Extend Time to File Answer *to May 12, 2023* ( Responses due by 4/26/2023.) by JEFFERSON ASHBY, EDWARD DAVID, THOMAS DOUGLAS, A PENDER MAKIN, JULIE ANN O'BRIEN, MARK WALKER (TAUB, CHRISTOPHER) (Entered: 04/05/2023) |

JA6

| 04/06/2023 | 13 | ORDER granting 12 Motion to Extend Time. Defendants shall answer or otherwise respond to Plaintiff's Complaint by 5/12/2023 and shall respond to Plaintiff's Motion for Preliminary injunction by 4/28/2023. By MAGISTRATE JUDGE KAREN FRINK WOLF. (WOLF, KAREN) (Entered: 04/06/2023) |
| --- | --- | --- |
| 04/06/2023 | | Set Answer Deadline for JEFFERSON ASHBY, EDWARD DAVID, THOMAS DOUGLAS, A PENDER MAKIN, JULIE ANN O'BRIEN, MARK WALKER per order #13: Answer due by 5/12/2023. (jad) (Entered: 04/06/2023) |
| 04/06/2023 | | reset Deadlines as to 5 MOTION for Preliminary Injunction per order #13: Responses due by 4/28/2023. (jad) (Entered: 04/06/2023) |
| 04/28/2023 | 14 | RESPONSE to Motion re 5 MOTION for Preliminary Injunction filed by JEFFERSON ASHBY, EDWARD DAVID, THOMAS DOUGLAS, A PENDER MAKIN, JULIE ANN O'BRIEN, MARK WALKER. Reply due by 5/12/2023. (Attachments: # 1 Exhibit - 1 (LD 1833), # 2 Exhibit - 2 (LD 1688), # 3 Exhibit - 3 (Testimony on LD 1688), # 4 Exhibit - 4 (Benjamin Deposition))(TAUB, CHRISTOPHER) (Entered: 04/28/2023) |
| 04/28/2023 | 15 | AFFIDAVIT of Megan Welter re 14 Response to Motion, filed by JEFFERSON ASHBY, EDWARD DAVID, THOMAS DOUGLAS, A PENDER MAKIN, JULIE ANN O'BRIEN, MARK WALKER. (TAUB, CHRISTOPHER) (Entered: 04/28/2023) |
| 04/28/2023 | 16 | Consent MOTION for Leave to File *Amici Curiae Brief* by American Civil Liberties Union of Maine, American Civil Liberties Union Responses due by 5/19/2023. (Attachments: # 1 Proposed Amici Curiae Brief)(HEIDEN, ZACHARY) (Entered: 04/28/2023) |
| 04/28/2023 | 17 | CERTIFICATION for Admission Pro Hac Vice of Heather Weaver filed by ZACHARY L. HEIDEN on behalf of American Civil Liberties Union, American Civil Liberties Union of Maine (Total admission fee $ 100 receipt number AMEDC-2792257.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (Attachments: # 1 list of court admissions)(HEIDEN, ZACHARY) (Entered: 04/28/2023) |
| 04/28/2023 | 18 | CERTIFICATION for Admission Pro Hac Vice of Daniel Mach filed by ZACHARY L. HEIDEN on behalf of American Civil Liberties Union, American Civil Liberties Union of Maine (Total admission fee $ 100 receipt number AMEDC-2792259.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (Attachments: # 1 list of court admissions)(HEIDEN, ZACHARY) (Entered: 04/28/2023) |
| 05/01/2023 | 19 | ORDER granting 16 Motion for Leave to File Amici Curiae Brief By JUDGE JOHN A. WOODCOCK, JR. (jad) (Entered: 05/01/2023) |
| 05/02/2023 | 20 | BRIEF *Amici Curiae in Opposition to Plaintiff's Motion for Preliminary Injunction* by AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF MAINE. (HEIDEN, ZACHARY) (Entered: 05/02/2023) |
| 05/12/2023 | 21 | REPLY to Response to Motion re 5 MOTION for Preliminary Injunction filed by CROSSPOINT CHURCH. (STRAWBRIDGE, PATRICK) (Entered: 05/12/2023) |
| 05/12/2023 | 22 | ADDITIONAL ATTACHMENTS filed by CROSSPOINT CHURCH re 21 Reply to Response to Motion . Main Document: Exhibit D. (STRAWBRIDGE, PATRICK) (Entered: 05/12/2023) |
| 05/12/2023 | 23 | ANSWER to 1 Complaint,, by JEFFERSON ASHBY, EDWARD DAVID, THOMAS DOUGLAS, A PENDER MAKIN, JULIE ANN O'BRIEN, MARK WALKER.(TAUB, |

JA7

| | | CHRISTOPHER) (Entered: 05/12/2023) |
|---|---|---|
| 05/15/2023 | [24](#) | SCHEDULING ORDER: Discovery due by 10/2/2023. Written Notice of Intent to File Summary Judgment Motion and Request for Pre-Filing Conference due by 10/10/2023. Motions due by 10/23/2023. Ready for Trial on 1/2/2024. By MAGISTRATE JUDGE KAREN FRINK WOLF. (jad) (Entered: 05/15/2023) |
| 05/23/2023 | [25](#) | NOTICE of Appearance by SARAH A. FORSTER on behalf of All Defendants (FORSTER, SARAH) (Entered: 05/23/2023) |
| 05/30/2023 | [26](#) | MOTION by Attorney Courtney A. Jones to Withdraw as Attorney by CROSSPOINT CHURCH Responses due by 6/20/2023. (JONES, COURTNEY) (Entered: 05/30/2023) |
| 05/31/2023 | 27 | ORDER granting [26](#) Motion to Withdraw as Attorney. By MAGISTRATE JUDGE KAREN FRINK WOLF. (WOLF, KAREN) (Entered: 05/31/2023) |
| 06/20/2023 | [28](#) | NOTICE/CORRESPONDENCE Re: Enactment of Maine Pub. L. 2023 ch. 188 by All Defendants (Attachments: # [1](#) Exhibit - A (Maine Pub. L. 2023, ch. 188))(TAUB, CHRISTOPHER) (Entered: 06/20/2023) |
| 06/27/2023 | [29](#) | NOTICE/CORRESPONDENCE Re: Enactment of Maine Pub. L. 2023 ch. 188 by All Plaintiffs (STRAWBRIDGE, PATRICK) (Entered: 06/27/2023) |
| 08/08/2023 | [30](#) | MOTION by Attorney Keisha Russell to Withdraw as Attorney by CROSSPOINT CHURCH Responses due by 8/29/2023. (RUSSELL, KEISHA) (Entered: 08/08/2023) |
| 08/08/2023 | 31 | ORDER granting [30](#) Motion to Withdraw as Attorney. By MAGISTRATE JUDGE KAREN FRINK WOLF. (WOLF, KAREN) (Entered: 08/08/2023) |
| 09/14/2023 | [32](#) | Joint MOTION to Amend Scheduling Order *to Extend Discovery Deadlines* by CROSSPOINT CHURCH Responses due by 10/5/2023. (STRAWBRIDGE, PATRICK) (Entered: 09/14/2023) |
| 09/14/2023 | 33 | ORDER granting [32](#) Motion to Amend Scheduling Order. Plaintiff shall make a written settlement by November 17, 2023, and Defendants shall respond in writing by December 1, 2023. Discovery shall be completed by December 1, 2023. Any notice of intent to file a summary judgment motion and request for pre-filing conference shall be filed by December 8, 2023. Dispositive motions and Daubert/Kumho motions shall be filed by December 22, 2023. The case shall be ready for trial on March 5, 2024. By MAGISTRATE JUDGE KAREN FRINK WOLF. (WOLF, KAREN) (Entered: 09/14/2023) |
| 09/14/2023 | | Reset Scheduling Order Deadlines - per Order No. 33: Discovery due by 12/1/2023. Written Notice of Intent to File Summary Judgment Motion and Request for Pre-Filing Conference due by 12/8/2023. Motions due by 12/22/2023. Ready for Trial on 3/5/2024. (jad) (Entered: 09/14/2023) |
| 11/17/2023 | [34](#) | Joint MOTION to Amend Scheduling Order *to Extend Discovery Deadlines* by CROSSPOINT CHURCH Responses due by 12/8/2023. (STRAWBRIDGE, PATRICK) (Entered: 11/17/2023) |
| 11/17/2023 | 35 | ORDER granting [34](#) Motion to Amend Scheduling Order. Plaintiff shall serve a written settlement demand by January 16, 2024 and Defendants shall respond in writing by January 30, 2024. Discovery shall be completed by January 30, 2024. Any notice of intent to file a summary judgment motion and request for pre-filing conference shall be filed by February 6, 2024. Dispositive motions and Daubert/Kumho motions shall be filed by February 20, 2024. The case shall be ready for trial on May 7, 2024. By MAGISTRATE JUDGE KAREN FRINK WOLF. (WOLF, KAREN) (Entered: 11/17/2023) |
| 11/17/2023 | | Reset Scheduling Order Deadlines - per Order No. 35: Discovery due by 1/30/2024. Written Notice of Intent to File Summary Judgment Motion and Request for Pre-Filing |

| | | |
|---|---|---|
| | | Conference due by 2/6/2024. Motions due by 2/20/2024. Ready for Trial on 5/7/2024. (jad) (Entered: 11/17/2023) |
| 01/12/2024 | 36 | Joint MOTION to Amend Scheduling Order *to Extend Discovery Deadlines* by CROSSPOINT CHURCH Responses due by 2/2/2024. (STRAWBRIDGE, PATRICK) (Entered: 01/12/2024) |
| 01/22/2024 | 37 | NOTICE of Hearing: Conference of Counsel set for 1/25/2024 11:00 AM via Zoom before MAGISTRATE JUDGE KAREN FRINK WOLF. On 1/22/2024, the Zoom information was sent via email to the parties.(lcb) (Entered: 01/22/2024) |
| 01/25/2024 | 38 | Minute Entry for proceedings held before MAGISTRATE JUDGE KAREN FRINK WOLF: Conference of Counsel held. Order to follow. (Court Reporter: Tammy Martell) (MGW) (Entered: 01/25/2024) |
| 01/25/2024 | 39 | ORDER. With the parties' agreement, the scheduling order deadlines are hereby STAYED pending resolution of the motion for a preliminary injunction (ECF No. 5). A new scheduling order will issue after a decision on the motion for a preliminary injunction is entered. By MAGISTRATE JUDGE KAREN FRINK WOLF. (MGW) (Entered: 01/25/2024) |
| 01/25/2024 | 40 | ORDER mooting 36 Motion to Amend Scheduling Order. By MAGISTRATE JUDGE KAREN FRINK WOLF. (MGW) (Entered: 01/25/2024) |
| 02/27/2024 | 41 | ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION denying 5 Motion for Preliminary Injunction By JUDGE JOHN A. WOODCOCK, JR. (CCS) (Entered: 02/27/2024) |
| 02/27/2024 | 42 | SCHEDULING ORDER: Discovery due by 7/16/2024. Written Notice of Intent to File Summary Judgment Motion and Request for Pre-Filing Conference due by 7/23/2024. Motions due by 8/6/2024. Ready for Trial on 10/1/2024. By MAGISTRATE JUDGE KAREN FRINK WOLF. (jad) (Entered: 02/27/2024) |
| 03/28/2024 | 43 | Joint Motion Convert Order on Preliminary Injunction into Order on Permanent Injunction by CROSSPOINT CHURCH Responses due by 4/18/2024. (STRAWBRIDGE, PATRICK) Modified on 3/29/2024 to clarify motion text (jam). Added MOTION for Judgment on 3/29/2024 (jam). (Entered: 03/28/2024) |
| 03/28/2024 | 44 | STIPULATION *of Facts* by CROSSPOINT CHURCH. (Attachments: # 1 Exhibit Sneirson Testimony, # 2 Exhibit BCS Admission Application, # 3 Exhibit BCS Student Handbook, # 4 Exhibit Faculty Contract, # 5 Exhibit Teacher Contract, # 6 Exhibit Benjamin Deposition, # 7 Exhibit Boone Deposition, # 8 Exhibit LD 182 Legislative History, # 9 Exhibit Hasson Interrogatories, # 10 Exhibit Cardigan Mountain School Correspondence, # 11 Exhibit Frey Statement June 21, 2022, # 12 Exhibit Frey Statement Dec. 8, 2021, # 13 Exhibit Fecteau Tweet)(STRAWBRIDGE, PATRICK) (Entered: 03/28/2024) |
| 04/01/2024 | 45 | ORDER ON JOINT MOTION TO CONVERT ORDER ON PRELIMINARY INJUNCTION INTO ORDER ON PERMANENT INJUNCTION AND ENTER FINAL JUDGMENT By JUDGE JOHN A. WOODCOCK, JR. (jam) (Entered: 04/01/2024) |
| 04/01/2024 | | Set Deadlines per Order No. 45: Counsel's Response to order due by 4/8/2024. (jam) (Entered: 04/01/2024) |
| 04/09/2024 | 46 | NOTICE of Hearing: Telephone Conference set for 4/22/2024 11:00 AM before JUDGE JOHN A. WOODCOCK JR. All participants will be provided with the Court's call-in information.(slg) (Entered: 04/09/2024) |
| 04/22/2024 | 47 | Minute Entry for proceedings held before JUDGE JOHN A. WOODCOCK, JR: Telephone Conference held, Set Deadlines( Response to Order No. 45 due by 4/29/2024.). (Court |

| | | |
|---|---|---|
| | | Reporter: Michelle Feliccitti (jam) (Entered: 04/22/2024) |
| 04/24/2024 | 48 | Joint MOTION Response to Court's Order on Joint Motion to Convert Order on Preliminary Injunction into Order on Permanent Injunction and Enter Final Judgment by JEFFERSON ASHBY, EDWARD DAVID, THOMAS DOUGLAS, A PENDER MAKIN, JULIE ANN O'BRIEN, MARK WALKER Responses due by 5/15/2024. (TAUB, CHRISTOPHER) (Entered: 04/24/2024) |
| 06/04/2024 | 49 | ORDER ON JOINT MOTION TO CONVERT ORDER ON PRELIMINARY INJUNCTION INTO ORDER ON PERMANENT INJUNCTION AND ENTER FINAL JUDGMENT granting 43 Motion to Convert Order on Preliminary Injunction Into Order on Permanent Injunction and Enter Final Judgment ; granting 48 Motion in Response to Court's Order on Joint Motion to Convert Order on Preliminary Injunction Into Order on Permanent Injunction and Enter Final Judgment By JUDGE JOHN A. WOODCOCK, JR. (CCS) (Entered: 06/04/2024) |
| 06/05/2024 | 50 | JUDGMENT By DEPUTY CLERK: Joanne McCue. (jam) (Entered: 06/05/2024) |
| 06/21/2024 | 51 | NOTICE OF APPEAL by CROSSPOINT CHURCH . ( Filing fee $ 605 receipt number AMEDC-2969975.)<br><br>**NOTICE TO FILER:** A transcript Report/Order form **MUST** be completed and submitted to the First Circuit Court of Appeals. The form can be found under the Forms & Fees section on their website at https://www.ca1.uscourts.gov.<br><br>**NOTICE TO COUNSEL:** Counsel should register for a First Circuit CM/ECF Appellate Filer Account at https://pacer.psc.uscourts.gov. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at https://www.ca1.uscourts.gov/cmecf (STRAWBRIDGE, PATRICK) (Entered: 06/21/2024) |
| 06/21/2024 | | COPIES of Notice of Appeal Sent to Counsel Re: 51 Notice of Appeal,,, filed by CROSSPOINT CHURCH. (jam) (Entered: 06/21/2024) |
| 06/21/2024 | 52 | APPEAL COVER SHEET Re: 51 Notice of Appeal (jam) (Entered: 06/21/2024) |
| 06/21/2024 | 53 | CLERK'S CERTIFICATE Re: 51 Notice of Appeal Documents sent to the U.S. Court of Appeals. (jam) (Entered: 06/21/2024) |
| 06/21/2024 | | Abbreviated Appeal Record Transmitted Electronically to U.S. Court of Appeals re 51 Notice of Appeal,,, (jam) (Entered: 06/21/2024) |
| 06/24/2024 | 54 | USCA Case Number 24-1590 for 51 Notice of Appeal filed by CROSSPOINT CHURCH. (jwr) (Entered: 06/24/2024) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/29/2024 13:43:50 | | |
| **PACER Login:** | ConsovoyMcCarthyLLC | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:23-cv-00146-JAW |
| **Billable Pages:** | 9 | **Cost:** | 0.90 |

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| Crosspoint Church, | |
| Plaintiff, | |
| v. | Civil Action No. 1:23-cv-00146-JAW |
| A. Pender Makin, in her official capacity as Commissioner of the Maine Department of Education, et al., | |
| Defendants. | |

---

## NOTICE OF APPEAL

---

Plaintiff Crosspoint Church now appeals to the United States Court of Appeals for the First Circuit this Court's Order on the Joint Motion to Convert Order on Preliminary Injunction and Enter Final Judgment (ECF 49) and Judgment for Defendants and against Plaintiff (ECF 50) entered in this action on June 4, 2024.

Date: June 21, 2024

Respectfully submitted,

*/s/ Patrick Strawbridge*
Patrick Strawbridge (Bar No. 10024)
Consovoy McCarthy PLLC
Ten Post Office Square
8th Floor South MPB 706
Boston, MA 02109
Tel: (617) 227-0548
patrick@consovoymccarthy.com

1

JA11

Tiffany H. Bates*
Consovoy McCarthy PLLC
1600 Wilson Blvd.
Ste. 700
Arlington, VA 22209
Tel: (703) 243-9423
tiffany@consovoymccarthy.com

Jeffrey C. Mateer*
David J. Hacker*
Lea E. Patterson*
First Liberty Institute
2001 W. Plano Parkway, Suite 1600
Plano, TX 75075
Tel: (972) 941-4444
Fax: (972) 941-54457
jmateer@firstliberty.org
dhacker@firstliberty.org
lepatterson@firstliberty.org

*Admitted *pro hac vice*

*Attorneys for the Plaintiff*

2

JA12

## **CERTIFICATE OF SERVICE**

I certify that on June 21, 2024, a true and correct copy of this notice of appeal was

filed and served on the following counsel of record using the Court's CM/ECF system:

Christopher C. Taub
Office of the Attorney General
State House Station 6
Augusta, ME 04333-0006
Tel: (207) 626-8800
Email: Christopher.C.Taub@Maine.gov

Sarah A. Forster
Office of the Attorney General
State House Station 6
Augusta, ME 04333-0006
Tel: (207) 626-8866
Email: Sarah.Forster@Maine.gov

*Attorneys for Defendants*

Anahita Sotoohi
American Civil Liberties Union of Maine
P.O. Box 7860
Portland, ME 04112
Tel: (860) 302-2427
Email: ASotoohi@ACLUMaine.org

Carol Garvan
American Civil Liberties Union of Maine
P.O. Box 7860
Portland, ME 04112
Tel: (207) 6198687
Email: CGarvan@ACLUMaine.org

Daniel Mach
American Civil Liberties Union Foundation DC
915 15th Street NW, Ste. 600
Washington, DC 20005
Tel: (202) 675-2330
Email: DMach@ACLU.org

Heather L. Weaver
American Civil Liberties Union Foundation DC
915 15th Street NW, Ste. 600
Washington, DC 20005

Tel: (202) 675-2330
Email: HWeaver@ACLU.org

Zachary L. Heiden
American Civil Liberties Union of Maine
P.O. Box 7860
Portland, ME 04112
Tel: (207) 774-5444
Email: ZHeiden@ACLUMaine.org

*Attorneys for Amicus Curiae*

Respectfully submitted,

*/s/ Patrick Strawbridge*
Patrick Strawbridge (Bar No. 10024)
Consovoy McCarthy PLLC
Ten Post Office Square
8th Floor South MPB 706
Boston, MA 02109
Tel: (617) 227-0548
patrick@consovoymccarthy.com

JA14

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| CROSSPOINT CHURCH,<br><br>Plaintiff,<br><br>v.<br><br>A. PENDER MAKIN, in her official capacity as Commissioner of the Maine Department of Education, and JEFFERSON ASHBY, EDWARD DAVID, JULIE ANN O'BRIEN, MARK WALKER, and THOMAS DOUGLAS, in their official capacities as Commissioners of the Maine Human Rights Commission,<br><br>Defendants. | Civil Action No. _____ |

## **COMPLAINT**

### INTRODUCTION

1.      After forty years of unconstitutional religious discrimination in Maine's school choice program, Maine continues to unconstitutionally exclude particular religious schools from participating in the state's school choice program because of their religious beliefs.

2.      In Maine, local "school administrative units" (SAUs) that do not operate their own secondary schools may pay tuition for resident students to attend either a private secondary school or another SAU's secondary school. For its first 100 years, the program initially permitted participation by private religious schools, but from 1980 until the Supreme Court's decision in *Carson v. Makin*, 142 S. Ct. 1987 (2022), the state excluded these schools from the tuitioning program (the "sectarian exclusion").

3.     Anticipating the Supreme Court's decision in *Carson*, the Legislature narrowed the religious exemption in 5 M.R.S.A. § 4602. The exemption previously covered all religious schools, but the amendment narrowed it to protect only religious schools that do not participate in the tuitioning program. Without the exemption, religious schools are subject to investigations, complaints, and large fines for offering instruction consistent with their sincerely held religious beliefs. This "poison pill" effectively deters religious schools from participating and thereby perpetuates the religious discrimination at the heart of the sectarian exclusion.

4.     From the start, Maine's Attorney General and the then-Speaker of the House of Representatives admitted this scheme was intentional. The Legislature crafted the poison pill explicitly to circumvent the Supreme Court's decision in *Carson*.

5.     The poison pill also specifically targeted Plaintiff, who operates one of the two schools that the *Carson* plaintiffs attended.

6.     Defendants' enforcement of the Maine Human Rights Act to discriminatorily exclude Plaintiff, who operates an otherwise qualified school, from becoming approved for tuition purposes violates the Free Exercise, Establishment, and Free Speech Clauses of the U.S. Constitution.

## PARTIES

7.     Plaintiff Crosspoint Church ("Plaintiff" or the "Church") is a Christian church incorporated as a nonprofit corporation under Maine law and is located at 1476 Broadway, Bangor, Maine 04401.

8.     Bangor Christian School, a private, Christian school educating students from K4 to 12th grade, is an integrated auxiliary of Plaintiff.

2

JA16

9.      Defendant A. Pender Makin is the Commissioner of the Maine Department of Education, an agency of the state of Maine, headquartered in Augusta, and created and empowered under 20-A M.R.S.A. § 201, to "[s]upervise, guide and plan for a coordinated system of public education for all citizens of the State."

10.     Defendant Makin has the primary responsibility and practical ability to enforce the legal and regulatory requirements for private schools seeking approval for tuition purposes, as well as the primary responsibility and practical ability to ensure that the Department's regulations, policies, and powers are implemented in accordance with the U.S. Constitution.

11.     Defendant Makin also possesses joint rulemaking and enforcement authority with the Maine Human Rights Commission to effectuate the portion of the Maine Human Rights Act ("MHRA") relating to educational discrimination, 5 M.R.S.A. § 4602. *Id.* § 4603.

12.     Defendants Jefferson Ashby, Edward David, Julie Ann O'Brien, Mark Walker, and Thomas Douglas are Commissioners of the Maine Human Rights Commission, an agency of the state of Maine, created and empowered under 5 M.R.S.A. § 4566 to enforce the MHRA, Me. Stat. tit. 5 part 12 ch. 337, including the portions of MHRA relating to educational discrimination, 5 M.R.S.A. § 4602, and employment discrimination, 5 M.R.S.A. § 4572.

13.     Defendants Ashby, David, O'Brien, Walker, and Douglas have the duty to investigate violations of MHRA and the power to enforce MHRA. They possess rulemaking authority to effectuate MHRA and share joint rulemaking authority with Commissioner Makin to effectuate the portion of MHRA relating to educational discrimination, 5 M.R.S.A. § 4602. *Id.* § 4603.

14.     All Defendants are sued only in their official capacities.

## JURISDICTION AND VENUE

15.     Plaintiff files this action pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201(a) and 2202 and seeks (1) a declaratory judgment that 5 M.R.S.A. § 4602 and 5 M.R.S.A. § 4572 are unconstitutional to the extent they condition participation in the tuitioning program on Plaintiff violating its statement of faith and (2) injunctive relief enjoining Defendants from enforcing portions of 5 M.R.S.A. § 4602 and 5 M.R.S.A. § 4572 against Plaintiff.

16.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331.

17.     Pursuant to 28 U.S.C. § 1391(b)(1) and (2), venue is proper in this judicial district because Defendants reside within it and the events giving rise to Plaintiff's claims occurred within it.

## STATEMENT OF FACTS

### A.     Background of Crosspoint Church

18.     Plaintiff incorporated in 1967 under its original name Bangor Baptist Church "[f]or the purpose of maintaining a church for the worship of Almighty God, preaching the Gospel of Jesus Christ, and conducting the education of adults and children."

19.     Crosspoint Church's objective is "full obedience to the will of the Lord Jesus Christ who is the Founder and Head of the Church."

20.     Crosspoint Church is an independent church not subject to the governance or authority of any higher ecclesiastical body.

21.     Crosspoint Church operates Bangor Christian School ("BCS"), a K4–12 school created in 1970 as an integrated auxiliary of the church.

22.     Crosspoint Church's Senior Pastor and Deacon Board govern BCS.

23.     Crosspoint Church operates BCS in accordance with its Statement of Faith, which summarizes its religious beliefs.

24.     BCS's principal reports to Crosspoint Church's Senior Pastor.

25.     BCS's mission "is to assist families in educating the whole child by encouraging spiritual maturity and academic excellence in a supportive environment. Our final authority in all matters is the Word of God." BCS Student Handbook at 1.

26.     BCS's vision "is to help students discover God's plan for their lives and to equip them to be successful on whatever path He is leading them." *Id.*

27.     BCS's Educational Objectives include:

   a.   To lead each unsaved student to trust Christ as his/her personal savior and then to follow Christ as Lord of his/her life.

   b.   To instill in each student a love for God and a personal sense of responsibility to be all God wants him/her to be.

   c.   To direct each student in the process of developing Christ-like character and actions.

   d.   To instill in each student love and honor for home and parents.

   e.   To prepare each student to be successful as measured by God's standards and not the world's.

   f.   To prepare each student for the important position in life of spiritual leadership in school, home, church, community, state, nation, and the world.

   g.   To develop within each student a sense of responsibility as a Christian citizen.

   h.   To develop within each student a Christian world view and Christian philosophy of life.

   i.   To develop within each student an appreciation and understanding of God's world and how to live productively in his environment.

   j.   To provide each student opportunities for developing skills necessary for their future careers.

k. To develop within each student a moral, ethical, and spiritual sense that will lead to an appreciation of his/her own personal worth to God and that of others. To teach each student to take responsibility for his/her actions and words and the choices he/she makes.

l. To offer each student an instructional program that is centered in God's Word and meets his/her academic needs.

m. To teach each student the thinking skills that will enable him/her to meet intellectual challenges.

n. To motivate each student to master the tools of learning and communication.

o. To provide each student opportunities to develop an understanding of and appreciation for the arts as well as contributing to them.

p. To offer opportunities to participate in wholesome forms of recreation and social activities.

BCS Student Handbook at 6.

28.     BCS operates in accordance with its Statement of Faith and provides in relevant part:

a. "We believe the Bible to be without error as recorded in the original manuscript. The Bible reveals God, the spiritual separation of man from God, the way of salvation, and how to have a personal relationship with God. (II Tim. 3:15-16; II Peter 1:20-21)."

b. "We believe salvation (a personal relationship with God) is by 'grace,' plus nothing and minus nothing. This salvation is found only by receiving Jesus Christ into your life. Salvation is by repentance and faith (truly being sorrowful for your sins, confessing that Jesus Christ died for your sins, and inviting Him into your life). (Eph.2:8-9; Titus 3:5-7)."

c. "We believe that those who receive Jesus Christ will go to Heaven and those who reject Him will be separated from the Lord forever. (Rev. 20:10-15)."

d. "Marriage and Sexuality:

We believe that the term 'marriage' has only one, legitimate meaning, and that is marriage sanctioned by God, which joins one man and one woman in a single, covenantal union, as delineated by Scripture. Whenever there is a conflict between this definition and

6

any new legal standard for marriage, our statement of faith, doctrines and biblical positions will govern. (Gen. 2:24; Eph. 5:22-23; Mark 10:6-9; I Cor. 7:1-9)

We believe that God has commanded that no intimate sexual activity be engaged in outside of marriage as defined above. We believe that any other type of sexual activity, identity or expression that lies outside of this definition of marriage, including those that are becoming more accepted in the culture and the courts, are sinful perversions of and contradictory to God's natural design and purpose for sexual activity. (Gen. 2:24; Gen. 19:5; Lev. 18:1-30; Rom. 1: 26-29; 1 Cor. 5:1; 6:9-10; 1 Thess. 4:1-8; Heb. 13:4). We believe that God designs each individual in his or her mother's womb (Psalm 139: 13,14). Therefore, each individual should cherish God's design because his deeds are perfect (Deut. 32:4). Any deviation from the sexual identity that God created will not be accepted."

BCS Handbook at 4–5.

29.    BCS's admissions policy explains:

Bangor Christian Schools adheres to and supports the historical truth claims and moral foundations of Christianity. This includes, but is not limited to, the biblical definition of marriage, sexuality and moral conduct, and the clear biblical teaching that gender is both sacred and established by God's design. Parents or the legal guardians, who choose to enroll their children at our school, are agreeing to support these and other basic biblical values derived from historical Christianity and the relevant Christian positions embraced by Crosspoint Church. Parents understand and agree that Bangor Christian Schools will teach these principles and biblical values.

Bangor Christian Schools does not discriminate in its practices against any person because of race, color, national or ethnic origin, gender, age, or disability.

BCS Handbook at 7.

30.    BCS determines admissions based on the following criteria:

a.    "The student has demonstrated the ability to profit from normal school instruction."

      b.   "The student has shown a behavior pattern reflecting a desire for an education and is in agreement with school policies."

      c.   "The parents express an understanding of the school's philosophy (including Statement of Faith and Objectives in Education) and are willing to have their children trained in accordance with this philosophy."

BCS Handbook at 7.

31.     BCS "will consider admission for students from any family who, despite their religious background or beliefs, is willing to support our philosophy of Christian education, student conduct requirements, and the above-stated positions and who is willing to allow their children to be educated and influenced in an intentionally Christian environment. Continued enrollment at Bangor Christian Schools is contingent upon this same understanding and support." BCS Handbook at 7.

32.     All parents are required to sign the Parent's Statement of Cooperation, and Students in grade 4–12 must sign the Student's Statement of Cooperation. BCS Handbook at 8.

33.     No student is admitted or allowed to remain in BCS who does not agree and cooperate with the overall purpose and program of the school as set forth in the handbook. *Id.*

34.     Students are required to attend BCS's weekly chapel service.

35.     If a student persistently and unrepentantly engages in "counter-witnessing," that is, advocating beliefs contrary to BCS's statement of faith, that student would be deemed not in agreement and compliance with BCS's purpose, handbook, and code of conduct and, thus, be subject to removal from the school.

36.     Students must adhere to BCS's code of conduct and dress code, which derive from Plaintiff's religious beliefs.

37.     BCS's code of conduct prohibits students from, among other things, engaging in immoral conduct, including sexual activity outside of marriage as defined in the Statement of Faith, or identifying as a gender other than their biological sex.

38.     BCS's dress code requires students to wear clothing consistent with their biological sex.

39.     Crosspoint Church employees, including BCS staff, must be co-religionists—that is, they must be in agreement with Crosspoint's Statement of Faith and engage in religious practice consistent with Crosspoint Church's spiritual standards.

40.     BCS teachers, as those primarily responsible for fulfilling BCS's religious mission, must agree to both BCS's Statement of Faith and the Educational Philosophy and Objectives and be committed to upholding them.

41.     BCS teachers serve as Christian role models to the students; and, accordingly, must adhere to biblical standards of conduct, including those relating to sexual behavior; the use of alcohol, drugs, and tobacco; lewd public dancing; gambling; and any other activity that would hinder a teacher's religious testimony.

**B.      The Tuitioning Program**

42.     The Maine Legislature (hereinafter "Legislature") guarantees every school-aged child residing within the state "an opportunity to receive the benefits of a free public education." 20-A M.R.S.A. § 2(1).

43.     The Legislature vests the authority to fulfill the guarantee of § 2(1) in local school administrative units (hereinafter "SAUs"). 20-A M.R.S.A. § 2(2).

44.     If an SAU does not maintain a secondary school or contract with a public or private school for secondary school privileges, the SAU "shall pay the tuition . . . at the public or

approved private school of the parent's choice at which the student is accepted." 20-A M.R.S.A. § 5204(4).

45.     The Legislature created this "tuitioning program" in 1873 to fulfill residents' educational needs where SAUs lacked sufficient population or means to maintain a secondary school.

46.     Under 20-A M.R.S.A. § 2951, to be approved for tuition purposes and thus qualified to participate in the tuitioning program, a private school must:

     a.  Meet the requirements for "basic school approval" under 20-A M.R.S.A. § 2901, 20-A M.R.S.A. § 2951(1);

     b.  be nonsectarian, 20-A M.R.S.A. § 2951(2);[1]

     c.  be incorporated under the laws of the state of Maine or of the United States, 20-A M.R.S.A. § 2951(3);

     d.  comply with the state's reporting, auditing, and applicable student assessment requirements, 20-A M.R.S.A. § 2951(4)–(6);

     e.  release student records to the SAU, if a student transfers from the private school, 20-A M.R.S.A. § 2951(7).

47.     An SAU that opts to pay tuition for students instead of maintaining or contracting with a single school to educate resident secondary students does not select which schools receive tuition payments. Parents are solely responsible for selecting the school their child attends.

48.     Similarly, if an SAU does not maintain or contract with an elementary school, it pays tuition for resident students to attend the public or approved private school of their choice. 20-A M.R.S.A. § 5203.

49.     BCS is accredited by the New England Association of Schools and Colleges.

---

[1] As explained *infra*, the Supreme Court declared the "nonsectarian" requirement unconstitutional in *Carson v. Makin*, 142 S. Ct. 1987 (2022).

50.     BCS annually maintains basic school approval under 20-A M.R.S.A.
§ 2901(2)(A).

51.     BCS meets the requirements for reporting and release of student records, *see* 20-A
M.R.S.A. §§ 2951(5), (7), 2952 and is willing to comply with the remaining applicable
requirements for tuitioning schools, *see id.* §§ 2951(5), 2953–2954.

52.     Twenty-eight current BCS high-school students live in tuitioning SAUs:
Bradford, Glenburn, Levant, Orrington, and Veazie, Maine.

53.     BCS's total high-school enrollment for the 2022–23 school year is 92 students.

54.     Crosspoint Church pays 95% of tuition for the children of Crosspoint Church
employees, including BCS staff, to attend BCS.

55.     For the 2023–24 school year, eight BCS high-school students are children of
Crosspoint Church employees and live in Glenburn, Maine—a tuitioning SAU.

56.     If the state approved BCS for tuition purposes, BCS would charge the tuition for
these eight students to Glenburn, resulting in an annual savings of approximately $47,120.

57.     If the state approved BCS for tuition purposes, the BCS high school students
residing in tuitioning SAUs would be eligible to participate in the tuitioning program instead of
paying BCS tuition out of pocket.

**C.     The Sectarian Exclusion**

58.     Until 1980, religious schools were eligible to and did participate in the tuitioning
program.

59.     In 1981, based on a 1980 opinion from the Maine Attorney General concluding
that allowing religious schools to participate in the tuitioning program violated the Establishment

Clause, the Legislature adopted 20-A M.R.S.A. § 2951(2), which required schools to be "nonsectarian" to receive approval for tuition purposes.

60.     In 2003, after the Supreme Court held that the Establishment Clause does not forbid school choice programs that allow parents to use state funding at religious schools, *see Zelman v. Simmons-Harris*, 536 U.S. 639 (2002), the Legislature considered repealing the sectarian exclusion. *See* L.D. 182, "An Act to Eliminate Discrimination Against Parents Who Want to Send Their Children to Religious Private Schools."

61.     L.D. 182 failed, due in part to legislators' opposition to many religious schools' practice of hiring only co-religionists, which some legislators described as "discriminatory." *Carson v. Makin*, No. 1:18-cv-327, ECF No. 24 (hereinafter "*Carson* Stip. R.") Ex. 2 at 25–47 (Legislative Record, House, May 13, 2003 at H-582–89[2]).

62.     Relying on this legislative history, the Education Commissioner determined that the sectarian exclusion's purpose (beyond complying with the Establishment Clause), is to exclude religious schools whose religious exercise the state considers to be "discriminatory," including "instruction that advances a particular religion" and restricting hiring to co-religionists. *Carson* Stip. R. at 221 (Interrogatory response of Education Commissioner).

63.     In administering the sectarian exclusion, the Education Department

> consider[ed] a sectarian school to be one that is associated with a particular faith or belief system and which, in addition to teaching academic subjects, promotes the faith or belief system with which it is associated and/or presents the material taught through the lens of this faith. While affiliation or association with a church or religious institution is one potential indicator of a sectarian school, it is not dispositive. The Department's focus [was] on what the school teaches through its curriculum and related activities, and how the material is presented.

---

[2] *Available at* http://lldc.mainelegislature.org/Open/LegRec/121/House/LegRec_2003-05-13_HP_pH0578-0608.pdf.

*Carson v. Makin*, 979 F.3d 21, 38 (1st Cir. 2020) (quoting interrogatory response of the Maine Education Commissioner).

64.     In practice, the Education Department deemed schools operated by religious organizations sufficiently nonsectarian when they taught "universal spiritual values." *Carson* Stip. R. Ex. 2 at 17–18; Transcript of Oral Argument at 63–64, *Carson v. Makin*, 142 S. Ct. 1987 (2022) (No. 20-1088).

65.     Thus, the Education Department administered the sectarian exclusion to exclude religious schools that operated according to disfavored religious beliefs while permitting religious schools operated according to favored religious beliefs to participate.

66.     The sectarian exclusion rendered BCS ineligible to participate in the tuitioning program.

**D.    *Carson v. Makin* invalidated the sectarian exclusion.**

67.     In 2018, three families, including two families whose children attended BCS, sued the Maine Education Commissioner to challenge the sectarian exclusion under the First Amendment's Free Exercise Clause. *Carson v. Makin*, 142 S. Ct. 1987, 1994–95 (2022).

68.     In June 2022, the U.S. Supreme Court held that the sectarian exclusion violates the Free Exercise Clause because it "operates to identify and exclude otherwise eligible schools on the basis of their religious exercise." *Id.* at 1997, 2002.

69.     Specifically, the Supreme Court held that "BCS . . . [is] disqualified from this generally available benefit 'solely because of [its] religious character,'" and "[b]y 'conditioning the availability of benefits in that manner,' Maine's tuition assistance program . . . 'effectively penalizes the free exercise' of religion." *Id.* at 1997 (quoting *Trinity Lutheran v. Comer*, 137 S. Ct. 2012, 2021 (2017)).

70.     The Supreme Court found the Education Department's practice of "scrutinizing whether and how a religious school pursues its educational mission" particularly troubling because of the potential for "state entanglement with religion and denominational favoritism." *Id*. at 2001.

71.     As a result of the Supreme Court's decision in *Carson*, the sectarian exclusion is unenforceable.

**E.     The Maine Legislature Adds a Poison Pill to the Tuitioning Program.**

72.     Throughout the *Carson* litigation, Commissioner Makin strove to deter Plaintiff from agreeing to participate in the tuitioning program if its students' suit succeeded. For example, Commissioner Makin contended that if the state approved BCS for tuition purposes, the employment discrimination provisions of the Maine Human Rights Act would require Plaintiff to hire employees that do not share its religious beliefs. Defendant's Mot. for Summ. J. at 7–8, 13–14, *Carson v. Makin*, 401 F. Supp. 3d 207 (D. Me. June 26, 2019) (No. 1:18-cv-327); Brief of Appellee at 22–23, *Carson v. Makin*, 979 F.3d 21 (1st Cir. 2020) (No. 19-1746).

73.     The U.S. Court of Appeals for the First Circuit ultimately rejected Commissioner Makin's argument that this somehow undermined the Plaintiffs' standing. *See Carson*, 979 F.3d at 28, 31.

74.     While the *Carson* plaintiffs' petition for certiorari was pending before the Supreme Court, the Legislature considered and adopted the poison pill, P.L. 2021, Ch. 366, § 19, "An Act to Improve Consistency in Terminology and within the Maine Human Rights Act."

75.     The poison pill amended 5 M.R.S.A. § 4602, the provision of the Maine Human Rights Act prohibiting educational discrimination, by adding gender identity and religion as protected classes and narrowing the preexisting exemption for religious schools.

76.     Prior to the poison pill, 5 M.R.S.A. § 4602(4) exempted all religious schools from the provisions relating to sexual orientation. The pre-poison pill language read, "The provisions in this subsection relating to sexual orientation do not apply to any education facility owned, controlled or operated by a bona fide religious corporation, association or society." 2005 Me. Legis. Serv. Ch. 10 (S.P. 413) (L.D. 1196).

77.     The poison pill conditioned the religious exemption on the refusal to accept tuition funds: "Nothing in this section . . . requires a religious corporation, association or society *that does not receive public funding* to comply with this section as it relates to sexual orientation or gender identity." P.L. 2021, Ch. 366, § 19; 5 M.R.S.A. § 4602(5)(C) (emphasis added).

78.     The poison pill contains no religious exemption from the prohibition on discrimination on the basis of religion in education and further requires that "to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing." P.L. 2021, Ch. 366, § 19; 5 M.R.S.A. § 4602(5)(D).

79.     A private school's becoming approved for tuition purposes triggers liability under Section 4602 if the school is not a single-sex school. 5 M.R.S.A. § 4553(2-A) (defining "educational institution" for purposes of the MHRA as "any public school or educational program, any public post-secondary institution, any private school or educational program approved for tuition purposes if both male and female students are admitted and the governing body of each such school or program.").

80.     By narrowing the religious exemption for the sexual orientation and gender identity provisions, the poison pill operates to deter religious schools from participating in the tuitioning program if they hold disfavored religious beliefs, including teaching from a particular

religious perspective or operating in accordance with traditional beliefs about the nature of marriage and sexuality.

81.     The poison pill took effect on or about October 18, 2021.

82.     On October 22, 2021, Commissioner Makin filed her response brief in *Carson*, arguing that the poison pill eliminated the *Carson* plaintiffs' standing because, under the poison pill, BCS's religious beliefs disqualified BCS from becoming approved for tuition purposes even if the Supreme Court invalidated the sectarian exclusion. *See* Brief for Respondent at 54, *Carson v. Makin*, 142 S. Ct. 1987 (2022) (No. 20-1088).

83.     Although it failed to moot *Carson*, the poison pill continues to effectuate the religious discrimination at the heart of the sectarian exclusion.

84.     This result is not accidental, as Maine Attorney General Frey explained in his press release[3] the day the Supreme Court decided *Carson*:

> The education provided by the schools at issue here is inimical to a public education. They promote a single religion to the exclusion of all others, refuse to admit gay and transgender children, and openly discriminate in hiring teachers and staff. One school teaches children that the husband is to be the leader of the household. While parents have the right to send their children to such schools, it is disturbing that the Supreme Court found that parents also have the right to force the public to pay for an education that is fundamentally at odds with values we hold dear. I intend to explore with Governor Mills' administration and members of the Legislature statutory amendments to address the Court's decision and ensure that public money is not used to promote discrimination, intolerance, and bigotry.
>
> While the Court's decision paves the way for religious schools to apply to receive public funds, it is not clear whether any religious schools will do so. Educational facilities that accept public funds must comply with anti-discrimination provisions of the Maine

---

[3] https://www.maine.gov/ag/news/article.shtml?id=8075979.

Human Rights Act, and this would require some religious schools to eliminate their current discriminatory practices.

85.     Attorney General Frey's press release specifically targeted and expressed hostility to Plaintiff's religious beliefs.

86.     This statement is consistent with General Frey's representation of the Education Commissioner throughout the *Carson* litigation. Indeed, Commissioner Makin's briefing routinely targeted Plaintiff's religious beliefs and characterized them as discriminatory. *See Carson v. Makin*, No. 1:18-cv-327, ECF No. 25 at ¶ 79 ("BCS believes that God has ordained distinct and separate spiritual functions for men and women, and the husband is to be leader of the home and men are to be the leaders of the church."); *Id.* ¶ 102 ("BCS teaches children that the husband is the leader of the household."); Defendant's Mot. for Summ. J. at 6 n.1, 7–8, 13–14, *Carson v. Makin*, 401 F. Supp. 3d 207 (D. Me. June 26, 2019) (No. 1:18-cv-327); Brief of Appellee at 9–12, *Carson v. Makin*, 979 F.3d 21 (1st Cir. 2020) (No. 19-1746); Brief of Respondent at 11, 28, 42, *Carson v. Makin*, 142 S. Ct. 1987 (2022) (No. 20-1088).

87.     The then-Speaker of the Maine House of Representatives also confirmed that the poison pill is designed to operate as an end-run around *Carson* to exclude Plaintiff from the tuitioning program:



https://twitter.com/SpeakerFecteau/status/1541041572636237826?s=20&t=YuvVEeWthiIx7ZxR

NhS5C.

## COUNT I: FREE EXERCISE OF RELIGION (FIRST AND FOURTEENTH AMENDMENTS) AS TO 5 M.R.S.A. § 4602.

88.     Plaintiff incorporates by reference Paragraphs 1 through 87.

89.     The Free Exercise Clause of the First Amendment to the U.S. Constitution

provides in relevant part that "Congress shall make no law . . . prohibiting the free exercise" of

religion.

90.     The Free Exercise Clause applies to States and their subdivisions through the

Fourteenth Amendment to the U.S. Constitution. *See Cantwell v. Connecticut*, 310 U.S. 296, 303

(1940).

91.     The Free Exercise Clause prohibits governmental entities from burdening a

plaintiff's "sincere religious practice pursuant to a policy that is not neutral or generally

applicable . . . unless the government can satisfy strict scrutiny by demonstrating its course was

justified by a compelling state interest and was narrowly tailored in pursuit of that interest."

*Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421–22 (2022) (quotations omitted).

92.     The Free Exercise Clause prohibits incidental burdens to the free exercise of

religion as well as direct prohibitions. *Sherbert v. Verner,* 374 U.S. 398, 404 (1963) ("It is too

late in the day to doubt that the libert[y] of religion . . . may be infringed by the denial of or

placing of conditions upon a benefit or privilege.").

93.     A law "will not qualify as neutral if it is 'specifically directed at . . . religious

practice,'" such as "if it 'discriminate[s] on its face,' or if a religious exercise is otherwise its

'object.'" *Kennedy*, 142 S. Ct. at 2422 (quoting *Emp't Div., Dep't of Hum. Res. of Ore. v. Smith*,

494 U.S. 872, 877 (1990); *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 533 (1993)).

94.     A law is not generally applicable "if it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way.'" *Id.* (quoting *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021)).

95.     BCS meets the statutory requirements to become approved for tuition purposes.

96.     If the state approves BCS for tuition purposes, the portions of P.L. 2021, Ch. 366, § 19 codified at 5 M.R.S.A. § 4602(1), (5)(C), (5)(D), relating to discrimination in education on the basis of religion, sexual orientation, and gender identity, will prohibit Plaintiff from (1) teaching its religious beliefs as true to the exclusion of other religions, (2) considering applicants' alignment with Plaintiff's statement of faith when making admissions decisions, (3) requiring that parents and students agree to cooperate with the religious purpose of the school, (4) requiring that students adhere to a code of conduct consistent with Plaintiff's statement of faith, and (5) otherwise operate BCS in accordance with its religious beliefs.

97.     5 M.R.S.A. § 4602(1), (5)(C), (5)(D) substantially burdens Plaintiff's sincere religious exercise by conditioning Plaintiff's participation in a generally available tuition program on Plaintiff forfeiting its right to operate BCS consistent with its religious beliefs.

98.     MHRA violations, including violations of 5 M.R.S.A. § 4602, carry civil monetary penalties of up to $20,000 for a first violation, up to $50,000 for a second violation, and up to $100,000 for subsequent violations, as well as attorney's fees in certain circumstances. 5 M.R.S.A. §§ 4613(2)(B)(7); 4614.

99.     The MHRA's monetary penalties impose a substantial burden on Plaintiff's sincere religious exercise.

100.    But for the poison pill's penalization of Plaintiff's religious exercise, Plaintiff would apply to become approved for tuition purposes.

101.    Plaintiff faces a credible threat of enforcement: Commissioner Makin's brief in *Carson v. Makin* threatened to enforce 5 M.R.S.A. § 4602 against Plaintiff if the state approved for tuition purposes, and Attorney General Frey's June 21, 2021 press release specifically identified Plaintiff as an enforcement target.

102.    The poison pill is not neutral and derives from religious hostility. It targets Plaintiff because of its religious exercise and is designed to exclude Plaintiff from the tuitioning program.

103.    The poison pill is designed to perpetuate the unconstitutional sectarian exclusion by excluding from the tuitioning program schools the state deems "pervasively sectarian" and "discriminatory."

104.    Gross statements of religious hostility surround the poison pill—not only towards all religious schools exercising disfavored religious beliefs, but towards Plaintiff's religious beliefs in particular.

105.    5 M.R.S.A. § 4602 is not generally applicable, because single-sex schools are categorically exempt from all of § 4602's educational nondiscrimination provisions (except those relating to disability), including those relating to sex, sexual orientation, gender identity, and religion. 5 M.R.S.A. § 4553(2-A).

106.    Defendants have no compelling interest in applying 5 M.R.S.A. § 4602 to prohibit Plaintiff's religious exercise or to exclude Plaintiff from the tuitioning program.

107.    The poison pill is not narrowly tailored to achieve any governmental interest Defendant purports to have.

108.    Mooting a Supreme Court case to avoid an adverse decision is not a compelling interest.

109.    Circumventing a Supreme Court decision is not a compelling interest.

110.    Withholding tuition funding from schools whose religious beliefs are considered "inimical to public education"[4] simply attempts to maintain stricter separation than the Establishment Clause requires, which is not a compelling interest.

111.    Avoiding state endorsement of a particular school's teaching or policies is not a compelling interest, because tuition funds only flow to religious schools because of the independent choices of tuition beneficiaries—the parents.

112.    Maine has no compelling interest in applying the nondiscrimination provisions against Plaintiff and other religious school when it categorically exempts all single-sex schools from those provisions.

113.    On its face and as applied to Plaintiffs, 5 M.R.S.A. § 4602(1), (5)(C), (5)(D) violates the Free Exercise Clause of the First Amendment to the U.S. Constitution insofar as it unconstitutionally conditions participation in the tuitioning program on Plaintiff relinquishing its constitutional right to free religious exercise.

## COUNT II: ESTABLISHMENT AND FREE EXERCISE CLAUSES (U.S. CONSTITUTION) AS TO 5 M.R.S.A. § 4572.

114.    Plaintiff incorporates by reference Paragraphs 1 through 113.

115.    Before the Maine Legislature adopted the poison pill, Commissioner Makin attempted to craft another poison pill from existing provisions of MHRA, contending that if the

---

[4] Statement of Maine Attorney General Aaron Frey on Supreme court Decision in *Carson v. Makin*, June 21, 2022, https://www.maine.gov/ag/news/article.shtml?id=8075979.

state approved BCS for tuition purposes, BCS would be subject to 5 M.R.S.A. § 4572(1)(A),

which prohibits employers from failing or refusing to hire or otherwise discriminating against

any applicant "because of race or color, sex, sexual orientation or gender identity, physical or

mental disability, religion, age, ancestry, national origin or familial status . . . .". *See* Defendant's

Mot. for Summ. J. at 7–8, 13–14, *Carson v. Makin*, 401 F. Supp. 3d 207 (D. Me. June 26, 2019)

(No. 1:18-cv-327); Brief of Appellee at 22–23, *Carson v. Makin*, 979 F.3d 21 (1st Cir. 2020)

(No. 19-1746).

116. Although the U.S. Court of Appeals for the First Circuit rejected this argument as

to the *Carson* plaintiff's standing, *Carson*, 979 F.3d at 28, 31, Plaintiff faces a credible threat of

Defendants enforcing 5 M.R.S.A. § 4572(1)(A) to prohibit its practice of hiring only co-

religionists if it participates in the tuitioning program. *See Statement from Attorney General Frey

on Carson v. Makin oral argument*, OFFICE OF THE MAINE ATTORNEY GENERAL, Dec. 8, 2021, at

https://www.maine.gov/ag/news/article.shtml?id=6220781.

117. Under the MHRA, the penalty for an employment discrimination violation for an

employer with 14-100 employees is compensatory and punitive damages up to $50,000 plus

attorney's fees. 5 M.R.S.A. § 4613(2)(B)(8)(e)(i); 5 M.R.S.A. § 4614.

118. The MHRA's plain language protects Plaintiff's right to hire only co-religionists,

even if it participates in the tuitioning program. 5 M.R.S.A. § 4553(4) ("'Employer' does not

include a religious or fraternal organization or association . . . with respect to employment of its

members of the same religion."); 5 M.R.S.A. § 4573-A(2) (defining as "not unlawful

employment discrimination" a religious organization requiring that all applicants and employees

conform to the religious tenets of the organization).

119.    Enforcing 5 M.R.S.A. § 4572 to prohibit Plaintiff from hiring only co-religionists if it participates in the tuitioning program violates the Establishment and Free Exercise Clauses of the First Amendment to the U.S. Constitution.

120.    The ministerial exception, grounded in the First Amendment, forbids a government from "[r]equiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so . . . ." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171,188 (2012).

121.    "By imposing an unwanted minister, the state infringes the Free Exercise Clause," and "[a]ccording the state the power to determine who will minister to the faithful also violates the Establishment Clause." *Id.* at 188–89.

122.    The Supreme Court has made clear that teachers or other employees who "play[] a vital part in carrying out the mission of the church" or a religious school are covered by the ministerial exception. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2066 (2020).

123.    Teachers and staff tasked with "educating young people in their faith, inculcating its teachings, and training them to live their faith" fulfill "responsibilities that lie at the very core of the mission of a private religious school" and are subject to the ministerial exception. *Id*. at 2064.

124.    Plaintiff's hiring practices for its ministries, including BCS, are protected under the ministerial exception.

125.    BCS teachers and staff uphold the Statement of Faith and Educational Philosophy and Objectives of the school.

126.     BCS teachers and staff carry out Plaintiff's mission by educating students in their faith and fostering their spiritual development. Their duties are vital to accomplishing Plaintiff's purpose in preaching and educating students in the Gospel of Jesus Christ.

127.     BCS teachers and staff educate students in Plaintiff's faith, inculcate its teaching, and train them to live their faith. They serve as Christian role models to the students, both in and out of school. They must not only agree that they share Plaintiff's Statement of Faith to be hired, but they must also feel that teaching at BCS is God's direction for them.

128.     If 5 M.R.S.A. § 4572(1)(A) requires Plaintiff to employ its ministers in accordance with the religion, sexual orientation, and gender identity nondiscrimination provisions in 5 M.R.S.A. § 4553(10)(G), it "[r]equir[es] a church to accept or retain an unwanted minister or punish[es] a church for failing to do so," violating both the Free Exercise Clause and the Establishment Clause. *Hosanna-Tabor*, 565 U.S. at 188.

129.     Therefore, Maine attempts to circumvent the ministerial exception by coercing religious organizations to choose between forfeiting public funds and hiring in accordance with their religious beliefs on one hand or accepting public funds and violating its religious beliefs on the other.

130.     Conditioning participation in the tuitioning program on Plaintiff relinquishing its constitutional right to select its own ministers violates the Religion Clauses of the U.S. Constitution.

131.     As applied to Plaintiff, 5 M.R.S.A. § 4572(1)(A) violates the Free Exercise Clause and Establishment Clause of the U.S. Constitution insofar as it unconstitutionally conditions participation in the tuitioning program on Plaintiff relinquishing its constitutional right to select its own ministers.

## COUNT III: FREE SPEECH (U.S. CONSTITUTION, FIRST AND FOURTEENTH AMENDMENTS) AS TO 5 M.R.S.A. § 4602.

132.    Plaintiff incorporates by reference Paragraphs 1 through 131.

133.    The Free Speech Clause of the First Amendment to the U.S. Constitution provides, in relevant part, that "Congress shall make no law . . . abridging the freedom of speech."

134.    The Free Speech Clause applies to states and their subdivisions and municipalities through the Fourteenth Amendment to the U.S. Constitution.

135.    The Free Speech Clause prohibits restrictions on speech that are based on content or viewpoint.

136.    Plaintiff's teaching of its religious beliefs is a form of speech and expression protected under the Free Speech Clause.

137.    The poison pill restricts Plaintiff's speech based on content and viewpoint because it requires Plaintiff to stop educating its students from its religious perspective as a condition of participating in the tuition program. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 831 (1995) ("Religion may be a vast area of inquiry, but it also provides, as it did here, a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered."); *id.* at 828–29 ("[T]he government offends the First Amendment when it imposes financial burdens on certain speakers based on the content of their expression.").

138.    The poison pill restricts Plaintiff's speech because the government disfavors its religious beliefs and expression.

139.    Punishing expression the government deems "offensive" violates the Free Speech Clause. *See Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017).

140.     Defendants violate the Free Speech Clause by imposing financial burdens on Plaintiff based on the content of its expression.

141.     Defendants cannot deny Plaintiff a benefit on a basis that infringes its interest in free speech.

142.     Defendants have no compelling interest in excluding Plaintiff from the tuitioning program because of its religious expression and teaching.

143.     The poison pill is not narrowly tailored to achieve any government interest Defendant purports to have.

144.     As applied to Plaintiff, 5 M.R.S.A. § 4602 violates the Free Speech Clause of the U.S. Constitution.

## PRAYER FOR RELIEF

Plaintiff respectfully requests the following relief:

A.     A declaratory judgment that the religion, sexual orientation, and gender identity provisions of 5 M.R.S.A. § 4602 are unconstitutional as applied to Plaintiff;

B.     A declaratory judgment that 5 M.R.S.A. § 4572 violates the federal and Maine Free Exercise clauses as applied to Plaintiff, insofar as it restricts Plaintiff's ability to employ only co-religionists as a condition of participating in the tuitioning program;

C.     Injunctive relief prohibiting Defendants from enforcing 5 M.R.S.A. § 4572 and the religion, sexual orientation, and gender identity provisions of 5 M.R.S.A. § 4602 against Plaintiff if the state approves it for tuition purposes or otherwise conditions approval for tuition purposes on Plaintiff violating its religious beliefs;

D.     An award of attorney's fees, costs, and expenses pursuant to 42 U.S.C. § 1988; and

E.      Any other legal and equitable relief the Court may deem appropriate and just.


Dated: March 27, 2023

                                                    Respectfully submitted,

                                                    _s/ Patrick Strawbridge_
                                                    Patrick Strawbridge (Bar No. 10024)
                                                        _Lead Counsel_
Jeffrey C. Mateer*                                  Consovoy McCarthy PLLC
David J. Hacker*                                    Ten Post Office Square
Lea E. Patterson*                                   8th Floor South PMB #706
Keisha T. Russell*                                  Boston, MA 02109
Courtney A. Jones*                                  (703) 243-9423
First Liberty Institute                             patrick@consovoymccarthy.com
2001 W Plano Parkway, Suite 1600
Plano, Texas 75075                                  Tiffany H. Bates*
(972) 941-4444                                      Consovoy McCarthy PLLC
lepatterson@firstliberty.org                        1600 Wilson Blvd.
                                                    Suite 700
                                                    Arlington, VA 22209
                                                    (703) 243-9423
                                                    tiffany@consovoymccarthy.com

                                                    *Certificates for admission _pro hac
                                                    vice_ pending

                                                    Attorneys for Plaintiff Crosspoint
                                                    Church

## **<u>VERIFICATION</u>**

I, Tom Brown, declare under penalty of perjury that: (1) I am over 18 years of age and am otherwise competent to testify and (2) I have reviewed the Complaint and the factual statements contained in this Complaint are true and correct to the best of my knowledge, information, and belief.

Date: <u>March 27, 2023</u>

 /s/ Tom Brown
Tom Brown
Senior Pastor, Crosspoint Church

**EXHIBIT 2**



# 130th MAINE LEGISLATURE

## FIRST SPECIAL SESSION-2021

**Legislative Document**          **No. 1688**

S.P. 544          In Senate, May 6, 2021

**An Act To Improve Consistency within the Maine Human Rights Act**

---

    Submitted by the Maine Human Rights Commission pursuant to Joint Rule 204.
    Received by the Secretary of the Senate on May 4, 2021.  Referred to the Committee on Judiciary pursuant to Joint Rule 308.2 and ordered printed.

DAREK M. GRANT
Secretary of the Senate

Presented by Senator HICKMAN of Kennebec.
Cosponsored by Representative TALBOT ROSS of Portland and
Senators: CARNEY of Cumberland, SANBORN of Cumberland, VITELLI of Sagadahoc,
Representatives: DUNPHY of Old Town, HARNETT of Gardiner.

**Be it enacted by the People of the State of Maine as follows:**

**Sec. 1.  5 MRSA §4552,** as amended by PL 2005, c. 10, §1, is further amended to read:

**§4552.  Policy**

To protect the public health, safety and welfare, it is declared to be the policy of this State to keep continually in review all practices infringing on the basic human right to a life with dignity, and the causes of these practices, so that corrective measures may, where possible, be promptly recommended and implemented, and to prevent discrimination in employment, housing, education, extension of credit or access to public accommodations on account of an individual's actual or perceived race, color, sex, sexual orientation or gender identity, physical or mental disability, religion, ancestry or national origin and in employment, extension of credit and access to public accommodations on the basis of age; and in employment and housing on the basis of familial status; and in employment, discrimination on account of age or because of the previous assertion of a claim or right against a prior employer under former Title 39 or Title 39-A and in housing because of familial status; and to prevent discrimination in the extension of credit on account of age, race, color, sex, sexual orientation, marital status, religion, ancestry or national origin; and to prevent discrimination in education on account of sex, sexual orientation or physical or mental disability and because of protected activity under Title 26, chapter 7, subchapter 5-B; and to prevent discrimination or retaliation on the basis of an assertion of rights under this Act or interference with an individual's right to be free from discrimination prohibited under this Act.

**Sec. 2.  5 MRSA §4553, sub-§5-A,** as amended by PL 2019, c. 464, §1, is further amended to read:

**5-A.  Familial status.**  "Familial status" means that a family unit may contain one or more individuals who have not attained 18 years of age and are living with that contains:

A.  A One or more individuals who have not attained 18 years of age and are living with a parent or another person having legal custody of the individual or individuals or the designee of the parent or other person having custody with the written permission of the parent or other person; or

B.  The designee of the parent or other person having custody, with the written permission of the parent or other person.

B-1.  One or more individuals 18 years of age or older who lack the ability to meet essential requirements for physical health, safety or self-care because the individual or individuals are unable to receive and evaluate information or make or communicate decisions.

The protections afforded against discrimination on the basis of familial status apply to any person who is pregnant or who is in the process of securing legal custody of any individual who has not attained 18 years of age.

**Sec. 3.  5 MRSA §4553, sub-§10, ¶G,** as amended by PL 2019, c. 464, §1, is further amended by amending subparagraph (3) to read:

(3)  Educational opportunity, as is more fully set forth in section 4602, subsection 4.

1  **Sec. 4.  5 MRSA §4571,** as amended by PL 2005, c. 10, §10, is further amended to
2  read:

3  **§4571.  Right to freedom from discrimination in employment**

4  The opportunity for an individual to secure employment without discrimination
5  because of race, color, sex, sexual orientation <u>or gender identity</u>, physical or mental
6  disability, religion, age, ancestry ~~or,~~ national origin <u>or familial status</u> is recognized as and
7  declared to be a civil right.

8  **Sec. 5.  5 MRSA §4572, sub-§1,** as amended by PL 2005, c. 10, §§11 and 12, is
9  further amended to read:

10  **1.  Unlawful employment.**  It is unlawful employment discrimination, in violation of
11  this Act, except when based on a bona fide occupational qualification:

12  A.  For any employer to fail or refuse to hire or otherwise discriminate against any
13  applicant for employment because of race or color, sex, sexual orientation <u>or gender</u>
14  <u>identity</u>, physical or mental disability, religion, age, ancestry ~~or,~~ national origin <u>or</u>
15  <u>familial status</u>, because of the applicant's previous assertion of a claim or right under
16  former Title 39 or Title 39-A or because of previous actions taken by the applicant that
17  are protected under Title 26, chapter 7, subchapter 5-B; or, because of those reasons,
18  to discharge an employee or discriminate with respect to hire, tenure, promotion,
19  transfer, compensation, terms, conditions or privileges of employment or any other
20  matter directly or indirectly related to employment; or, in recruiting of individuals for
21  employment or in hiring them, to utilize any employment agency that the employer
22  knows or has reasonable cause to know discriminates against individuals because of
23  their race or color, sex, sexual orientation <u>or gender identity</u>, physical or mental
24  disability, religion, age, ancestry ~~or,~~ national origin <u>or familial status</u>, because of their
25  previous assertion of a claim or right under former Title 39 or Title 39-A or because of
26  previous actions that are protected under Title 26, chapter 7, subchapter 5-B;

27  (1)  This paragraph does not apply to discrimination governed by Title 39-A,
28  section 353;

29  B.  For any employment agency to fail or refuse to classify properly, refer for
30  employment or otherwise discriminate against any individual because of race or color,
31  sex, sexual orientation <u>or gender identity</u>, physical or mental disability, religion, age,
32  ancestry ~~or,~~ national origin <u>or familial status</u>, because of the individual's previous
33  assertion of a claim or right under former Title 39 or Title 39-A or because of previous
34  actions taken by the individual that are protected under Title 26, chapter 7, subchapter
35  5-B; or to comply with an employer's request for the referral of job applicants if a
36  request indicates either directly or indirectly that the employer will not afford full and
37  equal employment opportunities to individuals regardless of their race or color, sex,
38  sexual orientation <u>or gender identity</u>, physical or mental disability, religion, age,
39  ancestry ~~or,~~ national origin <u>or familial status</u>, because of previous assertion of a claim
40  or right under former Title 39 or Title 39-A or because of previous actions that are
41  protected under Title 26, chapter 7, subchapter 5-B;

42  C.  For any labor organization to exclude from apprenticeship or membership or to
43  deny full and equal membership rights to any applicant for membership because of race
44  or color, sex, sexual orientation <u>or gender identity</u>, physical or mental disability,

1    religion, age, ancestry ~~or,~~ national origin <u>or familial status</u>, because of the applicant's
2    previous assertion of a claim or right under former Title 39 or Title 39-A or because of
3    previous actions taken by the applicant that are protected under Title 26, chapter 7,
4    subchapter 5-B; or, because of those reasons, to deny a member full and equal
5    membership rights, expel from membership, penalize or otherwise discriminate with
6    respect to hire, tenure, promotion, transfer, compensation, terms, conditions or
7    privileges of employment, representation, grievances or any other matter directly or
8    indirectly related to membership or employment, whether or not authorized or required
9    by the constitution or bylaws of that labor organization or by a collective labor
10   agreement or other contract; to fail or refuse to classify properly or refer for
11   employment or otherwise discriminate against any member because of race or color,
12   sex, sexual orientation <u>or gender identity</u>, physical or mental disability, religion, age,
13   ancestry ~~or,~~ national origin <u>or familial status</u>, because of the member's previous
14   assertion of a claim or right under former Title 39 or Title 39-A or because of previous
15   actions taken by the member that are protected under Title 26, chapter 7, subchapter
16   5-B; or to cause or attempt to cause an employer to discriminate against an individual
17   in violation of this section, except that it is lawful for labor organizations and employers
18   to adopt a maximum age limitation in apprenticeship programs, if the employer or labor
19   organization obtains prior approval from the Maine Human Rights Commission of any
20   maximum age limitation employed in an apprenticeship program. The commission
21   shall approve the age limitation if a reasonable relationship exists between the
22   maximum age limitation employed and a legitimate expectation of the employer in
23   receiving a reasonable return upon the employer's investment in an apprenticeship
24   program. The employer or labor organization bears the burden of demonstrating that
25   such a relationship exists;

26   D.  For any employer, employment agency or labor organization, prior to employment
27   or admission to membership of any individual, to:

28   (1)  Elicit or attempt to elicit information directly or indirectly pertaining to race
29   or color, sex, sexual orientation <u>or gender identity</u>, physical or mental disability,
30   religion, age, ancestry ~~or,~~ national origin <u>or familial status</u>, any previous assertion
31   of a claim or right under former Title 39 or Title 39-A or any previous actions that
32   are protected under Title 26, chapter 7, subchapter 5-B;

33   (2)  Make or keep a record of race or color, sex, sexual orientation <u>or gender</u>
34   <u>identity</u>, physical or mental disability, religion, age, ancestry ~~or,~~ national origin <u>or</u>
35   <u>familial status</u>, any previous assertion of a claim or right under former Title 39 or
36   Title 39-A or any previous actions that are protected under Title 26, chapter 7,
37   subchapter 5-B, except under physical or mental disability when an employer
38   requires a physical or mental examination prior to employment, a privileged record
39   of that examination is permissible if made and kept in compliance with this Act;

40   (3)  Use any form of application for employment, or personnel or membership
41   blank containing questions or entries directly or indirectly pertaining to race or
42   color, sex, sexual orientation <u>or gender identity</u>, physical or mental disability,
43   religion, age, ancestry ~~or,~~ national origin <u>or familial status</u>, any previous assertion
44   of a claim or right under former Title 39 or Title 39-A or any previous actions that
45   are protected under Title 26, chapter 7, subchapter 5-B. This section does not
46   prohibit any officially recognized government agency from keeping records

1  permitted to be kept under this Act in order to provide free services to individuals
2  requesting rehabilitation or employment assistance;

3  (4)  Print, publish or cause to be printed or published any notice or advertisement
4  relating to employment or membership indicating any preference, limitation,
5  specification or discrimination based upon race or color, sex, sexual orientation or
6  gender identity, physical or mental disability, religion, age, ancestry or, national
7  origin or familial status, any previous assertion of a claim or right under former
8  Title 39 or Title 39-A or any previous actions that are protected under Title 26,
9  chapter 7, subchapter 5-B; or

10  (5)  Establish, announce or follow a policy of denying or limiting, through a quota
11  system or otherwise, employment or membership opportunities of any group
12  because of the race or color, sex, sexual orientation or gender identity, physical or
13  mental disability, religion, age, ancestry or, national origin or familial status, the
14  previous assertion of a claim or right under former Title 39 or Title 39-A or because
15  of previous actions that are protected under Title 26, chapter 7, subchapter 5-B, of
16  that group; or

17  E.  For an employer, employment agency or labor organization to discriminate in any
18  manner against individuals because they have opposed a practice that would be a
19  violation of this Act or because they have made a charge, testified or assisted in any
20  investigation, proceeding or hearing under this Act.  This paragraph does not limit the
21  liability of persons pursuant to section 4633.

22  **Sec. 6.  5 MRSA §4573-A, sub-§3** is enacted to read:

23  **3.  Physical or mental disability.**  This subchapter does not prohibit an employer from
24  discharging or refusing to hire an individual with a physical or mental disability or subject
25  an employer to any legal liability resulting from the refusal to employ or the discharge of
26  the individual with a physical or mental disability if the employer establishes that the
27  individual, because of the physical or mental disability, is unable to perform job duties or
28  to perform job duties in a manner that would not endanger the health or safety of the
29  individual or others.

30  **Sec. 7.  5 MRSA §4581, first ¶,** as amended by PL 2011, c. 613, §10 and affected
31  by §29, is further amended to read:

32  The opportunity for an individual to secure housing in accordance with the individual's
33  ability to pay, and without discrimination because of race, color, sex, sexual orientation or
34  gender identity, physical or mental disability, religion, ancestry, national origin or familial
35  status is hereby recognized as and declared to be a civil right.

36  **Sec. 8.  5 MRSA §4581-A, sub-§1,** as enacted by PL 2011, c. 613, §11 and affected
37  by §29, is amended to read:

38  **1.  Sale or rental of housing and other prohibited practices.**  For any owner, lessee,
39  sublessee, managing agent or other person having the right to sell or rent or manage a
40  housing accommodation, or any agent of these, to:

41  A.  Make or cause to be made any written or oral inquiry concerning the race or color,
42  sex, sexual orientation or gender identity, physical or mental disability, religion,

1    ancestry, national origin or familial status of any prospective purchaser, occupant or
2    tenant of the housing accommodation;

3    B.  Refuse to show or refuse to sell, rent, lease, let or otherwise deny to or withhold
4    from any person the housing accommodation because of race or color, sex, sexual
5    orientation <u>or gender identity</u>, physical or mental disability, religion, ancestry, national
6    origin or familial status;

7    C.  Make, print or publish or cause to be made, printed or published any notice,
8    statement or advertisement relating to the sale, rental or lease of the housing
9    accommodation that indicates any preference, limitation or discrimination based upon
10   race or color, sex, sexual orientation <u>or gender identity</u>, physical or mental disability,
11   religion, ancestry, national origin or familial status or an intention to make any such
12   preference, limitation or discrimination;

13   D.  Discriminate against any person because of race or color, sex, sexual orientation <u>or</u>
14   <u>gender identity</u>, physical or mental disability, religion, ancestry, national origin or
15   familial status in the price, terms, conditions or privileges of the sale, rental or lease of
16   any housing accommodations or in the furnishing of facilities or services in connection
17   with any housing accommodations; or

18   E.  Evict or attempt to evict any tenant of any housing accommodation because of the
19   race or color, sex, sexual orientation <u>or gender identity</u>, physical or mental disability,
20   religion, ancestry, national origin or familial status of the tenant;

21   **Sec. 9.  5 MRSA §4581-A, sub-§2,** as enacted by PL 2011, c. 613, §11 and affected
22   by §29, is amended to read:

23   **2.  Selling, brokering or appraising of housing.**  For any real estate broker or real
24   estate salesperson, or any agent of these, to:

25   A.  Fail or refuse to show any person a housing accommodation listed for sale, lease or
26   rent because of race or color, sex, sexual orientation <u>or gender identity</u>, physical or
27   mental disability, religion, ancestry, national origin or familial status;

28   B.  Misrepresent, for the purpose of discriminating because of race or color, sex, sexual
29   orientation <u>or gender identity</u>, physical or mental disability, religion, ancestry, national
30   origin or familial status, the availability or asking price of a housing accommodation
31   listed for sale, lease or rent or for such reason to fail to communicate to the person
32   having the right to sell, rent or lease the housing accommodation any offer for the same
33   made by any applicant;

34   C.  In any other manner to discriminate against any applicant for a housing
35   accommodation because of race or color, sex, sexual orientation <u>or gender identity</u>,
36   physical or mental disability, religion, ancestry, national origin or familial status;

37   D.  Make or cause to be made any written or oral inquiry or record concerning the race
38   or color, sex, sexual orientation <u>or gender identity</u>, physical or mental disability,
39   religion, ancestry, national origin or familial status of any applicant for or intended
40   occupant of a housing accommodation; or

41   E.  Accept for listing any housing accommodation when the person having the right to
42   sell, rent or lease the housing accommodation has directly or indirectly indicated an
43   intention of discriminating among prospective tenants or purchasers on the ground of

1    race or color, sex, sexual orientation <u>or gender identity</u>, physical or mental disability,
2    religion, ancestry, national origin or familial status, or when the broker or salesperson
3    knows or has reason to know that the person having the right to sell, rent or lease the
4    housing accommodation has made a practice of discrimination since July 1, 1972;

5    **Sec. 10.  5 MRSA §4581-A, sub-§3,** as enacted by PL 2011, c. 613, §11 and
6    affected by §29, is amended to read:

7    **3.  Making of loans; other financial assistance.**  For any person to whom application
8    is made for a loan or other form of financial assistance for the acquisition, construction,
9    rehabilitation, repair or maintenance of any housing accommodation, whether secured or
10    unsecured, or agent of the person, to:

11    A.  Make or cause to be made any oral or written inquiry concerning the race or color,
12    sex, sexual orientation <u>or gender identity</u>, physical or mental disability, religion,
13    ancestry, national origin or familial status of any applicant for financial assistance or
14    of existing or prospective occupants or tenants of housing accommodations; or

15    B.  Discriminate in the granting of financial assistance, or in the terms, conditions or
16    privileges relating to obtaining or the use of any financial assistance, against any
17    applicant because of race or color, sex, sexual orientation <u>or gender identity</u>, physical
18    or mental disability, religion, ancestry, national origin or familial status; or

19    **Sec. 11.  5 MRSA §4583,** as amended by PL 2007, c. 243, §4, is further amended to
20    read:

21    **§4583.  Application**

22    Nothing in this Act may be construed to prohibit or limit the exercise of the privilege
23    of every person and the agent of any person having the right to sell, rent, lease or manage
24    a housing accommodation to set up and enforce specifications in the selling, renting,
25    leasing or letting or in the furnishings of facilities or services in connection with the
26    facilities that are consistent with business necessity and are not based on the race, color,
27    sex, sexual orientation <u>or gender identity</u>, physical or mental disability, religion, country of
28    ancestral origin or familial status of or the receipt of public assistance payments by any
29    prospective or actual purchaser, lessee, tenant or occupant.  Nothing in this Act may be
30    construed to prohibit or limit the exercise of the privilege of every person and the agent of
31    any person making loans for or offering financial assistance in the acquisition, construction,
32    rehabilitation, repair or maintenance of housing accommodations to set standards and
33    preferences, terms, conditions, limitations or specifications for the granting of loans or
34    financial assistance that are consistent with business necessity and are not based on the
35    race, color, sex, sexual orientation <u>or gender identity</u>, physical or mental disability, religion,
36    country of ancestral origin or familial status of or the receipt of public assistance payments
37    by the applicant for a loan or financial assistance or of any existing or prospective owner,
38    lessee, tenant or occupant of <u>a</u> housing accommodation.

39    **Sec. 12.  5 MRSA §4591,** as amended by PL 2005, c. 10, §16, is further amended to
40    read:

41    **§4591.  Equal access to public accommodations**

42    The opportunity for every individual to have equal access to places of public
43    accommodation without discrimination because of race, color, sex, sexual orientation <u>or</u>

1 <u>gender identity, age,</u> physical or mental disability, religion, ancestry or national origin is
2 recognized as and declared to be a civil right.

3 **Sec. 13.  5 MRSA §4592, sub-§1,** as amended by PL 2005, c. 10, §17, is further
4 amended to read:

5 **1.  Denial of public accommodations.**  For any public accommodation or any person
6 who is the owner, lessor, lessee, proprietor, operator, manager, superintendent, agent or
7 employee of any place of public accommodation to directly or indirectly refuse,
8 discriminate against or in any manner withhold from or deny the full and equal enjoyment
9 to any person, on account of race or color, sex, sexual orientation <u>or gender identity, age,</u>
10 physical or mental disability, religion, ancestry or national origin, any of the
11 accommodations, advantages, facilities, goods, services or privileges of public
12 accommodation, or in any manner discriminate against any person in the price, terms or
13 conditions upon which access to ~~accommodation~~ <u>accommodations,</u> advantages, facilities,
14 goods, services and privileges may depend.

15 For purposes of this subsection, unlawful discrimination also includes, but is not limited
16 to:

17 A.  The imposition or application of eligibility criteria that screen out or tend to screen
18 out an individual with a disability or any class of individuals with disabilities from fully
19 and equally enjoying any goods, services, facilities, privileges, advantages or
20 accommodations, unless the criteria can be shown to be necessary for the provision of
21 the goods, services, facilities, privileges, advantages or accommodations being offered;

22 B.  A failure to make reasonable modifications in policies, practices or procedures,
23 when modifications are necessary to afford the goods, services, facilities, privileges,
24 advantages or accommodations to individuals with disabilities, unless, in the case of a
25 private entity, the private entity can demonstrate that making the modifications would
26 fundamentally alter the nature of the goods, services, facilities, privileges, advantages
27 or accommodations;

28 C.  A failure to take steps that may be necessary to ensure that no individual with a
29 disability is excluded, denied services, segregated or otherwise treated differently than
30 other individuals because of the absence of auxiliary aids and services, unless, in the
31 case of a private entity, the private entity can demonstrate that taking those steps would
32 fundamentally alter the nature of the good, service, facility, privilege, advantage or
33 accommodation being offered or would result in an undue burden;

34 D.  A private entity's failure to remove architectural barriers and communication
35 barriers that are structural in nature in existing facilities and transportation barriers in
36 existing vehicles and rail passenger cars used by an establishment for transporting
37 individuals, not including barriers that can be removed only through the retrofitting of
38 vehicles or rail passenger cars by the installation of a hydraulic or other lift, where the
39 removal is readily achievable~~.~~<u>;</u>

40 When the entity can demonstrate that the removal of a barrier under this paragraph is
41 not readily achievable, a failure to make the goods, services, facilities, privileges,
42 advantages or accommodations available through alternative methods if alternative
43 methods are readily achievable; and

1     E.  A qualified individual with a disability, by reason of that disability, being excluded
2     from participation in or being denied the benefits of the services, programs or activities
3     of a public entity, or being subjected to discrimination by any such entity;

4     **Sec. 14.  5 MRSA §4592, sub-§2,** as amended by PL 2005, c. 10, §17, is further
5 amended to read:

6     **2.  Communication, notice or advertisement.**  For any person to directly or indirectly
7 publish, display or communicate any notice or advertisement to the effect that any of the
8 accommodations, advantages, facilities and privileges of any place of public
9 accommodation are refused, withheld from or denied to any person on account of race or
10 color, sex, sexual orientation <u>or gender identity, age</u>, physical or mental disability, religion,
11 ancestry or national origin, or that the patronage or custom of any person belonging to or
12 purporting to be of any particular race or color, sex, sexual orientation <u>or gender identity,</u>
13 <u>age</u>, physical or mental disability, religion, ancestry or national origin is unwelcome,
14 objectionable or not acceptable, desired or solicited, or that the clientele is restricted to any
15 particular race or color, <u>sex,</u> sexual orientation <u>or gender identity, age</u>, physical or mental
16 disability, religion, ancestry or national origin.  The production of any communication,
17 notice or advertisement purporting to relate to any place of accommodation is presumptive
18 evidence in any action that the action was authorized by its owner, manager or proprietor;

19     **Sec. 15.  5 MRSA §4592, sub-§6,** as amended by PL 2007, c. 664, §5, is further
20 amended to read:

21     **6.  Association.**  For a covered entity to exclude or otherwise deny equal goods,
22 services, facilities, privileges, advantages, accommodations or other opportunities to an
23 individual or entity because of the known ~~disability~~ <u>protected class status</u> of an individual
24 with whom the individual or entity is known to have a relationship or association;

25     **Sec. 16.  5 MRSA §4595,** as amended by PL 2005, c. 10, §18, is further amended to
26 read:

27 **§4595.  Right to freedom from discrimination solely on basis of age, race, color, sex,**
28        **sexual orientation <u>or gender identity</u>, marital status, ancestry, religion or**
29        **national origin in any credit transaction**

30     The opportunity for every individual to be extended credit without discrimination
31 solely because of any one or more of the following factors: age; race; color; sex; sexual
32 orientation <u>or gender identity</u>; marital status; ancestry; religion or national origin is
33 recognized as and declared to be a civil right.

34     **Sec. 17.  5 MRSA §4596,** as amended by PL 2005, c. 10, §19, is further amended to
35 read:

36 **§4596.  Unlawful credit extension discrimination**

37     It is unlawful credit discrimination for any creditor to refuse the extension of credit to
38 any person solely on the basis of any one or more of the following factors: age; race; color;
39 sex; sexual orientation <u>or gender identity</u>; marital status; ancestry; religion or national
40 origin in any credit transaction. It is not unlawful credit discrimination to comply with the
41 terms and conditions of any bona fide group credit life, accident and health insurance plan,
42 for a financial institution extending credit to a married person to require both the husband
43 and the wife to sign a note and a mortgage and to deny credit to persons under ~~the age of~~

1   18 years of age or to consider a person's age in determining the terms upon which credit
2   will be extended.

3   **Sec. 18. 5 MRSA §4601,** as amended by PL 2005, c. 10, §20, is further amended to
4   read:

5   **§4601.  Right to freedom from discrimination in education**

6   The opportunity for an individual at an educational institution to participate in all
7   educational, counseling and vocational guidance programs and, all apprenticeship and on-
8   the-job training programs and all extracurricular activities without discrimination because
9   of sex, sexual orientation or gender identity, a physical or mental disability, ancestry,
10  national origin or, race, color or religion is recognized and declared to be a civil right.

11  **Sec. 19. 5 MRSA §4602,** as amended by PL 2005, c. 662, Pt. A, §1, is further
12  amended to read:

13  **§4602.  Unlawful educational discrimination**

14  **1.   Unlawful educational discrimination on the basis of sex.**   It is unlawful
15  educational discrimination in violation of this Act, on the basis of sex, sexual orientation
16  or gender identity, physical or mental disability, ancestry, national origin, race, color or
17  religion, to:

18  A.  Exclude a person from participation in, deny a person the benefits of, or subject a
19  person to, discrimination in any academic, extracurricular, research, occupational
20  training or other program or activity;

21  B.  Deny a person equal opportunity in athletic programs;

22  C.  Apply any rule concerning the actual or potential family familial status or marital
23  status of a person or to exclude any person from any program or activity because of
24  pregnancy or related conditions or because of sex or sexual orientation or gender
25  identity;

26  D.  Deny a person admission to the institution or program or to fail to provide equal
27  access to and information about an institution or program through recruitment; or

28  E.  Deny a person financial assistance availability and opportunity.

29  ~~2.   Unlawful educational discrimination on the basis of physical or mental~~
30  ~~disability.  It is unlawful educational discrimination in violation of this Act solely on the~~
31  ~~basis of physical or mental disability to:~~

32  ~~A.  Exclude from participation in, deny the benefits of or subject to discrimination~~
33  ~~under any educational program or activity any otherwise qualified individual with~~
34  ~~physical or mental disability;~~

35  ~~B.  Deny any person equal opportunity in athletic programs, provided that no~~
36  ~~educational institution may be required under this subsection to provide separate~~
37  ~~athletic programs to serve persons with physical or mental disability;~~

38  ~~C.  Deny admission to any institution or program or fail to provide equal access to and~~
39  ~~information about an institution or program through recruitment; or~~

40  ~~D.  Deny financial assistance availability and opportunity.~~

1 ~~Nothing in this subsection may be construed to cover the rights of children with disabilities~~
2 ~~to special education programs under state or federal law.~~

3 ~~**3. Unlawful educational discrimination on the basis of national origin or race.** It~~
4 ~~is unlawful educational discrimination in violation of this Act, on the basis of national~~
5 ~~origin or race, to:~~

6 ~~A. Exclude a person from participation in, deny a person the benefits of, or subject a~~
7 ~~person to, discrimination in any academic, extracurricular, research, occupational~~
8 ~~training or other program or activity;~~

9 ~~B. Deny admission to the institution or program or to fail to provide equal access to~~
10 ~~and information about an institution or program through recruitment; or~~

11 ~~C. Deny financial assistance availability and opportunity.~~

12 ~~**4. Unlawful education discrimination on the basis of sexual orientation.** It is~~
13 ~~unlawful education discrimination in violation of this Act, on the basis of sexual~~
14 ~~orientation, to:~~

15 ~~A. Exclude a person from participation in, deny a person the benefits of or subject a~~
16 ~~person to discrimination in any academic, extracurricular, research, occupational~~
17 ~~training or other program or activity;~~

18 ~~B. Deny a person equal opportunity in athletic programs;~~

19 ~~C. Apply any rule concerning the actual or potential family or marital status of a person~~
20 ~~or to exclude any person from any program or activity because of their sexual~~
21 ~~orientation;~~

22 ~~D. Deny admission to the institution or program or to fail to provide equal access to~~
23 ~~any information about an institution or program through recruitment; or~~

24 ~~E. Deny financial assistance availability and opportunity.~~

25 ~~The provisions in this subsection relating to sexual orientation do not apply to any~~
26 ~~education facility owned, controlled or operated by a bona fide religious corporation,~~
27 ~~association or society.~~

28 **5. Application.** Nothing in this section:

29 A. Requires an educational institution to provide separate athletic or other
30 extracurricular programs to serve a person with a physical or mental disability;

31 B. May be construed to affect the rights of a person with a physical or mental disability
32 to special education programs under state or federal law;

33 C. Requires a religious corporation, association or society that does not receive public
34 funding to comply with this section as it relates to sexual orientation or gender identity;
35 or

36 D. Requires an educational institution to participate in or endorse any religious beliefs
37 or practices; to the extent that an educational institution permits religious expression,
38 it cannot discriminate between religions in so doing.

39 **Sec. 20. 5 MRSA §4612, sub-§2-A,** as enacted by PL 2019, c. 465, §6, is amended
40 by amending the first blocked paragraph to read:

An administrative dismissal operates as an order of dismissal and has the same effect as a finding by the commission that no reasonable grounds exist to believe that unlawful discrimination has occurred, except that an administrative dismissal pursuant to paragraph C does not entitle the complainant to an award of attorney's fees, civil penal damages or compensatory and punitive damages.

**Sec. 21.  5 MRSA §4622, sub-§1, ¶A,** as amended by PL 2019, c. 465, §8, is further amended to read:

A.  Dismissed the case under section 4612, subsection 2 or subsection 2-A, paragraphs A and B and D to F;

**Sec. 22.  5 MRSA §4634,** as enacted by PL 2001, c. 206, §1, is amended to read:

**§4634.  Right to breast-feed**

Notwithstanding any ~~other~~ provision of law to the contrary, a ~~mother~~ person may breast-feed ~~her~~ that person's baby in any location, public or private, where the ~~mother~~ person is otherwise authorized to be.

## SUMMARY

This bill addresses inconsistencies in the protections provided in different areas of jurisdiction under the Maine Human Rights Act.  The bill provides more inclusive protection by:

1. Including adult family members dependent for care in the definition of "familial status";

2. Including familial status as a protected class in employment;

3. Including age as a protected class in public accommodations; and

4. Clarifying the scope of the Maine Human Rights Act application in education.

The bill also clarifies that the sexual orientation provisions in the Maine Human Rights Act extend to gender identity.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

CROSSPOINT CHURCH,        )
                              )
          Plaintiff,      )
                              )
         v.              )     No. 1:23-cv-00146-JAW
                              )
A. PENDER MAKIN, in her      )
official capacity as Commissioner of    )
the Maine Department of Education, et al.,   )
                              )
         Defendants.     )

## JOINT STIPULATED FACTS

Solely for purposes of resolution of the parties' joint motion to convert the Order on Plaintiff's Motion for Preliminary Injunction into an Order on Permanent Injunction and enter final judgment, Plaintiff and Defendants stipulate to each of the following facts:[1]

### *Facts About Publicly Funded Education in Maine*

1.    The Maine Legislature guarantees every school-aged child residing within the state "an opportunity to receive the benefits of a free public education." 20-A M.R.S.A. § 2(1).

2.    The Legislature vests the authority to fulfill the guarantee of § 2(1) in local school administrative units (SAUs). 20-A M.R.S.A. § 2(2).

3.    Pursuant to 20-A M.R.S.A. § 5204(4), an SAU "that neither maintains a secondary school nor contracts for secondary school privileges pursuant to chapter 115 shall pay the tuition, in accordance with chapter 219, at the public school or the approved private school of the parent's choice at which the student is accepted."  Such SAUs are referred

---

[1] By stipulating to these facts, the parties do not concede that the facts are relevant or material, and the parties reserve the right to dispute the relevance and/or materiality of any stipulated fact. The parties also reserve the right to supplement the record.

to here as "tuitioning SAUs."

4.   20-A M.R.S.A. § 2901 lays out the requirements for a private school to operate as an approved private school for meeting the requirement of compulsory school attendance under 20-A M.R.S.A. § 5001-A(3)(A)(1)(a).

5.   20-A M.R.S.A. § 2951 contains the requirements for a private school to be approved to receive public funds for tuition purposes when resident secondary student's parents select an approved school.

6.   20-A M.R.S.A. § 2951(2) states, in pertinent part, that "[a] private school may be approved for the receipt of funds for tuition purposes only if it:…[i]s a nonsectarian school in accordance with the First Amendment of the United States Constitution." .

7.   The Supreme Court declared the "nonsectarian" requirement unconstitutional in *Carson v. Makin*, 142 S. Ct. 1987 (2022).

8.   The Defendant Commissioner of Education is responsible for enforcing the requirements of 20-A M.R.S.A. § 2951.

9.   From the date that the Supreme Court issued its decision in *Carson*, the Department of Education (the "Department") has understood that it may not prevent private schools from receiving approval for the receipt of public funds for tuition purposes solely because they are sectarian.

10.   On July 28, 2022, Cheverus High School, a sectarian high school in Portland, Maine, applied for approval for the receipt of public funds for tuition purposes.

11.   The Department processed Cheverus' application in the same manner that it processed applications for any private school seeking approval for tuition purposes for the first time.

12.   Cheverus' application was approved on September 16, 2022.

13.   No other sectarian school has applied for approval for the receipt of public funds for tuition

purposes.

### *Amendments to the Maine Human Rights Act*

14. Defendants Sanders, David, O'Brien, Walker, and Douglas are Commissioners of the Maine Human Rights Commission ("MHRC"), an agency of the state of Maine, created and empowered under 5 M.R.S. § 4566 to "investigat[e] all forms of invidious discrimination, whether carried out legally or illegally, and whether by public agencies or private persons."

15. On May 6, 2021, the MHRC submitted LD 1688, "An Act to Improve Consistency Within the Maine Human Rights Act."

16. Exhibit 1 to the Stipulated Facts is a true and accurate copy of testimony of the MHRC's then-Executive Director in support of LD 1688.

17. On June 17, 2021, the Maine Legislature enacted LD 1688 -- "An Act to Improve Consistency in Terminology and within the Maine Human Rights Act," P.L. 2021, Ch. 366, § 19, and it was signed into law by the Governor on June 24, 2021.

18. That legislation amended 5 M.R.S.A. § 4602, the provision of the Maine Human Rights Act prohibiting educational discrimination, by adding ancestry, color, and religion as protected classes. The legislation struck the provision exempting all religious organizations from the prohibition against sexual orientation discrimination and replaced it with a provision stating: "Nothing in this section . . . [r]equires a religious corporation, association or society that does not receive public funding to comply with this section as it relates to sexual orientation or gender identity."

### *Facts About the Plaintiff*

19. Plaintiff Crosspoint Church is a Christian church incorporated as a nonprofit corporation under Maine law and is located at 1476 Broadway, Bangor, Maine 04401.

20. Plaintiff incorporated in 1967 under its original name Bangor Baptist Church "[f]or the

purpose of maintaining a church for the worship of Almighty God, preaching the Gospel of Jesus Christ, and conducting the education of adults and children."

21. Crosspoint Church's objective is "full obedience to the will of the Lord Jesus Christ who is the Founder and Head of the Church."

22. Crosspoint Church is an independent church not subject to the governance or authority of any higher ecclesiastical body.

23. Crosspoint Church operates Bangor Christian School (BCS), a K4–12 school created in 1970 as an integrated auxiliary of the church.

24. Crosspoint Church's Senior Pastor and Deacon Board govern BCS.

25. Crosspoint Church operates BCS in accordance with its Statement of Faith, which summarizes its religious beliefs.

26. BCS's principal reports to Crosspoint Church's Senior Pastor.

27. BCS is accredited by the New England Association of Schools and Colleges.

28. BCS annually maintains basic school approval under 20-A M.R.S.A. § 2901(2)(A).

29. BCS meets the requirements for reporting and release of student records, *see* 20-A M.R.S.A. §§ 2951(5), (7), 2952 and is willing to comply with the remaining applicable requirements for tuitioning schools, *see id.* §§ 2951(5), 2953–2954.

30. BCS has not applied for approval for the receipt of public funds for tuition purposes, nor has BCS contacted Department personnel regarding the process for applying for approval.

31. But for the amendments to 5 M.R.S.A. § 4602, BCS would apply to become approved for tuition purposes.

32. During the 2022-23 school year, twenty-eight BCS high-school students lived in tuitioning SAUs: Bradford, Glenburn, Levant, Orrington, and Veazie, Maine.

33. BCS's total high-school enrollment for the 2022–23 school year is 92 students.

34. Crosspoint Church pays 95% of tuition for the children of Crosspoint Church employees, including BCS staff, to attend BCS.

35. For the 2023–24 school year, eight BCS high-school students are children of Crosspoint Church employees and live in Glenburn, Maine—a tuitioning SAU.

36. If the state approved BCS for tuition purposes, BCS would charge the tuition for these eight students to Glenburn, resulting in an annual savings of approximately $47,120.

37. If the state approved BCS for tuition purposes, the BCS high school students residing in tuitioning SAUs would be eligible to participate in the tuitioning program instead of paying BCS tuition out of pocket.

38. Students are required to attend BCS's weekly chapel service.

39. If a student persistently and unrepentantly engages in "counter-witnessing," that is, advocating beliefs contrary to BCS's statement of faith, that student would be deemed not in agreement and compliance with BCS's purpose, handbook, and code of conduct and, thus, be subject to removal from the school.

40. Students must adhere to BCS's code of conduct and dress code, which derive from Plaintiff's religious beliefs.

41. BCS's code of conduct prohibits students from, among other things, engaging in immoral conduct, including sexual activity outside of marriage as defined in the Statement of Faith, or identifying as a gender other than their biological sex.

42. BCS's dress code requires students to wear clothing consistent with their biological sex.

43. Crosspoint Church employees, including BCS staff, must be co-religionists—that is, they must be in agreement with Crosspoint's Statement of Faith and engage in religious practice consistent with Crosspoint Church's spiritual standards.

44. BCS teachers, as those primarily responsible for fulfilling BCS's religious mission, must

agree to both BCS's Statement of Faith and the Educational Philosophy and Objectives and be committed to upholding them.

45. BCS teachers serve as Christian role models to the students; and, accordingly, must adhere to biblical standards of conduct, including those relating to sexual behavior; the use of alcohol, drugs, and tobacco; lewd public dancing; gambling; and any other activity that would hinder a teacher's religious testimony.

46. BCS teachers and staff uphold the Statement of Faith and Educational Philosophy and Objectives of the school.

47. BCS teachers and staff carry out Plaintiff's mission by educating students in their faith and fostering their spiritual development. Their duties are vital to accomplishing Plaintiff's purpose in preaching and educating students in the Gospel of Jesus Christ.

48. BCS teachers and staff educate students in Plaintiff's faith, inculcate its teaching, and train them to live their faith. They serve as Christian role models to the students, both in and out of school. They must not only agree that they share Plaintiff's Statement of Faith to be hired, but they must also feel that teaching at BCS is God's direction for them.

49. BCS does not require students to profess to be born-again Christians as a condition of admission.

50. BCS is willing to consider admitting students from any religious background or faith so long as they are willing to support BCS' philosophy of Christian education and conduct.

51. BCS teaches children that the husband is the leader of the household.

52. Only men are eligible to serve on the Deacon Board.

53. Exhibit 2 to the Stipulated Facts is a true and accurate copy of BCS' Application for Admission.

54.   Exhibit 3 to the Stipulated Facts is a true and accurate copy of BCS' Student Handbook.

55.   Exhibit 4 to the Stipulated Facts is a true and accurate copy of BCS' Faculty Contract.

56.   Exhibit 5 to the Stipulated Facts is a true and accurate copy of BCS' Teacher Contract.

57.   Exhibit 6 to the Stipulated Facts is a true and accurate copy of the Deposition of Jeffrey Benjamin, part of the stipulated record in *Carson v. Makin*, No. 1:18-cv-00327, Doc. 24-8.

58.   Exhibit 7 to the Stipulated Facts is a true and accurate copy of the Deposition of Martha Boone, part of the stipulated record in *Carson v. Makin*, No. 1:18-cv-00327, Doc. 24-16.

### *Facts Regarding the Sectarian Exclusion*

59.   In 2003, the Maine Legislature considered repealing its sectarian exclusion. *See* L.D. 182, "An Act to Eliminate Discrimination Against Parents Who Want to Send Their Children to Religious Private Schools."

60.   Exhibit 8 to the Stipulated Facts is true and accurate copy of the legislative history of L.D. 182.

61.   Exhibit 9 to the Stipulated Facts is true and accurate copy of interrogatory responses from Education Commissioner Robert Hasson, Jr.

62.   Exhibit 10 to the Stipulated Facts is true and accurate copy of correspondence regarding the Cardigan Mountain School.

### *Facts Regarding Statements on Carson v. Makin and Amendments to Maine's Law*

63.   Exhibit 11 to the Stipulated Facts is a true and accurate copy of the Statement of Maine Attorney General Aaron Frey on the Supreme Court Decision in *Carson v. Makin* (June 21, 2022).

64.   Exhibit 12 to the Stipulated Facts is a true and accurate copy of the Statement of Attorney General Aaron Frey on the *Carson v. Makin* oral argument (Dec. 8, 2021).

65.   Exhibit 13 to the Stipulated Facts is a true and accurate copy of the Tweet of Speaker

of the House Ryan Fecteau on the Amendments to 5 M.R.S.A. § 4602 (June 26, 2022).


Date:  March 28, 2024                    Respectfully submitted,

/s/ *Christopher Taub*                    /s/ *Patrick Strawbridge*
Christopher C. Taub                       Patrick Strawbridge (Bar No. 10024)
Chief Deputy Attorney General              *Lead Counsel*
Sarah A. Forster                          Consovoy McCarthy PLLC
Assistant Attorney General                Ten Post Office Square
Office of the Attorney General            8th Floor South PMB #706
State House Station 6  Augusta,           Boston, MA 02109
ME 04333                                  (703) 243-9423
Telephone: (207) 626-8800                 patrick@consovoymccarthy.com
Email: Christopher.C.Taub@maine.gov
        sarah.forster@maine.gov           Tiffany H. Bates*
                                          Consovoy McCarthy PLLC
*Attorneys for Defendants*                1600 Wilson Blvd.
                                          Suite 700
                                          Arlington, VA 22209
                                          (703) 243-9423
                                          tiffany@consovoymccarthy.com

                                          Jeffrey C. Mateer*
                                          David J. Hacker*
                                          Lea E. Patterson*
                                          Keisha T. Russell*
                                          Courtney A. Jones*
                                          First Liberty Institute
                                          2001 W Plano Parkway, Suite 1600
                                          Plano, Texas 75075
                                          (972) 941-4444
                                          lepatterson@firstliberty.org

                                          *Admitted pro hac vice*

                                          *Attorneys for Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

I certify that, on March 28, 2024, I electronically filed the foregoing with the Court and

served it on opposing counsel through the Court's CM/ECF system.

Respectfully submitted,

<u>/s/Christopher C. Taub</u>
Christopher C. Taub
Chief Deputy Attorney General
Office of the Attorney General
State House Station 6
Augusta, ME 04333
(207) 626-8800
Christopher.C.Taub@maine.gov

<u>/s/ Patrick Strawbridge</u>
Patrick Strawbridge (Bar No. 10024)
  *Lead Counsel*
Consovoy McCarthy PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(703) 243-9423
patrick@consovoymccarthy.com

# Exhibit 1



# Maine Human Rights Commission

### # 51 State House Station, Augusta, ME 04333-0051

*Physical location: 19 Union Street, Augusta, ME 04330*
Phone (207) 624-6290 ▪ Fax (207) 624-8729 ▪ TTY: Maine Relay 711
*www.maine.gov/mhrc*

**Amy M. Sneirson**                                                                                 **Barbara Archer Hirsch**
EXECUTIVE DIRECTOR                                                                              COMMISSION COUNSEL

May 14, 2021

The Honorable Anne Carney, Senate Chair
The Honorable Thom Harnett, House Chair
Joint Standing Committee on Judiciary
100 State House Station
Augusta, ME 04333

    *Re:  An Act to Improve Consistency within the Maine Human Rights Act  – LD 1688*

Dear Senator Carney, Representative Harnett, and Members of the Joint Standing Committee on Judiciary:

    The Maine Human Rights Commission ("Commission") - the quasi-independent, neutral, apolitical State agency[1] charged with enforcing the Maine Human Rights Act, 5 M.R.S. §§ 4551, *et seq.* ("MHRA" or the "Act") - has the duty of: investigating, conciliating, and at times litigating discrimination cases under the MHRA; promulgating rules and regulations to effectuate the MHRA; and making recommendations for further legislation or executive action concerning infringements on human rights in Maine.  5 M.R.S. § 4566(7), (11).

    The MHRA has a long and distinguished history, influenced by time and public acceptance of certain protected groups, but its provisions have been amended in a piecemeal fashion.  As a result, the scope of the MHRA's protection varies based on which area of its jurisdiction is invoked:

| Area of Jurisd. | Protected Classes |
|---|---|
| Employment | sex, sexual orientation, race, color, national origin, ancestry, physical or mental disability, age, and religion, as well as retaliation for engaging in activity protected by the Maine Whistleblowers' Protection Act ("WPA") and for having made a workers' compensation claim against a previous employer. |
| Housing | sex, sexual orientation, race, color, national origin, ancestry, physical or mental disability, religion, familial status, and receipt of public assistance. |
| Public accommodation | sex, sexual orientation, race, color, national origin, ancestry, physical or mental disability, and religion. |
| Education | sex, sexual orientation, race, national origin, and physical or mental disability. |
| Extension of Credit | sex, sexual orientation, race, color, national origin, ancestry, physical or mental disability, religion, age, and marital status. |

    While there are some entirely appropriate reasons for these internal inconsistencies,[2] often there is not a logical rationale for them. LD 1703 attempts to update the balance of the MHRA's protections across areas of application so the Act is internally consistent, and more understandable and user-friendly for the public. To that end, the Commission is pleased to provide this testimony in support of LD 1703.

---

[1] The Commission itself is made up of five Commissioners, appointed by the Governor for staggered five-year terms.  By statute, there can be no more than three Commissioners from any political party.  5 M.R.S. § 4561.
[2] For example, the WPA applies only in employment. Even so, tenants often file Commission complaints alleging whistleblower retaliation for reporting unsafe or unlawful housing conditions, which is not covered in housing.

### Section 1

This section, the overall statement of the MHRA's "Policy", would be amended to reflect changes to coverage that are discussed below. Those changes include adding "familial status" protection in employment, updating education protections to include routine protected classes, and adding age to the protected classes covered in public accommodations.[3]  We will discuss each in detail below.

Another amendment within this Policy statement makes clear that the Act prohibits discrimination on the basis of both protected class status and perceived protected class status, meaning a person can file a complaint if they are subjected to discrimination because they are in the protected class or because they were perceived to be in the protected class.

➢ Currently, the MHRA explicitly protects against discrimination based on perceived disability: the definition of "physical or mental disability" includes "being regarded as having or likely to develop" a disability.  5 M.R.S. § 4553-A(1)(D).  "Perceived disability" claims are common at the Commission, especially in the employment context: for example, employees who are injured at work are often regarded as disabled even if their injury resolves within six months and they have no remaining restrictions.

➢ While these are the most common perception claims, they are not the only such claims filed with the Commission, and the Commission has interpreted the MHRA to include other perception-based claim. For example, the Commission has seen a number of claims from individuals alleging they were discriminated against based on their perceived sexual orientation.  In these cases, individuals who do not conform to gender stereotypes allege that they are perceived as gay and are harassed or otherwise discriminated against as a result.  In one such case, a student was bullied and harassed because his classmates perceived him to be gay; the harassment began as mocking his "man-boobs", making sexual comments, and repeatedly conducting a "gay test" by seeing how long it took him to react to being touched, and eventually escalated to alleged sexual assault.[4]

➢ The Commission believes it is important to make clear in the statute itself that discrimination on the basis of perceived protected class status is unlawful: otherwise, an individual engaged in blatant discriminatory conduct would be excused if they happened to target someone in error.

### Sections 2, 4 and 5

The MHRA already bars discrimination in housing based on "familial status", which currently is defined as a familial unit containing one or more individuals under the age of 18 and which prohibits housing providers from denying housing to families with minor children.  LD 1688 would make two changes to

---

[3] The Policy section also reflects amendments made to the MHRA in 2019 to add a distinct MHRA definition for "gender identity" separate from the definition of "sexual orientation".  Gender identity already is protected under the MHRA, but is included in the definition of sexual orientation; this is confusing for two distinct reasons.  First, gender identity is not a type of sexual orientation, and should not be defined as such.  Second, because the text of the nondiscrimination provisions of the Act (as opposed to the definition section) refers only to sexual orientation, members of the public frequently do not comprehend that gender identity is protected under the MHRA.  This word change will make it easier for people to understand what the Act covers and prohibit. The Policy proposal here simply carries that definition forward by changing references to sexual orientation to "sexual orientation or gender identity".  This update is applied in many sections of the Bill, including 4, 5, 7, 8, 9, 10, 11, 12, 13, 14, and 16 - 19.

[4] The student's mother (for herself and the student) and the Commission filed suit against the school unit, alleging a hostile educational environment based on sex and perceived sexual orientation.  The case eventually resolved.  *See Doe et al. v. Brunswick School Department*, Docket No. 15-CV-00257-DBH, U.S. District Court for the District of Maine.

familial-status coverage: (a) expand the definition of familial status to include caring for a dependent adult; and (b) make familial status discrimination unlawful in the employment context as well as housing.

➢ *Section 2 would amend the definition of "familial status" to include care for a dependent adult*:
   o The proposed change would include in the definition of familial status a familial unit containing "[o]ne or more individuals who lack the ability to meet essential requirements for physical health, safety or self-care because the individual or individuals are unable to receive and evaluate information or make or communicate decisions".
   o This definition was drawn from the definitions section of the Adult Protective Services Act, and uses language which became effective 7/1/19.  *See* 22 M.R.S. § 3472(10) ("Incapacitated adult").
   o This change is intended to reflect the reality of today's families, which often include not only minor children, but elderly or incapacitated adults who require assistance from family members.  This is particularly true in Maine, with the oldest population in the country.
   o A person's need to care for dependent family members should not be used as a reason to deny them access to housing or employment, whether that care is required for a child or incapacitated adult.

➢ *Sections 4 and 5 would add "familial status" to the protected classes in employment*:
   o This change would prohibit employers from discriminating based on an employee's need to care for dependent family members, whether those are children or adults. This is not intended to create a new type of leave for workers[5], but rather is intended to stop employers from making stereotypical assumptions about employees with family care obligations.
   o An employer would <u>not</u> be required to excuse an employee from their work responsibilities; if an employee is unable to perform their work because of family responsibilities, they would still be subject to the employer's usual disciplinary process. The employer would not, however, be able to (for example) refuse to hire an applicant who lives with their disabled sibling based on the assumption that the applicant would need time off from work to care for their family member.
   o Again, this change is intended to reflect the reality of today's families, where employees are often responsible for minor children and incapacitated or elderly adults.

➢ The Commission notes that these changes are not a substantial change to the scope of the MHRA, but rather a change in terminology and an effort to make the Act clearer.
   o Whether in employment or housing, the sort of discrimination covered under "familial status" might also be alleged as discrimination based on association with an individual with a disability.  The Commission purposely chose the definition of "incapacitated adult" rather than "dependent adult" in an effort to balance the rights of caretakers and families against the rights of employers and housing providers.  *Compare* 22 M.R.S. § 3472(10) *with* § 3472(6).
   o As for employment discrimination on the basis of having minor children, many potential claims could already be covered based on sex (disparate impact claims: claims that neutral policies have the effect of discriminating on the basis of protected class) or age (association with minor child).

## Section 6

In 2019, the MHRA was updated in several places, both via agency bills that the Commission introduced and via other proposals.  One of the changes made in a Commission agency bill was the removal of

---

[5] With the federal Family and Medical Leave Act and its Maine counterpart already protecting employees who need time away from work to care for a newborn child or a sick family member, and this Legislature's action in 2019 requiring employers to provide earned paid leave, it would be understandable (but incorrect) for employers to warily view the proposal in LD 1688 as another attempt to build employee leave requirements.

5 M.R.S. § 4573-A(1-B), which had provided that employers did not have to employ individuals with disabilities who could not travel to and from and/or remain at the workplace.[6] The Commission initiated this amendment related to clarify a ruling by the Maine Supreme Judicial Court, sitting as the Law Court, that the statutory section in question meant that a leave of absence was not a potential reasonable accommodation for individuals with disabilities. *See Carnicella v. Mercy Hospital,* 2017 ME 161. The *Carnicella* decision, which arose in a case where an employee sought indefinite leave from employment, was inconsistent with the MHRA's protections, the Commission's longstanding interpretation of the MHRA that temporary or finite leave *could* be a reasonable accommodation, and the ADA. At the Commission's behest, the Legislature removed 5 M.R.S. § 4573-A(1-B) from the MHRA.

Unfortunately, the removal of § 4573-A(1-B) in its entirety had the unintended consequence of casting doubt on the continued existence of the employer's so-called "safety defense" that arose from the removed section. The removed language had been interpreted to permit employers not to hire/retain disabled individuals if the employer proved that the individual caused a risk to the health and safety of themselves or others. Because of this uncertainty, the Commission has proposed reinserting language spelling out the contours of the safety defense in the statute. This will promote clarity and consistency of interpretation of the MHRA.

### Sections 12-14

Places of public accommodation are privately- or publicly-owned places, privileges or services that are offered or open to the public. The MHRA currently does not prohibit discrimination on the basis of age in places of public accommodation, and there is no logical rationale for excluding people based on age from Maine's publicly-offered spaces, privileges, and services. The Commission believes that it is important to add this coverage, both to make the MHRA more consistently applicable throughout the State and to address an issue that is important to Maine's aging population. In 2019, 21.9% of Mainers were age 65 or older, and Maine had the largest share of population in that age group in the country. *See* https://www.census.gov/newsroom/press-releases/2020/65-older-population-grows.html. Maine continues to have the highest median age (44.7 years old) in the country. *See* https://worldpopulationreview.com/en/state-rankings/median-age-by-state.

### Section 15

Another 2019 update to the MHRA confirmed the Commission's longstanding interpretation that the MHRA bars discrimination because of a person's association with another person who is in a protected class by amending the 5 M.R.S. § 4553(1-D) definition of an "aggrieved person" who could bring a MHRA claim, and the proposal in Section 15 would update references in the Act's public accommodation section to reflect that.

---

[6] Under the framework of disability employment laws, a person with a disability is allowed to request that their employer change how a policy is applied if necessary because of the employee's disability, which leads to an interactive dialogue between employer and employee about the request, its reasonableness, and its relationship to the employee's disability. The Commission always has interpreted the MHRA to acknowledged that a *temporary* leave of absence can be a reasonable accommodation that allows an employee with a disability to address a disability issue and then to return to work. This is consistent not only with the purpose of the MHRA, but with other state law (such as the Maine Family Medical Leave Act) and federal employment laws like the federal Family and Medical Leave Act and the Americans with Disabilities Act ("ADA"). Whether *open-ended* leave can be a reasonable accommodation is another question altogether, and the Commission, again consistent with state and federal law. has repeatedly held that indefinite leave is not a reasonable accommodation.

This aligns with the Commission's longstanding interpretation of the MHRA coverage as including associational claims, an interpretation upheld by courts reviewing MHRA actions.[7] There are circumstances when a person who is not themselves in a protected class is targeted for discrimination in a place of public accommodation because they are associated with someone who is in a protected class. Some examples could include a person who is denied service at a restaurant because someone else in their party has a service animal, or a family which was turned away from staying at a hotel because the mother wore a hijab. The discrimination still occurs **because of** the protected class, so the 2019 amendment to the "aggrieved person" definition and the proposed amendment to the MHRA in Section 15 allow the associated person who also was impacted by the discrimination to bring a claim related to it.

The proposal in this section would simply make clear to all reading the Act that the Commission's interpretation applies in places of public accommodation.

### Section 19

The MHRA's current education coverage is woefully out of date, and inconsistent with the rest of the Act. The Act's education provisions currently prohibit discrimination on the basis of race (but not color), national origin (but not ancestry), sex and sexual orientation, and physical or mental disability. This is confusing for at least two reasons.

First, there is no reason to cover race and national origin, but not color and ancestry. These most likely were simply drafting oversights due to the piecemeal amendment process mentioned above.

Second, most Maine educational institutions are also covered as places of public accommodation[8], as the MHRA specifically includes a "nursery, elementary, secondary, undergraduate or postgraduate school or other place of education" and an "establishment of the State" in its "public accommodation" definition. As public accommodations schools also are prohibited from discriminating on the basis of color, ancestry and religion.[9] Because those prohibitions are not currently made explicit in the education provisions of the Act, however, students, parents, and schools may not know of this coverage.

This proposed change would make the Act clearer and more consistent.

### Sections 20-21

In 2019, the Legislature added a new subsection to 5 M.R.S. § 4612 which spelled out the Executive Director's previously implicit (although found in the Commission's rules) authority to administratively dismiss certain claims without the need for investigations, such as cases falling outside the Commission's limited jurisdiction, or cases in which the complaining party refuses to cooperate with the Commission's process. One

---

[7] For example, in May 2017, the Commission prevailed in litigation establishing that both a Caucasian woman and an African American man were discriminated against based on race when they were denied the opportunity to rent housing once the housing provider learned of the man's race by observing and speaking with their biracial children. *Maine Human Rights Commission et al. v. Megunticook Management and Realty Corp.*, KEN-CV-15-135 (Me. Super. Ct. Ken. Cty., May 15, 2017)(*Murphy, J*).

[8] Schools are also covered as employers, but this aspect appears to the Commission to be fully understood both by schools and by their employees.

[9] The MHRA specifically excludes from its definition of "educational institution" single-sex schools. See 5 M.R.S. § 4553(2-A). It also provides that the sexual orientation protections in education do not apply to education facilities owned, controlled or operated by a bona fide religious corporation, association or society. Id. at § 4602(4).

such reason for administrative dismissal is failure to file a claim within the Commission's 300-day statute of limitations.  *See* 5 M.R.S. § 4612(2-A)(C).  We have since learned that this change created some confusion with regard to the award of attorneys' fees and costs in subsequent court cases.  The Act provides that attorneys' fees are available only if the plaintiff establishes that they had previously filed a complaint with the Commission, which had taken on of several specific enumerated actions on their complaint; the changes to the Act in 2019 added administrative dismissal to that list of actions.  *See id.* at § 4622(1)(A).  The Commission did not intend to amend the act to allow the award of attorneys' fees to individuals who had failed to timely file their Commission complaint.  This result would leave complaining parties with no incentive to file a timely complaint with the Commission, since the failure to do so would have no consequence in court.  It would also undermine the Commission's function of screening and evaluating cases before litigation is initiated, which is intended to easy the burden on Maine's courts.  This revision addresses any misunderstanding about the impact of an administrative dismissal for failure to timely file with the Commission.

### Section 22

A 2019 amendment of the MHRA revised wording about pregnancy to be gender-neutral, so that the reference is to a pregnant person rather than to a pregnant woman. This change was made in recognition of the fact that individuals whose gender is male or nonbinary can be pregnant. The proposal in Section 22 related to the right of a person to breast-feed wherever they may lawfully be reflects that wording update.

### Conclusion

Thank you for this opportunity to provide testimony in support of LD 1688.  The Commission takes seriously its duty to protect the people of Maine from discrimination, and its duty to safeguard the MHRA itself, and approaches these substantive amendments after much consideration. We greatly appreciate the Committee's attention at this late date in the session, and would be pleased to discuss these issues with you at your convenience, including at the work session on this matter.

Sincerely,

Amy M. Sneirson, Executive Director

Barbara Archer Hirsch, Commission Counsel

# Exhibit 2

`Test New Bangor Christian Schools - Year: 2024-2025 - Grade: 09`

## 2024-25 PreK - 12 Enrollment Packet

## Enrollee Information

| | |
|---|---|
| **Student Name:** | Test (New) Bangor Christian Schools |
| **Street Address:** | **Required** |
| **City:** | **Required** |
| **State:** | |
| **Country:** | **Required** |
| **Zip:** | **Required** |
| **Student Date of Birth:** | 1/1/2001 |
| **Student SSN/SIN:** | |
| **Student Email Address:** | |
| **Student Home Phone:** | **Required** |
| **Student Cell Phone:** | |
| **Local School District of Residence:** | |
| **Local School:** | |
| **District County:** | |
| **District State:** | |
| **Gender:** | **Required** |
| **Student Ethnicity:** | **Required** |
| **Student Race:** | **Required** |
| **Student Citizenship:** | **Required** |
| **Primary Language Spoken at Home:** | **Required** |
| **Birth City:** | |
| **Birth State:** | |
| **Birth Country:** | |

## Religious Affiliation

| | |
|---|---|
| **Religious Affiliation:** | **Required** |
| **Current Church/Congregation:** | **Required** |
| **Phone:** | |
| **Street Address:** | |
| **City:** | |
| **State:** | |
| **Zip:** | |
| **Senior Pastor:** | |
| **Local Church/Parish Member?** | ○ Yes  ○ No **Required** |

## Household

**Home Address**

| | |
|---|---|
| **Street Address:** | **Required** |
| **City:** | **Required** |
| **State:** | |
| **Zip:** | **Required** |
| **Country:** | **Required** |
| **Home Phone:** | **Required** |
| **List Family in Directory?** | Yes |

**Military Connection?**
**Required**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| **First Parent / Guardian** | **Second Parent / Guardian** |
|---|---|
| | (leave blank if not applicable) |
| **Last Name:** **Required** | **Last Name:** |
| **First Name:** **Required** | **First Name:** |
| **Please Remove From** No | **Please Remove From** No |

Test New Bangor Christian Schools - Year: 2024-2025 - Grade: 09

| | |
|---|---|
| **Household?** | **Household?** |
| **Middle Name:** | **Middle Name:** |
| **Suffix:** | **Suffix:** |
| **Salutation:** Required | **Salutation:** |
| **Gender:** Required | **Gender:** |
| **Relationship to Enrollee:** Required | **Relationship to Enrollee:** |
| **Custodial Rights?** Required | **Custodial Rights?** |
| **Financial Responsibility?** Required | **Financial Responsibility?** |
| **Receive Correspondence?** Required | **Receive Correspondence?** |
| **Marital Status:** Required | **Marital Status:** |
| **Email Address 1:** | **Email Address 1:** |
| **Email Address 2:** | **Email Address 2:** |
| **Work Phone:** | **Work Phone:** |
| **Cell Phone:** Required | **Cell Phone:** |
| **Occupation:** | **Occupation:** |
| **Job Category:** | **Job Category:** |
| **Employer:** | **Employer:** |
| **Employer Address:** | **Employer Address:** |
| **Employer City:** | **Employer City:** |
| **Employer State:** | **Employer State:** |
| **Employer Zip:** | **Employer Zip:** |
| **Religious Affiliation:** | **Religious Affiliation:** |
| **Current Church/Congregation:** | **Current Church/Congregation:** |

| | |
|---|---|
| **Highest Level of Education:** | **Highest Level of Education:** |
| **Year:** | **Year:** |
| **School Name:** | **School Name:** |
| **Degree:** | **Degree:** |

## Grandparents

Will you give us as much grandparent information as possible so that we can include them in information about student activities?

 Yes  No

## Emergency Contacts and Authorized Pickup

**Emergency Contacts:** In addition to the parents, please list persons we may contact in the event of an emergency.

**Authorized Pickups:** In addition to the parents, please indicate persons authorized to pick up this student.

## Medical Information

| | |
|---|---|
| **Doctor:** Required | |
| **Phone:** Required | |
| **Address:** | |
| **Hospital:** Required | |

| | |
|---|---|
| **Dentist:** | |
| **Phone:** | |
| **Address:** | |

| | |
|---|---|
| **Company:** Required | |
| **Policy:** Required | |
| **Group:** Required | |

`Test New Bangor Christian Schools - Year: 2024-2025 - Grade: 09`

**Permission To Treat:** In case of an emergency or accident, I desire to be contacted. If I cannot be reached, permission is granted to Bangor Christian Schools' officials to care for my child according to the seriousness of the case. I would prefer my child be taken to the hospital designated, if at all possible.

○ Yes  ○ No  **Required**

---

Medical/health conditions include Asthma, Diabetes, Heart Condition, Seizures, etc.

Does the student have any medical conditions?

○ Yes  ● No

---

Allergies include Insect Bites, Food, Medications, Seasonal, etc.

Does the student have any allergies?

○ Yes  ● No

**Is your child a returning student?**

○ *Yes*  ○ *No*
**Required**

Please upload your student's current immunization records or have your doctor's office fax them.  (207-262-9528)

# Student Driver Authorization

Will this student drive a car to school?

○ Yes  ○ No

**Required**

# Media Release

**Bangor Christian Schools on occasion will advertise in newspapers, brochures, flyers, or posters to promote the school. Candid pictures (or videos) are taken of our students at various times throughout the year to show student life at the school, and sometimes we use the pictures (or videos) in our advertising. I give permission to use pictures (or videos) of my child for this purpose, if the need arises:**

○ *Yes*  ○ *No*
**Required**

☐ Check here for Parent/Guardian Signature    Name: **Required**    Date: **Required**

# Handbook Acknowledgement

We have read and understand the entire contents of the Student/Parent Handbook, and we are willing to abide by all of the principles stated therein. We understand that my child will be subject to dismissal from school for violation of the discipline code in regard to the use of drugs (including tobacco and alcohol), immorality, or for possession or distribution of pornography or lewd materials. We also understand that attendance at Bangor Christian Schools is a privilege and not a right. We understand that the school may request withdrawal at any time, if in the opinion of the school, my child does not fit into the spirit of the institution, regardless of whether he/she conforms to the specific rules and regulations. We understand any non-factual information submitted on this application may lead to dismissal of my child. It is our prayerful desire to contribute positively to the spirit of Bangor Christian Schools and to lead a life pleasing to the Lord.

☐ Check here for Parent/Guardian Signature    Name: **Required**    Date: **Required**

☐ Check here for Student Signature    Name: **Required**    Date: **Required**

# Colleges and Military Recruiters Release

Test New Bangor Christian Schools - Year: 2024-2025 - Grade: 09

The No Child Left Behind Act requires secondary schools to provide students' names, addresses, and telephone numbers to both military recruiters and institutions of higher education, upon request. Parents and legal guardians of students, however, have the right to request that the school not release such information without prior written parental consent.

**The purpose of this notice is to inform you of this law and to provide you the opportunity to request that information about your child NOT be released to either military recruiters or institutions of higher education.** To prevent the release of information, you must inform us. If you do not inform us otherwise, we will be required by federal law to disclose your child's name, address, and telephone number to military recruiters and institutions of higher education that request this information.

**I am the parent or legal guardian. Please DO NOT release my child's name, address, or telephone number to the following without my prior written consent (check one or both):**

Check here for Parent/Guardian Signature   Name: **Required**   Date: **Required**

# FACTS Tuition

Payment method selection has not yet been made.

# Document Upload

Please submit the following documentation either directly to the school or by uploading here. If you will be uploading the document(s), you must upload prior to submitting the enrollment packet. You will be unable to come back and upload after the enrollment packet has been submitted.

**Birth Certificate, required for new students**

**Health Information and Immunization Record**

**Medication Permission Form, if applicable**

**Court/Custody Documents, if applicable**

# Electronic Signature Page

**Electronic Signature**

The electronic signatures below and their related fields are treated by Bangor Christian School like a physical handwritten signature on a paper form.

**Agreements**

My signature below affirms that all of the information contained in this enrollment packet is correct, complete, and honestly presented. I understand that withholding or misrepresenting information in this packet may jeopardize my child's enrollment.

Check for electronic signature **Required**   Name: **Required**   Date:

Exhibit 3

# BANGOR CHRISTIAN SCHOOLS



## Student Handbook

*Revised 8/15/22*

# TABLE OF CONTENTS

QUICK LINKS ................................................................................................................iv
INTRODUCTION ........................................................................................................... 1
HISTORY OF BANGOR CHRISTIAN SCHOOLS ..................................................... 1
MISSION AND VISION ............................................................................................. 1
FACILITIES .............................................................................................................. 1
SCHOOL COLORS, MASCOT AND SONG ............................................................. 2
STATEMENT OF FAITH ............................................................................................... 3
DOCTRINE ............................................................................................................... 3
CULTURAL ISSUES ................................................................................................. 4
OBJECTIVES IN EDUCATION ..................................................................................... 6
ADMISSIONS ............................................................................................................... 7
FINANCIAL INFORMATION .......................................................................................... 9
REGISTRATION ....................................................................................................... 9
TUITION ................................................................................................................... 9
FAMILY PLAN .......................................................................................................... 9
FINANCIAL AID ....................................................................................................... 9
ACADEMICS .............................................................................................................. 10
CURRICULA .......................................................................................................... 10
PRE-KINDERGARTEN & KINDERGARTEN ....................................................... 10
ELEMENTARY ................................................................................................... 10
MIDDLE SCHOOL .............................................................................................. 11
HIGH SCHOOL .................................................................................................. 11
HOMEWORK ......................................................................................................... 13
GRADING .............................................................................................................. 13
REPORTING ...................................................................................................... 13
GRADING SCALE .............................................................................................. 14
GRADUATION – HIGH SCHOOL ........................................................................... 15
REQUIREMENTS .............................................................................................. 15
VALEDICTORIAN/SALUTATORIAN ................................................................... 16
PROMOTION – ELEMENTARY/MIDDLE SCHOOL ................................................ 16
CONDUCT AND DISCIPLINE ..................................................................................... 17
PURPOSE AND PHILOSOPHY OF DISCIPLINE ................................................... 17
CONDUCT .............................................................................................................. 17
HARASSMENT ...................................................................................................... 17
DISCIPLINARY PROCEDURES AND EXPECTATIONS .......................................... 17
DISCIPLINE LEVELS ......................................................................................... 18
ELEMENTARY SCHOOL ................................................................................... 20
MIDDLE SCHOOL .............................................................................................. 20
HIGH SCHOOL .................................................................................................. 20
SUSPENSION / EXPULSION ............................................................................. 21

i

DRESS CODE ............................................................................................ 22
**basic guidelines for appropriate dress** ........................................................ 22
   **ACCEPTABLE** ................................................................................... 23
   **NOT ACCEPTABLE** ........................................................................... 23
Ladies ...................................................................................................... 23
Gentlemen ................................................................................................ 23
  CHEATING/PLAGIARISM ..................................................................... 24
  CLASSROOM BEHAVIOR ..................................................................... 24
  HALLWAY BEHAVIOR ........................................................................... 24
  LOITERING AND OFF LIMIT AREAS ..................................................... 24
  PROHIBITED ARTICLES ....................................................................... 25
  WITHDRAWAL AND DISMISSAL .......................................................... 25
GENERAL POLICIES AND PROCEDURES ............................................... 25
  ACADEMIC ........................................................................................... 25
   PARENT - TEACHER CONFERENCES .............................................. 25
   ATTENDANCE .................................................................................. 26
   MAKE-UP WORK .............................................................................. 27
   TEXTBOOKS .................................................................................... 27
  ADMINISTRATIVE ................................................................................. 27
   FERPA LAWS ................................................................................... 27
   STAFF CONDUCT WITH STUDENTS…………………………………………28
   SCHOOL DAY ................................................................................... 28
   TARDINESS ...................................................................................... 29
   EARLY DISMISSAL DAYS ................................................................. 30
   EARLY/LATE SUPERVISION ............................................................ 30
   LEAVING EARLY ............................................................................... 30
   INCLEMENT WEATHER - SCHOOL CLOSING .................................. 30
   COMMUNICATION ............................................................................ 30
   PHILOSOPHY OF FUNDRAISING ..................................................... 31
   SOLICITATION ................................................................................. 31
   CELL PHONE POLICY ...................................................................... 32
   OFFICE TELEPHONE ....................................................................... 32
   VISITS TO THE SCHOOL .................................................................. 32
   GUEST STUDENTS .......................................................................... 32
   GUEST SPEAKERS .......................................................................... 32
   PROMOTION .................................................................................... 33
   SCHOOL SPONSORED EVENTS ...................................................... 33
  SOCIAL ................................................................................................. 33
   SOCIAL NETWORKING SITES .......................................................... 33
   MEDIA .............................................................................................. 33
   PUBLIC DANCES ............................................................................. 33
  HEALTH AND SAFETY .......................................................................... 33
   HEALTH SERVICE ............................................................................ 33

HEALTH SCREENINGS ................................................................. 34
PRESCRIPTION MEDICATION ...................................................... 34
OVER THE COUNTER MEDICATION .............................................. 34
STUDENT IMMUNIZATIONS ......................................................... 34
ASBESTOS ................................................................................ 35
PEST CONTROL ......................................................................... 35
EMERGENCY EVACUATION .......................................................... 35
AUTOMOBILES AND STUDENT DRIVERS ...................................... 36
DROP OFF AND PICK UP ............................................................. 36
PROGRAMS AND SERVICES ......................................................... 35
RIGHTS OF CHILDREN AND PARENTS FOR CHILD CARE FACILITIES ................. 35
CHAPEL ................................................................................... 37
COMPUTER AND INTERNET USE ................................................. 37
ATHLETICS ............................................................................... 39
FINE ARTS ................................................................................ 41
FIELD TRIPS AND CHAPERONES ................................................. 41
GYMNASIUM ............................................................................. 41
HOLDING AN OFFICE ................................................................. 42
LOCKERS .................................................................................. 42
LOST ARTICLES ......................................................................... 42
LUNCH ..................................................................................... 42
CLOSING STATEMENT ................................................................. 42
STUDENT AND PARENT STATEMENT OF COOPERATION .................. 43

JA81

# QUICK LINKS

To help you navigate this manual efficiently, the following links will take you to the sections that are most commonly used throughout the school year.  On the digital version of this manual, press CTRL and click the link to move directly to that section.

MISSION AND VISION

STATEMENT OF FAITH
       DOCTRINE
       CULTURAL ISSUES

OBJECTIVES IN EDUCATION

ADMISSIONS

TUITION

ACADEMICS
       PRE-KINDERGARTEN & KINDERGARTEN
       ELEMENTARY
       MIDDLE SCHOOL
       HIGH SCHOOL

CONDUCT AND DISCIPLINE
       DISCIPLINE LEVELS
       SUSPENSION / EXPULSION
       DRESS CODE

GENERAL POLICIES AND PROCEDURES
       ACADEMIC
       ADMINISTRATIVE
       CELL PHONE POLICY
       COMPUTER AND INTERNET USE

STUDENT AND PARENT STATEMENT OF COOPERATION

# INTRODUCTION

## HISTORY OF BANGOR CHRISTIAN SCHOOLS

Bangor Christian Schools was founded in 1970 as a ministry of Bangor Baptist Church.  The school is now into its fifth decade of training young men and women to serve the Lord.  At its inception, the school consisted of 85 students and three faculty members in a rented building on French Street.  The Lord's blessings are evidenced by its growth and stability over the years.

## MISSION AND VISION

The **mission** of Bangor Christian Schools is to assist families in educating the whole child by encouraging spiritual maturity and academic excellence in a supportive environment. Our final authority in all matters is the Word of God.

Our **vision** is to help students discover God's plan for their lives and to equip them to be successful on whatever path He is leading them.

## FACILITIES

Bangor Christian Schools is situated on a spacious 35 acre campus.  Four buildings provide the facilities needed for operating.

   A.   The main church building contains the church sanctuary, pastoral offices, business offices, elementary classrooms, elementary office, a gymnasium, athletic director's office, locker rooms, music rooms, and cafeteria.
   B.   The brick building contains the main office, Headmaster's office, Assistant Principal's office, four middle school classrooms, science lab, and the library.
   C.   The high school building contains seven high school classrooms, a computer laboratory, and the Principal's office.
   D.   The Trudy Wilson Thrive Center is used for chapel services and other middle and high school activities.

In addition to the gymnasium in the main church building, athletic grounds include a regulation soccer field, middle school soccer field, baseball field, softball field, middle school cross country course, and an elementary playground.

**BANGOR CHRISTIAN SCHOOLS IS A SMOKE FREE CAMPUS.**

## SCHOOL COLORS, MASCOT AND SONG

Colors: Red, White, and Blue

Mascot: Patriots

Song:

V is for victory, sing it out, tis a glorious word.

V is for victory, it is ours through Christ our Lord.

Some days may be dark and drear,

In Christ our way's all clear,

For we have Victory, Victory in Christ our Lord.

V-I-C-T-O-R-Y

V-I-C-T-O-R-Y

V-I-C-T-O-R-Y

Victory!

Victory!

Victory!

2

# STATEMENT OF FAITH

<u>DOCTRINE</u>

A.  We believe the Bible to be without error as recorded in the original manuscript. The Bible reveals God, the spiritual separation of man from God, the way of salvation, and how to have a personal relationship with God. (II Tim. 3:15-16; II Peter 1:20-21)

B.  We believe the one, true God reveals Himself in three distinct persons: God the Father, God the Son, and God the Holy Spirit. All three are co-eternal, co-powerful, and co-equal. (I John 5:7)

C.  We believe that Jesus Christ is the Son of God, born of the virgin Mary. He lived a life without sin and is our example. (I Peter 2:21-25)

D.  We believe salvation (a personal relationship with God) is by "grace," plus nothing and minus nothing. This salvation is found only by receiving Jesus Christ into your life. Salvation is by repentance and faith (truly being sorrowful for your sins, confessing that Jesus Christ died for your sins, and inviting Him into your life). (Eph.2:8-9; Titus 3:5-7)

E.  We believe in the visible and personal return of Jesus Christ. (I Thess. 4:16-17)

F.  We believe that those who receive Jesus Christ will go to Heaven and those who reject Him will be separated from the Lord forever. (Rev. 20:10-15)

<u>CULTURAL ISSUES</u>

In recent years, certain biblical issues that are not necessarily "doctrinal" in nature have become the focus of litigation against Christians, churches, and Christian schools. This section serves to inform parents and students of Bangor Christian Schools about our position on such matters. These topics may or may not be explicitly taught in the classroom environment, but they are relevant to the Christian worldview that we promote.

*Love*
A.   We believe that we should demonstrate love for others, not only toward fellow believers, but also toward those who are not believers, those who oppose us, and those who engage in sinful actions. We are to deal with those who oppose us graciously, gently, patiently, and humbly. God forbids the stirring up of strife, the taking of revenge, or the threat or use of violence as a means of resolving personal conflict or obtaining personal justice. Although God commands us to abhor sinful actions, we are to love and pray for any person who engages in such actions. (Lev. 19:18; Matt. 5:44-48; Luke 6:31; John 13:34-35; Rom. 12:9-10; 17-21; 13:8-10; Phil. 2:2-4; 2 Tim. 2:24-26; Titus 3:2; I Peter 3:8-9; 1 John 3:17-18)

*Protection of Children*
B.   We believe that children are a heritage from the Lord and must be absolutely protected within the school from any form of abuse or molestation. The school has zero tolerance for any person, whether paid staff, volunteer, member, or visitor, who abuses or molests a child. (Ps. 127:3-5; Matt. 18:6; Matt. 19:14; Mark 10:14)

*Marriage and Sexuality*
C.   We believe that the term "marriage" has only one, legitimate meaning, and that is marriage sanctioned by God, which joins one man and one woman in a single, covenantal union, as delineated by Scripture. Whenever there is a conflict between this definition and any new legal standard for marriage, our statement of faith, doctrines and biblical positions will govern. (Gen. 2:24; Eph. 5:22-23; Mark 10:6-9; I Cor. 7:1-9)

We believe that God has commanded that no intimate sexual activity be engaged in outside of marriage as defined above. We believe that any other type of sexual activity, identity or expression that lies outside of this definition of marriage, including those that are becoming more accepted in the culture and the courts, are sinful perversions of and contradictory to God's natural design and purpose for sexual activity. (Gen. 2:24; Gen. 19:5; Lev. 18:1-30; Rom. 1: 26-29; 1 Cor. 5:1; 6:9-10; 1 Thess. 4:1-8; Heb. 13:4)

We believe that God designs each individual in his or her mother's womb (Psalm 139: 13,14). Therefore, each individual should cherish God's design because his deeds are perfect (Deut. 32:4). Any deviation from the sexual identity that God created will not be accepted.

*Family Relationships*

D.   We believe that men and women are spiritually equal in position before God but that God has ordained distinct and separate spiritual functions for men and women in the home and the church. The husband is to be the leader of the home, and men are to be the leaders (pastors and elders) of the church. (Gal. 3:28; Col. 3:18; 1 Tim. 2:8-15; 3:4-5, 12)

We believe that God has ordained the family as the foundational institution of human society. The husband is to love his wife as Christ loves the church. The wife is to submit herself to the Scriptural leadership of her husband as the church submits to the headship of Christ. Children are a wonderful gift and heritage from the Lord. Parents are responsible for teaching their children spiritual and moral values through consistent lifestyle example and appropriate training and discipline. Bangor Christian Schools seeks to support such teaching. (Gen. 1:26-28; Ex. 20:12; Deut. 6:4-9; Ps. 127:3-5; Prov. 19:18; 22:15; 23:13-14; Mk. 10:6-12; 1 Cor. 7:1-16; Eph. 5:21-33; 6:1-4; Col. 3:18-21; 1 Pet. 3:1-7)

*Divorce and Remarriage*

E.   We believe that God disapproves of and forbids divorce except on the grounds of adultery. (Mal. 2:14-17; Matt. 19:3-12; Mark 10:11-12; Rom. 7:1-3; I Tim. 3:2, 12; Titus 1:6; I Cor. 7:10-16)

*Abortion*

F.   We believe that human life begins at conception and that the unborn child is a living human being. Abortion is murder and constitutes the unjustified, unexcused taking of unborn human life. (Job 3:16; Ps. 51:5; 139:13-16; Isa. 44:24; 49:1, 5; Jer. 1:5; 20:15-18; Luke 1:36, 44)

*Euthanasia*

G.   We believe that an act or omission which, of itself or by intention, facilitates premature death, is assuming a decision that is to be reserved for God. We do not believe that discontinuing medical procedures that are extraordinary or disproportionate to the expected outcome is euthanasia. (Ex. 20:13; 23:7; Matt. 5:21; Acts 17:28)

# OBJECTIVES IN EDUCATION

A.    To lead each unsaved student to trust Christ as his/her personal savior and then to follow Christ as Lord of his/her life.

B.    To instill in each student a love for God and a personal sense of responsibility to be all God wants him/her to be.

C.    To direct each student in the process of developing Christ-like character and actions.

D.    To instill in each student love and honor for home and parents.

E.    To prepare each student to be successful as measured by God's standards and not the world's.

F.    To prepare each student for the important position in life of spiritual leadership in school, home, church, community, state, nation, and the world.

G.    To develop within each student a sense of responsibility as a Christian citizen.

H.    To develop within each student a Christian world view and Christian philosophy of life.

 I.    To develop within each student an appreciation and understanding of God's world and how to live productively in his environment.

J.    To provide each student opportunities for developing skills necessary for their future careers.

K.    To develop within each student a moral, ethical, and spiritual sense that will lead to an appreciation of his/her own personal worth to God and that of others.

L.    To teach each student to take responsibility for his/her actions and words and the choices he/she makes.

M.    To offer each student an instructional program that is centered in God's Word and meets his/her academic needs.

N.    To teach each student the thinking skills that will enable him/her to meet intellectual challenges.

O.    To motivate each student to master the tools of learning and communication.

P.    To provide each student opportunities to develop an understanding of and appreciation for the arts as well as contributing to them.

Q.    To offer opportunities to participate in wholesome forms of recreation and social activities.

# ADMISSIONS

Bangor Christian Schools adheres to and supports the historical truth claims and moral foundations of Christianity. As outlined above, this includes, but is not limited to, the biblical definition of marriage, sexuality and moral conduct, and the clear biblical teaching that gender is both sacred and established by God's design. Parents or the legal guardians, who choose to enroll their children at our school, are agreeing to support these and other basic biblical values derived from historical Christianity and the relevant Christian positions embraced by Crosspoint Church. Parents understand and agree that Bangor Christian Schools will teach these principles and biblical values.

Bangor Christian Schools does not discriminate in its practices against any person because of race, color, national or ethnic origin, gender, age, or disability.

Bangor Christian Schools will consider admission for students from any family who, despite their religious background or beliefs, is willing to support our philosophy of Christian education, student conduct requirements, and the above-stated positions and who is willing to allow their children to be educated and influenced in an intentionally Christian environment. Continued enrollment at Bangor Christian Schools is contingent upon this same understanding and support.

Parents who wish to enroll their children in Bangor Christian Schools for the first time are required to submit an application with the registration fee.  The full amount of the registration fee must accompany the application in order for it to be accepted for processing.  Parents who wish to re-enroll their children at Bangor Christian Schools need only fill out a re-enrollment form and submit it with the registration fee for a place to be reserved for the next school year.

Before being accepted as a student at Bangor Christian Schools, the student and his/her parent(s) will take part in an interview with an administrator. Students will be admitted based on the following criteria:

  A.   The student has demonstrated the ability to profit from normal school instruction.
  B.   The student has shown a behavior pattern reflecting a desire for an education and is in agreement with school policies.
  C.   The parents express an understanding of the school's philosophy (including Statement of Faith and Objectives in Education) and are willing to have their children trained in accordance with this philosophy.

It may be necessary for a student to take an entrance exam to determine the appropriate grade status.  The decision to test a student will be made by the administration upon receipt of the student records and the student interview. All high school students are given a math placement test.
**All parents** are required to sign the Parent's Statement of Cooperation included in the online application.

**Students in grade 4 - 12** must sign the Student's Statement of Cooperation included in the online application.

**No student is admitted or allowed to remain in Bangor Christian Schools who does not agree and cooperate with the overall purpose and program of the school as set forth in this handbook.**

8

# FINANCIAL INFORMATION

REGISTRATION

Registration for the school year is in two parts.  In-house registration for students currently enrolled is during the month of March.  All other applications are received and processed beginning in April.

TUITION

One of these plans can be used for the payment of tuition.
   A.    Twelve monthly payments due each month—first payment due June 20th.
   B.    Ten monthly payments due each month—first payment due August 20th.
   C.    Two equal payments due at the beginning of each semester.
   D.    Four equal payments due at the beginning of each academic quarter.
   E.    One payment due at the beginning of the school year.

If a student is withdrawn from the school at any point before the completion of the school year, the family is only responsible to pay tuition for the numbers of days that the student attended Bangor Christian Schools.

FAMILY PLAN

In an effort to alleviate some of the strain put on large families by the tuition costs, Bangor Christian Schools offers the Family Plan to families that have three or more students enrolled in BCS at the same time: first and second student(s) – full tuition; third student – half tuition plus 5% book fee; fourth student – 5% book fee.  Tuition for students in grades 7 - 12 is counted first and then tuition for elementary students is considered.

FINANCIAL AID

- There is a limited amount of financial aid available to returning families who have registered their children at Bangor Christian Schools.  Financial aid applications can be downloaded from the website or in the main office. The applications should be returned to the main office by June 10. Financial aid is awarded to families based on need, without regard to race, sex, color, religion or national origin.

- Church member discounts and alumni discounts are available for families enrolling their children in Bangor Christian for the first time.

- The Azure Dillon Scholarship is available for rising seniors with financial need.

- The Bill Prest scholarship is available to Middle and High School students with at least an 85% academic average and a commendable behavior record. Parents fill out an application and the students must write an essay as described on the application. The student is required to have two letters of recommendation: one from a teacher, one from his/her pastor.

9

# ACADEMICS

<u>CURRICULA</u>

**PRE-KINDERGARTEN & KINDERGARTEN**
Both programs are designed to prepare the students spiritually, socially, and academically.  The pre-kindergarten program teaches children a well-rounded readiness program enriched by music, art, and physical activities within the classroom and in the community through various educationally enriching trips.  Bible stories and memory verses are taught in both programs. Music and PE are activities kindergarten students enjoy weekly. The kindergarten program is designed to develop beginning reading, writing, and thinking skills and includes and introduction to science and social studies through hands-on activities.

**ELEMENTARY**

*BIBLE*
Bible is graded as an academic subject.  The grade is based upon assessment of memorization of scripture, concepts of lessons, and participation in the class.

*READING*
Reading is the foundational course in the elementary grades and is based upon an approach which incorporates phonics and a variety of reading strategies designed to improve both fluency and comprehension.  Students are exposed to a variety of instructional texts and literature which support our Christian values.

*LANGUAGE ARTS*
The language arts curriculum includes grammar, spelling, penmanship, study skills, and the writing process.  Teachers integrate materials in each of the areas to promote students' development of effective communication skills.

*MATHEMATICS*
Our curriculum includes instruction in math concepts, computation, and problem solving, using hands-on lessons and providing practice to develop automaticity in math facts.

*SOCIAL STUDIES*
Patriotism is an integral part of the social studies curriculum in each grade. History and geography are taught from a Biblical perspective.  United States History is taught each year through Grade 4, Maine history is also a focus in grade four, and Old world history and geography are taught in grade five.

*SCIENCE*
Science is taught in all grades.  The materials used for instruction have been selected for their emphasis on creation.  Health is integrated into the science curriculum in all grade levels.

*PHYSICAL EDUCATION, ART, MUSIC, AND BAND*
Physical Education and music are offered weekly to students in kindergarten through grade 5. Weekly art instruction is offered to students in grades 1 to 5.  Private music lessons for voice or instrument are available on site for a fee.

ACCELERATED MATH CLASSES
If a child moves up a year in math because he/she has shown above average math skills, taking Algebra I in middle school, he/she will be required to take Geometry, Algebra II, and Pre-calculus at BCS. The reason that we allow students to move up is to allow them to take higher level math classes in high school. They can then choose to take another math either at BCS or as a Dual Enrollment class during their senior year.

**MIDDLE SCHOOL**
Middle school students continue a program of general studies initiated in the elementary grades. The required course of study, which should adequately prepare the student for the rigors of high school work, is as follows:

- Bible
- English/Literature
- Mathematics
- Science
- History/Geography
- Physical Education
- Computer and Advanced Computer
- Art (Elective)
- Band (Elective)
- Chorus (Elective)

**HIGH SCHOOL**
The primary academic emphasis at Bangor Christian Schools is college preparation.  Students' schedules are worked out by the administration to assure each student of completing satisfactory work for graduation.

Students planning to attend college should write to the college of their choice for information about the admission requirements.  Students are to plan their study program with the administrator to assure fulfillment of particular college entrance requirements.

All summer school and external credits must be approved in advance by the administration for any student.  Students are not allowed to take any external credits unless all core courses have been fulfilled.

High School students may participate in the <u>Honors Diploma program</u> if they maintain at least a 90% in all subjects. All subjects may be taken as honors levels courses. These courses require extra work. Honors Diploma students must participate in service projects and attend outside seminars. They also must complete a senior capstone project.

COURSE OPTIONS

- Bible
- Language Arts
  - English
  - Grammar/World Literature
  - American Literature
  - Language and Composition
  - Advanced Placement Language and Composition
  - British Literature
  - Speech
- Mathematics
  - Pre-Algebra
  - Algebra I
  - Algebra II
  - Geometry
  - Pre-Calculus
  - Advanced Placement Calculus
  - Advanced Placement Statistics
  - Consumer Math
- Foreign Language
  - Spanish I
  - Spanish II
  - Spanish III
- Physical Education
- Science
  - Health
  - Physical Science
  - Biology
  - Chemistry
  - Physics
  - Anatomy & Physiology
- History
  - World History/Geography
  - Government
  - U.S. History
  - Economics/Current Events
- Computer
  - Keyboarding/Microsoft Office
  - Advanced Computer
- Music
  - Chorus
  - Band
  - Private lessons available
  - Music Theory
  - Ensemble
- Art

*HIGH SCHOOL CREDITS*

Students in grades 9 - 12 earn credits toward graduation based on the following criteria:

A. Each course which meets five days per week for a full period each day will earn 1 credit per year.

B. Classes that meet at least two times per week for a full period each day will earn a ½ credit per year.

C.  Credits are computed on the basis of the final grade for the year.

D.  **At least five academic subjects must be taken <u>each</u> year for four years.**  The exception to this will be for students taking vocational courses at another location.

E.  BCS has a two week drop/add period at the beginning of each school year in which no indication will be made on their transcript if a course is dropped.  Any student who withdraws from a course will receive a WP (withdrew passing) if the course is dropped while the student is receiving a passing grade.  If a student withdraws from a course after the specified drop/add period and is failing the course, a WF (withdrew failing) will be entered onto the transcript.

## <u>HOMEWORK</u>

Homework is a part of Bangor Christian Schools' academic emphasis.  Homework is given by classroom teachers for specific purposes including:

A.  For practice - following classroom explanation, illustration, and drills on new work.  It is given so that the material will be learned.

B.  For drill - drills help the student master and retain material that has already been presented in class.

C.  For remedial activity - homework is sometimes given to help a student improve weak areas within his grasp of the subject matter.

D.  For special projects - book reports, compositions, research assignments, and projects enable the student to apply the materials learned.

Each student is expected to complete the assigned homework.  Partial credit (or no credit) may be given for any assignment which is incomplete or not completed on time.

Because many of our families attend churches that have Wednesday night services, **Bangor Christian Schools does not assign homework on Wednesday nights**. In the high school grades, students may be assigned one test on Thursdays, but they will be given advance notice to minimize study required on Wednesday nights.

## <u>GRADING</u>

### REPORTING

The purpose of the reporting system is to give parents and students an accurate indication of the progress, or lack of progress, being made.  Grades are available to the parents and the students

through an online program.  Grading quarters are listed on the school calendar.  Final report cards are mailed home after the completion of the school year.

Student records are collected and maintained to promote the instruction, guidance, and educational progress of each student, and for legitimate educational research.  Parents have the right to inspect and review any and all official records, files, and data directly related to their own children.  Also, parents are allowed to make copies of materials contained in their child's records at their own expense.  A complete statement of policy pertaining to the Family Educational Rights and Privacy Act is available in the main office.

## GRADING SCALE

*PRE-KINDERGARTEN – 2nd Grade*
Students in 4-year-old kindergarten through grade 2 receive progress reports with a letter code to indicate the standing in academic areas as well as behavior and work habits.

| | |
|---|---|
| O | Outstanding |
| VG | Very Good |
| G | Good |
| S | Satisfactory |
| SI | Still Improving |
| NI | Needs Improvement |
| NA | Not Applicable |
| BE | Below Grade Level |
| AT | At Grade Level |
| AB | Above Grade Level |

*ELEMENTARY AND SECONDARY*

| | |
|---|---|
| A | 93 – 100 |
| B | 85 –  92 |
| C | 75 –  84 |
| D | 70 –  74 |
| F |  0 –  69 |
| I | Incomplete |

*HONOR ROLL*
Each nine week grading period Bangor Christian Schools publishes an Honor Roll of students whose academic work is outstanding or commendable.  All **elementary and secondary students** qualify for honor roll if their overall average is 85 or better, and they have no incomplete or failing grades at the time of the computation of the honor roll.  **Secondary students** with an A average (93 - 100) will be given High Honors.  Students with a B average (85 - 92) will receive Honors.

<u>GRADUATION – HIGH SCHOOL</u>

**REQUIREMENTS**

To graduate from Bangor Christian Schools, a student must demonstrate the ability to function in a manner that is in agreement with the philosophy of BCS.  Students must earn a minimum of 20 credits to graduate.  Seniors are not permitted to march in the commencement exercises if they lack more than one credit for graduation.  Arrangements have to be made to earn the one credit in an approved summer program before the student may march.  Bangor Christian Schools is not responsible for the inconvenience caused by a senior's failing courses during the last days of school.

The specific minimums in certain subject areas are as follows:

| | | |
|---|---|---|
| Bible | 4 | credits (or 1 credit for each year at BCS) |
| Language Arts | 4 | credits |
| Mathematics | 3 | credits* |
| Science | 3 | credits* |
| Social Studies | 3 | credits |
| Computer | 1 | credit |
| Phys. Education | 1 | credit |
| Health | ½ | credit (beginning with Class of 2010) |
| Foreign Language** | | |

*It is highly recommended that students planning to attend college take either 4 math credits or 4 science credits or 4 credits of both math and science.

**BCS highly recommends that students who plan on attending a four year college take two years of a foreign language.

Bangor Christian Schools' administration at times approves an early graduation after three years of high school.  To qualify for early graduation, a student must receive administrative approval prior to the third year of high school, earn a minimum of 22.5 credits and meet the following requirements:

| | | |
|---|---|---|
| Foreign Language | 2 | credits (same language) |
| Mathematics or Science | 1 | credit (additional) |
| Bible | 1 | credit (additional) |

JA97

**VALEDICTORIAN/SALUTATORIAN**

The valedictorian is the senior that has the highest grade average in the class at the end of the third quarter of his senior year.  The salutatorian is the senior that has the second highest grade average in the class at the end of the third quarter of his senior year.  Ranking of the seniors is based on all four years of full credit courses in high school.  To qualify to be valedictorian or salutatorian a student **must have attended four semesters at BCS**, and have taken courses that are comparable to the courses of a college preparatory program.  All courses completed outside of BCS are to be reviewed and approved by the administration.

<u>PROMOTION – ELEMENTARY/MIDDLE SCHOOL</u>

Promotion or retention of students in the elementary and middle school will be based upon achievement as measured by the teacher and standardized tests.  Students will be promoted when they have demonstrated the capability to profitably learn at the next grade level.

<u>SPECIAL NEEDS STUDENTS</u>

Bangor Christian Schools does not have a special education department. However, we do accept students with I.E.P.'s and 504 plans when we can meet their needs through accommodations and limited specialized instruction. The principal and school counselor review student records, educational plans, and evaluations when meeting with the parents to determine if we can meet the student's needs. Our school partners with the Bangor School Department using the Child Find process to determine if a student should be evaluated. Students who qualify for I.E.P.'s in the public school system are provided with an I.S.P. (Individual Service Plan) at our school. Through this plan students receive specific services from the Bangor School Department based on our portion of the special education funding.

A student with a current I.S.P. will be provided with their individual plan's applicable programming and services, determined by the I.S.P. Team, by qualified special education and service personnel. The principal and school counselor will make sure that the accommodations listed in the I.S.P or 504 plan are followed by the student's regular education teacher(s).

16

# CONDUCT AND DISCIPLINE

## PURPOSE AND PHILOSOPHY OF DISCIPLINE

The purpose of discipline at Bangor Christian Schools is to guide students through Biblical correction and encouragement and to create a classroom and school environment in which learning can take place. The result we seek through prayer, counseling, and consistent, loving correction, and discipline is a change in attitude, action, word, and thinking of students. The behavior of students in the classroom and school is crucial because without an orderly atmosphere, very little teaching or learning can occur. Discipline creates an atmosphere in which learning is optimal.

A well-disciplined life is an effective and productive life. BCS has the student's best interest in mind and has a genuine concern for the development of Christian character within each student. Anytime a student or parent would like an explanation of a rule, he/she will find the teacher and/or administrator happy to sit down and go into the matter fully.

## CONDUCT

It is the conviction of the administration that positive communication promotes Christian growth and community. Constructive suggestions made to the administration are always welcome. Students will be respectful to teachers, administration, staff, and fellow students at all times.

Some unacceptable behaviors at BCS include, but are not limited to inappropriate public displays of behavior, untruthfulness, cheating, direct disobedience, disrespect to teachers, horseplay, fighting, possession of lewd or indecent material, personal contact, profanity or vulgarity, vandalism, leaving campus without permission and truancy.

## HARASSMENT

Physical, verbal, or sexual harassment will not be tolerated at Bangor Christian Schools. Any incidents of this nature should be referred immediately to an administrator. No individual may physically harass or intimidate another individual by unwelcome touching, pushing, shoving, tripping, etc. No individual may verbally harass or intimidate another individual by taunting, teasing, ridiculing, etc. No individual may make sexual advances, request sexual favors, or engage in any other physical or verbal conduct of a sexual nature. No individual may participate in the spreading of rumors of another individual's sexual activity. Bangor Christian Schools considers harassment of any kind to be a very serious offense. Depending on the nature of the offense – harassment could possibly lead to immediate suspension or expulsion.

## DISCIPLINARY PROCEDURES AND EXPECTATIONS

This section outlines the disciplinary procedures of the school. Obviously, they are modified according to the severity of the offensive behavior and the age of the student. The purpose of each action is to bring about a change of behavior and is not simply punitive in nature. These actions are devised and applied to encourage acceptable conduct. All procedures may not be appropriate to use with every student. While they are listed below in an order of severity this does

not state nor imply that they will be used in this order.  Certain behavior may require serious disciplinary action such as suspension or expulsion on the first offense.

BCS follows the Biblical values of Matthew 18.  Teachers make every effort to counsel with students and encourage proper behavior before a detention is administered.  Once a detention is given, parents will be notified when the student is to serve the detention.  A record of detentions will be placed in the student's files.  The detention system requires students who violate rules to remain in a detention hall *after school.*  Parents will be notified of the student's assigned detention prior to the student serving the detention.

Classroom rules are also established by teachers, and teacher teams.  These rules must be adhered to so that all students may receive the best education possible.   We seek to encourage one another, help those who are struggling, pray for those in need, and to watch how we speak of each other.

If a problem with behavior or attitude persists, during some point in the procedures listed, the student may be placed on disciplinary probation.  This means that the student's behavior is evaluated frequently by the faculty and administration.  If the administration feels that these measures are not changing the student's behavior, the administration may suggest the parent withdraw the child before expulsion becomes necessary or possibly meet with a discipline committee for determination for expulsion.


**DISCIPLINE LEVELS**
Misconduct has been divided into three levels, depending on the severity of the incident. Level three is most severe. Students should avoid compromising situations, which might give the appearance of being involved in the following activities:

*Level 1 - Disobedience*
Any minor disturbances that interfere with classroom order and instruction. Any minor 1st time incident.

Incidents:
- Distracting other students from learning
- Not being prepared for class
- Chewing gum
- Minor dress code violation
- Cell phone use

Consequences:
- Conversation with teacher.  Possible call to parents.

*Level 2 - Disobedience, Disrespect, or Defiance*
Any repetitive level one incident OR any activities and attitudes that show a lack of respect for authority.
Incidents:

- Repeated level one incidents
- Leaving classroom without permission
- Immodest clothing
- Talking back to teacher
- Teasing
- Horseplay
- Cheating

Consequences:

- Conversation with teacher.
- Teacher calls parents.
- Possible meeting with teacher and parents.
- 1 or 2 Detentions*.
- Conversation with administration.
- Possible administration call to parents.

*The detention system requires students who violate rules to remain in a detention hall *after school.*  Parents will be notified of the student's assigned detention prior to the student serving the detention.

*Level 3 – Repetitive Disobedience, Disrespect, or Defiance*
Any repetitive level two incident. Any physical or verbal abuse. Any activity dangerous to self or others.

Incidents:

- Repeated level two incidents
- Fighting
- Bullying (Verbal, Physical, or Electronic (internet or text))
- "Pantsing"
- Public displays of affection
- Profanity, Immorality, Stealing, Lying
- Smoking, Vaping, Drinking, Illegal drug use

Consequences:

- Administration calls parents.
- Meeting with administration.
- Suspension (Either in school or out of school to be determined by administration.)
- Possible expulsion.

19

JA101

**ELEMENTARY SCHOOL**

At the elementary level, most discipline is carried out by the classroom teachers. If a student becomes a distraction or danger to himself or others, he/she will be sent to the elementary office for a time out. If the incident is of a physical nature, or if the student has had repeated trips to the elementary office, a member of the administrative team will be contacted to speak with the student. The parents will be contacted by both a member of the administrative team and the classroom teacher (when there is information that the teacher can better explain). The student will spend one or two recesses in one of the school offices. If a student's behavior does not come under control, or if any aggressive physical contact takes place, the parent will be called and asked to pick up the student for the remainder of the day.

**MIDDLE SCHOOL**

Students may be asked to fill out a Level 2 Incident Report when their behavior merits it. If the student completes a report, the teacher will write a description of the incident, and parents will receive the report in the mail. Parents should sign and return the form to the assistant principal.

*DETENTION LIMITS*

These limits are subject to change due to the specific nature of each situation.

- 4 Detentions – Co-curricular - 2 Game Suspension
- 5 Detentions – Co-curricular - Off the Team for the Season
- 8 Detentions – In House Suspension
- 10 Detentions – Suspension from School
- 15 Detentions – Suspension - Meets with Discipline Committee
- 20 Detentions – Subject to Expulsion

**HIGH SCHOOL**

Students serve detentions with the administration when their behavior is out of line with expected conduct. Parents will be notified when a student is assigned a detention.

*DETENTION LIMITS:*

These limits are subject to change due to the specific nature of each situation.

- 3 Detentions – Co-curricular - 2 Game Suspension
- 4 Detentions – Co-curricular - Off the Team for the Season
- 8 Detentions – In House Suspension
- 10 Detentions – Suspension from School
- 15 Detentions – Suspension - Meets with Discipline Committee
- 20 Detentions – Subject to Expulsion

**SUSPENSION / EXPULSION**

The purpose of suspension is to impress upon the offending student and his/her peers with the seriousness of the offense and to show them in an unmistakable manner that similar conduct may result in permanent separation from the school.

A student who is under suspension may not enter the school buildings or grounds during regular school hours, unless it is an in-house suspension.  He/she cannot attend any school function while under suspension, i.e., athletics, drama, competitions, banquets, and/or other graduation activities, etc.  All missed class work or homework must be submitted on the day the student returns.  All tests and quizzes missed during the suspension will be taken on the first day back, even if this requires the student to remain after school for a period of time.

Behavior that is grossly in conflict with the purpose and spirit of the program of the school may result in expulsion, even on the first offense.  Any offense which leads to the suspension from extra-curricular activities may carry over probation status into the following semester.

The following offenses, either on or off Campus, may lead to immediate suspension and probable expulsion:
- Drinking of alcoholic beverages
- Immoral activities
- Use of illegal drugs
- Stealing
- Use of tobacco, including vaping
- Presenting oneself as a gender other than the one included on his or her birth certificate.

21

DRESS CODE

## **BASIC GUIDELINES FOR APPROPRIATE DRESS**

OVERALL GOALS

Following the principles described in I Timothy 4:12, I Corinthians 6:19-20, and Philippians 4:8, the dress code at BCS seeks to honor God, provide a positive atmosphere for learning, represent the school favorably in the general community, and to build character and wisdom in the selection of clothing that exhibits modesty, neatness, cleanliness, self-discipline, humility, moderation, and respect for others. Students will wear clothing traditionally associated with his or her sex assigned at birth.

### REGULAR SCHOOL DAY DRESS CODE

| ACCEPTABLE | NOT ACCEPTABLE |
|---|---|
| Loose fitting dress style pants or capris. Neat and clean denim pants. Leggings worn only with a dress or skirt that comes to the top of the knee. | Skinny jeans; ripped torn or distressed jeans; yoga pants, leggings (unless worn under a knee length top or dress), and sweat pants/wind pants/flannel pants; shorts that do not come to the top of the knee |
| T-Shirts, sweatshirts/hoodies, sweaters, dress shirts, polo shirts, oxford shirts, tailored tops and turtlenecks. All clothing must be modest, covering shoulders, cleavage, waist/midriff and back. | Any attire with words or logos that would conflict with Christian values; ripped, torn, or dirty shirts of any kind; shirts that expose the midriff |
| Sleeveless dress shirts that cover to the edge of the shoulder | Tank tops; spaghetti strap shirts; muscle shirts; racerback tank tops; exercise shirts |
| Most footwear is allowed. Casual, dress shoes or clean sneakers and sandals, flip flops, rubber shoes, and slides | Slippers |
| Skirts or dresses that come to the top of the knee or longer when standing, including a student wearing leggings or a sheer over skirt. If the skirt is sheer, the underskirt must come at least to the top of the knee. If the dress is sleeveless, it needs to cover to the edge of the shoulder. | Short Skirts or dresses; spaghetti strap or tank dresses or dresses without straps |
| FOR ELEMENTARY ONLY (Through 5th grade): Girls may wear leggings underneath shirts or dresses if their shirt or dress is long enough to cover their bottom | |
| Tailored shorts, denim shorts or cargo shorts which come to the knee until Columbus Day in the fall and after spring break in April. | Shorts shorter than knee length |
| Hair: clean and neat in appearance, a natural hair color. Boys: Hair cut above the eyebrows, off the collar, and above the earlobe. Facial hair must be neatly trimmed. | Hair not neat in appearance or of unnatural color. Boys - Sideburns are not below the earlobe. |

22

| Girls: Jewelry that is worn by piercing must be worn only in the ear and not be in excess. | Excessive jewelry and piercing other than in the ear. Boys with piercings. No hats inside the buildings for girls or boys. |

### PHYSICAL EDUCATION (Grades 4-12) AND ATHLETIC PRACTICE DRESS CODE

| ACCEPTABLE | | NOT ACCEPTABLE |
| --- | --- | --- |
| Shorts that come at least to the ends of the student's fingertips when the arms are at the side of the body; Sweatpants or wind pants; | | Compression pants or leggings do not count as shorts; yoga pants; tight fitting shorts or sweatpants; |
| T-shirts or sweatshirts; | | Shirts with logos or graphics that are in conflict with Christian values; Shirts that do not cover the midriff; |
| Sneakers | | Flip flops, street shoes; any non-athletic footwear; |

## FORMAL FUNCTION DRESS CODE

**LADIES**

On special nights, such as Senior Banquet, we encourage our ladies to dress up as formally as desired, but our overriding standard is modesty.  Dresses should not be too short, too tight, or too revealing.  The front should not reveal cleavage and the back should not be below the shoulder blades.  No sheer midriffs are allowed.  Standard school dress length or longer for the dress or slit is required.

**GENTLEMEN**

We encourage dressing up as formally as desired; however, dress pants, dress shoes, dress shirts, and ties are required.

## SPECIAL OCCASION DRESS CODE

For certain occasions such as sports awards, participants and non-participants should wear standard school dress.

Students will be required to be in dress code and will not be allowed to attend classes until they are able to comply.  A pattern of violating these principles will lead to consequences for the student.  Consequences will be determined by the administration.

CHEATING/PLAGIARISM

Students who are caught cheating or plagiarizing will receive a zero for the assignment and up to two detentions for the first offense. Continued offenses will lead to progressively more serious consequences.

CLASSROOM BEHAVIOR

Obedience to these basic classroom rules and other rules and procedures is essential to the maintenance of an orderly classroom.

A.   Students are to be in their classroom when the bell rings.
B.   Students are to remain in their seats during class unless instructed otherwise by the teacher.  Students are dismissed by the teacher, not the bell: they are to be courteous and attentive until the teacher dismisses them.
C.   Students are not to talk during class except when called upon by the teacher.  All students are to address adults as Mr./Mrs./Miss, never by their first name.  Out of respect for the administration and faculty, we ask parents to set the example when speaking to or about the school personnel when students are present.
D.   Students are to refrain from disturbing the class by disorderly conduct.
E.   Students are expected to be adequately provisioned for each class with pencil, pen, notebook, textbook and any other items required by the teacher.
F.   Chewing gum is not allowed.

HALLWAY BEHAVIOR

A.   No running at any time.  Low, soft voices must be used.  No rough-housing allowed.
B.   Elementary students are to move in an orderly manner with their class.
C.   No secondary student is to be in the elementary building without a pass, except when attending a regularly scheduled class in that building.
D.   No student is to be in the hall or restroom during class periods without a pass.
E.   Students are to use their lockers and designated areas to store their belongings in a neat and orderly fashion.   All items must be in the locker before leaving for the day.  Students should not leave items on the floor in front of their lockers, or on top of their lockers when leaving for the day.

LOITERING AND OFF LIMIT AREAS

Loitering anywhere on school property is not allowed.  Four minutes are allowed between classes, and students are expected to be on time for all classes and events.

**The following areas are considered off limits to all unsupervised students:**
• Motor vehicles.
• Teachers' personal belongings, desk, filing cabinets, books, etc.
• Any supply closet, book closet, etc.

24

JA106

- The church office area, the Thrive Student Center, Upstreet, and the sanctuary except for chapel or other special functions.
- All students must attend aftercare if remaining on campus after 3:00.

PROHIBITED ARTICLES

Tobacco, alcoholic beverages, any narcotics and pornography are prohibited at all times.  Knives, guns, matches, explosives of any kind, are also prohibited.  Laser pointers and any other electronic device that are potentially disruptive to the academic environment are prohibited from the school buildings.  Lunch boxes, book covers, book bags and other school items should always display good taste and bear designs appropriate for a Christian school.  Skateboards, scooters, roller skates, and rollerblades are not permitted on campus without administrative approval.  Lockers, back packs, gym bags, and all personal possessions are subject to inspection at any time if deemed necessary by the administration.

WITHDRAWAL AND DISMISSAL

Withdrawals from school must be made by the parent to the administration.  All tuition charges continue until the Business Office receives official notice that the student has been withdrawn.  Students who are withdrawn at the request of the administration or dismissed will not be considered for re-enrollment during the current school year.  Parents must meet with the principal before re-enrollment will be considered.  A waiting period of two semesters is generally required before re-enrollment is considered.

# GENERAL POLICIES AND PROCEDURES

ACADEMIC

**PARENT - TEACHER CONFERENCES**

Since the school is an extension of the home, Bangor Christian Schools recognizes the importance of the home and school working together for the benefit of the child.  Therefore, a scheduled time has been set aside for parents and school personnel to meet to discuss the needs of the student at the end of first quarter.  Unscheduled conferences may also be necessary throughout the year.

Reasons for teacher-requested conferences include deficient grades, repeated failure to do homework, learning difficulties, disciplinary problems, repeated tardiness and/or personal habits which may be endangering scholastic progress and/or the welfare of the student and others in the class.

If an administrative request for a conference with a parent is not honored, the school reserves the right to withdraw the student from classes until the request is honored.

Parents are urged to arrange all conferences in advance, as teachers' time is heavily scheduled.  To schedule a conference, contact the school office or email the teacher directly.

**ATTENDANCE**

Bangor Christian Schools is a privately run Christian school, and it holds its standards high.  We try to adhere to Maine State Statutes regarding attendance.  We are also held accountable for accreditation purposes to the New England Association of Schools and Colleges.

Bangor Christian Schools holds high expectations for students.  Among them are honesty, excellent attendance, promptness, and responsibility.  All members of the Bangor Christian Schools community are expected to act with honesty and integrity.  We ask all members to be accountable for all that they say and all that they write.  Facts should not be misrepresented when reporting absences or tardies.

*ABSENCES*

The faculty and administration of Bangor Christian Schools believe that regular classroom attendance is necessary for a successful learning experience and that responsibility for attendance rests with students and their families.  State law mandates that school be in session for 175 days each year.  We believe that a student should be in attendance over 90% of that time in order to earn academic credit.  Missed class time cannot be duplicated through make-up work.  A student is expected to be in school every day that school is in session unless legally excused.  The school administration will determine legal absences according to Maine State Statutes.

Once a student has been absent from school unexcused for fifteen days, the principal will have a meeting with the student and his/her parents. The purpose for this meeting will be to review the school attendance policy and to see if there are any circumstances that would indicate if any of these absences might be considered legitimately excused. After the twentieth absence, the student and parents must meet with an attendance committee to review these absences. This committee will consist of the assistant principal and at least two members of the advisory board. Parents will be asked to provide documentation that should indicate if any of the twenty absences may be classified, under state law, as excused.  Bangor Christian Schools reserves the right to retain at his/her current grade level any elementary or middle school student who accumulates more than twenty unexcused absences during a given school year. The school also reserves the right to withhold credit from any course in which a high school student has missed more than twenty classes.

Absence will only be excused for the following reasons:

1. Personal illness (if a student is ill for only a portion of the day, please do not send the student to school later that day).
2. An appointment with a health professional that must be made during the regular school day (note from health professional required).
3. Observance of a recognized religious holiday when the observance is required during the regular school day.
4. A family emergency.

5. A planned absence for a personal or educational purpose, <u>which has been pre-approved with the administration.</u> (**See Make-up policy**)

**NOTE:** If a student is going to be absent or dismissed from school for one of the above reasons, <u>a parent must call, complete the absentee form, or email the school between 7:30 and 8:15 a.m. on or before the day of the absence</u>. Any un-verified absence will be considered an un-excused absence.

*UNEXCUSED ABSENCES*

If a student misses school without prior approval of the parents and the administration, the absence is un-excused. <u>Students will receive zeros for the day for un-excused absences</u>.

**MAKE-UP WORK**

Students returning from an excused absence, such as illness, have the same number of days to turn in make-up work that they were absent. Students absent due to a pre-approved absence (family vacations, non-school sports trips, etc.) are responsible to obtain their work from their teachers ahead of time and hand in completed work when they return. **All missed class work or homework must be submitted on the day the student returns. All tests and quizzes missed during the absence will be taken on the first day back, even if this requires the student to remain after school for a period of time.**

Middle and High students should email their teachers to obtain missed assignments, or have a sibling collect them from the teachers directly for an excused absence.

**TEXTBOOKS**

Hard-covered textbooks and soft-covered textbooks, procured on a rental basis, remain the property of the school and must be covered throughout the year. Books that are the property of the school are to be well maintained by the student. Students are not to cover books with covers or stickers bearing suggestive designs or pictures relating to the drug culture, secular music, or any other unwholesome materials.

<u>ADMINISTRATIVE</u>

**FERPA LAWS**

The Family Educational Rights and Privacy Act grants parents the right to inspect or review their child's education records within a reasonable period of time, but in no case later than 45 days after they have made a request. If parents ask, the school must provide explanation and interpretations of the records. In addition, school units are required to provide annual notice to parents of their rights with regard to education records. These rights pass to students once they reach the age of 18.

27

**STAFF CONDUCT WITH STUDENTS**
The Bangor Christian Schools expects all staff members, including teachers, educational technicians, secretaries, nurses, custodians, maintenance, food services, coaches, counselors, administrators, and others, to maintain the highest professional, moral and ethical standards in their conduct with students. For the purposes of this policy, staff members also include school volunteers, student teachers, and substitutes.

The intent of this policy is to ensure that the interactions and relationships between staff members and students are based upon mutual respect and trust, that staff members understand the importance of maintaining appropriate professional boundaries between adults and students in an educational setting, and that staff members conduct themselves in a manner consistent with the educational mission of the school. It is understood that staff members may interact with and have friendships and/or extended family relationships with students' families outside of school. This policy is not intended to prohibit such interactions for families and friendships, provided that professional boundaries are maintained at all times.

**A. Prohibited Conduct**
Examples of unacceptable conduct by staff members that are expressly prohibited include but are not limited to the following:
- Any type of sexual or inappropriate physical contact with students or any other conduct that might be considered harassment under the School Committee's policy on harassment and sexual harassment of students;
- Singling out a particular student or students for personal attention and friendship beyond the normal teacher-student relationship;
- For non-guidance/counseling staff, encouraging students to confide their personal or family problems and/or relationships. If a student initiates such discussions, staff members are expected to be supportive but to refer the student to appropriate guidance/counseling staff for assistance.
- Sexual banter, allusions, jokes or innuendos with students;
- Asking a student to keep a secret;
- Disclosing personal, sexual, family, employment concerns, or other private matters to one or more students;
- Addressing students with terms of endearment, pet names or otherwise in an overly familiar manner;
- Permitting students to address you by your first name, nickname or otherwise in an overly familiar manner;
- "Friending" and/or "gaming" with students on social networking sites (outside of any school approved activity); and
- Communicating with students on non-school matters via computer, text message, phone calls, letters, notes or any other means.

Before engaging in the following activities, staff members are expected to review the activity with the administration, as appropriate:
- Being alone with individual students out of public view;
- Driving students home or to other locations without parental consent;
- Inviting or allowing students to visit the staff member's home (unless the student's parent approves of the activity, such as when a student babysits or performs chores for a staff member);

- Visiting a student at home or in another location, unless on official school business known to the parent;
- Exchanging personal gifts (beyond the customary student-teacher gifts); and/or
- Socializing or spending time with students (including but not limited to activities such as going out for meals or movies, shopping, traveling, and recreational activities) outside of school sponsored events or organized community activities.

Staff members are expected to be sensitive to the appearance of impropriety in their conduct with students. Staff members are encouraged to discuss issues with their administrator or supervisor when they are unsure whether particular conduct may constitute a violation of this policy.

**B. Reporting Violations**
Students and/or their parents/guardians are strongly encouraged to notify the Principal if they believe a teacher or other staff member may be engaging in conduct that violates this policy. Staff members are required to promptly notify the Principal or Superintendent if they become aware of a situation that may constitute a violation of this policy.

**C. Disciplinary Action**
Staff Violations of this policy shall result in disciplinary action up to and including dismissal. Violations involving sexual or other abuse will also result in referral to the Department of Health and Human Services, the District Attorney and/or law enforcement.

**SCHOOL DAY**
The school day at Bangor Christian Schools begins at 7:50 a.m.  A warning bell will sound at 7:45 a.m. to indicate that students should be reporting to their homerooms.  The school day ends at 2:45 p.m.

**TARDINESS**
Promptness is a quality all should strive to attain.  Tardiness is recorded as part of a student's permanent attendance record.  Colleges and prospective employers look closely at student's attendance and tardy records.  Because of this, we feel it is important to establish positive performance in this area.

School begins at 7:50 a.m.  Students are considered tardy to school if they arrive after 7:50 a.m. Students must report directly to the office when arriving after 7:50 a.m.  Students will receive a tardy slip and then report to class.  Parents must either submit the online absentee form, send an email, call the office, or send in a signed note with their child when he/she is tardy.  If coming from a doctor's appointment, students must present a note from the doctor's office.  Students are considered truant if they arrive at school after 8:15 a.m. without an excuse, and consequently will receive zeros for the classes that they miss.  Athletes will not be able to participate in a practice or an event for that day if they arrive at school after 8:15 a.m. unless they have a note from a doctor's appointment. The administration, with input from the students and parents, will determine what is considered an excused or unexcused tardy based upon the Maine State Statutes.

29

<u>Middle or high school students will receive a detention for each set of three unexcused tardies in a quarter.</u>

**EARLY DISMISSAL DAYS**
Periodically during the school year, Bangor Christian Schools will have early dismissal days where the school day ends at 12:00 noon.  High school and middle school classes will run an abbreviated schedule for periods 1-7.  **Lunch will not be served, but there will still be an aftercare program.**

**EARLY/LATE SUPERVISION**
Teachers and staff will be on duty at 7:30 a.m. each school day.  Students are asked not to arrive before this time. An after school care program is offered from 3:00 to 5:15 pm at a reasonable fee.

All students who remain at school after 3:00 p.m. must remain under supervision in the after school program until their ride arrives to sign them out.  Students found on campus, not under adult supervision, after the required time will be given a verbal warning the first time. The second time the parent will be called. Following times will cause the student to be required to leave school grounds at 2:45 pm for one week. Parents will have to make other arrangements for their child during this week.

**LEAVING EARLY**
On the day that a student must leave school early, parent should complete the online absentee form or email or call the office <u>in advance</u> so that the teachers can be prepared.  Middle and high school students are to check out at the school office when leaving.  Parents of elementary students may pick up their children at the elementary office.  Students dismissing early are to turn in all homework and obtain all assignments before leaving.

Bangor Christian Schools operates on a "closed campus" principle.  This means that attendance at school is required from 7:50 a.m. until 2:45 p.m., regardless of the number of free periods a student may have.  High school seniors may leave campus before 2:45 p.m. if they have submitted a signed open campus form and they are passing all of their classes.

**INCLEMENT WEATHER - SCHOOL CLOSING**
During inclement weather, parents should first check our website and Facebook page for updates on school closings.  Announcements will also be made television (WABI, WLBZ, and WVII).  If we are open and conditions in your area are too severe to travel, please call the school to report the students for an excused absence.  We will not close school early except under extreme conditions.

**COMMUNICATION**
A variety of methods will be used to communicate with parents and students on an ongoing basis including: website announcements, emails, traditional mailings, and social media.  Daily announcements will be distributed to all classrooms each morning.

**PHILOSOPHY OF FUNDRAISING**

In an attempt to keep a quality Christian education affordable, Bangor Christian Schools must seek revenues beyond what is raised via tuition payments.   Although fundraising is often times seen as a controversial issue, it is a vital source of revenue to our school.  Because many of our families make great sacrifices to pay tuition, we make every effort to keep costs down.  At the same time, we are constantly expanding and improving our programs.  These fundraising events are one way that our students and families can serve our school community in assuring that a Bangor Christian experience is both valuable and affordable.  The Patriot Fund is Bangor Christian Schools' annual giving campaign.  Parents, family members, school employees, alumni and others are encouraged to participate in this effort to support the programs offered by our school.

The two most notable special interest groups that are involved in fundraising are the booster club and high school classes.  The booster club helps address our needs in the athletic program that are not met through the school-wide campaign.  These activities have included school lunch, memorabilia and merchandise auctions, and basketball program ads.  All fundraisers must be approved by the administration with a two week advance request.

Each high school class is permitted limited fundraising activity.  These revenues are reserved for their senior class trip, class gift, and graduation expenses.  Students are encouraged to engage in service oriented projects such as school dinners, car washes, dress-down days, etc.  Class fundraising is viewed as a privilege and not a right; therefore, classes are allowed to pursue class projects as long as they have responsibly participated in school-wide efforts. Each senior is required to contribute $600 toward the trip, either through fundraising or personal contributions.

**SOLICITATION**

Solicitation is not allowed at Bangor Christian Schools without the permission of the administration.  This includes the selling of tickets, candy, etc. and the distribution of political materials or product catalogues, the circulation of petitions or placing of posters.  In keeping with this policy, the telephone numbers and addresses of our students are not given out to anyone but school staff.  This information is used by school/church employees for conducting official business and providing related services to our school families.

There are times the school may be asked for a list of students from the military, colleges, or other organizations.  If you do not wish for your student's name to be released, you should sign the information release form provided by the school.  If you do not want your junior or senior to participate in ASVAB testing, you must let us know in advance.  Please notify the school office if you do not wish your student to participate.

**CELL PHONE POLICY**

Students are not allowed to use their cell phones during class time without teacher permission.  If a student is found using his phone or if the phone in any way disrupts the classroom, the cell phone will be confiscated and must be collected by the student from the office at the end of the day on the first offense and by a parent or guardian for any following offenses. Students may use their cell phones between classes. Middle school students must use the first ten minutes of their lunch time to eat, but may use their phones after that time. High school students may use their phones during lunch, but we encourage them to use this time to socialize with their peers. Students may use their phones to listen to music or for assignment related activities during study halls, with teacher permission.

**OFFICE TELEPHONE**

Students must remember that the telephone is a business phone and is not to be used for casual conversation.  Students are allowed to use the phones that are outside each school office with permission.  Talking on the phone is not a valid excuse for being late to class.  If a student needs to make a phone call during school hours, permission must be given by the office secretary. Incoming phone calls are not able to be transferred directly to teachers or students.  Please leave a message with the office staff and they will see that the message is delivered to the student or the teacher.

**VISITS TO THE SCHOOL**

Bangor Christian Schools welcomes parents and friends to visit during school hours.  Parents and visitors are required to check in at the school office and receive a visitor's pass before visiting any other area of the school campus.

**GUEST STUDENTS**

Bangor Christian Schools welcomes school age visitors for possible admission or transfer reasons only.  We ask that the following be observed:

A.   The student must obtain permission from the office at least one day in advance before bringing a visitor to school for the day.
B.   All BCS dress codes apply to the visitor.
C.   Guests are limited to a one-day visit to preserve the unity of the classes.  Exceptions may be made only with the permission of the principal.
D.   Guests are to remain with the host student as much as possible.
E.   The administration may determine that a guest may not be approved for admission to classes, either because of dress or attitude.  He or she may be asked to wait in the office until transportation home can be arranged.

**GUEST SPEAKERS**

No visitor or outsider may speak or perform in any program unless permission is secured from the administration in advance.  This includes guest speakers, lecturers in the classroom, and youth pastors leading a devotional with an individual or a group.

**PROMOTION**

No student or parent may use the name of the school on any radio or T.V. program or in any publication without the prior authorization from the school administration.

**SCHOOL SPONSORED EVENTS**

The school will not be held responsible for any party or social function that is not officially approved or sponsored by the school.

SOCIAL

**SOCIAL NETWORKING SITES**

Students will be held accountable for content posted on social networking websites if students post comments that are bullying to other students, that are disrespectful to teachers or administration, or are threatening to students or staff, or comments that suggest that the student is involved in prohibited behavior.

**MEDIA**

One purpose of the Christian school is to build into a young person the proper spiritual and academic direction for life. Bangor Christian Schools encourages students to select media choices (i.e. TV, music, movies) that promote the Christian values important to academic and spiritual growth.

**PUBLIC DANCES**

Bangor Christian Schools will not host an organized school dance, and although we do not encourage our students to attend public dances, such practice is not prohibited.  We feel this issue is best left to the discretion of the parents.

HEALTH AND SAFETY

**HEALTH SERVICE**

No student that is showing symptoms of illness, including running a fever, is allowed to remain at school. When contacted by the office about a sick child, parents are to make arrangements to pick the child up from school as soon as possible. Students must not return to school after having a fever, diarrhea, or vomiting until they have been symptom free for 24 hours without medication.

Students who are unable to participate at recess or in physical education classes are to bring a note from home.  For students to be excused from recess or physical education classes for more than three days, a signed doctor's excuse is required.

JA115

**HEALTH SCREENINGS**

The school nurse will provide direction and oversight for the vision and hearing screen program at Bangor Christian Schools.  Screenings will take place pursuant to Maine statutes.  A student, whose parent objects in writing to screening on religious grounds, will not be screened unless a sight or hearing defect is reasonably apparent.

**PRESCRIPTION MEDICATION**

The school, by law, is not allowed to prescribe or give medicine.  If a student must take medicine during the day, that medicine, along with written doctor's directions, is to be given to the office as soon as the student arrives at school. Note: Students requiring emergency inhalers or epi-pens must inform the school nurse before they can carry them on their person.

**OVER THE COUNTER MEDICATION**

Students are not allowed to carry any medication on their person or in their bags (other than pre-approved emergency inhalers or epi-pens). This includes cough drops, cold medication, allergy medication, acetaminophen, ibuprofen, and topical creams.  All over the counter medication must be turned into the office. Students will not be given any medication unless a parent or guardian has signed the medication permission form. If a student is found with any medications, the item will be confiscated and kept in the school office for a parent or guardian to retrieve.

**STUDENT IMMUNIZATIONS**

It is the family's responsibility to make sure that each child has received the appropriate immunizations.  A student will not be admitted to Bangor Christian Schools until the parent(s) completed the Student Health Information form provided in the admissions packet.  Maine State Law requires that all school children be protected against polio, diphtheria, pertussis, tetanus, measles, rubella, and varicella.  One dose of Meningococcal - MCV4 is required for children entering 7th grade. Any child entering 12th grade is required to receive two doses of MCV4. The first dose shall have been received on or after the 11th birthday, and the second dose shall have been received on or after the 16th birthday, at least eight weeks after the first dose. If the first dose is administered when the child is 16 years of age or older, only one dose is required.

As of September 2021, the state of Maine no longer allows religious or philosophical immunization exemptions. However, medical exemptions are still allowed as long as the parent or guardian of the student provides a statement from a licensed physician, nurse practitioner or physician assistant with the reason for the student's medical exemption. In accordance with MRS 20-A §6355, a student covered by an Individualized Education Plan on September I, 2021 who elected a philosophical or religious exemption from immunization requirements on or before September I, 2021 pursuant to the law in effect prior to that date may continue to attend school under that student's existing exemption as long as: A. The parent or guardian of the student provides a statement from a licensed physician, nurse practitioner or physician assistant that the physician, nurse practitioner or physician assistant has consulted with that parent or guardian and has made that parent or guardian aware of the risks and benefits associated with the choice to immunize; or B. If the student is 18 years of age or older, the student provides a statement from a licensed physician, nurse practitioner or physician assistant that the physician, nurse practitioner or physician assistant has consulted with that student and has made that student aware of the risks and benefits associated with the choice to immunize.

34

Parents may have their family physician fax immunizations records to the school at 207-262-9528.

## ASBESTOS
Our school has conducted an extensive asbestos survey of all of our buildings and a comprehensive management plan is maintained in the Operations Manager's office.  This plan is available for review during normal business hours.

## PEST CONTROL
Because pesticides pose risks, the school uses an alternative approach to merely applying pesticides.  Control of insects, rodents, and weeds at our school focuses on making the school buildings and grounds an unfavorable place for pests to live and breed.  Through maintenance and cleaning, we will reduce or eliminate available food and water sources and hiding places for the pests.  We will also routinely monitor the school area to detect pest problems and prevent the pests from becoming established.  Some techniques we will use include pest monitoring, sanitation, pest exclusion, proper food storage, pest removal and – as a last resort – pesticides. This holistic approach is often called Integrated Pest Management (IPM).

Sometimes pesticide use may be necessary to control a pest problem.  When that happens, the school will use the lowest risk products available.  If higher risk pesticides must be used, notices will be posted at application sites and parents, guardians, and staff, have a right to know.

Parents, legal guardians, and school staff will be notified of specific pesticide applications made at the school.  Notifications will be given at least two days before planned pesticide applications. Pesticide application notices will also be posted in school and on school grounds.  Notification need not be given for pesticide applications recognized by law to pose little or no risk of exposure to children or staff.

This school also keeps records of prior pesticide applications and information about the pesticides used.  You may review these records of prior pesticide applications and information about the pesticides used.  You may review these records as well as a copy of the Pesticides in Schools regulation (CMR 01-026 Chapter 27) by contacting our Operation Manager's office at 947-6576.

For further information about pests, pesticides, and your right to know, call the board of Pesticides Control at 207-287-2731 or visit the Maine School IPM web site at www.thinkfirstpraylast.org/schoolipm.

## EMERGENCY EVACUATION
The route to follow for emergency evacuation is posted in each classroom.  No talking will be allowed during the evacuation.  Students are to go quickly to the designated areas, turn to face the buildings, and wait quietly for the signal to    reenter.  Re-entry must be orderly.  Students are to leave books and personal items in the school.

**AUTOMOBILES AND STUDENT DRIVERS**

Cars are not to be occupied during school hours.  As soon as students arrive at school, they must leave the car and go to their designated areas.  Students are not to go to their cars without permission from the office.

**DROP OFF AND PICK UP**

Your cooperation is requested to help us protect your child from injury associated with coming to and leaving from the school campus.  All drivers are to demonstrate courteous driving habits. Parents of students in grades K-4 through 2nd grade are to escort their children to and from the classrooms.  If a student has a sibling in grade 6 or above, the older sibling may assist in escorting the younger sibling.  Cars are to observe the 10 MPH speed limit on school property. **PLEASE DO NOT PARK BETWEEN THE BRICK BUILDING AND THE CHURCH BUILDING AT ANY TIME DURING THE SCHOOL DAY**.

## PROGRAMS AND SERVICES

The four-year-old program and our aftercare program are considered part of a child care program by the State of Maine. We are required to follow the rules and regulations for child care facilities for these two programs, including adult to student ratios and other safety protocols.

If parents need access to assistance for languages other than English, the school will furnish information on where to find such support.

**RIGHTS OF CHILDREN AND PARENTS FOR CHILD CARE FACILITIES**

A. **Rights of Children**. Children receiving Child care from Child Care Facilities have the following rights.
1. Children must be free from emotional, physical and/or sexual abuse, neglect and exploitation.
2. Each Child has the right to freedom from harmful actions or practices that are detrimental to the Child's welfare, and to practices that are potentially harmful to the Child.
3. Each Child has a right to an environment that meets the health and safety standards in this rule.
4. Each Child must be provided Child care services without discrimination to race, age, national origin, religion, disability, sex or family composition.
5. Children must be treated with dignity, consideration and respect in full recognition of their individuality. This includes the use of developmentally appropriate practices by the Child Care Facility.

6. Each Child has the right to the implementation of any plan of service that has been developed for that Child in conjunction with community or state agencies by the Child Care Facility.
7. Each Child has the right to Developmentally Appropriate activities, materials, and equipment.
8. Children with disabilities have the right to reasonable modifications to Child Care Facility policies and practices.

B. **Rights of parents and legal guardians of children receiving child care from Child Care Facilities.**
1. A Child's Parent or Legal Guardian must be fully informed of items or services which are included in the rate they pay for Child care services.
2. A Child's Parent or Legal Guardian has the right to be fully informed of findings of the most recent inspection conducted by the Department. The Child Care Facility must inform Children's Parents or Legal Guardians that the licensing inspection results are public information and inspection results must be posted in a prominent place on the Premises.
3. Parents or Legal Guardians must be notified by the Child Care Facility within two business days of any actions taken against the Child Care Facility by the Department, including but not limited to, decisions to issue conditional Licenses, refusal to renew a License, or to impose fines or other sanctions.

## CHAPEL

Chapel is an integral part of campus life for each student at Bangor Christian Schools. Chapel speakers are varied, and topics covered are inspirational, challenging, and uplifting. Students are not allowed to miss chapel without administrative permission. Students are to enter the auditorium quietly and move quickly to find a seat.

Many times chapel worship is student led. Our middle and high school classes take turns though out the school year leading and planning chapel services. This is a highlight of our campus life. Parents and friends are invited to any chapel service. Call the office for information about the schedule.

## COMPUTER AND INTERNET USE

Each student is responsible for his/her actions and activities involving Bangor Christian Schools' computers, networks and Internet services, and for his/her computer files, passwords and accounts. These rules provide general guidance concerning the use of computers and examples of prohibited uses. The rules do not attempt to describe every possible prohibited activity by students. Students, parents and school staff who have questions about whether a particular activity is prohibited are encouraged to contact the principal or assistant principal.

*Consequences for Violation of Computer Use Policy and Rules*
Student use of Bangor Christian Schools' computers, networks and internet services is a privilege, not a right. Compliance with policies and rules concerning computer use is mandatory. Students who violate these policies and rules may have their computer privileges limited, suspended or

revoked.  Such violations may also result in disciplinary action, referral to law enforcement and/or legal action. The principal or assistant principal shall have the final authority to decide whether a student's privileges will be limited, suspended, or revoked based upon the circumstances of the particular case, the student's prior disciplinary record, and any other pertinent factors.

*Acceptable Use*

The Bangor Christian Schools' computers, networks and internet services are provided for educational purposes and research consistent with its educational mission, curriculum and instructional goals.  All policies, school rules, and expectations concerning student conduct and communications apply when students are using computers.  Students are also expected to comply with all specific instructions from teachers and other school staff when using the school's computers.

*Prohibited Uses*

Examples of unacceptable uses of Bangor Christian Schools' computers that are expressly prohibited include, but are not limited to, the following:

1. Accessing Inappropriate Materials - Accessing, submitting, posting, publishing, forwarding, downloading, scanning or displaying defamatory, abusive, obscene, vulgar, sexually explicit, sexually suggestive, threatening, discriminatory, harassing and/or illegal materials.
2. Illegal Activities - Using school computers, networks and Internet services for any illegal activity or in violation of any policy or school rules.  Bangor Christian Schools assumes no responsibility for illegal activities of students while using school computers.
3. Violating Copyrights – Copying, downloading, or sharing any type of copyrighted materials (including music or films) without the owner's permission. Bangor Christian Schools assumes no responsibility for copyright violations by students.
4. Copying Software - Copying or downloading software without the express authorization of the principal or assistant principal.  Unauthorized copying of software is illegal and may subject the copier to substantial civil and criminal penalties.  The Bangor Christian Schools assumes no responsibility for illegal software copying by students.
5. Plagiarism - Representing as one's own work any materials obtained on the Internet (such as term papers, articles, music, etc.).  When Internet sources are used in student work, the author, publisher and web site must be identified.
6. Non-School-Related Uses - Using Bangor Christian Schools computers, networks and Internet services for non-school-related purposes such as private financial gain; commercial, advertising or solicitation purposes; or any other personal use not connected with the educational program or assignments.
7. Misuse of Passwords/Unauthorized Access - Sharing passwords, using other users' passwords, and accessing or using other users' accounts.
8. Malicious Use/Vandalism - Any malicious use, disruption or harm Bangor Christian Schools computers, networks and Internet services, including but not limited to hacking activities and creation/uploading of computer viruses.

*No Expectation of Privacy*

Bangor Christian Schools' computers remain under the control, custody and supervision of the Bangor Christian Schools at all times.  Students have no expectation of privacy in their use of school computers, including e-mail, stored files and Internet access logs.

*Compensation for Losses, Costs and/or Damages*

The student and his/her parents are responsible for compensating the Bangor Christian Schools for any losses, costs, or damages incurred by the school for violations of policies and school rules while the student is using Bangor Christian Schools computers, including the cost of investigating such violations.  The Bangor Christian Schools assumes no responsibility for any unauthorized charges or costs incurred by a student while using school computers.

*Student Security*

A student is not allowed to reveal his/her full name, address, telephone number, social security number or other personal information on the Internet.  Students should never agree to meet people they have contacted through the Internet without parental permission.  Students should inform their teacher if they access information or messages that are dangerous, inappropriate or make them uncomfortable in any way.

*System Security*

The security of the Bangor Christian Schools' computers, networks and Internet services is a high priority.  Any student who identifies a security problem must notify his/her teacher immediately. The student shall not demonstrate the problem to others or access unauthorized material.   Any user who attempts to breach system security, causes a breach of system security or fails to report a system security problem shall be subject to disciplinary and/or legal action in addition to having his/her computer privileges limited, suspended or revoked.

*Use of Personal Laptops / Electronic devices:*

A student may bring his/her personal laptop or tablet to school. During the school day (7:50 am – 2:45 pm) devices may only be used for school related work and the student must have a teacher's written permission to use any device.  All provisions of Bangor Christian Schools' Student Computer and Internet Use Rules apply to students using personal devices, both on and off campus.  Bangor Christian Schools assume no responsibility for personal devices brought to school by students.

**ATHLETICS**

Society places significant emphasis on athletics and as such many athletes are seen as leaders. We expect our athletes to be positive role models and leaders spiritually, socially, and academically.  The purpose for athletic activities is to:

1. Show effective testimony of a changed life;
2. Be an active, positive contributor to the community;
3. Promote healthy competition and school spirit; and
4. Provide for rigorous exercise of the body.

Bangor Christian High School participates in the Maine Principal's Association for all athletic competitions.  This allows us to compete with other schools and be involved in post-season tournament activities for championships.

In order for a student to be eligible for a Bangor Christian Schools team, he/she must maintain a grade point average of 75% or better with no F's and at least a 75% in Bible.  No student who is on disciplinary probation is allowed to participate in any extracurricular activities.

1. An athlete may begin each sports season, fall, winter, and spring.
2. If the student is failing any subjects or has below a 75% in Bible at the next marking period (mid-quarter or quarter) during any season that student will be removed from the team for the remainder of the season.
3. The administration reserves the right to amend these expectations on a case by case basis.

From time to time, student-athletes will miss class time due to a scheduled game or competition. This will be treated as an excused absence and any missed work will fall under these guidelines.

The athletic director will make every effort to avoid scheduling games on Wednesday nights so that athletes may attend mid-week church services. All practices will end by 5:00pm on Wednesdays.

*Season Limits for Detentions for Athletes:*
> 3 Detentions – 2 Game Suspension
> 4 Detentions – Off the Team for the Season

Detentions are not necessarily scheduled around sporting practices.  If a student is scheduled for a detention, the student may be required to serve the detention before the student is allowed to participate in a practice, especially if the student has shown repetition of poor behavior.

**Athletes may not participate in a practice or an event for that day if they arrive at school after 8:15 a.m. unless they have a note from a doctor's appointment.**

Team members are expected to attend all scheduled practices and games, and display exemplary sportsmanship.  The principal will suspend or permanently remove a player from any team if that student's conduct or attitude makes him/her a poor testimony.

**Student athletes and their parents are required to read and sign the athletic handbook.**

**FINE ARTS**

Bangor Christian Schools places great emphasis on its fine arts program.  Participation in fine arts programs allows a student to use and improve his/her talents for Christian service.

Chorus and drama are offered for all students.  The elementary and high school chorus and bands perform twice a year at our Christmas and spring concerts.  Choir and band member attendance at the concert is required to receive credit for the class.  If a student is unable to attend, **prior** administrative approval is required.

Additionally, the following programs are offered at the school:

- Group and private piano and instrument instruction is offered to students in grades 1 - 12.
- Band instruction is available to students in grades 4 - 12.
- Piano and instrumental instruction, are non-credit electives that involve a fee to cover the cost of music, supplies, instrument repair, etc.

Art is offered to students as part of the regular elementary curriculum. At the middle and high school levels, art is an elective course.

**FIELD TRIPS AND CHAPERONES**

Field trips are taken at various times during the school year to places of educational interest. Information regarding cost, times, and dress standards will be sent home with the students prior to each trip.  All field trips are adequately chaperoned at the rate of at least one adult for each ten students.  Drivers are adults.  The students are expected to maintain the same degree of self-discipline on field trips as is expected at school.  Absences because of field trips are handled the same as excused absences from school.

There are times throughout the school year when parents may be asked to serve as chaperones or will desire to do so.  The school asks parents to follow the same standard of dress and conduct as is required of the students.

**GYMNASIUM**

In order to insure that the gymnasium is properly cared for, that all spectators and players have an enjoyable time, and that the Lord Jesus Christ is honored, we ask that the following rules be observed.

A.    Show good sportsmanship. Please, no "booing" or other discourteous actions.

B.    Please do not pound on the bleachers with your feet.
C.    Please confine all food and drink to the gymnasium and cafeteria.
D.    Please keep the gym clean and neat.  Discard all trash and cans in the proper receptacles.
E.    Students are not allowed to be in the gymnasium without approved adult supervision.

**HOLDING AN OFFICE**
Only students with 75% or better average, no F's, and at least a 75% in Bible will be eligible to serve as class officers, or officers in any official school organization.  Students qualify on the basis of the most recent semester grades.  The placing of a student on disciplinary probation disqualifies them from holding office.

**LOCKERS**
Lockers are assigned to all junior high and high school students.  All lockers are to be kept clean and are subject to inspections.  Personal locks are permitted if the combination or spare key has been left with the office.  Students are not to enter the locker of another student.

**LOST ARTICLES**
All articles lost on the premises may be claimed at the lost and found at the close of the school day.  Vital items such as eyeglasses, coats, etc., may be sought at the school office when the classroom teacher issues a pass.  Unclaimed items are given to charity at the end of each quarter.

**LUNCH**
A lunch program is available at school.  Meals are provided for a reasonable price. Vending machines are also available for students.  Students are to always maintain proper conduct and etiquette while in the cafeteria.  Teachers seek to uphold and teach proper manners during lunch period.  At dismissal time, each student is responsible to see that his lunch area is clean.  No students are dismissed until the teacher inspects the area.

# CLOSING STATEMENT

The contents of this handbook are to be used as a guide.  This book is in no way an all-inclusive statement of Bangor Christian School's rules, regulations, and philosophy.  The administration reserves the right to determine acceptable actions, behavior and conduct.  The administration also reserves the right to add or delete elements of this handbook at any time if it is deemed necessary.

It is understood that attendance at Bangor Christian Schools is a privilege and not a right.  This privilege may be forfeited by any student who does not conform to the standards and regulations of this institution.  Bangor Christian Schools may request the withdrawal at any time of any student, who, in the opinion of the school, does not fit into the spirit of the institution, regardless of whether or not he/she conforms to the specific rules and regulations of Bangor Christian Schools.

# STUDENT AND PARENT STATEMENT OF COOPERATION

We have read and understand the entire contents of the Parent/Student Handbook, including the Student Computer and Internet Use Rules, and are willing to abide by all the principles stated therein.  We understand the student will be subject to dismissal from school for violation of the discipline code in regard to the use of drugs (including tobacco and alcohol), immorality or for possession or distribution of pornography or lewd materials.  We also understand that attendance at Bangor Christian Schools is a privilege and not a right.  We understand that the school may request withdrawal at any time if in the opinion of the school the student does not fit into the spirit of the institution regardless of whether or not he/she conforms to the specific rules and regulations.  It is our prayerful desire to contribute positively to the spirit of Bangor Christian Schools and to live a life pleasing to the Lord.

Student Signature          _____    Date _____

Parent / Guardian Signature _____    Date _____

Parent / Guardian Signature _____    Date _____

Bangor Christian Schools on occasion will use advertising in newspapers, brochures, flyers, or posters to promote our school.  Candid pictures are taken of our students at various times through the year to show student life at our school, and sometimes we use these pictures in our advertising

JA125

or on our website.   May we have written permission to use pictures of your child for advertising purposes or on our website if the need arises in the future?

_____Yes, you have my permission to use pictures of my child for advertising purposes or on the school's website.

_____No, you do not have my permission to use pictures of my child for advertising purposes or on the school's website.

Parent / Guardian Signature _____

44

# Exhibit 4

## <u>BANGOR CHRISTIAN SCHOOLS – STAFF AGREEMENT 2021/22</u>

**For:** _____

### CONDITIONS OF EMPLOYMENT

**1**) The staff member affirms that, as part of the qualifications for this position, he/she is a "Born Again" Christian who knows the Lord Jesus Christ as Savior. (John 3:3, I Peter 1:23).

**2**) The staff member gives testimony that he/she has a sense of God's will, and that working in this Christian school is God's direction.

**3**) The staff member will model the highest Christian virtue and personal behavior, serving as a **<u>Christian role model</u>** (I Timothy 4:12) both in and out of school to pupils (Luke 6:40), and as an example to parents and fellow faculty members in judgment, dignity, respect, and Christian living.   These are biblical standards of conduct in the areas of abstaining from the use of alcohol, drugs, and tobacco, lewd public dancing, practice of gambling, and any other activity that would hinder your testimony.   We require agreement with the standards: 2 Peter 1:5-8, Colossians 3:17, and Titus 2:7-8.

The staff member further agrees that the Bible dictates the standards for sexual behavior. Any promiscuity, homosexuality, or other deviant sexual behavior is forbidden and as such violates the bona fide occupational requirement of being a **<u>Christian role model</u>**. (Romans 1:24-32) Deviation from Scriptural standards may be grounds for termination. (Romans 12:1-2; I Corinthians 6:9-20; Ephesians 4:1-11, 5:3-5; I Thessalonians 4:3-8; I Timothy 4:12; II Timothy 2:19-22; I Peter 1:15-16, 2:15-17; I John 3:1-3).

**4**) The staff member will faithfully attend and financially support a local church whose fundamental beliefs are in agreement with the Statement of Faith of this school. (Hebrews 10:25).

**5**) The staff member accepts without verbal or mental reservations both the Statement of Faith and the Educational Philosophy and Objectives of this school and is committed to upholding them.

**6**) The staff member has also read and agrees to abide by the regulations set forth in the Faculty and Student Handbooks, as well as any additions or changes made during this contract year. He/she agrees to cooperate in every way with the school authorities and adhere to the policies.  All employees are encouraged to discuss with the Administration privately any policies they to not understand or do not agree with.

**7**) Duties are to be assigned at the discretion of the Administrator after consultation with the staff member. He/she agrees to accept his/her proportionate amount of responsibilities outside of their regular duties.  The extent of such assignment is to be determined by the Administrator who will seek as far as possible to achieve equity in all staff assignments.

**8**) The staff member will strive at all times to understand, appreciate, love, and serve the pupils and their families, and will to the best of his/her ability provide for their fullest spiritual, intellectual, physical, and emotional development.

**9**) The staff member will maintain an atmosphere that is conducive to a learning environment. This includes maintaining a professional appearance.

**10**) The staff member will arrive on time to work and fulfill their hourly obligation.  The staff member agrees to be present and on time for faculty/staff devotions and meetings.  He/she also agrees to remain after school for such duties, meetings, and conferences as may be called by the Administration.

**11**) The staff member will avoid highly debatable topics as much as possible that tend to divide evangelical believers. A student is to be referred to his/her local church if a debatable topic arises of a theological nature.

**12**) The staff member agrees to follow the Biblical pattern of Matthew 18:15-17 and Galatians 6:1 and always give a good report. All differences are to be resolved by utilizing Biblical principles - always presenting a <u>united front</u>. Appropriate confidentiality will be observed in regard to pupil, parent, and school matters. (Titus 3:2 and Galatians 5:15)

**13**) The staff member agrees that Christians believe that the Bible commands them to make every effort to live at peace and to resolve disputes with each other in private or within the Christian community in conformity with the Biblical injunctions of I Corinthians 6:1-8, Matthew 5:23-24, and Matthew 18:15-20.

**14**) Any previous agreements, whether written or oral, are fully merged into this agreement and no other agreement, statement or promise other than those contained in this agreement shall be valid or binding on either party.

Where cause exists, the Administration may terminate this agreement, provided that the staff member has been informed in writing of the cause or causes for discharge and has been given an opportunity to respond to them prior to final termination. Dismissal may be immediate or with longer notice depending upon the reason for dismissal.

Cause, as used herein includes, but is not limited to, any conduct tending to reflect discredit upon the school, the Administration, or upon the staff member, or tending to seriously impair his/her continued usefulness as a **<u>Christian role model.</u>**

**15**) **Bangor Christian Schools** has been classified as a 501 (c) (3) non-profit <u>church related</u> organization and has chosen not to participate in the Federal Unemployment Tax Act. Therefore upon termination of employment, regardless of the reason(s), unemployment benefits are not available.

Believing that God has led in this decision, the Administration of **Bangor Christian Schools** has appointed ==Name of Staff== as the ==**Position Held**== for the 2021/22 school year. This contract begins **August 15, 2021** and ends **June 15, 2022**, depending upon satisfactory performance of assigned duties. In so doing, we recognize and affirm the ministry of teaching for you as a God-ordained vocation. We rejoice that God has brought you to us as a "fellow-laborer" in this ministry. This contract provides a framework of mutual obligation and responsibility to assure the orderly operation of an exemplary program at Bangor Christian Schools.

By accepting this appointment, said staff member specifically acknowledges that this contract is for a limited duration and that all rights and privileges herein shall terminate upon the expiration date of this contract, unless voided earlier pursuant to the provisions listed below. The parties agree that no rights of tenure or presumption of continued employment are conferred or implied by this contract or by a number of consecutive contracts. The parties further agree that no right to notice of renewal or non-renewal of the contract is conferred or implied.

Gross salary for this period of employment will be ==no more than $ _____.== ==(_____) days for (_____) hours a day at ($_____) per hour and will be payable in== ==installments, to be received on the 15th and 30th of each month,== beginning on August 30, 2021 and ending June 15, 2022.

**This contract will be valid only if it is signed and returned by  _____/_____/_____.**

**I have read and understand the duties, responsibilities, salary and benefits and will abide with the terms and conditions of this contract.**

_____
**Staff Signature                                                    Date**

**We at Bangor Christian Schools extend our warmest welcome to you. We pledge our prayer support and help as you minister to our students.**

_____
**Administrator Signature                                     Date**

JA130

# Exhibit 5

# BANGOR CHRISTIAN SCHOOLS – TEACHER CONTRACT 2022-23

For:  _____

### CONDITIONS OF EMPLOYMENT

**1**) The teacher affirms that, as part of the qualifications for this position, he/she is a "Born Again" Christian who knows the Lord Jesus Christ as Savior. (John 3:3, I Peter 1:23).

**2**) The teacher gives testimony that he/she has a sense of God's will, that teaching is his/her calling, and that teaching in this Christian school is God's direction.

**3**) The teacher will model the highest Christian virtue and personal behavior, serving as a **Christian role model** (I Timothy 4:12) both in and out of school to pupils (Luke 6:40), and as an example to parents and fellow faculty members in judgment, dignity, respect, and Christian living.   These are biblical standards of conduct in the areas of abstaining from the use of alcohol, drugs, and tobacco, lewd public dancing, practice of gambling, and any other activity that would hinder your testimony.   We require agreement with the standards: 2 Peter 1:5-8, Colossians 3:17, and Titus 2:7-8.

The teacher further agrees that the Bible dictates the standards for sexual behavior. Any promiscuity, homosexuality, or other deviant sexual behavior is forbidden and as such violates the bona fide occupational requirement of being a **Christian role model**. (Romans 1:24-32) Deviation from Scriptural standards may be grounds for termination. (Romans 12:1-2; I Corinthians 6:9-20; Ephesians 4:1-11, 5:3-5; I Thessalonians 4:3-8; I Timothy 4:12; II Timothy 2:19-22; I Peter 1:15-16, 2:15-17; I John 3:1-3).

**4**) The teacher will faithfully attend and financially support a local church whose fundamental beliefs are in agreement with the Statement of Faith of this school. (Hebrews 10:25).

**5**) The teacher accepts without verbal or mental reservations both the Statement of Faith and the Educational Philosophy and Objectives of this school and is committed to upholding them.

**6**)  The teacher has also read and agrees to abide by the regulations set forth in the Faculty and Student Handbooks, as well as any additions or changes made during this contract year. He/she agrees to cooperate in every way with the school authorities and adhere to the policies. All employees are encouraged to discuss with the Administration privately any policies they to not understand or do not agree with.

**7**) The teacher will provide the Administrator with a copy of any teaching certificates and an official transcript of all college and graduate studies prior to the first day of school or make other acceptable arrangements with the administration or this contract is voided.  The teacher agrees to work toward teacher certification if required to do so.

**8**)   Assignment to room, grade, subject, and extracurricular duties is to be made at the discretion of the Administrator after consultation with the teacher. He/she agrees to accept his/her proportionate amount of supervision outside of the regular classroom assignment.  The extent of such supervision and assignment is to be determined by the Administrator who will seek as far as possible to achieve equity in all staff assignments.

**9**) The teacher will strive at all times to understand, appreciate, love, and serve the pupils entrusted to him/her for instruction, and will to the best of his/her ability provide for their fullest spiritual, intellectual, physical, and emotional development.

**10**) The teacher will maintain a classroom atmosphere that is conducive to learning. This includes maintaining a professional appearance.

**11**) The teacher will arrive to school at 7:30 a.m. each morning, and will remain in the building until 3:30 p.m.   The teacher agrees to be present and on time for faculty devotions and

JA132

meetings.   He/she also agrees to remain after school for such duties, meetings, and conferences as may be called by the Administration.  Teachers are also expected to be present at school programs and functions where children they normally teach are present.

**12)** The teacher will avoid highly debatable topics as much as possible that tend to divide evangelical believers. A student is to be referred to his/her local church if a debatable topic arises of a theological nature.

**13)** The teacher agrees to follow the Biblical pattern of Matthew 18:15-17 and Galatians 6:1 and always give a good report. All differences are to be resolved by utilizing Biblical principles - always presenting a <u>united front</u>. Appropriate confidentiality will be observed in regard to pupil, parent, and school matters. (Titus 3:2 and Galatians 5:15)

**14)** The teacher agrees that Christians believe that the Bible commands them to make every effort to live at peace and to resolve disputes with each other in private or within the Christian community in conformity with the Biblical injunctions of I Corinthians 6:1-8, Matthew 5:23-24, and Matthew 18:15-20.

**15)** The teacher acknowledges that he/she is fully aware of his/her obligations under state law regarding child abuse reporting requirements and that he/she will fulfill those obligations.

**16)** Any previous agreements, whether written or oral, are fully merged into this agreement and no other agreement, statement or promise other than those contained in this contract shall be valid or binding on either party. This contract shall be interpreted under the laws of the State of Maine.

**17)** The teacher must give the Administration one month prior written notice of intended resignation unless a different termination date is mutually agreed upon. If the teacher resigns or is terminated during the period of service covered by this contract, payment shall be made of that proportionate part of the annual salary, which the number of days of actual duty bears to the number of days covered by the contract. All fringe benefits would end on the last day of employment. All of the employer's property in the teacher's custody must be returned before he/she is entitled to final payment of any amounts due upon separation.

Where cause exists, the Administration may terminate this contract, provided that the teacher has been informed in writing of the cause or causes for discharge and has been given an opportunity to respond to them prior to final termination. Dismissal may be immediate or with longer notice depending upon the reason for dismissal.

Cause, as used herein includes, but is not limited to, any conduct tending to reflect discredit upon the school, the Administration, or upon the teacher, or tending to seriously impair his/her continued usefulness as a <u>**Christian role model**</u> for the students.

**18)** Bangor Christian Schools has been classified as a 501 (c) (3) non-profit <u>church related</u> organization and has chosen not to participate in the Federal Unemployment Tax Act. Therefore upon termination of employment, regardless of the reason(s), unemployment benefits are not available.

Believing that God has led in this decision, the Administration of **Bangor Christian Schools** has appointed ==Teacher Name== to teach **Grade etc**  for the <u>2021-22</u> school year. This contract begins <u>August 16, 2021</u> and ends <u>August 15, 2023</u> depending upon satisfactory performance of

assigned duties. In so doing, we recognize and affirm the ministry of teaching for you as a God-ordained vocation. We rejoice that God has brought you to us as a "fellow-laborer" in this ministry. This contract provides a framework of mutual obligation and responsibility to assure the orderly operation of an exemplary program at Bangor Christian Schools.

By accepting this appointment, said teacher specifically acknowledges that this contract is for a limited duration and that all rights and privileges herein shall terminate upon the expiration date of this contract, unless voided earlier pursuant to the provisions listed below. The parties agree that no rights of tenure or presumption of continued employment are conferred or implied by this contract or by a number of consecutive contracts. The parties further agree that no right to notice of renewal or non-renewal of the contract is conferred or implied.

Gross salary for this period of employment will be **$amount** payable in 24 installments, to be received on the 15th and 30th of each month, beginning on August 30, 2021 and ending August 15, 2022.  Teachers are expected to be available during the entire contract period if necessary. Full-time teachers are expected to report for work no more than one full week before the first day of school, and will be expected to work no more than one full week after high school graduation as a standard.  You will be notified of exact dates.

**This contract is predicated on availability of funding for this position for the upcoming school year.**

**This contract will be valid only if it is signed and returned by July 23, 2021.**

**I have read and understand the duties, responsibilities, salary and benefits and will abide with the terms and conditions of this contract.**

_____

**Teacher Signature**                          **Date**

**We at Bangor Christian Schools extend our warmest welcome to you. We pledge our prayer support and help as you minister to our students.**

_____

**Administrator Signature**                  **Date**

# Exhibit 6

```
 1                  UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF MAINE
 2

 3

 4                      Civil Action No. 18-cv-00327 DBH

 5

 6    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

 7    DAVID and AMY CARSON, et al.,

 8                        Plaintiffs

 9          vs

10    ROBERT G. HASSON, JR., in his official
      Capacity as Commissioner of the Maine
11    Department of Education,

12                        Defendant
      *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

13

14
                    DEPONENT:  JEFFREY BENJAMIN
15

16
      Taken before Joanne P. Alley, a Notary Public in and for
17    the State of Maine, at the offices of the Maine Attorney
      General, Cross State Office Building, Sixth Floor,
18    Sewall Street, Augusta, Maine, on December 17, 2018,
      beginning at 1:00 p.m., pursuant to notice given.
19

20

21

22

23

24

25
```

```
 1    APPEARANCES:

 2    SARAH FORSTER, AAG
      CHRISTOPHER TAUB, AAG
 3    DEPARTMENT OF ATTORNEY GENERAL
      6 State House Station
 4    Augusta, ME 04333-0006
      207-626-8800
 5    sarah.forster@maine.gov
      christopher.taub@maine.gov
 6    Attorneys for Defendant

 7    TIM KELLER, ESQ.
      INSTITUTE FOR JUSTICE
 8    398 S. Mill Avenue, Suite 301
      Tempe, AZ 85281
 9    480-557-8300
      tkeller@ij.org
10    Attorney for Plaintiffs

11    ARIF PANJU, ESQ.
      INSTITUTE FOR JUSTICE
12    816 Congress Avenue, Suite 960
      Austin, TX 78701
13    512-480-5396
      apanju@ij.org

14
      KIMBERLY Y. SMITH RIVERA
15    NATIONAL CENTER FOR LIFE AND LIBERTY
      11803 104th Street
16    Largo, FL 33773
      888-233-6255
17    krivera@ncll.org

18

19

20

21

22

23

24

25
```

JA137

```
 1                      I N D E X

 2        DEPONENT:

 3           JEFFREY BENJAMIN

 4               By Attorney Forster          4

 5               By Attorney Keller         None

 6

 7

 8

 9

10

11                   E X H I B I T S
                                             Page
12
        Exhibit No. 12                         6
13         Notice of Deposition
        Exhibit No. 13                        15
14         Teacher Contract
        Exhibit No. 14                        21
15         BCS Faculty Manual
        Exhibit No. 15                        27
16         Student Handbook
        Exhibit No. 16                        34
17         Financial Aid Application
        Exhibit No. 17                        39
18         E-mail Chain
        Exhibit No. 18                        41
19         Application for Admission

20

21

22

23

24

25
```

1          (Deposition taken before Joanne P. Alley,

2     Notary Public, at the offices of Maine Attorney General,

3     Cross State Office Building, Sixth Floor, Sewall Street,

4     Augusta, Maine, on December 17, 2018, beginning at 1:00

5     p.m.)

6          (The deponent was administered the oath by

7     the Notary Public.)

8          **JEFFREY BENJAMIN**, after having been duly

9     sworn by the Notary Public, was deposed and testified as

10    follows:

11                    **EXAMINATION**

12    **BY MS. FORSTER:**

13    Q.   Good afternoon.

14    A.   Good afternoon.

15    Q.   I'm Sarah Forster.  I know we've spoken on the

16         phone briefly and now we've finally met in person,

17         and as you know, I'm an assistant attorney general

18         and along with my colleague Chris Taub we represent

19         the Commissioner of Education, Dr. Robert Hasson,

20         in some litigation that's been brought by a number

21         of families challenging a statute in Maine that

22         involves who is and is not eligible for the payment

23         or for the approval to receive public funds for the

24         payment of tuition, and so today we're going to do

25         what's hopefully not a very long deposition.  Have

1      you ever been deposed before?

2   A.   No, I have not.

3   Q.   Okay.  Well, your counsel probably told you but

4      just so we're clear on a few very basic rules, the

5      way a deposition works is I'm going to ask you some

6      questions and you'll give me some answers to the

7      best of your knowledge and ability, and the most

8      important person in the room will take down the

9      answers and that means a couple of things; one is

10     that you have to give an answer that's actually a

11     word.  So um-hum doesn't work very well nor does

12     the roll of the eye or the nod of the head because

13     even though we know that in court those are very

14     dramatic gestures, they're not very helpful for a

15     cold transcript.

16         The second thing is, even though you're going

17     to know what I'm going to say before I finish

18     saying it and I'm probably going to know what your

19     answer is before you finish answering, we really

20     have to pause and take turns because remarkably a

21     transcript can't get two people talking at once.

22  A.   Okay.

23  Q.   This is probably not going to be a very long

24     deposition but if in any event you want a break,

25     need a timeout, it's not meant to be an endurance

```
 1        test, just say the word and we will sort it out.

 2        Anyway, do you have any questions for me about the

 3        deposition before we start?

 4   A.   No, I don't.

 5   Q.   Okay.

 6              MS. FORSTER:  So let's start by if you would

 7        mark this, please.

 8         (Exhibit No. 12 marked for identification.)

 9   BY MS. FORSTER:

10   Q.   If you'd look at that, what's marked as Exhibit 12,

11        and I'd ask do you recognize it?

12   A.   Yes, I do.

13   Q.   All right.  Could you turn to I believe it's the

14        fifth page, yes, where there's a list of things on

15        Exhibit A and I'm wondering if you could tell me

16        just for the record which of these numbers you are

17        responsible for being the designee for.

18   A.   One, two, three, seven, eight, nine, ten.

19   Q.   Okay, and if you could look one page further at

20        Exhibit B, do you recognize this list?

21   A.   Yes, I do.

22   Q.   And I want to thank you for getting all the

23        documents to us early, that was extremely helpful

24        in preparing and should probably make this a lot

25        shorter than if we were seeing stuff for the first
```

```
 1        time during the deposition, and I just want to

 2        check, is everything that your counsel has provided

 3        to us everything that you intend to produce on this

 4        list?  There's nothing else that --

 5   A.   No, that's everything.

 6   Q.   Okay, all right, thank you.  So Dr. Benjamin, where

 7        did you go to school?

 8   A.   The University of New Brunswick.

 9   Q.   The University of New Brunswick and is that in

10        Canada?

11   A.   Yes, Fredericton, New Brunswick.

12   Q.   Did you go to high school in Canada also?

13   A.   Yes.

14   Q.   When did you first come to Maine?

15   A.   2006.

16   Q.   And did you come for a job?

17   A.   Yes, I did.

18   Q.   What job was that?

19   A.   Assistant professor at the University of Maine.

20   Q.   What did you teach?

21   A.   Forestry.

22   Q.   Forestry.  There was a former Commissioner of

23        Education who somehow became Commissioner of

24        Education after being an Assistant Commissioner of

25        Forestry, so there's an obvious connection there
```

```
 1        that I'm just not getting.  Anyway, what did you do
 2        after you were a professor at the University of
 3        Maine?
 4   A.   Well, I went through the ten-year process there for
 5        six years, seven years.
 6   Q.   Um-hum.
 7   A.   And I became a full professor, associate professor,
 8        and then in 2015, I took a position at Bangor
 9        Christian Schools as head of school.
10   Q.   You gave up a full tenured professorship?
11   A.   Yes.
12   Q.   Oh, my goodness, you are a brave man.  So when you
13        came to Bangor Christian Schools, what position was
14        that?
15   A.   Head of school.
16   Q.   And you've been head of school ever since?
17   A.   Yes.
18   Q.   Could you just say briefly, what are the sort of
19        typical duties and important duties of head of
20        school?
21   A.   I'm responsible for the budgets for sure, overall
22        hiring, the overall vision, direction of the school,
23        the international program.
24   Q.   And who do you report to?
25   A.   Senior pastor of the church, Dr. Jerry Mick, and the
```

9

```
 1        Deacon Board.
 2   Q.   And is the senior pastor a member of the Deacon
 3        Board?
 4   A.   No.
 5   Q.   Those are two separate entities?
 6   A.   (Nods).
 7   Q.   Do you have an employment agreement with somebody?
 8   A.   Yes, with Crosspoint Church.
 9   Q.   With Crosspoint Church, and is Crosspoint Church
10        also known by another name or formerly known as
11        something else?
12   A.   Formerly Bangor Baptist Church.
13   Q.   Okay.  So Bangor Baptist Church became Crosspoint
14        Church?
15   A.   Um-hum, yes.
16   Q.   When did that happen?
17   A.   A couple of years ago.
18   Q.   And what type of church is Crosspoint Church?  Is
19        it a particular denomination?
20   A.   It's an independent Baptist Church.
21   Q.   An independent Baptist Church.  What's the
22        difference between an independent Baptist Church
23        and some other sort of Baptist Church?
24   A.   Well, it's not part of a grouping of churches.  It's
25        by itself so it's independent.
```

10

```
 1    Q.   Okay, and is that the same thing that it was when
 2         it was Bangor Baptist Church?
 3    A.   Um-hum.
 4    Q.   Do you have a role with respect to Crosspoint
 5         Church other than being head of school?
 6    A.   Yes.  I'm actually also what they call a connections
 7         pastor, just help new families get connected into the
 8         church.
 9    Q.   And as a connections pastor, do you report to the
10         pastor -- lead pastor?
11    A.   Um-hum.
12    Q.   Okay.  I almost said pastor in chief and then I
13         realized I had the wrong operation going here.  Are
14         you a member of Crosspoint?
15    A.   Yes, I am.
16    Q.   You said the Deacon Board.  Is that the highest
17         board of the church?
18    A.   Yes.
19    Q.   And who is on the Deacon Board?
20    A.   Looking for the names?
21    Q.   No, no, no, descriptively, who are the Deacon
22         Board?
23    A.   They're men that are the leaders in the church.
24    Q.   Okay.
25    A.   Yup.
```

| | | |
|---|---|---|
| 1 | Q. | Okay, and is there a different board that's |
| 2 | | particularly interested in the school, Bangor |
| 3 | | Christian Schools? |
| 4 | A. | We have an Advisory Board for the school. |
| 5 | Q. | Okay, and who is a member of the Advisory Board? |
| 6 | A. | We have some parents, we have some former parents, we |
| 7 | | have just some people that are committed to Christian |
| 8 | | education as well. |
| 9 | Q. | And I guess from its name, but would you confirm, |
| 10 | | the Advisory Board doesn't have policymaking |
| 11 | | authority with respect to the school? |
| 12 | A. | Correct, they are there to advise the administration. |
| 13 | Q. | And so policy decisions like curriculum decisions, |
| 14 | | who would be responsible for making those? |
| 15 | A. | That would be Mrs. Boone and myself. |
| 16 | Q. | Okay, and if there was a dispute or someone was |
| 17 | | unhappy about that, is there an appellate -- you |
| 18 | | know, could they take a complaint to somebody else |
| 19 | | or are you both the final say of that? |
| 20 | A. | I suppose it could go as high as the Deacon Board but |
| 21 | | I've never known that to happen. |
| 22 | Q. | So one of the things that you said that you were |
| 23 | | going to talk about or were designated to talk |
| 24 | | about are the hiring and your faculty, and so what |
| 25 | | criteria do you apply when you're looking for |

| | | |
|---|---|---|
| 1 | | teachers for Bangor Christian Schools? |
| 2 | A. | Well, in our faculty manual it outlines it pretty |
| 3 | | much step by step.  Do you want me to read through |
| 4 | | that or do you have a copy of that? |
| 5 | Q. | I do have a copy of your faculty manual and we'll |
| 6 | | get to that in a second, but I was just wondering |
| 7 | | sort of if you could tell me what are the things |
| 8 | | that you're looking for when you go to hire faculty |
| 9 | | for the school? |
| 10 | A. | Well, if I can take a look at the manual, I can step |
| 11 | | you through each one.  I mean, we're looking for -- |
| 12 | | we're looking for teachers. |
| 13 | Q. | Yup. |
| 14 | A. | We're looking for Born Again believers. |
| 15 | Q. | Okay.  Could you just help me, what is the |
| 16 | | difference between a Born Again Christian and a |
| 17 | | Christian?  Is there a difference? |
| 18 | A. | A Born Again Christian recognizes that they have |
| 19 | | sinned, have not met God's standard, recognizes that |
| 20 | | trusting in Jesus is the only way for them to be |
| 21 | | saved from their sins and invites God and Jesus to |
| 22 | | really lead their life and to direct them for the |
| 23 | | rest of their life. |
| 24 | Q. | And so those are sort of the requirements or the |
| 25 | | criterion for one to say that you're a Born Again |

13

```
 1        Christian?
 2   A.   Um-hum.
 3   Q.   And then Christian I guess is a bigger term, right,
 4        because that includes like Methodists and Catholics
 5        and --
 6   A.   People can be Born Again believers in any
 7        denomination.
 8   Q.   Okay.  So Born Again underlies sort of all of the
 9        possible Christian denominations?
10   A.   Could you repeat that?
11   Q.   The idea of being Born Again is a concept that
12        could underlie one or more of these Christian
13        denominations?
14   A.   It could.
15   Q.   It's not unique to --
16   A.   It's actually a Biblical description.  Jesus himself
17        said, you know, in order for you to be with me
18        forever, you need to be Born Again.
19   Q.   Okay.  One more question and then I promise I'll
20        try to keep these things straight.  What is an
21        Evangelical Christian?
22   A.   Evangelical Christian is one who would be Born Again,
23        would be saved, also feels a commitment to sharing
24        their faith with others.
25   Q.   So is Crosspoint Church an Evangelical Christian
```

JA148

14

| | | |
|---|---|---|
| 1 | | Church? |
| 2 | A. | Yes. |
| 3 | Q. | Okay, and is it a requirement that you be Born |
| 4 | | Again to be a member of Crosspoint Church? |
| 5 | A. | Through a statement of faith, yes. |
| 6 | Q. | Okay.  So in order to be a teacher at the church -- |
| 7 | | at the school, Bangor Christian School, you need to |
| 8 | | be Born Again, Christian, Evangelical, all of those |
| 9 | | three? |
| 10 | A. | We don't describe it that way. |
| 11 | Q. | Okay. |
| 12 | A. | We say a Born Again believer, a statement of faith |
| 13 | | that they have trusted Jesus with their life. |
| 14 | Q. | Um-hum. |
| 15 | A. | And then we have several different criteria for |
| 16 | | teaching experience -- |
| 17 | Q. | Yup. |
| 18 | A. | -- in their area of expertise. |
| 19 | Q. | Right.  Could a person -- |
| 20 | A. | Sorry. |
| 21 | Q. | Go ahead. |
| 22 | A. | They need to have a commitment to -- to developing a |
| 23 | | Biblical world view with their students. |
| 24 | Q. | Okay. |
| 25 | | MS. FORSTER:  Let's mark this next item as |

JA149

```
 1        number 13.

 2            (Exhibit No. 13 marked for identification.)

 3    BY MS. FORSTER:

 4    Q.  Do you recognize this item?

 5    A.  Yes, I do.

 6    Q.  What is this?

 7    A.  This is a sample of a teacher contract.

 8    Q.  So one thing I notice is that in a couple of places

 9        here right on the front page it says in bold, "a

10        Christian role model" and that's underlined but

11        there's no description of what that is.  What do

12        you mean by a Christian role model?

13    A.  Well, if they're following this, they would be a

14        Christian role model.

15    Q.  So if -- I'm looking at paragraph #3.  Is that what

16        you're looking at too?

17    A.  (Nods).

18    Q.  And do you mean that they follow the Biblical

19        standards of conduct in the area of alcohol, drugs,

20        tobacco, public dances, gambling, et cetera?  Is

21        that what you're talking about?

22    A.  That would be part of it for sure, yes.

23    Q.  And you talk about some very specific verses.  I'm

24        not even going to try to -- Colossians?

25    A.  Colossians, yes.
```

| | |
|---|---|
| 1 | Q. Colossians and Titus and -- |
| 2 | A. Thessalonians. |
| 3 | Q. -- Thessalonians, see, all that Latin and I can't |
| 4 | -- anyway, and so they know that that's where they |
| 5 | look to find whether or not they're a good |
| 6 | Christian role model? |
| 7 | A. Those are examples, yes. |
| 8 | Q. The next paragraph there talks about standards for |
| 9 | sexual behavior? |
| 10 | A. Um-hum. |
| 11 | Q. Am I correct that a person who is homosexual would |
| 12 | not be eligible for a teaching position? |
| 13 | A. Well, we have high Biblical standards for what we're |
| 14 | looking for in our teachers and our students so if |
| 15 | they are not able to live up to those standards, then |
| 16 | that would be -- |
| 17 | Q. And one of those Biblical standards is that |
| 18 | homosexuality is not appropriate, is that fair? |
| 19 | A. Correct. |
| 20 | Q. Please know, I mean, to put this on the record, |
| 21 | these questions aren't in any way to judge or to |
| 22 | suggest that something is wrong or not wrong.  I'm |
| 23 | just trying to obtain information. |
| 24 | A. Right. |
| 25 | Q. So please don't think any of this is to suggest |

```
 1        that any of these answers are right or wrong.
 2   A.   And we follow what the Bible says and that's what we
 3        refer to for our standards of conduct for our
 4        faculty, for our leaders, for our students.
 5   Q.   And when you say you follow what the Bible says, do
 6        you take the word of the Bible literally?
 7   A.   Yes.
 8   Q.   Sort of exactly as it says?
 9   A.   Yes.
10   Q.   Okay.  So what about a person who presents or who
11        identifies as a gender that's different than that
12        on his or her birth certificate, would that fit
13        within this paragraph about being a Christian role
14        model?
15   A.   Well, again, we would follow what the Bible says
16        about sexuality or gender and ask that our faculty,
17        our staff, follow.
18   Q.   And does the Bible say or suggest that a person is
19        the gender that they're born as or that they're
20        biologically?
21   A.   That is what the Bible says.
22   Q.   Okay.  To the extent you know, do you know whether
23        or not a nonsectarian school could discriminate or
24        choose not to hire someone based on their being
25        homosexual?
```

```
 1   A.  Could you repeat that?
 2   Q.  Sure.  Oh, yeah, that's another rule, by the way.
 3       If I say something that doesn't make sense, which
 4       happens, I don't know, Chris, what, approximately
 5       once every ten minutes, you should definitely ask
 6       instead of trying to answer.  If you were not a
 7       sectarian school, if you were a nonsectarian
 8       school, do you know whether or not you would be
 9       allowed to say that an individual who's a
10       homosexual can't be a teacher here?
11   A.  I haven't looked at those standards.
12   Q.  Okay.  Would it be okay with you if in order to
13       receive public funding you had to change the
14       standard and hire individuals who were homosexual?
15   A.  Well, our position is that, you know, we're
16       interested in this as a possibility as long as we
17       don't have to change what we do.
18   Q.  So in other words, one of the conditions or one of
19       the things that you would be considering is whether
20       or not accepting tuition would allow you to
21       continue to have these restrictions on who you
22       hire?
23   A.  With everything -- if we're able to do everything
24       that we're currently doing, then, you know, we would
25       consider accepting the funds.
```

```
1   Q.   Right, and I suppose conversely, if the State or if
2        the law said to you, well, you can't continue to
3        exclude groups of people based on homosexuality,
4        presenting or identifying as a gender other than
5        biology at birth, that would be a problem?
6             MS. RIVERA:  I'm going to object because I
7        think that's somewhat mischaracterized but go ahead
8        and answer if you understand the question.
9             MS. FORSTER:  You mean because of the 14
10       different clauses in there?
11            MS. RIVERA:  A little confusing.
12  BY MS. FORSTER:
13  A.   Yeah, I wouldn't mind you repeating the question.
14  Q.   As if I could.  It's okay, we can move on.  Another
15       part of this contract, if you look at paragraph 13,
16       it talks about the resolution of differences and it
17       says underlined "always presenting a united front."
18       What does that mean?
19  A.   Well, it means that we may not always agree on things
20       but we're not going to go out in -- in the public or
21       in -- in other parties and air our differences.
22  Q.   So I can't believe that you haven't considered
23       whether or not the school might be a plaintiff in
24       one of these lawsuits.  Have you ever considered
25       being a plaintiff as the school, not as you
```

```
 1        personally?
 2   A.   Not really.
 3   Q.   If you look at paragraph 14, it talks about
 4        resolution of disputes and it says, "with each
 5        other in private or within the Christian
 6        community."  Does this mean that you don't think
 7        people should resort to courts to resolve disputes?
 8   A.   No, this is talking about -- this is a contract with
 9        a teacher in terms of, you know, working at the
10        school.  You're asking if we don't believe in the
11        court system?  I'm not clear.
12   Q.   Well, what I was thinking about is if an employee,
13        someone who signs this contract, is unhappy with
14        their condition, can they bring a complaint before
15        the Maine Human Rights Commission?
16   A.   They would be allowed to for sure.
17   Q.   Okay, and they could bring a complaint in court if
18        they felt that that was not resolved?
19   A.   Yeah.
20   Q.   Okay.  So this language isn't meant to suggest to
21        your employees that they're somehow limited in
22        their rights to dispute resolution?
23   A.   No, it's just a hope that we can come to an
24        agreement.
25   Q.   You want it to be worked out privately because
```

```
 1        nobody wants to be a party to I would say this, but
 2        you know what I mean.  One other question, what
 3        does it mean to say in paragraph 13 to "always give
 4        a good report?"
 5   A.   It would mean being positive, look for the positive
 6        in each situation.
 7   Q.   And so as part of an employment contract, to treat
 8        their job as if they're always putting their best
 9        face forward?
10   A.   That's what I've done in my positions.
11             MS. FORSTER:  Let's mark this.
12        (Exhibit No. 14 marked for identification.)
13   BY MS. FORSTER:
14   Q.   I believe this is what you were talking about
15        before.  If you could please turn to page on the
16        bottom, where apparently my secretary thinks Bangor
17        Christian Schools is BDS as opposed to BCS, 72.
18        Well, she got TA right this morning for Temple
19        Academy.  When I asked you a few minutes ago about
20        the criteria for employment and you said, oh, it's
21        in our faculty manual, is this what you were
22        speaking about?
23   A.   Yes, it is.
24   Q.   Okay, and so I guess there's one more level of
25        thing that I need to understand, "a tithing member
```

```
 1        of a Bible-believing church," what does that mean?
 2   A.   A Bible-believing church does not have to be a
 3        Baptist church, it can be an independent church.
 4   Q.   Okay.
 5   A.   Those that take the Bible literally.
 6   Q.   Okay.  So those were not Evangelical but Born
 7        Again?  No?
 8   A.   Well, you're talking about the church.
 9   Q.   Okay.  The person is Born Again?
10   A.   The person is Born Again.
11   Q.   The church, a Bible-believing church?
12   A.   Think of it as those churches whose leadership, the
13        pastors, accept the Bible as God's word as truth.
14   Q.   Okay.
15   A.   Literal interpretation and that's what is -- that's
16        what is preached.
17   Q.   Okay.  So that's a Bible-believing church?
18   A.   Yes.
19   Q.   And then a tithing member?
20   A.   Giving, like an offering, so those that are active
21        and give to their church.
22   Q.   Okay, got it.  I think now we have all the terms
23        down, the difference between the churches and the
24        people, the people are Born Again, the church is a
25        Bible-believing church.  On page 64, right at the
```

```
1        beginning, number one, says "that this is a full-
2        time Christian ministry."  What does that mean?
3        The school, I assume, you're saying is a full-time
4        Christian ministry?
5    A.  No.
6    Q.  Oh, okay.
7    A.  The vocation that they are called to is full-time and
8        they're -- the work they're doing is ministry.
9    Q.  And what does it mean to say the work is ministry?
10   A.  It's their calling, it's their vocation, they're
11       there to serve, minister to the students that are in
12       their influence.
13   Q.  Okay, and this is the current version of your
14       faculty manual, correct?
15   A.  Yes.
16   Q.  And it's accurate as of today?
17   A.  (Nods).
18           MS. RIVERA:  You have to answer.
19   BY MS. FORSTER:
20   A.  Oh, yes.
21   Q.  Let's talk about students and the eligibility for
22       admission to Bangor Christian Schools.
23   A.  Okay.
24   Q.  Again, before we get to the actual student
25       handbook, what criteria are you looking for in
```

```
 1        deciding whether or not a student is appropriate
 2        for admission to your school?
 3   A.   Our mission is to assist families in educating the
 4        whole child by encouraging spiritual maturity and
 5        academic excellence in a supportive environment and
 6        our final authority in all matters is the Bible.
 7        That's our mission statement.  So what we're looking
 8        for is it works best for the student if the parents,
 9        the church and the school are all on the same page
10        with those things.
11   Q.   Okay.
12   A.   And the student also wants to be at the school.
13        That's -- that's when it really works.
14   Q.   Okay.
15   A.   So those are the things that through our interview
16        process we try to determine in talking with the
17        families and talking with the students, if they want
18        what we can offer.
19   Q.   Okay, and when you talk with the families who are
20        interested in applying, do you ask them, the
21        parents, about their religious beliefs?
22   A.   Yes.  We ask them where they go to church.
23   Q.   Is it a requirement that they go to church?
24   A.   No.
25   Q.   Is it a requirement that they be Christian?
```

```
 1   A.   No.  We -- I'm trying to think.  We don't have any
 2        that are not -- they don't profess to believe but we
 3        have some that don't go to church for one reason or
 4        another, but as long as we're on the same page of
 5        what they're going to be learning in the school and
 6        the students want to be there.
 7   Q.   So you haven't had the experience of a family that
 8        is Jewish or is Muslim coming to you and interested
 9        in enrolling a child in the school?
10   A.   No, we have.
11   Q.   And how -- how have you discussed whether or not
12        that was appropriate?
13   A.   Well, we tell them what they're going to be learning
14        and we talk about our goal of developing a Biblical
15        world view for their son or daughter and sometimes it
16        doesn't work, they say no, that's not what we want,
17        and sometimes they say yes and then we go ahead.
18   Q.   Oh, I thought you said that you didn't have any
19        students that weren't Christian in the school.  You
20        have in the past?
21   A.   You said were there families.
22   Q.   Oh, oh, oh.  So do you have students who aren't
23        Christian?
24   A.   Well, when you get back to what a -- whether someone
25        is saved or not, we don't know whether someone is.
```

```
 1        That's between them and God.
 2   Q.   Okay.
 3   A.   So for me to say whether we have -- we have 300
 4        students, whether all 300 are saved and Born Again
 5        believers, it's impossible for me to say.
 6   Q.   Because that's not something you would discuss?
 7   A.   Not in the admissions, you know, component, no, but
 8        we let them know what we believe, what we do, why we
 9        do it, and there's lots of reasons for families to
10        want to come to the school.
11   Q.   Okay.  What are some of those?
12   A.   Well, the main one is so their child can develop a
13        Biblical world view.
14   Q.   Okay.
15   A.   But we also have strong academics, you know, the
16        environment is different at our school than other
17        schools so that could be reasons why families would
18        like to, and as I said, we sit down and look at all
19        four points that I described and assess whether it's
20        a good fit for the family, for the student and for
21        us.
22   Q.   So when you're having that discussion, if it
23        appears that it's perhaps not a good fit, do you
24        discourage them from applying or do they apply and
25        then there's someone who reviews the applications
```

```
 1        and decides this is not a good idea?

 2   A.   We've done both of those.

 3   Q.   Okay.  Let's see, I'm looking for -- this is what

 4        happens when I number things.  I guess I'll catch

 5        up with it somewhere else.  This may be a big jump

 6        ahead because I know you aren't designated to talk

 7        about curriculum, but let's mark this next.

 8           (Exhibit No. 15 marked for identification.)

 9   BY MS. FORSTER:

10   Q.   Is that familiar?  Do you recognize this?

11   A.   Yes, I do.

12   Q.   Okay.  On page 19 is where I'm looking about

13        admissions and the second paragraph.

14   A.   19 on your numbers or my numbers?

15   Q.   Oh, sorry, 19 on my numbers.

16   A.   Yes.

17   Q.   "Any family who, despite their religious background

18        or beliefs, is willing to support our philosophy of

19        Christian education," et cetera, et cetera.  So if

20        a family is a devout believer of another faith,

21        would it be possible for them to agree to this; in

22        other words, how could someone who is doctrinally

23        and otherwise faithful to the Jewish faith agree to

24        something like this statement?  Is that a real

25        possibility?
```

1   A.   I can't answer that for them.

2   Q.   It just seems -- well, maybe turning the script

3        would make more sense.  You've told me about what

4        your schools' views are.  If you were to be asked

5        as a condition of enrolling your child and by

6        "your," I mean a child whose family espouses the

7        beliefs consistent with the doctrinal beliefs of

8        Bangor Christian Schools in another school and they

9        had this same sort of statement that said

10       regardless of your religion, you have to espouse

11       our beliefs?

12           MS. RIVERA:  I'm going to object to the

13       question.  You can answer if you know the answer.

14  **BY MS. FORSTER:**

15  A.   I'm not really sure what you're asking, so maybe

16       rephrase or say it again.  I'm not following the

17       path.

18  Q.   Sure.  What I'm trying to ask, and this is such a

19       hard question, Chris and I were talking about how

20       you would ask this question, but it seems possible

21       that one of the things or requirements of one's

22       faith is a level of belief that would make it

23       impossible to agree to another faith's beliefs for

24       purposes of attending school.  Does that sound at

25       all rational?

```
 1              MS. RIVERA:  I'm going to object.  I think
 2         it calls for speculation.  You can answer if you
 3         know.
 4    BY MS. FORSTER:
 5    A.   I don't know.
 6    Q.   Okay, because this suggests that you would accept
 7         someone from any religious background, any
 8         religious faith, so long as they were willing to
 9         support your philosophy of Christian education,
10         conduct, et cetera, et cetera?
11              MS. RIVERA:  Are you asking him if that's
12         the case?
13              MS. FORSTER:  Yes.
14    BY MS. FORSTER:
15    Q.   Is that the case?
16    A.   Yes, we will do that.
17    Q.   Okay.  So what would happen if the child who came
18         to you was outwardly homosexual and the family who
19         came to you, they were all aware that their child
20         was homosexual?
21    A.   Well, as I said before, we abide by Biblical
22         standards and if the families are not -- if the
23         families and students are not willing to support
24         that, then we're not a good fit.
25    Q.   So the mere fact that the student is homosexual
```

```
 1        would mean they wouldn't be a good fit for the
 2        program, for the school?
 3   A.   Well, they wouldn't be able to sign our -- our, you
 4        know, agreement that we have in the handbook if
 5        that's how they felt.
 6   Q.   Okay.
 7   A.   So they would -- they would not -- I don't know how
 8        they could sign that.
 9   Q.   Okay, and would the same be true if the child was
10        identifying or presenting themselves as a gender
11        that was not their biological gender at birth?
12   A.   I'd answer it the same way.  We have firm Biblical
13        standards and we expect our students and staff and
14        leaders to follow that and if they can't, then we're
15        not the school for them.
16   Q.   Do you admit students with disabilities?
17   A.   Can you expand on that?
18   Q.   Well, okay, very simply, do you admit students who
19        have individualized education programs --
20   A.   Yes.
21   Q.   -- under IDEA, and for those students, do you offer
22        to provide them with special education and related
23        services?
24   A.   We have what's called 504 plans.
25   Q.   Okay, and I'm going to guess the reason you have
```

```
 1        504 plans, do you take federal funds?

 2   A.   We do not receive federal funds.

 3   Q.   You do not receive federal funds?

 4   A.   We don't receive money for that.  We have services

 5        that are provided through Title I and Title II.

 6   Q.   So you have Title I and Title II services at your

 7        school?

 8   A.   Yes, but it's through the Bangor School Department.

 9   Q.   Right.

10   A.   We don't receive the money.

11   Q.   So as an entity that doesn't receive any federal

12        funds, do you have to provide 504 services?

13   A.   We don't have to.

14   Q.   But you choose to?

15   A.   Yes.

16   Q.   Okay, and do you make the referrals for Title

17        services?  Are you involved in the identification

18        and evaluation of what students would need Title

19        services?

20   A.   Mrs. Boone is the one that should be answering those

21        questions.

22   Q.   Okay, perfectly legitimate answer.  I just didn't

23        know whether or not you made -- do you make that

24        sort of inquiry at the time of admission or is that

25        something that happens once you -- she would know?
```

```
 1    A.   That's the answer.  Ask her, yeah.

 2    Q.   Okay.  Well, you said that you did finances, right?

 3    A.   Um-hum.

 4    Q.   Okay.  So I'm safe if I talk to you about financial

 5         aid?

 6    A.   Yes.

 7    Q.   Excellent.  So I guess the first question I have

 8         is, is Bangor Christian Schools a separate entity

 9         from Crosspoint Church financially?

10    A.   We're a separate 501(c)(3), yes.

11    Q.   Okay, and what are the sources of funding for the

12         school?

13    A.   Tuition revenue.

14    Q.   Okay.

15    A.   And fundraising efforts.

16    Q.   Um-hum.

17    A.   We have some fees associated with sports programs,

18         things of that nature.

19    Q.   Okay.

20    A.   Those are the bulk of it.

21    Q.   And what determines or who determines how much

22         tuition is?

23    A.   I put forward a proposal each year and the budget

24         gets approved by the Deacon Board and I take advice

25         from Advisory Board.
```

```
 1    Q.   But the final say as to what tuition is, is the
 2         Deacon Board?
 3    A.   Yeah, they approve the budget.
 4    Q.   Okay.  Do students receive a discount on tuition if
 5         they're a member or members of Crosspoint Church?
 6    A.   No.
 7    Q.   Does the school offer any merit-based scholarships
 8         sort of regardless of need?
 9    A.   There is one small scholarship each year that is
10         based on that, yes.
11    Q.   And what is that?
12    A.   The name of the scholarship?
13    Q.   It has a name?
14    A.   Or the amount of money?  I'm not sure what you're
15         asking.
16    Q.   Could you describe the scholarship that's merit
17         based as opposed to financial aid?
18    A.   Sure.  A rising senior has the opportunity to receive
19         somewhere between -- it's around $500 -- $500 to $800
20         from a named scholarship from years before.
21    Q.   And does that go to the highest-ranking rising
22         senior?
23    A.   No, they apply based on -- and the financial aid
24         committee reviews their application.
25    Q.   And the school also offers need-based financial
```

| 1 | aid, yes? |
| 2 | A. That's the bulk of what the financial aid is. |
| 3 | Q. Okay. |
| 4 | **(Exhibit No. 16 marked for identification.)** |
| 5 | **BY MS. FORSTER:** |
| 6 | Q. Take a look at this.  Do you recognize this |
| 7 | document? |
| 8 | A. Yes, I do. |
| 9 | Q. Okay.  Does the student need to be a member of a |
| 10 | church in order to apply for financial aid? |
| 11 | A. No. |
| 12 | Q. So on page -- well, my number is 56, the second |
| 13 | page of the document, that church information |
| 14 | section, you can N/A or skip that and still be |
| 15 | eligible? |
| 16 | A. Um-hum. |
| 17 | Q. And approximately how many students receive |
| 18 | financial aid or what percentage of the students, |
| 19 | if that's easier? |
| 20 | A. Probably through this process, probably 15, maybe 20. |
| 21 | Q. Percent of the students? |
| 22 | A. No, students. |
| 23 | Q. Oh. |
| 24 | A. You asked how many students. |
| 25 | Q. Yes.  So how many students in total attend the |

```
1        school?

2   A.   A round number is 300.  This year we're at 293 I

3        think right now.

4   Q.   And what grades is that?

5   A.   K/4 all the way to twelfth grade.

6   Q.   Okay, so K to 12 is 300 students?

7   A.   (Nods).

8   Q.   Of whom 15 to 20 receive financial aid?

9   A.   Yes, through this process.

10  Q.   So there's this process.  There's one student who

11       receives the merit scholarship?

12  A.   Right.

13  Q.   What other processes are there for financial aid?

14  A.   Well, the other piece that I was running through my

15       head, we have staff discounts which is all the

16       same -- you know, it's still financial aid.

17  Q.   Yup.

18  A.   So the staff discount would add more families to that

19       if that's what you're looking for, but in terms of

20       this strict application process, it's probably about

21       20 students.

22  Q.   Okay, and then individuals' who work at the schools

23       children attend for a discounted rate?

24  A.   Yes.

25  Q.   I understand.
```

```
 1   A.   Oh, the multi kid discount too I suppose, yeah.
 2   Q.   Okay.  I flashed in my mind the multi policy
 3        discount for insurance.
 4   A.   Well, it's kind of like that but there's not a --
 5        there's not a financial aid, you know, package for
 6        that so we have those discounts too.
 7   Q.   Okay.  So if you have more than one child attending
 8        the school there's a discount?
 9   A.   If you have more than two there's a discount.
10   Q.   More than two, okay.  That starts talking about big
11        families.  Is one of your responsibilities also to
12        manage or oversee the NEASC accreditation process?
13   A.   Yes.
14   Q.   And when was the last time you went through
15        accreditation review?
16   A.   We're in the middle of our self study right now.
17   Q.   And is the self study the year before?
18   A.   Yes.
19   Q.   I've heard of this before.  So that must mean that
20        you were last accredited in '09?
21   A.   Yes, before I got there.
22   Q.   When you apply for accreditation, do you supply
23        information about your curriculum to the NEASC
24        people?
25   A.   Yes, that's one of the standards.
```

```
 1   Q.   And when they review the curriculum, are they
 2        reviewing it to see whether or not it's consistent
 3        with the standards of the state that the school is
 4        located in or do they have another standard?
 5   A.   I can't answer that.
 6   Q.   Okay.  When was the first time you heard that there
 7        might be a lawsuit challenging this tuition
 8        statute?
 9   A.   It was last spring I think.
10   Q.   And how did you find out?
11   A.   Mr. Keller and I think there was another -- another
12        lawyer involved mentioned that they were looking for
13        some families to join a lawsuit for that.
14   Q.   And did you speak to them on the phone, in writing?
15   A.   Speak to who?
16   Q.   Attorney Keller or the other individual that you
17        thought --
18   A.   E-mail was first.
19   Q.   Okay.
20   A.   And we met in person.  I don't have the date on when
21        that was.
22   Q.   And as the -- as the result of that meeting, did
23        you make a decision about whether or not to assist
24        in identifying potential families?
25   A.   What I agreed to do was e-mail our families
```

```
 1        information that they were putting forward.

 2   Q.   So I'm going to show you something that's already

 3        been marked as Exhibit 2 from a prior deposition.

 4   A.   Um-hum.

 5   Q.   Is that the e-mail that you're talking about?

 6             MS. RIVERA:  Can I see it?

 7   BY MS. FORSTER:

 8   A.   Yeah, that's the one in May, so springtime.

 9   Q.   Other than sending that e-mail, did you do anything

10        else to assist either Attorney Keller or anyone

11        else in identifying plaintiffs?

12   A.   Not that I recall.

13   Q.   Did the Carsons speak with you about whether or not

14        they should become plaintiffs?

15   A.   No, he just sent me an e-mail to say you can give Mr.

16        Keller my information, so I just passed that along

17        through e-mail.

18   Q.   And what about the Gillises, did you have any

19        conversations with the Gillises?

20   A.   No, I don't think they had replied to me.  I think

21        they must have contacted the lawyers directly, and --

22        no.

23   Q.   And how did you feel representing the school about

24        having the Carsons and the Gillises be plaintiffs?

25             MS. RIVERA:  I'm going to object.  I think
```

```
 1        WE'RE getting beyond the scope of the deposition here
 2        asking him about how he felt about it.
 3   BY MS. FORSTER:
 4   Q.   How does Bangor Christian Schools feel about having
 5        the Carsons and the Gillises be plaintiffs in this
 6        case?
 7   A.   Well, it's -- I don't know, it's not really for us to
 8        say.  This is their -- this is their decision to go
 9        forward and challenge the law.
10   Q.   Are you aware that in the complaint the plaintiffs
11        assert that Bangor Christian Schools would be
12        interested in receiving tuition funds?
13   A.   Yes.
14   Q.   And is that an accurate statement?
15   A.   As long as we don't -- our position has been as long
16        as we don't have to change anything we're doing, we
17        would consider it.
18   Q.   So you would have to look at what the actual
19        requirements for receipt of tuition would be?
20   A.   Sure.
21           (Exhibit No. 17 marked for identification.)
22   BY MS. FORSTER:
23   Q.   Showing you a chain of e-mails.
24   A.   Um-hum.
25   Q.   If you could take a look at those and see if you
```

```
 1        remember this exchange.
 2   A.   Yes.
 3   Q.   And what was -- why did you reach out to Ms.
 4        Ford-Taylor?
 5   A.   When I took over as head of school, my predecessor
 6        stepped me through the process of what he had to do
 7        each year to be approved --
 8   Q.   Okay.
 9   A.   -- and there was a checklist and I had to gather a
10        bunch of documents and mail it down to Augusta and
11        within a week we got a certificate in the mail.  I
12        did it, you know, it took about a week over the
13        summer and I did that the first year and second year
14        and then I think it was 2017 the process changed.
15   Q.   Okay.
16   A.   And a lot more information was needed.  All of a
17        sudden our -- our staff needed to go through a
18        fingerprinting process and the State was talking
19        about every teacher has to be certified and we didn't
20        really understand where that was coming from.
21   Q.   Okay.
22   A.   So we -- we did that, we went through the
23        fingerprinting exercise, the State then said for this
24        year you don't have to worry about the certification
25        requirements, and so we just kind of went into a
```

```
 1        holding pattern with it.  We were certified -- sorry
 2        -- we were approved that year and that's when the
 3        next year leading up to that summer I said, okay,
 4        we've got to figure out what do we have to do, what
 5        are we not going to do, and so I began asking some
 6        basic questions with Ms. Taylor -- Ms. Ford-Taylor
 7        about the two different levels of I guess I'll call
 8        it approval and that's where that came from.  We were
 9        trying to decide, do we stick with the full approval
10        process, are we going to have to have all the
11        teachers certified or is our NEASC accreditation
12        enough along with the equivalent instructions.
13   Q.   Sure, and what did you ultimately decide the right
14        decision was for your school?
15   A.   To be an approved school.
16   Q.   And was that because you learned that as a NEASC
17        accredited institution, you didn't need to have
18        full certification for all of your staff?
19   A.   Yeah, that was a big part of it.
20   Q.   And have -- you may not know this but has Bangor
21        Christian Schools also been approved as opposed to
22        recognized?
23   A.   I don't know.
24   Q.   Okay.
25           (Exhibit No. 18 marked for identification.)
```

```
 1   BY MS. FORSTER:

 2   Q.   I just want to make sure, if you'd look at the

 3        second page which is BDS 5, the student and parent

 4        statement of corporation?

 5   A.   Um-hum.

 6   Q.   Is that what you were referring to when you said

 7        that they wouldn't be able to sign -- you said --

 8        I'm not doing this very well.  You said awhile ago

 9        that the student needed to be able to sign a

10        statement agreeing or understanding what the

11        school's beliefs were.  Is this what you were

12        referring to that they would struggle to sign?

13   A.   This is the statement that they need to sign to say

14        that they understand what is in our handbook.

15   Q.   Okay.

16   A.   Understand what we are doing as a school.

17   Q.   Is there another statement that you might have been

18        referring to?

19   A.   I don't know.  If there a way to reread what we said

20        here because I'm not --

21   Q.   I'm just -- I'm looking at the last page of

22        Exhibit -- which is the student handbook, the

23        exhibit sticker?

24   A.   These are the same.

25   Q.   Okay.
```

| | | |
|---|---|---|
| 1 | A. | These are the same.  Now I understand. |
| 2 | Q. | Okay.  If you look in pretty much the middle of |
| 3 | | that paragraph, there's a statement in there, "we |
| 4 | | understand that the school may request withdrawal |
| 5 | | at any time if in the opinion of the school the |
| 6 | | student does not fit into the spirit of the |
| 7 | | institution regardless of whether or not he/she |
| 8 | | conforms to the specific rules and regulations." |
| 9 | | Could you explain or give an example of what that |
| 10 | | might be? |
| 11 | A. | Well, we're a pretty small school and if I give |
| 12 | | examples of this, my understanding is this at some |
| 13 | | point could be public record.  It's going to be very |
| 14 | | easy for -- |
| 15 | Q. | Could you give a hypothetical example?  What could |
| 16 | | someone do that wasn't a violation of a rule or |
| 17 | | regulation but would still give you concern enough |
| 18 | | to suggest they withdraw from the school? |
| 19 | A. | It could be something they're not -- hum, |
| 20 | | hypotheticals are always hard. |
| 21 | Q. | I mean, I certainly don't want to violate any of |
| 22 | | your students' privacy, they have nothing to do |
| 23 | | with any of this, but I'm just trying to figure |
| 24 | | out, I mean, generally speaking you judge whether |
| 25 | | or not someone gets to stay based on do they comply |

```
 1      with the rules.  It strikes me there's something

 2      else you're getting at here.

 3   A. Hum, no, there's nothing different that we're getting

 4      at in there.  I'm trying to come up with a -- an

 5      example that would not -- would not violate a

 6      student's privacy and I cannot.

 7   Q. Okay.

 8           MS. FORSTER:  So I think this is all that I

 9      have for this witness.  Do you want to ask

10      questions --

11           MR. TAUB:  Why don't we take a break first.

12           MS. FORSTER:  Okay.

13           (OFF RECORD FROM 2:02 TO 2:07)

14   BY MS. FORSTER:

15   Q. Just a couple more questions.

16   A. I thought I was off.

17   Q. I know you were so hoping but it's going to be

18      quick.  Way back at the beginning when you talked

19      about the Church Board of Deacons, you said the men

20      on the Church Board of Deacons.  Are there any

21      women on the Church Board of Deacons?

22   A. No, there are not.

23   Q. Could there be?

24   A. No, there cannot.

25   Q. And why is that?
```

| | | |
|---|---|---|
| 1 | A. | You'll have to ask the leadership of the church I |
| 2 | | guess.  It's not a Biblical principle for women to |
| 3 | | lead the church. |
| 4 | Q. | I see.  We spent a lot of time talking about either |
| 5 | | homosexual or transgender potential employees, and |
| 6 | | I just want to be clear, an individual who |
| 7 | | identifies as being homosexual or as being |
| 8 | | transgender, the gender that is not on his or her |
| 9 | | birth certificate, would they be eligible for a |
| 10 | | teaching position? |
| 11 | A. | I'll just repeat the same thing that I said.  We have |
| 12 | | firm Biblical standards associated with the conduct |
| 13 | | of our teachers, staff, students and if they're not |
| 14 | | able to do that, then we're not a good fit for |
| 15 | | them -- |
| 16 | Q. | So no? |
| 17 | A. | -- for employment or for education. |
| 18 | Q. | Why isn't that just no? |
| 19 | | MS. RIVERA:  Objection.  If you need further |
| 20 | | explanation, you can explain. |
| 21 | **BY MS. FORSTER:** | |
| 22 | Q. | Assume that you could be eligible for tuition |
| 23 | | purposes without changing anything, okay, just as |
| 24 | | you are right now you could be eligible, would you |
| 25 | | agree to take tuition? |

1   A.   Yeah, I think I've answered that question.  All
2        things being equal, that is something that we would
3        consider.
4   Q.   You would consider it?
5   A.   Well, I can't make that decision today in front of
6        you.  I have a board that I go through, the deacons
7        would vote on it and so I would put it forward.
8   Q.   Um-hum.  You would tell them you don't have to
9        change anything.
10  A.   I would say we don't have to change anything, this is
11       an opportunity we have, but I can't begin to predict
12       right now what everybody is going to do in a vote.
13  Q.   Can you think of something else they might consider
14       in making that decision?
15            MS. RIVERA:  Objection.  Speculation.
16  **BY MS. FORSTER:**
17  A.   I don't know.
18  Q.   If we're telling you, the State, you don't have to
19       change anything about what you're doing --
20  A.   Um-hum.
21  Q.   -- what would be the basis to still say no?
22            MS. RIVERA:  Objection.  You can answer if
23       you know.
24  **BY MS. FORSTER:**
25  A.   I can't answer because I don't know what they would

47

```
 1        have for reasons.
 2   Q.   If you had a family come to you and they said to
 3        you, we think that you have the right environment
 4        for our child, the academic environment, the
 5        spiritual environment, but we don't believe in God,
 6        is that something that would concern you in making
 7        an admission decision?
 8   A.   Well, the answer to every question that we ask in
 9        those interviews is concerning.  We take it into --
10        under advisement, and so to answer that, yes, that
11        would be.
12   Q.   And they say to you, we can sign your statement but
13        just know we don't believe, is that --
14   A.   Is there a question there?  I'm sorry.
15   Q.   Yeah, is that an acceptable answer or would you
16        probe more as to even if they think they can sign
17        your statement, it still might really not be a good
18        fit?
19   A.   Would you repeat that?
20   Q.   Assuming that they tell you very honestly that they
21        don't believe in God but they say we will sign your
22        statement agreeing to behave and to conduct
23        ourselves in accordance with your school, does the
24        mere fact that they are still saying, you know, we
25        are telling you right out we don't believe in God,
```

```
 1        is that a problem from an admissions perspective?

 2   A.   Is it a problem?

 3   Q.   Yes.  Is that something that would give you either

 4        a negative inference or cause you concern about

 5        admission?

 6   A.   Well, it would cause us to have more questions and

 7        have longer -- maybe a longer discussion.  We meet

 8        with families for anywhere from 45 minutes to an hour

 9        and a half or more.

10   Q.   Longer than that deposition?

11   A.   Yes.

12              MR. TAUB:  Although it doesn't feel that

13        way.

14              THE WITNESS:  It doesn't feel that way and

15        it's a little easier questions.

16                      (LAUGHTER)

17   BY MS. FORSTER:

18   A.   But for one question, yeah, we're a Christian school

19        and if they're not -- if they don't -- if they come

20        into it not believing the Bible, then we've got to

21        find out, well, why are you here, why do you want to

22        come to the school and it doesn't exclude them but

23        your question was does it give us some concern, yes.

24        We would ask more questions and find out what they're

25        looking for but it doesn't exclude them.
```

49

```
1              MS. FORSTER:  All right.  Do you have any
2       questions?
3              MR. KELLER:  I do not.
4              MS. FORSTER:  All right.  Thank you very
5       much.
6              MS. RIVERA:  We'll read his deposition.
7              (Whereupon, the above-named deposition was
8       concluded at 2:13 p.m.)
9              (The deponent does not waive reading and
10      signing.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

50

```
 1                        CERTIFICATE
 2          I, Joanne P. Alley, a Notary Public in and for
 3   the State of Maine, hereby certify that on the 17th day
 4   of December, 2018, personally appeared before me the
 5   within-named deponent who was sworn to testify to the
 6   truth, the whole truth, and nothing but the truth in the
 7   aforementioned cause of action and that the foregoing is
 8   a true and accurate record as taken by me by means of
 9   computer-aided machine shorthand.
10
11          I further certify that I am a disinterested
12   person in the event or outcome of the aforementioned
13   cause of action.
14
15          IN WITNESS WHEREOF, I have hereunto set my hand
16   this 11th day of January, 2018.
17
18                        _____
19                        Joanne P. Alley
20                        Court Reporter/Notary Public
21
22   My commission expires:  July 17, 2022
23
24
25
```

```
 1              ALLEY & MORRISETTE REPORTING SERVICE

 2                     1203 Augusta Road

 3                   Belgrade, ME   04917

 4
                            January 14, 2018
 5

 6

 7   Dr. Jeffrey Benjamin
     c/o Kimberly Y. Smith Rivera, Esq.
 8   11803 104th Street.
     Largo, FL 33773
 9

10
     RE: Carson, et al. v Robert G. Hasson
11
     Enclosed please find a copy of your deposition taken in
12   the above-mentioned action.  Also enclosed is the
     original signature page and a sheet for corrections.
13   Please read the copy of the deposition and sign the
     original signature page before a Notary Public.  If
14   there are any corrections you wish to make, they should
     be made on the enclosed correction sheet.  Do not mark
15   on the deposition.

16   Please return the signed original signature page and
     correction sheet to Alley & Morrisette at the above
17   address within 30 days.

18   Thank you.

19

20

21

22

23

24

25
```

```
1   THE ORIGINAL DEPOSITION OF DR. JEFFREY BENJAMIN SHOULD

2   INCLUDE THE FOLLOWING CORRECTIONS:

3

4   Page Line     Change from this     To this

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1            TO BE COMPLETED BY THE DEPONENT:

 2        I, _____, have read the

 3   foregoing pages and have noted any stenographic errors

 4   of my testimony together with their respective

 5   corrections and the reasons therefore on the following

 6   Errata Sheet.

 7

 8            (SIGNATURE) _____

 9                (DATE) _____

10            * * * * * * * * * *

11   TO BE COMPLETED BY THE NOTARY PUBLIC/ATTORNEY

12        I, _____, a Notary Public/Attorney,

13   hereby acknowledge that the above-named deponent

14   personally appeared before me and affixed his/her

15   signature as his/her own true act and deed.

16

17            (SIGNATURE) _____

18                (DATE) _____

19   TITLE:  Carson, et al. v Robert Hasson

20   DEPOSITION OF:  Jeffrey Benjamin

21   DATE OF DEPOSITION:  December 17, 2018

22   NOTICING PARTY:  Sarah Forster, Esq.

23   REPORTER:  Joanne P. Alley

24

25
```

## #

**#3** [1] - 15:15

## $

**$500** [2] - 33:19
**$800** [1] - 33:19

## '

**'09** [1] - 36:20

## 0

**04333-0006** [1] - 2:4
**04917** [1] - 51:3

## 1

**104th** [2] - 2:15, 51:8
**11803** [2] - 2:15, 51:8
**11th** [1] - 50:16
**12** [4] - 3:12, 6:8, 6:10, 35:6
**1203** [1] - 51:2
**13** [5] - 3:13, 15:1, 15:2, 19:15, 21:3
**14** [5] - 3:14, 19:9, 20:3, 21:12, 51:4
**15** [5] - 3:13, 3:15, 27:8, 34:20, 35:8
**16** [2] - 3:16, 34:4
**17** [6] - 1:18, 3:17, 4:4, 39:21, 50:22, 53:21
**17th** [1] - 50:3
**18** [2] - 3:18, 41:25
**18-cv-00327** [1] - 1:4
**19** [3] - 27:12, 27:14, 27:15
**1:00** [2] - 1:18, 4:4

## 2

**2** [1] - 38:3
**20** [3] - 34:20, 35:8, 35:21
**2006** [1] - 7:15
**2015** [1] - 8:8
**2017** [1] - 40:14
**2018** [6] - 1:18, 4:4, 50:4, 50:16, 51:4, 53:21
**2022** [1] - 50:22
**207-626-8800** [1] - 2:4
**21** [1] - 3:14
**27** [1] - 3:15
**293** [1] - 35:2
**2:02** [1] - 44:13
**2:07** [1] - 44:13

**2:13** [1] - 49:8

## 3

**30** [1] - 51:17
**300** [4] - 26:3, 26:4, 35:2, 35:6
**301** [1] - 2:8
**33773** [2] - 2:16, 51:8
**34** [1] - 3:16
**39** [1] - 3:17
**398** [1] - 2:8

## 4

**4** [1] - 3:4
**41** [1] - 3:18
**45** [1] - 48:8
**480-557-8300** [1] - 2:9

## 5

**5** [1] - 42:3
**501(c)(3** [1] - 32:10
**504** [3] - 30:24, 31:1, 31:12
**512-480-5396** [1] - 2:13
**56** [1] - 34:12

## 6

**6** [2] - 2:3, 3:12
**64** [1] - 22:25

## 7

**72** [1] - 21:17
**78701** [1] - 2:12

## 8

**816** [1] - 2:12
**85281** [1] - 2:8
**888-233-6255** [1] - 2:16

## 9

**960** [1] - 2:12

## A

**AAG** [2] - 2:2, 2:2
**abide** [1] - 29:21
**ability** [1] - 5:7
**able** [6] - 16:15, 18:23, 30:3, 42:7, 42:9, 45:14
**above-mentioned** [1] - 51:12

**above-named** [2] - 49:7, 53:13
**academic** [2] - 24:5, 47:4
**academics** [1] - 26:15
**Academy** [1] - 21:19
**accept** [2] - 22:13, 29:6
**acceptable** [1] - 47:15
**accepting** [1] - 18:20, 18:25
**accordance** [1] - 47:23
**accreditation** [4] - 36:12, 36:15, 36:22, 41:11
**accredited** [2] - 36:20, 41:17
**accurate** [3] - 23:16, 39:14, 50:8
**acknowledge** [1] - 53:13
**act** [1] - 53:15
**action** [3] - 50:7, 50:13, 51:12
**Action** [1] - 1:4
**active** [1] - 22:20
**actual** [2] - 23:24, 39:18
**add** [1] - 35:18
**address** [1] - 51:17
**administered** [1] - 4:6
**administration** [1] - 11:12
**admission** [5] - 23:22, 24:2, 31:24, 47:7, 48:5
**Admission** [1] - 3:19
**admissions** [3] - 26:7, 27:13, 48:1
**admit** [2] - 30:16, 30:18
**advice** [1] - 32:24
**advise** [1] - 11:12
**advisement** [1] - 47:10
**Advisory** [4] - 11:4, 11:5, 11:10, 32:25
**affixed** [1] - 53:14
**aforementioned** [2] - 50:7, 50:12
**afternoon** [2] - 4:13, 4:14
**ago** [3] - 9:17, 21:19, 42:8
**agree** [5] - 19:19, 27:21, 27:23, 28:23, 45:25
**agreed** [1] - 37:25
**agreeing** [2] - 42:10,

47:22
**agreement** [3] - 9:7, 20:24, 30:4
**ahead** [4] - 14:21, 19:7, 25:17, 27:6
**aid** [11] - 32:5, 33:17, 33:23, 34:1, 34:2, 34:10, 34:18, 35:8, 35:13, 35:16, 36:5
**Aid** [1] - 3:17
**aided** [1] - 50:9
**air** [1] - 19:21
**al** [3] - 1:7, 51:10, 53:19
**alcohol** [1] - 15:19
**Alley** [6] - 1:16, 4:1, 50:2, 50:19, 51:16, 53:23
**ALLEY** [1] - 51:1
**allow** [1] - 18:20
**allowed** [2] - 18:9, 20:16
**almost** [1] - 10:12
**amount** [1] - 33:14
**AMY** [1] - 1:7
**AND** [1] - 2:15
**answer** [18] - 5:10, 5:19, 18:6, 19:8, 23:18, 28:1, 28:13, 29:2, 30:12, 31:22, 32:1, 37:5, 46:22, 46:25, 47:8, 47:10, 47:15
**answered** [1] - 46:1
**answering** [1] - 5:19, 31:20
**answers** [3] - 5:6, 5:9, 17:1
**anyway** [3] - 6:2, 8:1, 16:4
**apanju@ij.org** [1] - 2:13
**APPEARANCES** [1] - 2:1
**appeared** [2] - 50:4, 53:14
**appellate** [1] - 11:17
**Application** [2] - 3:17, 3:19
**application** [2] - 33:24, 35:20
**applications** [1] - 26:25
**apply** [5] - 11:25, 26:24, 33:23, 34:10, 36:22
**applying** [2] - 24:20, 26:24
**appropriate** [3] - 16:18, 24:1, 25:12

**approval** [3] - 4:23, 41:8, 41:9
**approve** [1] - 33:3
**approved** [5] - 32:24, 40:7, 41:2, 41:15, 41:21
**area** [2] - 14:18, 15:19
**ARIF** [1] - 2:11
**assert** [1] - 39:11
**assess** [1] - 26:19
**assist** [3] - 24:3, 37:23, 38:10
**Assistant** [1] - 7:24
**assistant** [2] - 4:17, 7:19
**associate** [1] - 8:7
**associated** [2] - 32:17, 45:12
**assume** [2] - 23:3, 45:22
**assuming** [1] - 47:20
**attend** [2] - 34:25, 35:23
**attending** [2] - 28:24, 36:7
**Attorney** [7] - 1:17, 2:10, 3:4, 3:5, 4:2, 37:16, 38:10
**attorney** [1] - 4:17
**ATTORNEY** [1] - 2:3
**Attorneys** [1] - 2:6
**Augusta** [5] - 1:18, 2:4, 4:4, 40:10, 51:2
**Austin** [1] - 2:12
**authority** [2] - 11:11, 24:6
**Avenue** [2] - 2:8, 2:12
**aware** [2] - 29:19, 39:10
**awhile** [1] - 42:8
**AZ** [1] - 2:8

## B

**background** [2] - 27:17, 29:7
**Bangor** [16] - 8:8, 8:13, 9:12, 9:13, 10:2, 11:2, 12:1, 14:7, 21:16, 23:22, 28:8, 31:8, 32:8, 39:4, 39:11, 41:20
**Baptist** [8] - 9:12, 9:13, 9:20, 9:21, 9:22, 9:23, 10:2, 22:3
**based** [8] - 17:24, 19:3, 33:7, 33:10, 33:17, 33:23, 33:25, 43:25

**basic** [2] - 5:4, 41:6
**basis** [1] - 46:21
**BCS** [2] - 3:15, 21:17
**BDS** [2] - 21:17, 42:3
**BE** [2] - 53:1, 53:11
**became** [3] - 7:23, 8:7, 9:13
**become** [1] - 38:14
**began** [1] - 41:5
**begin** [1] - 46:11
**beginning** [4] - 1:18, 4:4, 23:1, 44:18
**behave** [1] - 47:22
**behavior** [1] - 16:9
**Belgrade** [1] - 51:3
**belief** [1] - 28:22
**beliefs** [7] - 24:21, 27:18, 28:7, 28:11, 28:23, 42:11
**believer** [2] - 14:12, 27:20
**believers** [3] - 12:14, 13:6, 26:5
**BENJAMIN** [4] - 1:14, 3:3, 4:8, 52:1
**Benjamin** [3] - 7:6, 51:7, 53:20
**best** [3] - 5:7, 21:8, 24:8
**between** [5] - 9:22, 12:16, 22:23, 26:1, 33:19
**beyond** [1] - 39:1
**Bible** [15] - 17:2, 17:5, 17:6, 17:15, 17:18, 17:21, 22:1, 22:2, 22:5, 22:11, 22:13, 22:17, 22:25, 24:6, 48:20
**Bible-believing** [5] - 22:1, 22:2, 22:11, 22:17, 22:25
**Biblical** [11] - 13:16, 14:23, 15:18, 16:13, 16:17, 25:14, 26:13, 29:21, 30:12, 45:2, 45:12
**big** [3] - 27:5, 36:10, 41:19
**bigger** [1] - 13:3
**biological** [1] - 30:11
**biologically** [1] - 17:20
**biology** [1] - 19:5
**birth** [4] - 17:12, 19:5, 30:11, 45:9
**Board** [15] - 9:1, 9:3, 10:16, 10:19, 10:22, 11:4, 11:5, 11:10, 11:20, 32:24, 32:25,

33:2, 44:19, 44:20, 44:21
**board** [3] - 10:17, 11:1, 46:6
**bold** [1] - 15:9
**boone** [1] - 31:20
**Boone** [1] - 11:15
**born** [1] - 17:19
**Born** [17] - 12:14, 12:16, 12:18, 12:25, 13:6, 13:8, 13:11, 13:18, 13:22, 14:3, 14:8, 14:12, 22:6, 22:9, 22:10, 22:24, 26:4
**bottom** [1] - 21:16
**brave** [1] - 8:12
**break** [2] - 5:24, 44:11
**briefly** [2] - 4:16, 8:18
**bring** [2] - 20:14, 20:17
**brought** [1] - 4:20
**Brunswick** [3] - 7:8, 7:9, 7:11
**budget** [2] - 32:23, 33:3
**budgets** [1] - 8:21
**Building** [2] - 1:17, 4:3
**bulk** [2] - 32:20, 34:2
**bunch** [1] - 40:10
**BY** [22] - 4:12, 6:9, 15:3, 19:12, 21:13, 23:19, 27:9, 28:14, 29:4, 29:14, 34:5, 38:7, 39:3, 39:22, 42:1, 44:14, 45:21, 46:16, 46:24, 48:17, 53:1, 53:11

## C

**c/o** [1] - 51:7
**Canada** [2] - 7:10, 7:12
**cannot** [2] - 44:6, 44:24
**capacity** [1] - 1:10
**Carson** [2] - 51:10, 53:19
**CARSON** [1] - 1:7
**Carsons** [3] - 38:13, 38:24, 39:5
**case** [3] - 29:12, 29:15, 39:6
**catch** [1] - 27:4
**Catholics** [1] - 13:4
**CENTER** [1] - 2:15
**certainly** [1] - 43:21
**CERTIFICATE** [1] - 50:1

**certificate** [3] - 17:12, 40:11, 45:9
**certification** [2] - 40:24, 41:18
**certified** [3] - 40:19, 41:1, 41:11
**certify** [2] - 50:3, 50:11
**cetera** [5] - 15:20, 27:19, 29:10
**Chain** [1] - 3:18
**chain** [1] - 39:23
**challenge** [1] - 39:9
**challenging** [4] - 4:21, 37:7
**Change** [1] - 52:4
**change** [6] - 18:13, 18:17, 39:16, 46:9, 46:10, 46:19
**changed** [1] - 40:14
**changing** [1] - 45:23
**check** [1] - 7:2
**checklist** [1] - 40:9
**chief** [1] - 10:12
**child** [10] - 24:4, 25:9, 26:12, 28:5, 28:6, 29:17, 29:19, 30:9, 36:7, 47:4
**children** [1] - 35:23
**choose** [2] - 17:24, 31:14
**Chris** [3] - 4:18, 18:4, 28:19
**Christian** [38] - 8:9, 8:13, 11:3, 11:7, 12:1, 12:16, 12:17, 12:18, 13:1, 13:3, 13:9, 13:12, 13:21, 13:22, 13:25, 14:7, 14:8, 15:10, 15:12, 15:14, 16:6, 17:13, 20:5, 21:17, 23:2, 23:4, 23:22, 24:25, 25:19, 25:23, 27:19, 28:8, 29:9, 32:8, 39:4, 39:11, 41:21, 48:18
**CHRISTOPHER** [1] - 2:2
**christopher.taub@ maine.gov** [1] - 2:5
**church** [25] - 8:25, 9:18, 10:8, 10:17, 10:23, 14:6, 22:1, 22:2, 22:3, 22:8, 22:11, 22:17, 22:21, 22:24, 22:25, 24:9, 24:22, 24:23, 25:3, 34:10, 34:13, 45:1, 45:3

**Church** [21] - 9:8, 9:9, 9:12, 9:13, 9:14, 9:18, 9:20, 9:21, 9:22, 9:23, 10:2, 10:5, 13:25, 14:1, 14:4, 32:9, 33:5, 44:19, 44:20, 44:21
**churches** [3] - 9:24, 22:12, 22:23
**Civil** [1] - 1:4
**clauses** [1] - 19:10
**clear** [3] - 5:4, 20:11, 45:6
**cold** [1] - 5:15
**colleague** [1] - 4:18
**Colossians** [3] - 15:24, 15:25, 16:1
**coming** [2] - 25:8, 40:20
**Commission** [1] - 20:15
**commission** [1] - 50:22
**Commissioner** [5] - 1:10, 4:19, 7:22, 7:23, 7:24
**commitment** [2] - 13:23, 14:22
**committed** [1] - 11:7
**committee** [1] - 33:24
**community** [1] - 20:6
**complaint** [4] - 11:18, 20:14, 20:17, 39:10
**COMPLETED** [2] - 53:1, 53:11
**comply** [1] - 43:25
**component** [1] - 26:7
**computer** [1] - 50:9
**computer-aided** [1] - 50:9
**concept** [1] - 13:11
**concern** [4] - 43:17, 47:6, 48:4, 48:23
**concerning** [1] - 47:9
**concluded** [1] - 49:8
**condition** [2] - 20:14, 28:5
**conditions** [1] - 18:18
**conduct** [5] - 15:19, 17:3, 29:10, 45:12, 47:22
**confirm** [1] - 11:9
**conforms** [1] - 43:8
**confusing** [1] - 19:11
**Congress** [1] - 2:12
**connected** [1] - 10:7
**connection** [1] - 7:25
**connections** [2] - 10:6, 10:9
**consider** [5] - 18:25,

39:17, 46:3, 46:4, 46:13
**considered** [2] - 19:22, 19:24
**considering** [1] - 18:19
**consistent** [2] - 28:7, 37:2
**contacted** [1] - 38:21
**continue** [2] - 18:21, 19:2
**Contract** [1] - 3:14
**contract** [5] - 15:7, 19:15, 20:8, 20:13, 21:7
**conversations** [1] - 38:19
**conversely** [1] - 19:1
**copy** [4] - 12:4, 12:5, 51:11, 51:13
**corporation** [1] - 42:4
**correct** [4] - 11:12, 16:11, 16:19, 23:14
**correction** [2] - 51:14, 51:16
**corrections** [3] - 51:12, 51:14, 53:5
**CORRECTIONS** [1] - 52:2
**counsel** [2] - 5:3, 7:2
**couple** [4] - 5:9, 9:17, 15:8, 44:15
**COURT** [1] - 1:1
**Court** [1] - 50:20
**court** [3] - 5:13, 20:11, 20:17
**courts** [1] - 20:7
**criteria** [4] - 11:25, 14:15, 21:20, 23:25
**criterion** [1] - 12:25
**Cross** [2] - 1:17, 4:3
**Crosspoint** [11] - 9:8, 9:9, 9:13, 9:18, 10:4, 10:14, 13:25, 14:4, 32:9, 33:5
**current** [2] - 23:13
**curriculum** [4] - 11:13, 27:7, 36:23, 37:1

## D

**dances** [1] - 15:20
**DATE** [3] - 53:9, 53:18, 53:21
**date** [1] - 37:20
**daughter** [2] - 25:15
**DAVID** [1] - 1:7
**days** [1] - 51:17
**DBH** [1] - 1:4

**Deacon** [8] - 9:1, 9:2, 10:16, 10:19, 10:21, 11:20, 32:24, 33:2
**Deacons** [3] - 44:19, 44:20, 44:21
**deacons** [1] - 46:6
**December** [4] - 1:18, 4:4, 50:4, 53:21
**decide** [2] - 41:9, 41:13
**decides** [1] - 27:1
**deciding** [1] - 24:1
**decision** [6] - 37:23, 39:8, 41:14, 46:5, 46:14, 47:7
**decisions** [2] - 11:13
**deed** [1] - 53:15
**Defendant** [2] - 1:12, 2:6
**definitely** [1] - 18:5
**denomination** [2] - 9:19, 13:7
**denominations** [2] - 13:9, 13:13
**Department** [2] - 1:11, 31:8
**DEPARTMENT** [1] - 2:3
**deponent** [4] - 4:6, 49:9, 50:5, 53:13
**DEPONENT** [3] - 1:14, 3:2, 53:1
**deposed** [2] - 4:9, 5:1
**Deposition** [1] - 3:13
**DEPOSITION** [3] - 52:1, 53:20, 53:21
**deposition** [14] - 4:1, 4:25, 5:5, 5:24, 6:3, 7:1, 38:3, 39:1, 48:10, 49:6, 49:7, 51:11, 51:13, 51:15
**describe** [2] - 14:10, 33:16
**described** [1] - 26:19
**description** [2] - 13:16, 15:11
**descriptively** [1] - 10:21
**designated** [2] - 11:23, 27:6
**designee** [1] - 6:17
**despite** [1] - 27:17
**determine** [1] - 24:16
**determines** [2] - 32:21
**develop** [1] - 26:12
**developing** [2] - 14:22, 25:14
**devout** [1] - 27:20
**difference** [4] - 9:22, 12:16, 12:17, 22:23

**differences** [2] - 19:16, 19:21
**different** [7] - 11:1, 14:15, 17:11, 19:10, 26:16, 41:7, 44:3
**direct** [1] - 12:22
**direction** [1] - 8:22
**directly** [1] - 38:21
**disabilities** [1] - 30:16
**discount** [8] - 33:4, 35:18, 36:1, 36:3, 36:8, 36:9
**discounted** [1] - 35:23
**discounts** [2] - 35:15, 36:6
**discourage** [1] - 26:24
**discriminate** [1] - 17:23
**discuss** [1] - 26:6
**discussed** [1] - 25:11
**discussion** [2] - 26:22, 48:7
**disinterested** [1] - 50:11
**dispute** [2] - 11:16, 20:22
**disputes** [2] - 20:4, 20:7
**DISTRICT** [2] - 1:1, 1:1
**doctrinal** [1] - 28:7
**doctrinally** [1] - 27:22
**document** [2] - 34:7, 34:13
**documents** [2] - 6:23, 40:10
**done** [2] - 21:10, 27:2
**down** [4] - 5:8, 22:23, 26:18, 40:10
**Dr** [4] - 4:19, 7:6, 8:25, 51:7
**DR** [1] - 52:1
**dramatic** [1] - 5:14
**drugs** [1] - 15:19
**duly** [1] - 4:8
**during** [1] - 7:1
**duties** [1] - 8:19

**E**

**e-mail** [6] - 37:18, 37:25, 38:5, 38:9, 38:15, 38:17
**E-mail** [1] - 3:18
**e-mails** [1] - 39:23
**early** [1] - 6:23
**easier** [2] - 34:19, 48:15
**easy** [1] - 43:14
**educating** [1] - 24:3
**Education** [4] - 1:11,

4:19, 7:23, 7:24
**education** [6] - 11:8, 27:19, 29:9, 30:19, 30:22, 45:17
**efforts** [1] - 32:15
**eight** [1] - 6:18
**either** [3] - 38:10, 45:4, 48:3
**eligibility** [1] - 23:21
**eligible** [6] - 4:22, 16:12, 34:15, 45:9, 45:22, 45:24
**employee** [1] - 20:12
**employees** [2] - 20:21, 45:5
**employment** [4] - 9:7, 21:7, 21:20, 45:17
**Enclosed** [1] - 51:11
**enclosed** [2] - 51:12, 51:14
**encouraging** [1] - 24:4
**endurance** [1] - 5:25
**enrolling** [2] - 25:9, 28:5
**entities** [1] - 9:5
**entity** [2] - 31:11, 32:8
**environment** [5] - 24:5, 26:16, 47:3, 47:4, 47:5
**equal** [1] - 46:2
**equivalent** [1] - 41:12
**Errata** [1] - 53:6
**errors** [1] - 53:3
**espouse** [1] - 28:10
**espouses** [1] - 28:6
**ESQ** [2] - 2:7, 2:11
**Esq** [1] - 51:7, 53:22
**et** [8] - 1:7, 15:20, 27:19, 29:10, 51:10, 53:19
**evaluation** [1] - 31:18
**Evangelical** [5] - 13:21, 13:22, 13:25, 14:8, 22:6
**event** [2] - 5:24, 50:12
**exactly** [1] - 17:8
**EXAMINATION** [1] - 4:11
**example** [3] - 43:9, 43:15, 44:5
**examples** [2] - 16:7, 43:12
**excellence** [1] - 24:5
**Excellent** [1] - 32:7
**exchange** [1] - 40:1
**exclude** [2] - 19:3, 48:22, 48:25
**exercise** [1] - 40:23
**exhibit** [1] - 42:23

**Exhibit** [19] - 3:12, 3:13, 3:14, 3:15, 3:16, 3:17, 3:18, 6:8, 6:10, 6:15, 6:20, 15:2, 21:12, 27:8, 34:4, 38:3, 39:21, 41:25, 42:22
**expand** [1] - 30:17
**expect** [1] - 30:13
**experience** [2] - 14:16, 25:7
**expertise** [1] - 14:18
**expires** [1] - 50:22
**explain** [2] - 43:9, 45:20
**explanation** [1] - 45:20
**extent** [1] - 17:22
**extremely** [1] - 6:23
**eye** [1] - 5:12

**F**

**face** [1] - 21:9
**fact** [2] - 29:25, 47:24
**faculty** [8] - 11:24, 12:2, 12:5, 12:8, 17:4, 17:16, 21:21, 23:14
**Faculty** [1] - 3:15
**fair** [1] - 16:18
**faith** [7] - 13:24, 14:5, 14:12, 27:20, 27:23, 28:22, 29:8
**faith's** [1] - 28:23
**faithful** [1] - 27:23
**familiar** [1] - 27:10
**families** [16] - 4:21, 10:7, 24:3, 24:17, 24:19, 25:21, 26:9, 26:17, 29:22, 29:23, 35:18, 36:11, 37:13, 37:24, 37:25, 48:8
**family** [7] - 25:7, 26:20, 27:17, 27:20, 28:6, 29:18, 47:2
**federal** [4] - 31:1, 31:2, 31:3, 31:11
**fees** [1] - 32:17
**felt** [3] - 20:18, 30:5, 39:2
**few** [2] - 5:4, 21:19
**fifth** [1] - 6:14
**figure** [2] - 41:4, 43:23
**final** [3] - 11:19, 24:6, 33:1
**finally** [1] - 4:16
**finances** [1] - 32:2
**Financial** [1] - 3:17
**financial** [11] - 32:4,

33:17, 33:23, 33:25, 34:2, 34:10, 34:18, 35:8, 35:13, 35:16, 36:5
**financially** [1] - 32:9
**fingerprinting** [2] - 40:18, 40:23
**finish** [2] - 5:17, 5:19
**firm** [2] - 30:12, 45:12
**first** [7] - 6:25, 7:14, 32:7, 37:6, 37:18, 40:13, 44:11
**fit** [8] - 17:12, 26:20, 26:23, 29:24, 30:1, 43:6, 45:14, 47:18
**FL** [2] - 2:16, 51:8
**flashed** [1] - 36:2
**Floor** [2] - 1:17, 4:3
**follow** [6] - 15:18, 17:2, 17:5, 17:15, 17:17, 30:14
**FOLLOWING** [1] - 52:2
**following** [3] - 15:13, 28:16, 53:5
**follows** [1] - 4:10
**FOR** [4] - 1:1, 2:7, 2:11, 2:15
**Ford** [2] - 40:4, 41:6
**Ford-Taylor** [2] - 40:4, 41:6
**foregoing** [2] - 50:7, 53:3
**forestry** [2] - 7:21, 7:22
**Forestry** [1] - 7:25
**forever** [1] - 13:18
**former** [2] - 7:22, 11:6
**formerly** [2] - 9:10, 9:12
**FORSTER** [30] - 2:2, 4:12, 6:6, 6:9, 14:25, 15:3, 19:9, 19:12, 21:11, 21:13, 23:19, 27:9, 28:14, 29:4, 29:13, 29:14, 34:5, 38:7, 39:3, 39:22, 42:1, 44:8, 44:12, 44:14, 45:21, 46:16, 46:24, 48:17, 49:1, 49:4
**Forster** [3] - 3:4, 4:15, 53:22
**forward** [5] - 21:9, 32:23, 38:1, 39:9, 46:7
**four** [1] - 26:19
**Fredericton** [1] - 7:11
**FROM** [1] - 44:13
**front** [3] - 15:9, 19:17,

46:5
**full** [7] - 8:7, 8:10, 23:1, 23:3, 23:7, 41:9, 41:18
**full-time** [2] - 23:3, 23:7
**funding** [2] - 18:13, 32:11
**fundraising** [1] - 32:15
**funds** [7] - 4:23, 18:25, 31:1, 31:2, 31:3, 31:12, 39:12

## G

**gambling** [1] - 15:20
**gather** [1] - 40:9
**gender** [7] - 17:11, 17:16, 17:19, 19:4, 30:10, 30:11, 45:8
**general** [1] - 4:17
**GENERAL** [1] - 2:3
**generally** [1] - 43:24
**gestures** [1] - 5:14
**Gillises** [4] - 38:18, 38:19, 38:24, 39:5
**given** [1] - 1:18
**goal** [1] - 25:14
**God** [5] - 12:21, 26:1, 47:5, 47:21, 47:25
**God's** [2] - 12:19, 22:13
**goodness** [1] - 8:12
**grade** [1] - 35:5
**grades** [1] - 35:4
**grouping** [1] - 9:24
**groups** [1] - 19:3
**guess** [8] - 11:9, 13:3, 21:24, 27:4, 30:25, 32:7, 41:7, 45:2

## H

**half** [1] - 48:9
**hand** [1] - 50:15
**Handbook** [1] - 3:16
**handbook** [4] - 23:25, 30:4, 42:14, 42:22
**hard** [2] - 28:19, 43:20
**HASSON** [1] - 1:10
**Hasson** [3] - 4:19, 51:10, 53:19
**he/she** [1] - 43:7
**head** [8] - 5:12, 8:9, 8:15, 8:16, 8:19, 10:5, 35:15, 40:5
**heard** [2] - 36:19, 37:6
**help** [2] - 10:7, 12:15

**helpful** [2] - 5:14, 6:23
**hereby** [2] - 50:3, 53:13
**hereunto** [1] - 50:15
**high** [3] - 7:12, 11:20, 16:13
**highest** [2] - 10:16, 33:21
**highest-ranking** [1] - 33:21
**himself** [1] - 13:16
**hire** [4] - 12:8, 17:24, 18:14, 18:22
**hiring** [2] - 8:22, 11:24
**his/her** [2] - 53:14, 53:15
**holding** [1] - 41:1
**homosexual** [9] - 16:11, 17:25, 18:10, 18:14, 29:18, 29:20, 29:25, 45:5, 45:7
**homosexuality** [2] - 16:18, 19:3
**honestly** [1] - 47:20
**hope** [1] - 20:23
**hopefully** [1] - 4:25
**hoping** [1] - 44:17
**hour** [1] - 48:8
**House** [1] - 2:3
**hum** [18] - 5:11, 8:6, 9:15, 10:3, 10:11, 13:2, 14:14, 16:10, 32:3, 32:16, 34:16, 38:4, 39:24, 42:5, 43:19, 44:3, 46:8, 46:20
**Human** [1] - 20:15
**hypothetical** [1] - 43:15
**hypotheticals** [1] - 43:20

## I

**idea** [2] - 13:11, 27:1
**IDEA** [1] - 30:21
**identification** [8] - 6:8, 15:2, 21:12, 27:8, 31:17, 34:4, 39:21, 41:25
**identifies** [2] - 17:11, 45:7
**identifying** [4] - 19:4, 30:10, 37:24, 38:11
**II** [2] - 31:5, 31:6
**important** [2] - 5:8, 8:19
**impossible** [2] - 26:5, 28:23
**IN** [1] - 50:15

**INCLUDE** [1] - 52:2
**includes** [1] - 13:4
**independent** [5] - 9:20, 9:21, 9:22, 9:25, 22:3
**individual** [3] - 18:9, 37:16, 45:6
**individualized** [1] - 30:19
**individuals** [1] - 18:14
**individuals'** [1] - 35:22
**inference** [1] - 48:4
**influence** [1] - 23:12
**information** [6] - 16:23, 34:13, 36:23, 38:1, 38:16, 40:16
**inquiry** [1] - 31:24
**instead** [1] - 18:6
**INSTITUTE** [2] - 2:7, 2:11
**institution** [2] - 41:17, 43:7
**instructions** [1] - 41:12
**insurance** [1] - 36:3
**intend** [1] - 7:3
**interested** [5] - 11:2, 18:16, 24:20, 25:8, 39:12
**international** [1] - 8:23
**interpretation** [1] - 22:15
**interview** [1] - 24:15
**interviews** [1] - 47:9
**invites** [1] - 12:21
**involved** [2] - 31:17, 37:12
**involves** [1] - 4:22
**item** [2] - 14:25, 15:4
**itself** [1] - 9:25

## J

**January** [2] - 50:16, 51:4
**Jeffrey** [1] - 51:7, 53:20
**JEFFREY** [4] - 1:14, 3:3, 4:8, 52:1
**Jerry** [1] - 8:25
**Jesus** [4] - 12:20, 12:21, 13:16, 14:13
**Jewish** [2] - 25:8, 27:23
**Joanne** [5] - 1:16, 4:1, 50:2, 50:19, 53:23
**job** [3] - 7:16, 7:18, 21:8

**join** [1] - 37:13
**JR** [1] - 1:10
**judge** [2] - 16:21, 43:24
**July** [1] - 50:22
**jump** [1] - 27:5
**JUSTICE** [2] - 2:7, 2:11

## K

**K/4** [1] - 35:5
**keep** [1] - 13:20
**KELLER** [2] - 2:7, 49:3
**Keller** [5] - 3:5, 37:11, 37:16, 38:10, 38:16
**kid** [1] - 36:1
**Kimberly** [1] - 51:7
**KIMBERLY** [1] - 2:14
**kind** [2] - 36:4, 40:25
**knowledge** [1] - 5:7
**known** [3] - 9:10, 11:21
**krivera@ncll.org** [1] - 2:17

## L

**language** [1] - 20:20
**Largo** [2] - 2:16, 51:8
**last** [4] - 36:14, 36:20, 37:9, 42:21
**Latin** [1] - 16:3
**lAUGHTER** [1] - 48:16
**law** [2] - 19:2, 39:9
**lawsuit** [2] - 37:7, 37:13
**lawsuits** [1] - 19:24
**lawyer** [1] - 37:12
**lawyers** [1] - 38:21
**lead** [3] - 10:10, 12:22, 45:3
**leaders** [3] - 10:23, 17:4, 30:14
**leadership** [2] - 22:12, 45:1
**leading** [1] - 41:3
**learned** [1] - 41:16
**learning** [2] - 25:5, 25:13
**legitimate** [1] - 31:22
**level** [2] - 21:24, 28:22
**levels** [1] - 41:7
**LIBERTY** [1] - 2:15
**life** [3] - 12:22, 12:23, 14:13
**LIFE** [1] - 2:15
**limited** [1] - 20:21
**Line** [1] - 52:4
**list** [3] - 6:14, 6:20, 7:4

**literal** [1] - 22:15
**literally** [2] - 17:6, 22:5
**litigation** [1] - 4:20
**live** [1] - 16:15
**located** [1] - 37:4
**look** [13] - 6:10, 6:19, 12:10, 16:5, 19:15, 20:3, 21:5, 26:18, 34:6, 39:18, 39:25, 42:2, 43:2
**looked** [1] - 18:11
**looking** [17] - 10:7, 11:25, 12:8, 12:11, 12:12, 12:14, 15:15, 15:16, 16:14, 23:25, 24:7, 27:3, 27:12, 35:19, 37:12, 42:21, 48:25

## M

**machine** [1] - 50:9
**mail** [9] - 3:18, 37:18, 37:25, 38:5, 38:9, 38:15, 38:17, 40:10, 40:11
**mails** [1] - 39:23
**main** [1] - 26:12
**MAINE** [1] - 1:1
**Maine** [12] - 1:10, 1:17, 1:18, 4:2, 4:4, 4:21, 7:14, 7:19, 8:3, 20:15, 50:3
**man** [1] - 8:12
**manage** [1] - 36:12
**Manual** [1] - 3:15
**manual** [5] - 12:2, 12:5, 12:10, 21:21, 23:14
**mark** [5] - 6:7, 14:25, 21:11, 27:7, 51:14
**marked** [9] - 6:8, 6:10, 15:2, 21:12, 27:8, 34:4, 38:3, 39:21, 41:25
**matters** [1] - 24:6
**maturity** [1] - 24:4
**ME** [2] - 2:4, 51:3
**mean** [18] - 12:11, 15:12, 15:18, 16:20, 19:9, 19:18, 20:6, 21:2, 21:3, 21:5, 22:1, 23:2, 23:9, 28:6, 30:1, 36:19, 43:21, 43:24
**means** [3] - 5:9, 19:19, 50:8
**meant** [2] - 5:25, 20:20
**meet** [1] - 48:7

**meeting** [1] - 37:22
**member** [8] - 9:2, 10:14, 11:5, 14:4, 21:25, 22:19, 33:5, 34:9
**members** [1] - 33:5
**men** [2] - 10:23, 44:19
**mentioned** [2] - 37:12, 51:12
**mere** [2] - 29:25, 47:24
**merit** [3] - 33:7, 33:16, 35:11
**merit-based** [1] - 33:7
**met** [3] - 4:16, 12:19, 37:20
**Methodists** [1] - 13:4
**Mick** [1] - 8:25
**middle** [2] - 36:16, 43:2
**might** [6] - 19:23, 37:7, 42:17, 43:10, 46:13, 47:17
**Mill** [1] - 2:8
**mind** [2] - 19:13, 36:2
**minister** [1] - 23:11
**ministry** [4] - 23:2, 23:4, 23:8, 23:9
**minutes** [3] - 18:5, 21:19, 48:8
**mischaracterized** [1] - 19:7
**mission** [2] - 24:3, 24:7
**model** [5] - 15:10, 15:12, 15:14, 16:6, 17:14
**money** [3] - 31:4, 31:10, 33:14
**morning** [1] - 21:18
**MORRISETTE** [1] - 51:1
**Morrisette** [1] - 51:16
**most** [1] - 5:7
**move** [1] - 19:14
**MR** [3] - 44:11, 48:12, 49:3
**MS** [41] - 4:12, 6:6, 6:9, 14:25, 15:3, 19:6, 19:9, 19:11, 19:12, 21:11, 21:13, 23:18, 23:19, 27:9, 28:12, 28:14, 29:1, 29:4, 29:11, 29:13, 29:14, 34:5, 38:6, 38:7, 38:25, 39:3, 39:22, 42:1, 44:8, 44:12, 44:14, 45:19, 45:21, 46:15, 46:16, 46:22, 46:24, 48:17, 49:1, 49:4, 49:6

**multi** [2] - 36:1, 36:2
**Muslim** [1] - 25:8
**must** [2] - 36:19, 38:21

## N

**N/A** [1] - 34:14
**name** [4] - 9:10, 11:9, 33:12, 33:13
**named** [4] - 33:20, 49:7, 50:5, 53:13
**names** [1] - 10:20
**NATIONAL** [1] - 2:15
**nature** [1] - 32:18
**NEASC** [4] - 36:12, 36:23, 41:11, 41:16
**need** [12] - 5:25, 13:18, 14:7, 14:22, 21:25, 31:18, 33:8, 33:25, 34:9, 41:17, 42:13, 45:19
**need-based** [1] - 33:25
**needed** [3] - 40:16, 40:17, 42:9
**negative** [1] - 48:4
**never** [1] - 11:21
**New** [3] - 7:8, 7:9, 7:11
**new** [1] - 10:7
**next** [4] - 14:25, 16:8, 27:7, 41:3
**nine** [1] - 6:18
**nobody** [1] - 21:17
**Nods** [1] - 15:17
**nods** [3] - 9:6, 23:17, 35:7
**None** [1] - 3:5
**nonsectarian** [2] - 17:23, 18:7
**Notary** [7] - 1:16, 4:2, 4:7, 4:9, 50:2, 51:13, 53:12
**NOTARY** [1] - 53:11
**noted** [1] - 53:3
**nothing** [4] - 7:4, 43:22, 44:3, 50:6
**notice** [2] - 1:18, 15:8
**Notice** [1] - 3:13
**NOTICING** [1] - 53:22
**number** [6] - 4:20, 15:1, 23:1, 27:4, 34:12, 35:2
**numbers** [2] - 6:16, 27:14, 27:15

## O

**oath** [1] - 4:6
**object** [4] - 19:6,

28:12, 29:1, 38:25
**objection** [3] - 45:19, 46:15, 46:22
**obtain** [1] - 16:23
**obvious** [1] - 7:25
**OF** [5] - 1:1, 2:3, 52:1, 53:20, 53:21
**OFF** [1] - 44:13
**offer** [3] - 24:18, 30:21, 33:7
**offering** [1] - 22:20
**offers** [1] - 33:25
**Office** [2] - 1:17, 4:3
**offices** [2] - 1:17, 4:2
**official** [1] - 1:10
**once** [3] - 5:21, 18:5, 31:25
**one** [28] - 5:9, 6:18, 6:19, 11:22, 12:11, 12:25, 13:12, 13:19, 13:22, 15:8, 16:17, 18:18, 19:24, 21:2, 21:24, 23:1, 25:3, 26:12, 28:21, 31:20, 33:9, 35:10, 36:7, 36:11, 36:25, 38:8, 48:18
**one's** [1] - 28:21
**operation** [1] - 10:13
**opinion** [1] - 43:5
**opportunity** [2] - 33:18, 46:11
**opposed** [3] - 21:17, 33:17, 41:21
**order** [4] - 13:17, 14:6, 18:12, 34:10
**original** [3] - 51:12, 51:13, 51:16
**ORIGINAL** [1] - 52:1
**otherwise** [1] - 27:23
**ourselves** [1] - 47:23
**outcome** [1] - 50:12
**outlines** [1] - 12:2
**outwardly** [1] - 29:18
**overall** [2] - 8:21, 8:22
**oversee** [1] - 36:12
**own** [1] - 53:15

## P

**p.m** [3] - 1:18, 4:5, 49:8
**package** [1] - 36:5
**Page** [2] - 3:11, 52:4
**page** [15] - 6:14, 6:19, 15:9, 21:15, 22:25, 24:9, 25:4, 27:12, 34:12, 34:13, 42:3, 42:21, 51:12, 51:13, 51:16

**pages** [1] - 53:3
**PANJU** [1] - 2:11
**paragraph** [8] - 15:15, 16:8, 17:13, 19:15, 20:3, 21:3, 27:13, 43:3
**parent** [1] - 42:3
**parents** [4] - 11:6, 24:8, 24:21
**part** [5] - 9:24, 15:22, 19:15, 21:7, 41:19
**particular** [1] - 9:19
**particularly** [1] - 11:2
**parties** [1] - 19:21
**PARTY** [1] - 53:22
**party** [1] - 21:1
**passed** [1] - 38:16
**past** [1] - 25:20
**pastor** [7] - 8:25, 9:2, 10:7, 10:9, 10:10, 10:12
**pastors** [1] - 22:13
**path** [1] - 28:17
**pattern** [1] - 41:1
**pause** [1] - 5:20
**payment** [2] - 4:22, 4:24
**people** [8] - 5:21, 11:7, 13:6, 19:3, 20:7, 22:24, 36:24
**percent** [1] - 34:21
**percentage** [1] - 34:18
**perfectly** [1] - 31:22
**perhaps** [1] - 26:23
**person** [10] - 4:16, 5:8, 14:19, 16:11, 17:10, 17:18, 22:9, 22:10, 37:20, 50:12
**personally** [2] - 20:1, 50:4, 53:14
**perspective** [1] - 48:1
**philosophy** [2] - 27:18, 29:9
**phone** [2] - 4:16, 37:14
**piece** [1] - 35:14
**places** [1] - 15:8
**plaintiff** [2] - 19:23, 19:25
**Plaintiffs** [2] - 1:8, 2:10
**plaintiffs** [5] - 38:11, 38:14, 38:24, 39:5, 39:10
**plans** [2] - 30:24, 31:1
**point** [1] - 43:13
**points** [1] - 26:19
**policy** [2] - 11:13, 36:2
**policymaking** [1] - 11:10

**position** [6] - 8:8, 8:13, 16:12, 18:15, 39:15, 45:10
**positions** [1] - 21:10
**positive** [2] - 21:5
**possibility** [2] - 18:16, 27:25
**possible** [3] - 13:9, 27:21, 28:20
**potential** [2] - 37:24, 45:5
**preached** [1] - 22:16
**predecessor** [1] - 40:5
**predict** [1] - 46:11
**preparing** [1] - 6:24
**presenting** [2] - 19:4, 19:17, 30:10
**presents** [1] - 17:10
**pretty** [3] - 12:2, 43:2, 43:11
**principle** [1] - 45:2
**privacy** [2] - 43:22, 44:6
**private** [1] - 20:5
**privately** [1] - 20:25
**probe** [1] - 47:16
**problem** [3] - 19:5, 48:1, 48:2
**process** [11] - 8:4, 24:16, 34:20, 35:9, 35:10, 35:20, 36:12, 40:6, 40:14, 40:18, 41:10
**processes** [1] - 35:13
**produce** [1] - 7:3
**profess** [1] - 25:2
**professor** [4] - 7:19, 8:2, 8:7
**professorship** [1] - 8:10
**program** [2] - 8:23, 30:2
**programs** [2] - 30:19, 32:17
**promise** [1] - 13:19
**proposal** [1] - 32:23
**provide** [2] - 30:22, 31:12
**provided** [2] - 7:2, 31:5
**public** [5] - 4:23, 15:20, 18:13, 19:20, 43:13
**Public** [4] - 1:16, 4:2, 4:7, 4:9, 50:2, 50:20, 51:13
**PUBLIC/ATTORNEY** [1] - 53:11
**Public/Attorney** [1] - 53:12

**purposes** [2] - 28:24, 45:23
**pursuant** [1] - 1:18
**put** [3] - 16:20, 32:23, 46:7
**putting** [2] - 21:8, 38:1

## Q

**questions** [11] - 5:6, 6:2, 16:21, 31:21, 41:6, 44:10, 44:15, 48:6, 48:15, 48:24, 49:2
**quick** [1] - 44:18

## R

**ranking** [1] - 33:21
**rate** [1] - 35:23
**rational** [1] - 28:25
**RE** [1] - 51:10
**reach** [1] - 40:3
**read** [4] - 12:3, 49:6, 51:13, 53:2
**reading** [1] - 49:9
**real** [1] - 27:24
**realized** [1] - 10:13
**really** [8] - 5:19, 12:22, 20:2, 24:13, 28:15, 39:7, 40:20, 47:17
**reason** [2] - 25:3, 30:25
**reasons** [4] - 26:9, 26:17, 47:1, 53:5
**receipt** [1] - 19:12
**receive** [11] - 4:23, 18:13, 31:2, 31:3, 31:4, 31:10, 31:11, 33:4, 33:18, 34:17, 35:8
**receives** [1] - 35:11
**receiving** [1] - 39:12
**recognize** [5] - 6:11, 6:20, 15:4, 27:10, 34:6
**recognized** [1] - 41:22
**recognizes** [2] - 12:18, 12:19
**record** [4] - 6:16, 16:20, 43:13, 50:8
**RECORD** [1] - 44:13
**refer** [1] - 17:3
**referrals** [1] - 31:16
**referring** [3] - 42:6, 42:12, 42:18
**regardless** [3] - 28:10, 33:8, 43:7
**regulation** [1] - 43:17
**regulations** [1] - 43:8

**related** [1] - 30:22
**religion** [1] - 28:10
**religious** [4] - 24:21, 27:17, 29:7, 29:8
**remarkably** [1] - 5:20
**remember** [1] - 40:1
**repeat** [3] - 13:10, 18:1, 45:11, 47:19
**repeating** [1] - 19:13
**rephrase** [1] - 28:16
**replied** [1] - 38:20
**report** [3] - 8:24, 10:9, 21:4
**REPORTER** [1] - 53:23
**Reporter/Notary** [1] - 50:20
**REPORTING** [1] - 51:1
**represent** [1] - 4:18
**representing** [1] - 38:23
**request** [1] - 43:4
**requirement** [3] - 14:3, 24:23, 24:25
**requirements** [4] - 12:24, 28:21, 39:19, 40:25
**reread** [1] - 42:19
**resolution** [3] - 19:16, 20:4, 20:22
**resolve** [1] - 20:7
**resolved** [1] - 20:18
**resort** [1] - 20:7
**respect** [2] - 10:4, 11:11
**respective** [1] - 53:4
**responsibilities** [1] - 36:11
**responsible** [3] - 6:17, 8:21, 11:14
**rest** [1] - 12:23
**restrictions** [1] - 18:21
**result** [1] - 37:22
**return** [1] - 51:16
**revenue** [1] - 32:13
**review** [2] - 36:15, 37:1
**reviewing** [1] - 37:2
**reviews** [2] - 26:25, 33:24
**Rights** [1] - 20:15
**rights** [1] - 20:22
**rising** [2] - 33:18, 33:21
**RIVERA** [13] - 2:14, 19:6, 19:11, 23:18, 28:12, 29:1, 29:11, 38:6, 38:25, 45:19, 46:15, 46:22, 49:6
**Rivera** [1] - 51:7

**Road** [1] - 51:2
**Robert** [3] - 4:19, 51:10, 53:19
**ROBERT** [1] - 1:10
**role** [6] - 10:4, 15:10, 15:12, 15:14, 16:6, 17:13
**roll** [1] - 5:12
**room** [1] - 5:8
**round** [1] - 35:2
**rule** [2] - 18:2, 43:16
**rules** [3] - 5:4, 43:8, 44:1
**running** [1] - 35:14

## S

**safe** [1] - 32:4
**sample** [1] - 15:7
**Sarah** [2] - 4:15, 53:22
**SARAH** [1] - 2:2
**sarah.forster@ maine.gov** [1] - 2:5
**saved** [4] - 12:21, 13:23, 25:25, 26:4
**scholarship** [5] - 33:9, 33:12, 33:16, 33:20, 35:11
**scholarships** [1] - 33:7
**School** [2] - 14:7, 31:8
**school** [51] - 7:7, 7:12, 8:9, 8:15, 8:16, 8:20, 8:22, 10:5, 11:2, 11:4, 11:11, 12:9, 14:7, 17:23, 18:7, 18:8, 19:23, 19:25, 20:10, 23:3, 24:2, 24:9, 24:12, 25:5, 25:9, 25:19, 26:10, 26:16, 28:8, 28:24, 30:2, 30:15, 31:7, 32:12, 33:7, 33:25, 35:1, 36:8, 37:3, 38:23, 40:5, 41:14, 41:15, 42:16, 43:4, 43:5, 43:11, 43:18, 47:23, 48:18, 48:22
**school's** [1] - 42:11
**schools** [2] - 26:17, 35:22
**Schools** [11] - 8:9, 8:13, 11:3, 12:1, 21:17, 23:22, 28:8, 32:8, 39:4, 39:11, 41:21
**schools'** [1] - 28:4
**scope** [1] - 39:1
**script** [1] - 28:2
**second** [6] - 5:16,

12:6, 27:13, 34:12, 40:13, 42:3
**secretary** [1] - 21:16
**sectarian** [1] - 18:7
**section** [1] - 34:14
**see** [6] - 16:3, 27:3, 37:2, 38:6, 39:25, 45:4
**seeing** [1] - 6:25
**self** [2] - 36:16, 36:17
**sending** [1] - 38:9
**senior** [4] - 8:25, 9:2, 33:18, 33:22
**sense** [2] - 18:3, 28:3
**sent** [1] - 38:15
**separate** [3] - 9:5, 32:8, 32:10
**serve** [1] - 23:11
**SERVICE** [1] - 51:1
**services** [6] - 30:23, 31:4, 31:6, 31:12, 31:17, 31:19
**set** [1] - 50:15
**seven** [2] - 6:18, 8:5
**several** [1] - 14:15
**Sewall** [2] - 1:18, 4:3
**sexual** [1] - 16:9
**sexuality** [1] - 17:16
**sharing** [1] - 13:23
**sheet** [3] - 51:12, 51:14, 51:16
**Sheet** [1] - 53:6
**shorter** [1] - 6:25
**shorthand** [1] - 50:9
**SHOULD** [1] - 52:1
**show** [1] - 38:2
**showing** [1] - 39:23
**sign** [10] - 30:3, 30:8, 42:7, 42:9, 42:12, 42:13, 47:12, 47:16, 47:21, 51:13
**signature** [4] - 51:12, 51:13, 51:16, 53:15
**SIGNATURE** [2] - 53:8, 53:17
**signed** [1] - 51:16
**signing** [1] - 49:10
**signs** [1] - 20:13
**simply** [1] - 30:18
**sinned** [1] - 12:19
**sins** [1] - 12:21
**sit** [1] - 26:18
**situation** [1] - 21:6
**six** [1] - 8:5
**Sixth** [2] - 1:17, 4:3
**skip** [1] - 34:14
**small** [2] - 33:9, 43:11
**Smith** [1] - 51:7
**SMITH** [1] - 2:14

**someone** [10] - 11:16, 17:24, 20:13, 25:24, 25:25, 26:25, 27:22, 29:7, 43:16, 43:25
**sometimes** [2] - 25:15, 25:17
**somewhat** [1] - 19:7
**somewhere** [2] - 27:5, 33:19
**son** [1] - 25:15
**sorry** [4] - 14:20, 27:15, 41:1, 47:14
**sort** [10] - 6:1, 8:18, 9:23, 12:7, 12:24, 13:8, 17:8, 28:9, 31:24, 33:8
**sound** [1] - 28:24
**sources** [1] - 32:11
**speaking** [2] - 21:22, 43:24
**special** [1] - 30:22
**specific** [2] - 15:23, 43:8
**speculation** [2] - 29:2, 46:15
**spent** [1] - 45:4
**spirit** [1] - 43:6
**spiritual** [2] - 24:4, 47:5
**spoken** [1] - 4:15
**sports** [1] - 32:17
**spring** [1] - 37:9
**springtime** [1] - 38:8
**staff** [7] - 17:17, 30:13, 35:15, 35:18, 40:17, 41:18, 45:13
**standard** [2] - 12:19, 18:14, 37:4
**standards** [12] - 15:19, 16:8, 16:13, 16:15, 16:17, 17:3, 18:11, 29:22, 30:13, 36:25, 37:3, 45:12
**start** [2] - 6:3, 6:6
**starts** [1] - 36:10
**State** [9] - 1:17, 1:17, 2:3, 4:3, 19:1, 40:18, 40:23, 46:18, 50:3
**state** [1] - 37:3
**statement** [14] - 14:5, 14:12, 24:7, 27:24, 28:9, 39:14, 42:4, 42:10, 42:13, 42:17, 43:3, 47:12, 47:17, 47:22
**STATES** [1] - 1:1
**Station** [1] - 2:3
**statute** [2] - 4:21, 37:8
**stay** [1] - 43:25
**stenographic** [1] -

53:3
**step** [3] - 12:3, 12:10
**stepped** [1] - 40:6
**stick** [1] - 41:9
**sticker** [1] - 42:23
**still** [6] - 34:14, 35:16, 43:17, 46:21, 47:17, 47:24
**straight** [1] - 13:20
**Street** [4] - 1:18, 2:15, 4:3, 51:8
**strict** [1] - 35:20
**strikes** [1] - 44:1
**strong** [1] - 26:15
**struggle** [1] - 42:12
**Student** [1] - 3:16
**student** [12] - 23:24, 24:1, 24:8, 24:12, 26:20, 29:25, 34:9, 35:10, 42:3, 42:9, 42:22, 43:6
**student's** [1] - 44:6
**students** [26] - 14:23, 16:14, 17:4, 23:11, 23:21, 24:17, 25:6, 25:19, 25:22, 26:4, 29:23, 30:13, 30:16, 30:18, 30:21, 31:18, 33:4, 34:17, 34:18, 34:21, 34:22, 34:24, 34:25, 35:6, 35:21, 45:13
**students'** [1] - 43:22
**study** [2] - 36:16, 36:17
**stuff** [1] - 6:25
**sudden** [1] - 40:17
**suggest** [5] - 16:22, 16:25, 17:18, 20:20, 43:18
**suggests** [1] - 29:6
**Suite** [2] - 2:8, 2:12
**summer** [2] - 40:13, 41:3
**supply** [1] - 36:22
**support** [3] - 27:18, 29:9, 29:23
**supportive** [1] - 24:5
**suppose** [3] - 11:20, 19:1, 36:1
**sworn** [2] - 4:9, 50:5
**system** [1] - 20:11

## T

**TA** [1] - 21:18
**talks** [3] - 16:8, 19:16, 20:3
**TAUB** [3] - 2:2, 44:11, 48:12

**Taub** [1] - 4:18
**Taylor** [3] - 40:4, 41:6
**teach** [1] - 7:20
**Teacher** [1] - 3:14
**teacher** [5] - 14:6, 15:7, 18:10, 20:9, 40:19
**teachers** [5] - 12:1, 12:12, 16:14, 41:11, 45:13
**teaching** [3] - 14:16, 16:12, 45:10
**Tempe** [1] - 2:8
**Temple** [1] - 21:18
**ten** [3] - 6:18, 8:4, 18:5
**ten-year** [1] - 8:4
**tenured** [1] - 8:10
**term** [1] - 13:3
**terms** [3] - 20:9, 22:22, 35:19
**test** [1] - 6:1
**testified** [1] - 4:9
**testify** [1] - 50:5
**testimony** [1] - 53:4
**THE** [6] - 1:1, 48:14, 52:1, 52:2, 53:1, 53:11
**themselves** [1] - 30:10
**therefore** [1] - 53:5
**Thessalonians** [2] - 16:2, 16:3
**thinking** [1] - 20:12
**thinks** [1] - 21:16
**three** [2] - 6:18, 14:9
**TIM** [1] - 2:7
**timeout** [1] - 5:25
**tithing** [2] - 21:25, 22:19
**Title** [6] - 31:5, 31:6, 31:16, 31:18
**TITLE** [1] - 53:19
**Titus** [1] - 16:1
**tkeller@ij.org** [1] - 2:9
**TO** [3] - 44:13, 53:1, 53:11
**tobacco** [1] - 15:20
**today** [3] - 4:24, 23:16, 46:5
**together** [1] - 53:4
**took** [3] - 8:8, 40:5, 40:12
**total** [1] - 34:25
**transcript** [2] - 5:15, 5:21
**transgender** [2] - 45:5, 45:8
**treat** [1] - 21:7
**true** [3] - 30:9, 50:8, 53:15

**trusted** [1] - 14:13
**trusting** [1] - 12:20
**truth** [2] - 22:13, 50:6
**try** [3] - 13:20, 15:24, 24:16
**trying** [7] - 16:23, 18:6, 25:1, 28:18, 41:9, 43:23, 44:4
**tuition** [11] - 4:24, 18:20, 32:13, 32:22, 33:1, 33:4, 37:7, 39:12, 39:19, 45:22, 45:25
**turn** [2] - 6:13, 21:15
**turning** [1] - 28:2
**turns** [1] - 5:20
**twelfth** [1] - 35:5
**two** [6] - 5:21, 6:18, 9:5, 36:9, 36:10, 41:7
**TX** [1] - 2:12
**type** [1] - 9:18
**typical** [1] - 8:19

## U

**ultimately** [1] - 41:13
**um-hum** [16] - 5:11, 8:6, 9:15, 10:3, 10:11, 13:2, 14:14, 16:10, 32:3, 32:16, 34:16, 38:4, 39:24, 42:5, 46:8, 46:20
**under** [2] - 30:21, 47:10
**underlie** [1] - 13:12
**underlies** [1] - 13:8
**underlined** [2] - 15:10, 19:17
**unhappy** [2] - 11:17, 20:13
**unique** [1] - 13:15
**UNITED** [1] - 1:1
**united** [1] - 19:17
**University** [4] - 7:8, 7:9, 7:19, 8:2
**up** [5] - 8:10, 16:15, 27:5, 41:3, 44:4

## V

**verses** [1] - 15:23
**version** [1] - 23:13
**view** [3] - 14:23, 25:15, 26:13
**views** [1] - 28:4
**violate** [2] - 43:21, 44:5
**violation** [1] - 43:16
**vision** [1] - 8:22

**vocation** [2] - 23:7, 23:10
**vote** [2] - 46:7, 46:12
**vs** [1] - 1:9

## W

**waive** [1] - 49:9
**wants** [2] - 21:1, 24:12
**WE'RE** [1] - 39:1
**week** [2] - 40:11, 40:12
**WHEREOF** [1] - 50:15
**whole** [2] - 24:4, 50:6
**willing** [3] - 27:18, 29:8, 29:23
**wish** [1] - 51:14
**withdraw** [1] - 43:18
**withdrawal** [1] - 43:4
**within-named** [1] - 50:5
**witness** [1] - 44:9
**WITNESS** [2] - 48:14, 50:15
**women** [2] - 44:21, 45:2
**wondering** [2] - 6:15, 12:6
**word** [4] - 5:11, 6:1, 17:6, 22:13
**words** [2] - 18:18, 27:22
**works** [3] - 5:5, 24:8, 24:13
**world** [3] - 14:23, 25:15, 26:13
**worry** [1] - 40:24
**writing** [1] - 37:14

## Y

**year** [11] - 8:4, 32:23, 33:9, 35:2, 36:17, 40:7, 40:13, 40:24, 41:2, 41:3
**years** [4] - 8:5, 9:17, 33:20
**yup** [4] - 10:25, 12:13, 14:17, 35:17

# Exhibit 7

1

1   UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF MAINE
2

3   Civil Action No. 18-cv-00327 DBH

4

5

6

7   * * * * * * * * * * * * * * * * * *

8   DAVID and AMY CARSON, et al.,

9   Plaintiffs

10       vs

11   ROBERT G. HASSON, JR., in his official
     Capacity as Commissioner of the Maine
12   Department of Education,

13   Defendant
     * * * * * * * * * * * * * * * * * *

14

15   DEPONENT:  **MARTHA BOONE**

16

17

18   Taken before Joanne P. Alley, a Notary Public in and for
     the State of Maine, at the offices of the Maine Attorney
     General, Cross State Office Building, Sixth Floor,
19   Sewall Street, Augusta, Maine, on December 17, 2018,
     beginning at 2:15 p.m., pursuant to notice given.
20

21

22

23

24

25

JA197

1   APPEARANCES:

2   SARAH FORSTER, AAG
    CHRISTOPHER TAUB, AAG
3   DEPARTMENT OF ATTORNEY GENERAL
    6 State House Station
4   Augusta, ME 04333-0006
    207-626-8800
5   sarah.forster@maine.gov
    christopher.taub@maine.gov
6   Attorneys for Defendant

7   TIM KELLER, ESQ.
    INSTITUTE FOR JUSTICE
8   398 S. Mill Avenue, Suite 301
    Tempe, AZ 85281
9   480-557-8300
    tkeller@ij.org
10  Attorney for Plaintiffs

11  ARIF PANJU, ESQ.
    INSTITUTE FOR JUSTICE
12  816 Congress Avenue, Suite 960
    Austin, TX 78701
13  512-480-5396
    apanju@ij.org
14
    KIMBERLY Y. SMITH RIVERA
15  NATIONAL CENTER FOR LIFE AND LIBERTY
    11803 104th Street
16  Largo, FL 33773
    888-233-6255
17  krivera@ncll.org

18

19

20

21

22

23

24

25

```
 1                    I N D E X

 2     DEPONENT:

 3        MARTHA BOONE

 4            By Attorney Forster            4

 5            By Attorney Keller          None

 6

 7

 8

 9

10

11                 E X H I B I T S

                                           Page
12
     No Exhibits Marked or Offered
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Deposition taken before Joanne P. Alley,

 2    Notary Public, at the offices of Maine Attorney General,

 3    Cross State Office Building, Sixth Floor, Sewall Street,

 4    Augusta, Maine, on December 17, 2018, beginning at 2:15

 5    p.m.)

 6              (The deponent was administered the oath by

 7    the Notary Public.)

 8              MARTHA BOONE, after having been duly sworn by

 9    the Notary Public, was deposed and testified as follows:

10                         EXAMINATION

11    BY MS. FORSTER:

12    Q.  Good afternoon.

13    A.  Hi.

14    Q.  So just to confirm, going back to the very first

15        exhibit, you are here to respond to four, five and

16        six?

17    A.  Yes.

18    Q.  All right.  What is your educational background?

19    A.  My bachelor's degree is in elementary education,

20        specifically more middle school, fourth through

21        eighth grade, and then my master's degree is in

22        leadership and supervision.

23    Q.  And where did you get those degrees?

24    A.  Both at Liberty University in Lynchburg, Virginia.

25    Q.  And what is your work history?
```

```
 1   A.   My work history, my husband and I were missionaries
 2        for 20 years and so my first four years of teaching
 3        I taught at a school for missionary kids in
 4        Swaziland, Africa in a composite seventh and eighth
 5        grade classroom; and then when my children were
 6        born, I started doing remedial reading and math
 7        instruction both for missionary kids and then for
 8        local children in the area and then we moved to the
 9        Island of Guam, and we were there for four and a
10        half years and I did the remedial reading and math
11        instruction for K through 8 kids at that school for
12        four and a half years and then we moved to
13        Melbourne, Australia, for four years and then I
14        worked in the special ed department there at a K
15        through 12 school, primarily focused in grades 5
16        through 10, working in reading and math
17        remediation.  So then in 2003, we moved to Maine
18        and I taught at Bangor Christian, I did -- I was
19        science my first semester.  I was a long-term sub
20        for a teacher that had to leave for the first
21        semester and then I taught high school language
22        arts until I moved into administration in the fall
23        of 2008.
24   Q.   So you've been in administration for ten years now?
25   A.   I have, yes.
```

```
 1   Q.   Are you in the classroom at all now?

 2   A.   I teach seventh grade math.

 3   Q.   Can't get away, right?

 4   A.   Can't get away.

 5   Q.   Do you have a role with respect to Crosspoint

 6        Church?

 7   A.   I volunteer.  My husband is the youth pastor there

 8        and so I volunteer, I teach high school Sunday

 9        School and I help out with the youth but no

10        official role, just as a volunteer.

11   Q.   You're a member of the church?

12   A.   Yes.

13   Q.   And the youth pastor is another one of the people

14        who report to the --

15   A.   Senior pastor.

16   Q.   -- senior pastor?

17   A.   Yes, that's right.

18   Q.   I keep getting that pastor in chief stuck in my

19        head.  We already marked the student handbook.

20   A.   Yes.

21   Q.   If you look at page 15, our numbers, so the little

22        numbers on the bottom, Statement of Faith?

23   A.   Um-hum.

24   Q.   Is this a true and accurate Statement of Faith that

25        governs the school?
```

```
 1    A.   Yes.
 2    Q.   And if you look at page 16 --
 3    A.   Um-hum.
 4    Q.   -- that first paragraph, the first sentence,
 5         "certain Biblical issues that are not necessarily
 6         doctrinal in nature have become the focus of
 7         litigation against Christians, churches and
 8         Christian schools."
 9    A.   Um-hum.
10    Q.   Could you give me an example of what those are?
11    A.   Basically the things that are delineated below
12         that.
13    Q.   Oh, okay, so questions about protection of
14         children, marriage and sexuality, a statement about
15         love, these are issues that you believe have become
16         the source of litigation?
17    A.   Among others, yeah, but those would be primarily,
18         yup.
19    Q.   On the next page --
20    A.   Um-hum.
21    Q.   -- which is page 17 --
22    A.   Yup.
23    Q.   -- if you look at family relationships, where it
24         says "the husband is to be the leader of the home,"
25         is that something that you teach as part of the
```

8

```
 1        school curriculum or is that just an underlying

 2        assumption?

 3   A.   That would be taught in some of the Bible classes,

 4        yeah, because the scriptures that we have, one of

 5        the high school Bible classes covers Galatians,

 6        Ephesians, Philippians and Colossians and so those

 7        two verses that are referenced there would

 8        naturally be covered when they are studying through

 9        those books in their Bible class.  So it would be

10        something that is discussed, yes, as part of their

11        Bible curriculum.

12   Q.   And the same for the next paragraph about the role

13        of the wife --

14             MS. RIVERA:  I'm going to object here

15        because I think the specific beliefs are beyond the

16        scope of the examination.

17   BY MS. FORSTER:

18   Q.   The question is, is it taught in the school?

19   A.   Yes.

20             MS. RIVERA:  Is what taught?

21   BY MS. FORSTER:

22   Q.   These beliefs, are they actively taught as part of

23        the school curriculum?

24   A.   Um-hum.

25             MR. TAUB:  You have to say yes or no.
```

```
 1              THE DEPONENT:  Yes, yes.
 2   BY MS. FORSTER:
 3   Q.  On the next page, page 18, Objectives in Education,
 4       is this a true and accurate statement of the
 5       objectives?
 6   A.  Yes.
 7   Q.  Is it fair to say that one of the objectives of
 8       Bangor Christian Schools is to teach students to be
 9       good Christians?
10   A.  Yes.
11   Q.  To teach students to promote Christian values?
12   A.  Yes.
13   Q.  To develop Christian leadership?
14   A.  Yes.
15   Q.  On page 26 I believe it is, yes, you explain the
16       grading scales and then down at the bottom of the
17       page you talk about academic probation.
18   A.  Um-hum.
19   Q.  One way you can get academic probation is an
20       overall grade average below 75 and then another way
21       is a grade below 75 in Bible.
22   A.  Um-hum.
23   Q.  Why is Bible singled out as a subject?
24   A.  Because that is the primary thing in our school.
25       We are a Christian school and we always tell
```

```
 1        families that that's not just a name, that is what
 2        we do, and as you asked, what are our objectives,
 3        all of those things that you listed, our biggest
 4        emphasis is that.  We want to make sure that they
 5        are taking that class seriously.  It could be one
 6        that they could think, well, it doesn't matter when
 7        I go to college, if I go to the University of
 8        Maine, they don't care what I get on Bible, they
 9        might care what I get on English, and we are
10        emphasizing that that is the utmost importance to
11        us.  We want you to do well in your other content
12        areas and this is of the utmost importance to us.
13   Q.   And I believe that that's also a condition for
14        being able to play sports, right?
15   A.   Yes.
16   Q.   Or to hold office in a student organization?
17   A.   Yes.
18   Q.   Or an honor academically?
19   A.   Um-hum, that's correct.
20             MS. RIVERA:  Let her finish her questions
21        before you answer.
22             THE DEPONENT:  I'm sorry.
23   BY MS. FORSTER:
24   Q.   On page 27, the next page, under High School
25        Graduation, the first sentence, "to graduate from
```

```
 1        Bangor Christian Schools a student must demonstrate
 2        the ability to function in a manner that is in the
 3        agreement with the philosophy of BCS."  What does
 4        that mean?
 5   A.   So they could be -- it's basically -- it's weird to
 6        be there I guess in the academic requirements but
 7        they could be asked to leave the school if they're
 8        not behaving and functioning in a manner that's in
 9        agreement with the philosophy of BCS, and so that's
10        what that means.  It's odd, you're right, that that
11        sentence is there attached to the academic stuff
12        that's going on in course requirements.
13   Q.   So in reality, are the graduation requirements the
14        credit requirements listed below?
15   A.   Um-hum.
16   Q.   And this statement is more of an issue of whether
17        or not you maintain presence in the school?
18   A.   Right.
19   Q.   So a student having attained these credit
20        requirements will receive a diploma from BCS?
21   A.   If they have -- yes, if they survive to June
22        whatever it is of that year of graduation, yes,
23        then they will.
24   Q.   So physical presence plus credits earned?
25   A.   Yes.
```

```
 1   Q.   Excellent.  On page 30, and this is part of your
 2        conduct and discipline section.
 3   A.   Um-hum.
 4   Q.   It says, "BCS follows the Biblical values of
 5        Matthew 18?"
 6   A.   Um-hum.
 7   Q.   Could you describe what the Biblical values of
 8        Matthew 18 say about discipline?
 9   A.   Well, it's dealing with the idea of if you have a
10        problem with someone, that you go to that person
11        and you talk to that person about it, and so when a
12        teacher recognizes or I, as the principal,
13        recognize that a student is having difficulties, I
14        need to go to that person and talk to them about it
15        and we deal with it in that way, don't just kick
16        somebody out without talking to them about it or
17        trying to help them with it and work through it.
18        If you notice in our discipline levels, one of the
19        consequences at each level is a conversation with
20        the teacher.  That's a big part of that Matthew 18
21        thing, making sure that our discipline is not
22        punitive, the got-you sort of situation but a
23        learning -- we want you to learn from whatever it
24        is.  We want to help you not make that choice again
25        or make that mistake again and so that Matthew 18
```

```
 1        is that as believers, we're to go to each other.

 2        If I know you've offended me, I should go to you;

 3        if you know that you've offended me, you should

 4        come to me and so it's that perspective.

 5   Q.   And does that always give the student the

 6        opportunity to tell their side --

 7   A.   Um-hum.

 8   Q.   -- before you make a decision about discipline?

 9   A.   Um-hum, yes.

10   Q.   Does that run even to when you're thinking of

11        something more significant like a suspension or an

12        expulsion?

13   A.   Yes, it does.

14   Q.   So students have the right to tell their side?

15   A.   Yes.

16   Q.   And who makes the final decision on something as

17        significant as a suspension or expulsion?

18   A.   Generally speaking, a suspension would be my

19        decision but that is something that the

20        administrative team, including our school

21        counselor, plays a role in.  I have never made a

22        decision by myself without having a discussion with

23        the school counselor and with whoever was the

24        headmaster at that time.  Before an expulsion

25        happened, that always goes all the way to the top
```

1        and we talk about is there any way we can save this

2        child, we prefer not to remove a kid from the

3        school, you know, what can we do to work with the

4        child and with the family and all of that, but that

5        one always goes all the way through because that's

6        such a significant impact on the long-term on the

7        child.

8    Q.  And who is the top?  Is it the headmaster?

9    A.  Yes, yes.

10   Q.  Do you report directly to the headmaster?

11   A.  I do.

12   Q.  And who reports directly to you?

13   A.  The teachers report to me, yup.

14   Q.  The whole K/12?

15   A.  Yes.

16   Q.  And any sort of para-educators that are in the

17       school, do they also report to you?

18   A.  The school counselor reports to me and then really

19       the only other para-educators are our classroom

20       aides and they would.

21   Q.  And when you say the school counselor, do you mean

22       a guidance counselor?

23   A.  Her degree and license is as a school counselor.

24   Q.  Okay.  I just didn't know whether you meant a

25       counselor like through the church or --

1    A.   No.

2    Q.   An academic version?

3    A.   Right.

4    Q.   Okay.  Thank you for presenting so many documents

5         about your curriculum.  I feel like I've learned

6         more about how a curriculum works than I ever knew

7         before by reading them all.  I wondered though, is

8         there sort of a base that you use to build your

9         curriculum?  How do those documents all start?

10   A.   We began the process ten years ago as part of our

11        reaccreditation with NEASC in 2009, and so where

12        they began was with each committee that was

13        dedicated to a different content area, reviewing

14        national standards, at the time the Maine State

15        Learning Standards, to see what are the things that

16        students should be learning at each grade level,

17        what are the skills, content, you know, all of

18        those things that they should be learning at each

19        content level and each content level at each grade

20        level.  So we developed those curricular maps based

21        on that looking at our -- the textbooks and things

22        that we chose and felt fit our philosophy the best,

23        aligning those then with the standards that are

24        appropriate for students to learn and then that's

25        how we've continued as we go through a rotation

```
 1          each year of reviewing different curricular maps.

 2          We refer back again to the national and state

 3          standards, look to them to align with them and go

 4          that way.

 5    Q.    I noticed, particularly in your science curriculum,

 6          that you have a column on the far left that talks

 7          about the Biblical foundation.  I may not have

 8          those words exactly right.

 9    A.    Yes, um-hum.

10    Q.    And then the next column talks about the course

11          objectives.

12    A.    Yes.

13    Q.    How do you decide what pieces of Biblical

14          foundation get used in each of your classes?  Is

15          that something you do after you have the template

16          you described or do you start with the Biblical

17          foundations?

18    A.    It might have gone the second way starting with the

19          Biblical and going to the content; however, we

20          built the curricular maps the first time through in

21          2009 without specifically putting those pieces in,

22          and so as we have reviewed the curriculum, we

23          recognize that -- the word that we're using is that

24          we have to be intentional and thinking about how

25          are we going to make sure that everything we say
```

```
 1        we're doing in our philosophy statements is
 2        actually being accomplished and isn't just
 3        something that sounds nice written on a piece of
 4        paper.  So that's something we have backwards --
 5        worked backwards and said these are the different
 6        things and this is where they will be placed in and
 7        how we'll introduce them and marry them with the
 8        standards that they're learning in science or
 9        English or math and so forth going forward.  So
10        that's why it should have probably been the other
11        way but that is how it ended up happening.
12   Q.   What happens when there's a conflict?
13   A.   Explain what you mean.
14   Q.   So again thinking about the science standards, are
15        there sometimes when your Biblical reference
16        conflicts with what an academic standard might be?
17   A.   No.
18   Q.   Okay.  So when you talk about cell mutation, for
19        example, yet at the same time on your left-hand
20        side you're talking about creationism or
21        intelligent design as opposed to basic cell
22        mutation, how do you make those work together?
23   A.   They actually work together perfectly because there
24        is no place where science contradicts scripture or
25        scripture contradicts science, and so what we're
```

```
 1            able to do is use scientific fact and research and
 2            show how there isn't a conflict between those
 3            things, and so there isn't an issue and I guess
 4            that's how I would answer the question.  There
 5            isn't ever a conflict between -- one does not
 6            contradict the other.
 7      Q.    And is that consistent throughout the curriculum?
 8            I mean, I picked science only because it's been the
 9            most highly-publicized area where people have had
10            questions.  When you teach English language arts,
11            for example, do you use some Christian texts and
12            some regular or ordinary text?
13      A.    Yes, we do; yes, we do.  I guess you could give me
14            some examples of exactly what you mean by that.
15      Q.    Well, this morning we talked about with respect to
16            Temple Academy that there was a concern about what
17            was appropriate reading material for children and
18            they pointed out that they taught Macbeth even
19            though they're the witches of Macbeth.  So when you
20            choose texts for your courses, are you looking for
21            good, Christian-appropriate stories even when they
22            might be also traditional academic favorites that
23            you read in high school?
24      A.    So I believe you're asking me -- and you can tell
25            me if this is correct -- do we use any texts that
```

```
 1        would be also used in, say, a nonsectarian school?
 2    Q.  Right.
 3    A.  Yes, we do.
 4    Q.  And you have some texts that are specifically or
 5        deliberately Christian in focus, is that correct?
 6    A.  Do you mean -- are we still talking about language
 7        arts or just in the broad curriculum?
 8    Q.  Well, I was thinking about language arts and
 9        particularly in the younger grades those are books
10        that are, I'm using specifically Christian, but
11        they're designed and I noticed in the bibliography
12        are Christian publishing houses.  Do you ever
13        consider and reject books to be used as part of
14        your English language arts curriculum because you
15        think they're inappropriate in a Christian
16        environment?
17    A.  Um-hum, yes, we do.
18    Q.  Could you give me an example?
19    A.  Of a book we have considered and rejected?
20            MS. RIVERA:  Is that what you're asking?
21            MS. FORSTER:  Yes.
22    BY MS. FORSTER:
23    A.  I can't think of one because our curriculum has
24        been pretty consistent for several years.  What we
25        read in our various English classes has been fairly
```

```
 1        consistent.  I mean, there have been -- when I was

 2        teaching language arts, there were books that I

 3        reviewed and didn't choose not just because of a

 4        Christian content but I felt were not age

 5        appropriate, you know, in general.

 6   Q.   Right.

 7   A.   But I can't -- no, I can't give you an example of

 8        something we rejected.

 9   Q.   I was hoping you would say Moby Dick.  Everyone

10        wants to get out of reading Moby Dick, I mean, but

11        apparently the whale is just fine, huh?

12   A.   Yeah.

13   Q.   Is there any way in topics other than Bible to

14        separate the religious instruction from the

15        academic instruction or is it completely

16        intertwined?

17   A.   It's completely intertwined.

18   Q.   Okay, and there would be no way to have a student

19        be successful in the school if they were resistant

20        to the sectarian instruction?

21   A.   That's correct.

22   Q.   When you make decisions about grading, are those

23        decisions based on traditional academic indicia,

24        performance on tests, class participation, et

25        cetera, alone or is there also an element of
```

```
 1          faithfulness of belief, of performance with respect
 2          to the overarching values that goes into that
 3          calculation?
 4     A.   Not into our academic calculations, no.  It's
 5          academic performance, yup.
 6     Q.   Outside of -- well, are there any chapel services
 7          that occur during the school day?
 8     A.   Yes, once -- once a week.
 9     Q.   And are they led by pastors, by students?
10     A.   Yes.
11     Q.   Oh, all of the above?
12     A.   Yes.
13     Q.   Is part of what students learn to do either in
14          Bible class or in one of the other classes present
15          at chapel?
16     A.   I'm not sure what you mean.
17     Q.   Do you help them or do they learn how to be
18          effective communicators at chapel or, you know,
19          speaking about their faith at chapel, is that one
20          of the things that they're taught?
21     A.   Not specifically at chapel.  You know, part of the
22          language arts curriculum is communication and one
23          of our goals for learning to be good communicators
24          is to communicate their beliefs and their faith and
25          so that would be hopefully a carryover to if I can
```

```
 1        communicate through speaking in my class, then if I
 2        have the opportunity to also speak at chapel, that
 3        carries over, but that's not one of the goals.  To
 4        train them to speak in chapel would not be one of
 5        the goals.
 6   Q.   I notice that you have a very specific homework
 7        policy about Wednesday nights.
 8   A.   Um-hum.
 9   Q.   What happens on Wednesday night?
10   A.   Many churches have a midweek service on Wednesday
11        nights, and we want to leave the opportunity for
12        kids who want to go to their youth group to go to
13        their church service on Wednesday nights and not
14        have to feel, oh, I've got a boatload of homework
15        to do.  They've got that option to go.
16   Q.   From how many churches would you say your student
17        population comes?
18   A.   Over 40, and we have a group of churches that most
19        of them come from, 75 percent or so come from.
20   Q.   Okay.
21   A.   Five to seven churches, and then that other 25
22        percent is one kid from this church and one kid
23        from that church over the -- all over the area.
24   Q.   Wow.  When I was looking on page 33 --
25   A.   Your 33, right?
```

| | | |
|---|---|---|
| 1 | Q. | Yes, BDS 33, "the following offenses," and this is |
| 2 | | the last paragraph, "may lead to immediate |
| 3 | | suspension and probable expulsion," the last bullet |
| 4 | | point, "presenting oneself as a gender other than |
| 5 | | the one included on his or her birth certificate." |
| 6 | A. | Um-hum. |
| 7 | Q. | Is that essentially nonnegotiable? |
| 8 | A. | We would work with any kid, just like we would with |
| 9 | | all of these things.  That's why it isn't an |
| 10 | | immediate -- it may lead to but doesn't always lead |
| 11 | | to, so there would be conversations that would go |
| 12 | | on with the student and their parent and working |
| 13 | | with them just like we would with any other area, |
| 14 | | but if even through working with them there was no |
| 15 | | movement on the part of the student, that that was |
| 16 | | how they were going to present oneself, would that |
| 17 | | mean they could no longer attend school?  Just like |
| 18 | | all the other areas, if there were no movement, if |
| 19 | | the child wanted to continue drinking every weekend |
| 20 | | or whatever, you know, any of those other issues, |
| 21 | | yes. |
| 22 | Q. | Um-hum.  What if a student didn't present him or |
| 23 | | herself as a gender other than the one included on |
| 24 | | the birth certificate but was openly gay and, you |
| 25 | | know, communicated that regularly in the school |

| | |
|---|---|
| 1 | environment and to his or her classmates? |
| 2 | A. So if you refer back to where in the beginning |
| 3 | where we talk about our Statement of Faith and how |
| 4 | we look at those things, that would fall under an |
| 5 | immoral activity by that definition.  So yes, it -- |
| 6 | that would fall just like again if I was |
| 7 | heterosexual and sleeping with my boyfriend and |
| 8 | saying I'm going to continue doing this, I don't -- |
| 9 | I'm not -- you know, that would be the same |
| 10 | situation. |
| 11 | Q. And so there would be counseling but ultimately if |
| 12 | there was no change in the student's position, that |
| 13 | would be done? |
| 14 | A. Um-hum, yes. |
| 15 | Q. All right.  I'm going to take a break, consult with |
| 16 | my cocounsel here and, you know, you can argue on |
| 17 | the way home about who had it worse. |
| 18 | **(OFF RECORD FROM 2:40 TO 2:42)** |
| 19 | **BY MS. FORSTER:** |
| 20 | Q. A couple of very quick follow-ups.  Right before we |
| 21 | broke when we were talking about behavior that |
| 22 | would lead to expulsion, you said when I asked you |
| 23 | about a student who was a professed homosexual, you |
| 24 | said it was similar or just like if another student |
| 25 | was having sex on the weekend and didn't want to |

 1      cease that activity.  I just want to be clear, if

 2      the student who professed that they were homosexual

 3      was celibate, this wasn't about actually having

 4      sex, would that still be a problem?

 5   A.  There would be discussions with him or her to see

 6      what's going on in their life and their world and

 7      their thinking, so it wouldn't be automatic but if

 8      they are entrenched in this is who I am, I think

 9      that it is right and good, it clearly goes against

10      our Biblical beliefs so, yes, it would be that as

11      well.

12   Q.  Okay.  I just couldn't tell whether you were

13      focused on the conduct or --

14   A.  Correct, I gotcha.

15   Q.  Chapel is mandatory, isn't it?

16   A.  Yes.

17   Q.  And is one of the things -- I think you said one of

18      the things that you were teaching them was about

19      the ability to spread Christianity in the world.

20      Is that part of what they're learning not

21      necessarily through chapel but through all of their

22      education?

23   A.  Yes.

24          MS. FORSTER:  Okay, I think that's it.

25          MR. KELLER:  I have nothing.

```
 1                 MS. RIVERA:  We will read.

 2            (Whereupon, the above-named deposition was

 3       concluded at 2:43 p.m.)

 4            (The deponent does not waive reading and

 5       signing.)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

27

```
 1                        CERTIFICATE

 2          I, Joanne P. Alley, a Notary Public in and for

 3     the State of Maine, hereby certify that on the 17th day

 4     of December, 2018, personally appeared before me the

 5     within-named deponent who was sworn to testify to the

 6     truth, the whole truth, and nothing but the truth in the

 7     aforementioned cause of action and that the foregoing is

 8     a true and accurate record as taken by me by means of

 9     computer-aided machine shorthand.

10

11          I further certify that I am a disinterested

12     person in the event or outcome of the aforementioned

13     cause of action.

14

15          IN WITNESS WHEREOF, I have hereunto set my hand

16     this 11th day of January, 2018.

17

18               _____

19                    Joanne P. Alley

20                  Court Reporter/Notary Public

21

22     My commission expires:  July 17, 2022

23

24

25
```

```
 1              ALLEY & MORRISETTE REPORTING SERVICE

 2                       1203 Augusta Road

 3                      Belgrade, ME  04917

 4
                               January 14, 2018
 5

 6

 7   Ms. Martha Boone
     c/o Kimberly Y. Smith Rivera, Esq.
 8   11803 104th Street.
     Largo, FL 33773
 9

10
     RE: Carson, et al. v Robert G. Hasson
11
     Enclosed please find a copy of your deposition taken in
12   the above-mentioned action.  Also enclosed is the
     original signature page and a sheet for corrections.
13   Please read the copy of the deposition and sign the
     original signature page before a Notary Public.  If
14   there are any corrections you wish to make, they should
     be made on the enclosed correction sheet.  Do not mark
15   on the deposition.

16   Please return the signed original signature page and
     correction sheet to Alley & Morrisette at the above
17   address within 30 days.

18   Thank you.

19

20

21

22

23

24

25
```

JA224

29

```
 1   THE ORIGINAL DEPOSITION OF MARTHA BOONE SHOULD INCLUDE

 2   THE FOLLOWING CORRECTIONS:

 3

 4   Page Line     Change from this     To this

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1            TO BE COMPLETED BY THE DEPONENT:

 2          I, _____, have read the

 3    foregoing pages and have noted any stenographic errors

 4    of my testimony together with their respective

 5    corrections and the reasons therefore on the following

 6    Errata Sheet.

 7

 8              (SIGNATURE) _____

 9                  (DATE) _____

10              * * * * * * * * * *

11    TO BE COMPLETED BY THE NOTARY PUBLIC/ATTORNEY

12        I, _____, a Notary Public/Attorney,

13    hereby acknowledge that the above-named deponent

14    personally appeared before me and affixed his/her

15    signature as his/her own true act and deed.

16

17              (SIGNATURE) _____

18                  (DATE) _____

19    TITLE:  Carson, et al. v Robert Hasson

20    DEPOSITION OF:  Martha Boone

21    DATE OF DEPOSITION:  December 17, 2018

22    NOTICING PARTY:  Sarah Forster, Esq.

23    REPORTER:  Joanne P. Alley

24

25
```

## 0

04333-0006 [1] - 2:4
04917 [1] - 28:3

## 1

10 [1] - 5:16
104th [2] - 2:15, 28:8
11803 [2] - 2:15, 28:8
11th [1] - 27:16
12 [1] - 5:15
1203 [1] - 28:2
14 [1] - 28:4
15 [1] - 6:21
16 [1] - 7:2
17 [5] - 1:19, 4:4, 7:21, 27:22, 30:21
17th [1] - 27:3
18 [5] - 9:3, 12:5, 12:8, 12:20, 12:25
18-cv-00327 [1] - 1:3

## 2

20 [1] - 5:2
2003 [1] - 5:17
2008 [1] - 5:23
2009 [2] - 15:11, 16:21
2018 [6] - 1:19, 4:4, 27:4, 27:16, 28:4, 30:21
2022 [1] - 27:22
207-626-8800 [1] - 2:4
25 [1] - 22:21
26 [1] - 9:15
27 [1] - 10:24
2:15 [2] - 1:19, 4:4
2:40 [1] - 24:18
2:42 [1] - 24:18
2:43 [1] - 26:3

## 3

30 [2] - 12:1, 28:17
301 [1] - 2:8
33 [3] - 22:24, 22:25, 23:1
33773 [2] - 2:16, 28:8
398 [1] - 2:8

## 4

4 [1] - 3:4
40 [1] - 22:18
480-557-8300 [1] - 2:9

## 5

5 [1] - 5:15

512-480-5396 [1] - 2:13

## 6

6 [1] - 2:3

## 7

75 [3] - 9:20, 9:21, 22:19
78701 [1] - 2:12

## 8

8 [1] - 5:11
816 [1] - 2:12
85281 [1] - 2:8
888-233-6255 [1] - 2:16

## 9

960 [1] - 2:12

## A

AAG [2] - 2:2, 2:2
ability [2] - 11:2, 25:19
able [2] - 10:14, 18:1
above-mentioned [1] - 28:12
above-named [2] - 26:2, 30:13
academic [1] - 9:17, 9:19, 11:6, 11:11, 15:2, 17:16, 18:22, 20:15, 20:23, 21:4, 21:5
academically [1] - 10:18
Academy [1] - 18:16
accomplished [1] - 17:2
accurate [3] - 6:24, 9:4, 27:8
acknowledge [1] - 30:13
act [1] - 30:15
Action [1] - 1:3
action [3] - 27:7, 27:13, 28:12
actively [1] - 8:22
activity [2] - 24:5, 25:1
address [1] - 28:17
administered [1] - 4:6
administration [2] - 5:22, 5:24
administrative [1] - 13:20

affixed [1] - 30:14
aforementioned [2] - 27:7, 27:12
Africa [1] - 5:4
afternoon [1] - 4:12
age [1] - 20:4
ago [1] - 15:10
agreement [1] - 11:3, 11:9
aided [1] - 27:9
aides [1] - 14:20
al [3] - 1:8, 28:10, 30:19
align [1] - 16:3
aligning [1] - 15:23
ALLEY [1] - 28:1
Alley [6] - 1:17, 4:1, 27:2, 27:19, 28:16, 30:23
alone [1] - 20:25
AMY [1] - 1:8
AND [1] - 2:15
answer [2] - 10:21, 18:4
apanju@ij.org [1] - 2:13
APPEARANCES [1] - 2:1
appeared [2] - 27:4, 30:14
appropriate [4] - 15:24, 18:17, 18:21, 20:5
area [5] - 5:8, 15:13, 18:9, 22:23, 23:13
areas [2] - 10:12, 23:18
argue [1] - 24:16
ARIF [1] - 2:11
arts [7] - 5:22, 18:10, 19:7, 19:8, 19:14, 20:2, 21:22
assumption [1] - 8:2
attached [1] - 11:11
attained [1] - 11:19
attend [1] - 23:17
Attorney [5] - 1:18, 2:10, 3:4, 3:5, 4:2
ATTORNEY [1] - 2:3
Attorneys [1] - 2:6
Augusta [4] - 1:19, 2:4, 4:4, 28:2
Austin [1] - 2:12
Australia [1] - 5:13
automatic [1] - 25:7
Avenue [2] - 2:8, 2:12
average [1] - 9:20
AZ [1] - 2:8

## B

bachelor's [1] - 4:19
background [1] - 4:18
backwards [2] - 17:4, 17:5
Bangor [3] - 5:18, 9:8, 11:1
base [1] - 15:8
based [2] - 15:20, 20:23
basic [1] - 17:21
BCS [4] - 11:3, 11:9, 11:20, 12:4
BDS [1] - 23:1
BE [2] - 30:1, 30:11
become [2] - 7:6, 7:15
began [2] - 15:10, 15:12
beginning [3] - 1:19, 4:4, 24:2
behaving [1] - 11:8
behavior [1] - 24:21
Belgrade [1] - 28:3
belief [1] - 21:1
beliefs [4] - 8:15, 8:22, 21:24, 25:10
believers [1] - 13:1
below [4] - 7:11, 9:20, 9:21, 11:14
best [1] - 15:22
between [2] - 18:2, 18:5
beyond [1] - 8:15
Bible [10] - 8:3, 8:5, 8:9, 8:11, 9:21, 9:23, 10:8, 20:13, 21:14
Biblical [9] - 7:5, 12:4, 12:7, 16:7, 16:13, 16:16, 16:19, 17:15, 25:10
bibliography [1] - 19:11
big [1] - 12:20
biggest [1] - 10:3
birth [2] - 23:5, 23:24
boatload [1] - 22:14
book [1] - 19:19
books [4] - 8:9, 19:9, 19:13, 20:2
Boone [2] - 28:7, 30:20
BOONE [4] - 1:15, 3:3, 4:8, 29:1
born [1] - 5:6
bottom [2] - 6:22, 9:16
boyfriend [1] - 24:7
break [1] - 24:15
broad [1] - 19:7

broke [1] - 24:21
build [1] - 15:8
Building [2] - 1:18, 4:3
built [1] - 16:20
bullet [1] - 23:3
BY [9] - 4:11, 8:17, 8:21, 9:2, 10:23, 19:22, 24:19, 30:1, 30:11

## C

c/o [1] - 28:7
calculation [1] - 21:3
calculations [1] - 21:4
capacity [1] - 1:11
care [2] - 10:8, 10:9
carries [1] - 22:3
carryover [1] - 21:25
Carson [2] - 28:10, 30:19
CARSON [1] - 1:8
cease [1] - 25:1
celibate [1] - 25:3
cell [2] - 17:18, 17:21
CENTER [1] - 2:15
certain [1] - 7:5
CERTIFICATE [1] - 27:1
certificate [2] - 23:5, 23:24
certify [2] - 27:3, 27:11
cetera [1] - 20:25
Change [1] - 29:4
change [1] - 24:12
chapel [9] - 21:6, 21:15, 21:18, 21:19, 21:21, 22:2, 22:4, 25:15, 25:21
chief [1] - 6:18
child [4] - 14:2, 14:4, 14:7, 23:19
children [4] - 5:5, 5:8, 7:14, 18:17
choice [1] - 12:24
choose [2] - 18:20, 20:3
chose [1] - 15:22
Christian [14] - 5:18, 7:8, 9:8, 9:11, 9:13, 9:25, 11:1, 18:11, 18:21, 19:5, 19:10, 19:12, 19:15, 20:4
Christian-appropriate [1] - 18:21
Christianity [1] - 25:19
Christians [2] - 7:7,

9:9
**CHRISTOPHER** [1] - 2:2
**christopher.taub@ maine.gov** [1] - 2:5
**Church** [1] - 6:6
**church** [5] - 6:11, 14:25, 22:13, 22:22, 22:23
**churches** [5] - 7:7, 22:10, 22:16, 22:18, 22:21
**Civil** [1] - 1:3
**class** [5] - 8:9, 10:5, 20:24, 21:14, 22:1
**classes** [5] - 8:3, 8:5, 16:14, 19:25, 21:14
**classmates** [1] - 24:1
**classroom** [3] - 5:5, 6:1, 14:19
**clear** [1] - 25:1
**clearly** [1] - 25:9
**cocounsel** [1] - 24:16
**college** [1] - 10:7
**Colossians** [1] - 8:6
**column** [2] - 16:6, 16:10
**commission** [1] - 27:22
**Commissioner** [1] - 1:11
**committee** [1] - 15:12
**communicate** [2] - 21:24, 22:1
**communicated** [1] - 23:25
**communication** [1] - 21:22
**communicators** [2] - 21:18, 21:23
**COMPLETED** [2] - 30:1, 30:11
**completely** [2] - 20:15, 20:17
**composite** [1] - 5:4
**computer** [1] - 27:9
**computer-aided** [1] - 27:9
**concern** [1] - 18:16
**concluded** [1] - 26:3
**condition** [1] - 10:13
**conduct** [2] - 12:2, 25:13
**confirm** [1] - 4:14
**conflict** [3] - 17:12, 18:2, 18:5
**conflicts** [1] - 17:16
**Congress** [1] - 2:12
**consequences** [1] - 12:19

**consider** [1] - 19:13
**considered** [1] - 19:19
**consistent** [3] - 18:7, 19:24, 20:1
**consult** [1] - 24:15
**content** [7] - 10:11, 15:13, 15:17, 15:19, 16:19, 20:4
**continue** [2] - 23:19, 24:8
**continued** [1] - 15:25
**contradict** [1] - 18:6
**contradicts** [2] - 17:24, 17:25
**conversation** [1] - 12:19
**conversations** [1] - 23:11
**copy** [2] - 28:11, 28:13
**correct** [5] - 10:19, 18:25, 19:5, 20:21, 25:14
**correction** [2] - 28:14, 28:16
**corrections** [3] - 28:12, 28:14, 30:5
**CORRECTIONS** [1] - 29:2
**counseling** [1] - 24:11
**counselor** [7] - 13:21, 13:23, 14:18, 14:21, 14:22, 14:23, 14:25
**couple** [1] - 24:20
**course** [2] - 11:12, 16:10
**courses** [1] - 18:20
**Court** [1] - 27:20
**COURT** [1] - 1:1
**covered** [1] - 8:8
**covers** [1] - 8:5
**creationism** [1] - 17:20
**credit** [2] - 11:14, 11:19
**credits** [1] - 11:24
**Cross** [2] - 1:18, 4:3
**Crosspoint** [1] - 6:5
**curricular** [3] - 15:20, 16:1, 16:20
**curriculum** [13] - 8:1, 8:11, 8:23, 15:5, 15:6, 15:9, 16:5, 16:22, 18:7, 19:7, 19:14, 19:23, 21:22

---

## D

**DATE** [3] - 30:9, 30:18, 30:21
**DAVID** [1] - 1:8

**days** [1] - 28:17
**DBH** [1] - 1:3
**deal** [1] - 12:15
**dealing** [1] - 12:9
**December** [4] - 1:19, 4:4, 27:4, 30:21
**decide** [1] - 16:13
**decision** [4] - 13:8, 13:16, 13:19, 13:22
**decisions** [2] - 20:22, 20:23
**dedicated** [1] - 15:13
**deed** [1] - 30:15
**Defendant** [2] - 1:13, 2:6
**definition** [1] - 24:5
**degree** [3] - 4:19, 4:21, 14:23
**degrees** [1] - 4:23
**deliberately** [1] - 19:5
**delineated** [1] - 7:11
**demonstrate** [1] - 11:1
**department** [1] - 5:14
**Department** [1] - 1:12
**DEPARTMENT** [1] - 2:3
**deponent** [4] - 4:6, 26:4, 27:5, 30:13
**DEPONENT** [5] - 1:15, 3:2, 9:1, 10:22, 30:1
**deposed** [1] - 4:9
**DEPOSITION** [3] - 29:1, 30:20, 30:21
**deposition** [5] - 4:1, 26:2, 28:11, 28:13, 28:15
**describe** [1] - 12:7
**described** [1] - 16:16
**design** [1] - 17:21
**designed** [1] - 19:11
**develop** [1] - 9:13
**developed** [1] - 15:20
**Dick** [2] - 20:9, 20:10
**different** [3] - 15:13, 16:1, 17:5
**difficulties** [1] - 12:13
**diploma** [1] - 11:20
**directly** [2] - 14:10, 14:12
**discipline** [5] - 12:2, 12:8, 12:18, 12:21, 13:8
**discussed** [1] - 8:10
**discussion** [1] - 13:22
**discussions** [1] - 25:5
**disinterested** [1] - 27:11
**DISTRICT** [2] - 1:1, 1:1
**doctrinal** [1] - 7:6

**documents** [2] - 15:4, 15:9
**done** [1] - 24:13
**down** [1] - 9:16
**drinking** [1] - 23:19
**duly** [1] - 4:8
**during** [1] - 21:7

---

## E

**earned** [1] - 11:24
**ed** [1] - 5:14
**education** [2] - 4:19, 25:22
**Education** [2] - 1:12, 9:3
**educational** [1] - 4:18
**educators** [2] - 14:16, 14:19
**effective** [1] - 21:18
**eighth** [2] - 4:21, 5:4
**either** [1] - 21:13
**element** [1] - 20:25
**elementary** [1] - 4:19
**emphasis** [1] - 10:4
**emphasizing** [1] - 10:10
**Enclosed** [2] - 28:11
**enclosed** [2] - 28:12, 28:16
**ended** [1] - 17:11
**English** [5] - 10:9, 17:9, 18:10, 19:14, 19:25
**entrenched** [1] - 25:8
**environment** [2] - 19:16, 24:1
**Ephesians** [1] - 8:6
**Errata** [1] - 30:6
**errors** [1] - 30:3
**ESQ** [2] - 2:7, 2:11
**Esq** [2] - 28:7, 30:22
**essentially** [1] - 23:7
**et** [4] - 1:8, 20:24, 28:10, 30:19
**event** [1] - 27:12
**exactly** [2] - 16:8, 18:14
**EXAMINATION** [1] - 4:10
**examination** [1] - 8:16
**example** [5] - 7:10, 17:19, 18:11, 19:18, 20:7
**examples** [1] - 18:14
**Excellent** [1] - 12:1
**exhibit** [1] - 4:15
**Exhibits** [1] - 3:12
**expires** [1] - 27:22
**explain** [2] - 9:15,

17:13
**expulsion** [5] - 13:12, 13:17, 13:24, 23:3, 24:22

---

## F

**fact** [1] - 18:1
**fair** [1] - 9:7
**fairly** [1] - 19:25
**faith** [2] - 21:19, 21:24
**Faith** [3] - 6:22, 6:24, 24:3
**faithfulness** [1] - 21:1
**fall** [3] - 5:22, 24:4, 24:6
**families** [1] - 10:1
**family** [2] - 7:23, 14:4
**far** [1] - 16:6
**favorites** [1] - 18:22
**felt** [2] - 15:22, 20:4
**final** [1] - 13:16
**fine** [1] - 20:11
**finish** [1] - 10:20
**first** [8] - 4:14, 5:2, 5:19, 5:20, 7:4, 10:25, 16:20
**fit** [1] - 15:22
**five** [2] - 4:15, 22:21
**FL** [2] - 2:16, 28:8
**Floor** [2] - 1:18, 4:3
**focus** [2] - 7:6, 19:5
**focused** [2] - 5:15, 25:13
**follow** [1] - 24:20
**follow-ups** [1] - 24:20
**FOLLOWING** [1] - 29:2
**following** [2] - 23:1, 30:5
**follows** [2] - 4:9, 12:4
**FOR** [4] - 1:1, 2:7, 2:11, 2:15
**foregoing** [2] - 27:7, 30:3
**Forster** [2] - 3:4, 30:22
**FORSTER** [10] - 2:2, 4:11, 8:17, 8:21, 9:2, 10:23, 19:21, 19:22, 24:19, 25:24
**forth** [1] - 17:9
**forward** [1] - 17:9
**foundation** [2] - 16:7, 16:14
**foundations** [1] - 16:17
**four** [5] - 4:15, 5:2, 5:9, 5:12, 5:13
**fourth** [1] - 4:20
**FROM** [1] - 24:18

---

**function** [1] - 11:2
**functioning** [1] - 11:8

### G

**Galatians** [1] - 8:5
**gay** [1] - 23:24
**gender** [2] - 23:4, 23:23
**general** [1] - 20:5
**General** [2] - 1:18, 4:2
**GENERAL** [1] - 2:3
**generally** [1] - 13:18
**given** [1] - 1:19
**goals** [3] - 21:23, 22:3, 22:5
**got-you** [1] - 12:22
**gotcha** [1] - 25:14
**governs** [1] - 6:25
**grade** [7] - 4:21, 5:5, 6:2, 9:20, 9:21, 15:16, 15:19
**grades** [2] - 5:15, 19:9
**grading** [2] - 9:16, 20:22
**graduate** [1] - 10:25
**graduation** [2] - 11:13, 11:22
**Graduation** [1] - 10:25
**group** [2] - 22:12, 22:18
**Guam** [1] - 5:9
**guess** [3] - 11:6, 18:3, 18:13
**guidance** [1] - 14:22

### H

**half** [2] - 5:10, 5:12
**hand** [2] - 17:19, 27:15
**handbook** [1] - 6:19
**HASSON** [1] - 1:11
**Hasson** [2] - 28:10, 30:19
**head** [1] - 6:19
**headmaster** [3] - 13:24, 14:8, 14:10
**help** [4] - 6:9, 12:17, 12:24, 21:17
**hereby** [2] - 27:3, 30:13
**hereunto** [1] - 27:15
**herself** [1] - 23:23
**heterosexual** [1] - 24:7
**hi** [1] - 4:13
**High** [1] - 10:24
**high** [4] - 5:21, 6:8, 8:5, 18:23

**highly** [1] - 18:9
**highly-publicized** [1] - 18:9
**his/her** [2] - 30:14, 30:15
**history** [2] - 4:25, 5:1
**hold** [1] - 10:16
**home** [2] - 7:24, 24:17
**homework** [2] - 22:6, 22:14
**homosexual** [2] - 24:23, 25:2
**honor** [1] - 10:18
**hopefully** [1] - 21:25
**hoping** [1] - 20:9
**House** [1] - 2:3
**houses** [1] - 19:12
**hum** [19] - 6:23, 7:3, 7:9, 7:20, 8:24, 9:18, 9:22, 10:19, 11:15, 12:3, 12:6, 13:7, 13:9, 16:9, 19:17, 22:8, 23:6, 23:22, 24:14
**husband** [3] - 5:1, 6:7, 7:24

### I

**idea** [1] - 12:9
**immediate** [2] - 23:2, 23:10
**immoral** [1] - 24:5
**impact** [1] - 14:6
**importance** [2] - 10:10, 10:12
**IN** [1] - 27:15
**inappropriate** [1] - 19:15
**INCLUDE** [1] - 29:1
**included** [2] - 23:5, 23:23
**including** [1] - 13:20
**indicia** [1] - 20:23
**INSTITUTE** [2] - 2:7, 2:11
**instruction** [5] - 5:7, 5:11, 20:14, 20:15, 20:20
**intelligent** [1] - 17:21
**intentional** [1] - 16:24
**intertwined** [2] - 20:16, 20:17
**introduce** [1] - 17:7
**Island** [1] - 5:9
**issue** [2] - 11:16, 18:3
**issues** [3] - 7:5, 7:15, 23:20

### J

**January** [2] - 27:16, 28:4
**Joanne** [5] - 1:17, 4:1, 27:2, 27:19, 30:23
**JR** [1] - 1:11
**July** [1] - 27:22
**June** [1] - 11:21
**JUSTICE** [2] - 2:7, 2:11

### K

**K/12** [1] - 14:14
**keep** [1] - 6:18
**KELLER** [2] - 2:7, 25:25
**Keller** [1] - 3:5
**kick** [1] - 12:15
**kid** [4] - 14:2, 22:22, 23:8
**kids** [4] - 5:3, 5:7, 5:11, 22:12
**Kimberly** [1] - 28:7
**KIMBERLY** [1] - 2:14
**krivera@ncll.org** [1] - 2:17

### L

**language** [7] - 5:21, 18:10, 19:6, 19:8, 19:14, 20:2, 21:24
**Largo** [2] - 2:16, 28:8
**last** [2] - 23:2, 23:3
**lead** [4] - 23:2, 23:10, 24:22
**leader** [1] - 7:24
**leadership** [2] - 4:22, 9:13
**learn** [4] - 12:23, 15:24, 21:13, 21:17
**learned** [1] - 15:5
**learning** [6] - 12:23, 15:16, 15:18, 17:8, 21:23, 25:20
**Learning** [1] - 15:15
**leave** [3] - 5:20, 11:7, 22:11
**led** [1] - 21:9
**left** [2] - 16:6, 17:19
**left-hand** [1] - 17:19
**level** [5] - 12:19, 15:16, 15:19, 15:20
**levels** [1] - 12:18
**Liberty** [1] - 4:24
**LIBERTY** [1] - 2:15
**license** [1] - 14:23
**life** [1] - 25:6

**LIFE** [1] - 2:15
**Line** [1] - 29:4
**listed** [2] - 10:3, 11:14
**litigation** [2] - 7:7, 7:16
**local** [1] - 5:8
**long-term** [2] - 5:19, 14:6
**look** [5] - 6:21, 7:2, 7:23, 16:3, 24:4
**looking** [3] - 15:21, 18:20, 22:24
**love** [1] - 7:15
**Lynchburg** [1] - 4:24

### M

**Macbeth** [2] - 18:18, 18:19
**machine** [1] - 27:9
**MAINE** [1] - 1:1
**Maine** [10] - 1:11, 1:18, 1:19, 4:2, 4:4, 5:17, 10:8, 15:14, 27:3
**maintain** [1] - 11:17
**mandatory** [1] - 25:15
**manner** [2] - 11:2, 11:8
**maps** [3] - 15:20, 16:1, 16:20
**mark** [1] - 28:14
**Marked** [1] - 3:12
**marked** [1] - 6:19
**marriage** [1] - 7:14
**marry** [1] - 17:7
**martha** [1] - 30:20
**Martha** [1] - 28:7
**MARTHA** [4] - 1:15, 3:3, 4:8, 29:1
**master's** [1] - 4:21
**material** [1] - 18:17
**math** [5] - 5:16, 5:10, 5:16, 6:2, 17:9
**matter** [1] - 10:6
**Matthew** [4] - 12:5, 12:8, 12:20, 12:25
**ME** [2] - 2:4, 28:3
**mean** [10] - 11:4, 14:21, 17:13, 18:8, 18:14, 19:6, 20:1, 20:10, 21:16, 23:17
**means** [2] - 11:10, 27:8
**meant** [1] - 14:24
**Melbourne** [1] - 5:13
**member** [1] - 6:11
**mentioned** [1] - 28:12
**middle** [1] - 4:20
**midweek** [1] - 22:10

**might** [4] - 10:9, 16:18, 17:16, 18:22
**Mill** [1] - 2:8
**missionaries** [1] - 5:1
**missionary** [2] - 5:3, 5:7
**mistake** [1] - 12:25
**Moby** [2] - 20:9, 20:10
**morning** [1] - 18:15
**Morrisette** [1] - 28:16
**MORRISETTE** [1] - 28:1
**most** [2] - 18:9, 22:18
**moved** [4] - 5:8, 5:12, 5:17, 5:22
**movement** [2] - 23:15, 23:18
**MR** [2] - 8:25, 25:25
**MS** [14] - 4:11, 8:14, 8:17, 8:20, 8:21, 9:2, 10:20, 10:23, 19:20, 19:21, 19:22, 24:19, 25:24, 26:1
**must** [1] - 11:1
**mutation** [2] - 17:18, 17:22

### N

**name** [1] - 10:1
**named** [3] - 26:2, 27:5, 30:13
**national** [2] - 15:14, 16:2
**NATIONAL** [1] - 2:15
**naturally** [1] - 8:8
**nature** [1] - 7:6
**NEASC** [1] - 15:11
**necessarily** [2] - 7:5, 25:21
**need** [1] - 12:14
**never** [1] - 13:21
**next** [5] - 7:19, 8:12, 9:3, 10:24, 16:10
**nice** [1] - 17:3
**night** [1] - 22:9
**nights** [3] - 22:7, 22:11, 22:13
**None** [1] - 3:5
**nonnegotiable** [1] - 23:7
**nonsectarian** [1] - 19:1
**Notary** [7] - 1:17, 4:2, 4:7, 4:9, 27:2, 28:13, 30:12
**NOTARY** [1] - 30:11
**noted** [1] - 30:3
**nothing** [2] - 25:25, 27:6

**notice** [3] - 1:19, 12:18, 22:6
**noticed** [2] - 16:5, 19:11
**NOTICING** [1] - 30:22
**numbers** [2] - 6:21, 6:22

**O**

**oath** [1] - 4:6
**object** [1] - 8:14
**objectives** [4] - 9:5, 9:7, 10:2, 16:11
**Objectives** [1] - 9:3
**occur** [1] - 21:7
**odd** [1] - 11:10
**OF** [5] - 1:1, 2:3, 29:1, 30:20, 30:21
**OFF** [1] - 24:18
**offended** [2] - 13:2, 13:3
**offenses** [1] - 23:1
**Offered** [1] - 3:12
**office** [1] - 10:16
**Office** [2] - 1:18, 4:3
**offices** [2] - 1:18, 4:2
**official** [2] - 1:11, 6:10
**once** [1] - 21:8
**one** [20] - 6:13, 8:4, 9:7, 9:19, 10:5, 12:18, 14:5, 18:5, 19:23, 21:14, 21:19, 21:22, 22:3, 22:4, 22:22, 23:5, 23:23, 25:17
**oneself** [2] - 23:4, 23:16
**openly** [1] - 23:24
**opportunity** [3] - 13:6, 22:2, 22:11
**opposed** [1] - 17:21
**option** [1] - 22:15
**ordinary** [1] - 18:12
**organization** [1] - 10:16
**original** [3] - 28:12, 28:13, 28:16
**ORIGINAL** [1] - 29:1
**outcome** [1] - 27:12
**outside** [1] - 21:6
**overall** [1] - 9:20
**overarching** [1] - 21:2
**own** [1] - 30:15

**P**

**p.m** [3] - 1:19, 4:5, 26:3
**page** [15] - 6:21, 7:2,
7:19, 7:21, 9:3, 9:15, 9:17, 10:24, 12:1, 22:24, 28:12, 28:13, 28:16
**Page** [2] - 3:11, 29:4
**pages** [1] - 30:3
**PANJU** [1] - 2:11
**paper** [1] - 17:4
**para** [2] - 14:16, 14:19
**para-educators** [2] - 14:16, 14:19
**paragraph** [3] - 7:4, 8:12, 23:2
**parent** [1] - 23:12
**part** [11] - 7:25, 8:10, 8:22, 12:1, 12:20, 15:10, 19:13, 21:13, 21:21, 23:15, 25:20
**participation** [1] - 20:24
**particularly** [2] - 16:5, 19:9
**PARTY** [1] - 30:22
**pastor** [5] - 6:7, 6:13, 6:15, 6:16, 6:18
**pastors** [1] - 21:9
**people** [2] - 6:13, 18:9
**percent** [2] - 22:19, 22:22
**perfectly** [1] - 17:23
**performance** [3] - 20:24, 21:1, 21:5
**person** [4] - 12:10, 12:11, 12:14, 27:12
**personally** [2] - 27:4, 30:14
**perspective** [1] - 13:4
**Philippians** [1] - 8:6
**philosophy** [4] - 11:3, 11:9, 15:22, 17:1
**physical** [1] - 11:24
**picked** [1] - 18:8
**piece** [1] - 13:21
**pieces** [2] - 16:13, 16:21
**place** [1] - 17:24
**placed** [1] - 17:6
**Plaintiffs** [1] - 1:9, 2:10
**play** [1] - 10:14
**plays** [1] - 13:21
**plus** [1] - 11:24
**point** [1] - 23:4
**pointed** [1] - 18:18
**policy** [1] - 22:7
**population** [1] - 22:17
**position** [1] - 24:12
**prefer** [1] - 14:2
**presence** [2] - 11:17, 11:24

**present** [3] - 21:14, 23:16, 23:22
**presenting** [2] - 15:4, 23:4
**pretty** [1] - 19:24
**primarily** [2] - 5:15, 7:17
**primary** [1] - 9:24
**principal** [1] - 12:12
**probable** [1] - 23:3
**probation** [2] - 9:17, 9:19
**problem** [2] - 12:10, 25:4
**process** [1] - 15:10
**professed** [2] - 24:23, 25:2
**promote** [1] - 9:11
**protection** [1] - 7:13
**Public** [7] - 1:17, 4:2, 4:7, 4:9, 27:2, 27:20, 28:13
**PUBLIC/ATTORNEY** [1] - 30:11
**Public/Attorney** [1] - 30:12
**publicized** [1] - 18:9
**publishing** [1] - 19:12
**punitive** [1] - 12:22
**pursuant** [1] - 1:19
**putting** [1] - 16:21

**Q**

**questions** [3] - 7:13, 10:20, 18:10
**quick** [1] - 4:20

**R**

**RE** [1] - 28:10
**reaccreditation** [1] - 15:11
**read** [5] - 18:23, 19:25, 26:1, 28:13, 30:2
**reading** [7] - 5:6, 5:10, 5:16, 15:7, 18:17, 20:10, 26:4
**reality** [1] - 11:13
**really** [1] - 14:18
**reasons** [1] - 30:5
**receive** [1] - 11:20
**recognize** [2] - 12:13, 16:23
**recognizes** [1] - 12:12
**record** [1] - 27:8
**RECORD** [1] - 24:18
**refer** [2] - 16:2, 24:2
**reference** [1] - 17:15

**referenced** [1] - 8:7
**regular** [1] - 18:12
**regularly** [1] - 23:25
**reject** [1] - 19:13
**rejected** [2] - 19:19, 20:8
**relationships** [1] - 7:23
**religious** [1] - 20:14
**remedial** [2] - 5:6, 5:10
**remediation** [1] - 5:17
**remove** [1] - 14:2
**report** [4] - 6:14, 14:10, 14:13, 14:17
**REPORTER** [1] - 30:23
**Reporter/Notary** [1] - 27:20
**REPORTING** [1] - 28:1
**reports** [2] - 14:12, 14:18
**requirements** [5] - 11:6, 11:12, 11:13, 11:14, 11:20
**research** [1] - 18:1
**resistant** [1] - 20:19
**respect** [3] - 6:5, 18:15, 21:1
**respective** [1] - 30:4
**respond** [1] - 4:15
**return** [1] - 28:16
**reviewed** [2] - 16:22, 20:3
**reviewing** [2] - 15:13, 16:1
**Rivera** [1] - 28:7
**RIVERA** [6] - 2:14, 8:14, 8:20, 10:20, 19:20, 26:1
**Road** [1] - 28:2
**ROBERT** [1] - 1:11
**Robert** [2] - 28:10, 30:19
**role** [4] - 6:5, 6:10, 8:12, 13:21
**rotation** [1] - 15:25
**run** [1] - 13:10

**S**

**SARAH** [1] - 2:2
**Sarah** [1] - 30:22
**sarah.forster@ maine.gov** [1] - 2:5
**save** [1] - 14:1
**scales** [1] - 9:16
**school** [28] - 4:20, 5:3, 5:11, 5:15, 5:21, 6:8, 6:25, 8:1, 8:5, 8:18,

8:23, 9:24, 9:25, 11:7, 11:17, 13:20, 13:23, 14:3, 14:17, 14:18, 14:21, 14:23, 18:23, 19:1, 20:19, 21:7, 23:17, 23:25
**School** [2] - 6:9, 10:24
**Schools** [2] - 9:8, 11:1
**schools** [1] - 7:8
**science** [7] - 5:19, 16:5, 17:8, 17:14, 17:24, 17:25, 18:8
**scientific** [1] - 18:1
**scope** [1] - 8:16
**scripture** [2] - 17:24, 17:25
**scriptures** [1] - 8:4
**second** [1] - 16:18
**sectarian** [1] - 20:20
**section** [1] - 12:2
**see** [2] - 15:15, 25:5
**semester** [2] - 5:19, 5:21
**senior** [2] - 6:15, 6:16
**sentence** [3] - 7:4, 10:25, 11:11
**separate** [1] - 20:14
**seriously** [1] - 10:5
**SERVICE** [1] - 28:1
**service** [2] - 22:10, 22:13
**services** [1] - 21:6
**set** [1] - 27:15
**seven** [1] - 22:21
**seventh** [2] - 5:4, 6:2
**several** [1] - 19:24
**Sewall** [1] - 1:19, 4:3
**sex** [2] - 24:25, 25:4
**sexuality** [1] - 7:14
**sheet** [3] - 28:12, 28:14, 28:16
**Sheet** [1] - 30:6
**shorthand** [1] - 27:9
**SHOULD** [1] - 29:1
**show** [1] - 18:2
**side** [3] - 13:6, 13:14, 17:20
**sign** [1] - 28:13
**signature** [4] - 28:12, 28:13, 28:16, 30:15
**SIGNATURE** [2] - 30:8, 30:17
**signed** [1] - 28:16
**significant** [3] - 13:11, 13:17, 14:6
**signing** [1] - 26:5
**similar** [1] - 24:24
**singled** [1] - 9:23
**situation** [1] - 12:22,

24:10
**six** [1] - 4:16
**Sixth** [2] - 1:18, 4:3
**skills** [1] - 15:17
**sleeping** [1] - 24:7
**Smith** [1] - 28:7
**SMITH** [1] - 2:14
**someone** [1] - 12:10
**sometimes** [1] - 17:15
**sorry** [1] - 10:22
**sort** [3] - 12:22, 14:16, 15:8
**sounds** [1] - 17:3
**source** [1] - 7:16
**speaking** [3] - 13:18, 21:19, 22:1
**special** [1] - 5:14
**specific** [2] - 8:15, 22:6
**specifically** [5] - 4:20, 16:21, 19:4, 19:10, 21:21
**sports** [1] - 10:14
**spread** [1] - 25:19
**standard** [1] - 17:16
**standards** [5] - 15:14, 15:23, 16:3, 17:8, 17:14
**Standards** [1] - 15:15
**start** [2] - 15:9, 16:16
**started** [1] - 5:6
**starting** [1] - 16:18
**State** [6] - 1:18, 1:18, 2:3, 4:3, 15:14, 27:3
**state** [1] - 16:2
**Statement** [3] - 6:22, 6:24, 24:3
**statement** [3] - 7:14, 9:4, 11:16
**statements** [1] - 17:1
**STATES** [1] - 1:1
**Station** [1] - 2:3
**stenographic** [1] - 30:3
**still** [2] - 19:6, 25:4
**stories** [1] - 18:21
**Street** [4] - 1:19, 2:15, 4:3, 28:8
**stuck** [1] - 6:18
**student** [14] - 6:19, 10:16, 11:1, 11:19, 12:13, 13:5, 20:18, 22:16, 23:12, 23:15, 23:22, 24:23, 24:24, 25:2
**student's** [1] - 24:12
**students** [7] - 9:8, 9:11, 13:14, 15:16, 15:24, 21:9, 21:13
**studying** [1] - 8:8

**stuff** [1] - 11:11
**sub** [1] - 5:19
**subject** [1] - 9:23
**successful** [1] - 20:19
**Suite** [2] - 2:8, 2:12
**Sunday** [1] - 6:8
**supervision** [1] - 4:22
**survive** [1] - 11:21
**suspension** [4] - 13:11, 13:17, 13:18, 23:3
**Swaziland** [1] - 5:4
**sworn** [2] - 4:8, 27:5

### T

**talks** [2] - 16:6, 16:10
**TAUB** [2] - 2:2, 8:25
**taught** [9] - 5:3, 5:18, 5:21, 8:3, 8:18, 8:20, 8:22, 18:18, 21:20
**teach** [6] - 6:2, 6:8, 7:25, 9:8, 9:11, 18:10
**teacher** [3] - 5:20, 12:12, 12:20
**teachers** [1] - 14:13
**teaching** [3] - 5:2, 20:2, 25:18
**team** [1] - 13:20
**Tempe** [1] - 2:8
**template** [1] - 16:15
**Temple** [1] - 18:16
**ten** [2] - 5:24, 15:10
**term** [2] - 5:19, 14:6
**testified** [1] - 4:9
**testify** [1] - 27:5
**testimony** [1] - 30:4
**tests** [1] - 20:24
**text** [1] - 18:12
**textbooks** [1] - 15:21
**texts** [4] - 18:11, 18:20, 18:25, 19:4
**THE** [7] - 1:1, 9:1, 10:22, 29:1, 29:2, 30:1, 30:11
**therefore** [1] - 30:5
**they've** [1] - 22:15
**thinking** [5] - 13:10, 16:24, 17:14, 19:8, 25:7
**throughout** [1] - 18:7
**TIM** [1] - 2:7
**TITLE** [1] - 30:19
**tkeller@ij.org** [1] - 2:9
**TO** [3] - 24:18, 30:1, 30:11
**together** [3] - 17:22, 17:23, 30:4
**top** [2] - 13:25, 14:8

**topics** [1] - 20:13
**traditional** [2] - 18:22, 20:23
**train** [1] - 22:4
**true** [4] - 6:24, 9:4, 27:8, 30:15
**truth** [3] - 27:6
**trying** [1] - 12:17
**two** [1] - 8:7
**TX** [1] - 2:12

### U

**ultimately** [1] - 24:11
**um-hum** [19] - 6:23, 7:3, 7:9, 7:20, 8:24, 9:18, 9:22, 10:19, 11:15, 12:3, 12:6, 13:7, 13:9, 16:9, 19:17, 22:8, 23:6, 23:22, 24:14
**under** [2] - 10:24, 24:4
**underlying** [1] - 8:1
**UNITED** [1] - 1:1
**University** [2] - 4:24, 10:7
**up** [1] - 17:11
**ups** [1] - 24:20
**utmost** [2] - 10:10, 10:12

### V

**values** [4] - 9:11, 12:4, 12:7, 21:2
**various** [1] - 19:25
**verses** [1] - 8:7
**version** [1] - 15:2
**Virginia** [1] - 4:24
**volunteer** [3] - 6:7, 6:8, 6:10
**vs** [1] - 1:10

### W

**waive** [1] - 26:4
**wants** [1] - 20:10
**Wednesday** [4] - 22:7, 22:9, 22:10, 22:13
**week** [1] - 21:8
**weekend** [2] - 23:19, 24:25
**weird** [1] - 11:5
**whale** [1] - 20:11
**WHEREOF** [1] - 27:15
**whole** [2] - 14:14, 27:6
**wife** [1] - 8:13
**wish** [1] - 28:14
**witches** [1] - 18:19
**within-named** [1] -

27:5
**WITNESS** [1] - 27:15
**wondered** [1] - 15:7
**word** [1] - 16:23
**words** [1] - 16:8
**works** [1] - 15:6
**world** [2] - 25:6, 25:19
**worse** [1] - 24:17
**wow** [1] - 22:24
**written** [1] - 17:3

### Y

**year** [2] - 11:22, 16:1
**years** [8] - 5:2, 5:10, 5:12, 5:13, 5:24, 15:10, 19:24
**younger** [1] - 19:9
**youth** [4] - 6:7, 6:9, 6:13, 22:12
**yup** [4] - 7:18, 7:22, 14:13, 21:5

Exhibit 8



# 121st MAINE LEGISLATURE

## FIRST REGULAR SESSION-2003

Legislative Document                                        No. 182

H.P. 141                          House of Representatives, January 21, 2003

**An Act to Eliminate Discrimination Against Parents Who Want to
Send Their Children to Religious Private Schools**

Reference to the Committee on Education and Cultural Affairs suggested and ordered
printed.

*Millicent M. MacFarland*

MILLICENT M. MacFARLAND
Clerk

Presented by Representative GLYNN of South Portland.
Cosponsored by Senator NASS of York and
Representatives: DAIGLE of Arundel, SHIELDS of Auburn.

D000020

Printed on recycled paper

Be it enacted by the People of the State of Maine as follows:

2

Sec. 1. 20-A MRSA §2951, sub-§2, as enacted by PL 1981, c.
4    693, §§5 and 8, is repealed.

6

## SUMMARY

8

Current law prohibits religious private schools from
10   receiving public funding to educate children from school
districts that do not have secondary schools. This bill repeals
12   that prohibition.

Page 1–LR1043(1)

D000021

LEGISLATIVE RECORD - House, May 13, 2003

(6-2) Majority Report of the Committee on **EDUCATION AND CULTURAL AFFAIRS** reporting **Ought Not to Pass** on Bill "An Act to Eliminate Discrimination Against Parents Who Want to Send Their Children to Religious Private Schools"

(H.P. 141) (L.D. 182)

Signed:
Senators:
DOUGLASS of Androscoggin
BRENNAN of Cumberland
MITCHELL of Penobscot
Representatives:
CUMMINGS of Portland
GAGNE-FRIEL of Buckfield
FINCH of Fairfield
LEDWIN of Holden
NORTON of Bangor
THOMAS of Orono
FISCHER of Presque Isle
DAVIS of Falmouth

Minority Report of the same Committee reporting **Ought to Pass as Amended by Committee Amendment "A" (H-324)** on same Bill.

Signed:
Representatives:
MURPHY of Kennebunk
ANDREWS of York

(Representative Fischer moves Maj ONTP & TTL)
(Representative Fischer withdrew motion to TTL)

The SPEAKER:   The Chair recognizes the Representative from South Portland, Representative Glynn.

Representative **GLYNN**: Mr. Speaker, Ladies and Gentlemen of the House. I rise in support of this bill and against the motion of Ought Not to Pass on this bill. This bill is a step toward ending discrimination against parents who want to send their children to religious or private schools.

This bill was collaborative of a number of parents as well as the Roman Catholic Diocese. Maine has a school voucher program that allows parents in towns without their own schools to use up to $6,000 in public funds to send their children to any public school or a non-religious private school. Several years ago parents were able to use the money to send their children to religious schools, but that changed in 1981. The Maine Legislature enacted a law banning the use of public funds for religious schools. Maine's ban saying that parents cannot choose to have their children be taught by people in a religious school is discrimination. Our public policy is a discriminatory one as if the state enacted a ban to prohibit children from being taught by people with a different color or a different gender. In this case we are saying that people can't be taught by someone of another faith.

D000022

LEGISLATIVE RECORD - House, May 13, 2003

Discrimination is wrong no matter how it is labeled, no matter how it is colored and how it is sold. This ban is clearly unconstitutional and it will be struck down. Because the Maine Legislature has not dealt with this issue equitably, parents have been forced to file lawsuits against this ban in court. One lawsuit was filed in state court by six families from Minot, Durham and Raymond. Another suit has been filed in federal court by two families from Minot. Both suits charge that the prohibition policy by Maine amounts to religious discrimination.

Ladies and gentlemen of the House, public policy should not be set by the court system. It should be set by the Maine State Legislature. If the education community does nothing to address this discrimination, we will, in fact, be mandated to implement these changes perhaps in a consent decree very similar to the one that was used to implement reform and changes in Maine's mental health clients a few short years ago. Additionally in a time with a projected $1.2 billion shortfall that we have been dealing with, Maine will be spending between $100,000 to $300,000 in legal fees and judgments should we continue to discriminate against Maine people's religious choices.

Do we really wish to continue this discrimination against people of faith? If your answer is the same as mine, no you don't, then I urge you to defeat the Majority Ought Not to Pass Report and move on to striking down this discriminatory practice. Thank you Mr. Speaker. When the vote is taken, Mr. Speaker, I request the yeas and nays.

The SPEAKER: The Chair recognizes the Representative from Presque Isle, Representative Fischer.

Representative **FISCHER**: Mr. Speaker, Ladies and Gentlemen of the House. I rise today in sincere opposition to LD 182, "An Act to Eliminate Discrimination Against Parents Who Want to Send their Children to Private Religious Schools." While the title of this bill might sound appealing, its effects, whether intended or unintended, would have dire consequences for the citizens of the State of Maine.

Mr. Speaker, I submit to you and to this body that there are a number of reasons why this bill should be rejected. These reasons are compelling and have at their root the sovereign prerogative of the people of the State of Maine regarding how public funds can and should be used in supporting public education for the children of this state.

At the outset, it is important to clarify the meaning of the recent Supreme Court decision that the proponents of this bill rely upon. That case, Zelman v. Simmons-Harris, decided what a state may do regarding public funding of religious schools. It did not decide what Maine must do.

In no way did that decision limit the sovereign power of the people of the State of Maine, through their duly elected representatives, to decide whether to fund religious schools. Publicly funding education for our children is one of the most important and vital functions of our state and it is this body's responsibility to carefully exercise discretion over our education system.

Mr. Speaker, I submit it is fundamentally wrong for us to fund discrimination, but that is exactly what this bill calls for. Private religious schools freely admit that they do not hire individuals whose beliefs are not consistent with the school's religious teachings. Yet the Maine Human Rights Act and the US Civil Right Act both clearly state the

D000023

LEGISLATIVE RECORD - House, May 13, 2003

following, "It is unlawful employment discrimination for any employer to refuse to hire any applicant because of the race, sex, physical or mental disability, religion, age, ancestry or national origin of the applicant."

This would lead the casual observer to the conclusion that the private religious schools are currently in violation of the Maine Human Rights Act and the US Civil Rights Act. The casual observer, Mr. Speaker, would be wrong.

The reason for this is due to an exclusion in both acts for private religious entities. As we all know, the Constitution protects religious freedom, so both acts include the following exclusion. "It shall not be unlawful employment discrimination for a religious school to hire employees of a particular religion if such a school is in whole or a substantial part owned or supported by a particular religion." Therefore, it's currently legal for private religious schools to discriminate in hiring against individuals of other religions.

That, however, is only the current situation. LD 182 would allow for public money to go to private religious schools. That begs the question, what happens when the school is no longer "in whole or substantial part owned or supported by a particular religion" but rather it is subsidized by the taxpayers of the State of Maine?

Ladies and gentlemen of the House, I ask you to consider this question, can private religious schools discriminate against citizens of the State of Maine, including even members of this body, because of their religious beliefs? Yes, they can. Is it right for them to do this with our tax money? No, it is not.

Ladies and gentlemen of the House, do you want to take our preciously limited resources and promote discrimination?

Mr. Speaker, that is exactly what LD 182 asks for this body to condone, discrimination. When the Governor asked me to raise my right hand and to swear to uphold the Constitution of the United States of America and the State of Maine, I promised I would. The Maine Human Rights Act and the US Civil Rights Act both state quite clearly that freedom from discrimination in employment is a civil right. As the State Representative from Presque Isle, it's my duty to defend these laws, to oppose discrimination and to protect the civil rights of my constituents.

Mr. Speaker, these responsibilities are the same for every member of this chamber. Public money should never be used to subsidize discrimination against the citizens, against the taxpayers, of the State of Maine. I urge you to support the Majority Report, LD 182, Ought Not to Pass. Thank you Mr. Speaker.

The SPEAKER:     The Chair recognizes the Representative from Arundel, Representative Daigle.

Representative **DAIGLE**: Mr. Speaker, Ladies and Gentlemen of the House. This is a very, very sad day in the history of this body when I hear the Catholic Church being accused of being a discriminatory agency. Perhaps if I stay around here long enough, I might hear worse, but it is unlikely.

I encourage you to look at this bill in a different manner. I actually wish you would vote against the pending motion, Ought Not to Pass, and go on to pass this bill. First, let me emphasize that this bill would only relate to communities that are tuitioning their

D000024

LEGISLATIVE RECORD - House, May 13, 2003

students outside their school district. If you live in a town that has a school that already serves your students and parents which to send their kids to parochial school, this would not apply.

Let me give you an example in Arundel, the town where I live and represent, obviously, why this would be a very attractive option for Arundel. We currently tuition our students to area high schools, paying $6,000 per student per year. The parent wants to send their child to Chevrus High School, so what. It would still be $6,000 as opposed to going to Kennebunk High School, Thornton Academy or Biddeford High School. Right now we are in the position of having to expand our middle school. We are going to have to send our sixth, seventh and eighth graders to Thornton Academy. It will cost us $6,000 per year, per child to send all of our sixth, seventh and eighth graders to Thornton Academy. St. James School in Biddeford offers an excellent education for parishioners for the cost of $1,800 per year. For non-parishioners it is $3,000 per year.

Referring back to the early comment about discrimination, the parochial school system does not discriminate on religion on hiring teachers. It does not discriminate on religion of students enrolled in that school. In fact, if you check the facts in this matter, there are many teachers who are not Roman Catholics and there are far, far many students who are not Roman Catholics. People want to work for the school system because it is a good employer with an excellent environment. Parents want to send their school children to the school because they get an excellent education. If this law were to pass, for every student in Arundel that goes to St. James instead of Thornton Academy, the Town of Arundel and the school funding formula would save $4,200 per student per year for a parishioner and at least $3,000 per student per year for non-parishioners. There is nothing else this body has done in the time I have been up here to reduce the cost of education ever. We have always said we don't fund enough for education ever. If we were to pass this bill, to the extent that parents would go to an option they prefer, St. James, we would be returning many thousands of thousands of dollars and reducing the costs of education.

I encourage you to think of that, if for no other reason, as being one thing we could do to tell our towns that this year we didn't give you enough money, but we gave you the ability to run your schools less expensive than you are running them today. Thank you.

The SPEAKER:   The Chair recognizes the Representative from Kennebunk, Representative Murphy.

Representative **MURPHY**: Mr. Speaker, Men and Women of the House. This bill was like a time travel experience, because sometimes you see the after affects of mischief. I had gone on the Education Committee in 1981. In 1979 or 80 there had been a court case on this type of issue. We went through a recodification in 1981 or early 1982 and in those days, and I assume today that you couldn't do mischief in a recodification. You couldn't drop little nuggets in there that shouldn't have been there. What happened in that recodification, either a staff member or a committee chair had put this language in banning those districts that do not have a secondary school of being able to have that option of a youngster being able to go to a parochial school. That was only discovered much later.

D000025

LEGISLATIVE RECORD - House, May 13, 2003

We are not sure whose fingerprints were on that change or the violation of the recodification process, but it was there and it is in there as law. The law swings like a pendulum in terms of court cases. In 1979-80, the courts were ruling such bans on public monies and state monies moving towards private schools or parochial schools. The pendulum has swung the other way now. The courts are saying, yes, that those monies going to the parents and then they have the choice as to where their child wants to go. This involves only a handful of communities. As the Representative from Arundel, Representative Daigle, had indicated, this is the practice in Arundel. Up until 1982, because they don't have a middle school, it is real important for you to understand, this only applies to communities that do not have a secondary school, either a high school or a middle school. The parents then have a choice. The town gives them the money and they can go to a neighboring public school or they can go to North Yarmouth Academy or Berwick Academy or out of state to a private school if they want to. Up until the court law changed and then someone snuck this into the law in 1982, parents had that option.

Many parents in Arundel, which is just on the other side of the river from me, and I can look across and see the houses, and up until 1982, their children, many of them had the option of going to Chevrus or Catherine McCauley. The courts decided against that. Someone slipped that into the law and now the pendulum has moved the other way, but we still have this little treasure, this little hidden nugget that remains in the statute. This is what this is all about. The courts have definitely begun to rule against this in Cleveland and other communities. The two positions that are before you is one that just says, no, the door slammed shut and remained shut for the next two years. The other one says, let's follow what is happening in the court. Let's take a closer look at it and be ready for when the court decisions come in. This only involves a handful of communities in the State of Maine and it is parent choice, student choice. What we are looking to do is reaffirm what existed up to 1982 so that those students have a choice.

The SPEAKER:     The Chair recognizes the Representative from Portland, Representative Cummings.

Representative **CUMMINGS**: Mr. Speaker, Men and Women of the House. There are three good and simple reasons why you should stand behind the overwhelming Majority Report. It says that this is the wrong policy move for the State of Maine at this time. Let me start with the most basic one. You can't afford it. I share the sympathies and the positions of Representative Glynn from South Portland. Representative Glynn is concerned about money. Let me remind you that in GPA next year, for the first time in over 12 years, we will be facing smaller amounts than we presently have. The resources yesterday to drain off from public schools to make this happen will be an endangerment to the quality of our public schools and that is a serious consideration.

Secondly, we have for a long time held in the State of Maine a position that the courts are not the best place to make public policy, but you, sent here by your constituents, are the best place to make public policy. Do not give up that right today by allocating to the courts a decision that ought to be within our own jurisdiction to make. Why should we make that decision? There is no clear firewall in the US Constitution, there is clearly a delineation within the US Constitution that our state and our private

D000026

LEGISLATIVE RECORD - House, May 13, 2003

religious sector should be separate. That entanglement is a serious entanglement, one that releases you from accountability or releases entities from accountability of quality.

I want to go back to the Zelman case quickly. In the Zelman case overwhelming evidence of failure in the Cleveland public schools allowed, under some conditions, for vouchers to be an option. Let me tell you it would be hard to say with a straight face that Maine teachers have failed you in the quality of their public education. If you vote for this, you are implicitly saying that the Zelman case allows you, under conditions of inadequate, inappropriate and unworthy public education to support the use of vouchers. It is not clear how the US courts will decide in this case. What is clear is that the policy decisions that are before you today.

Let me make my third point. If we were to move in the direction of religious vouchers at this time in our history, we would effectively be giving up the rights for the education of our children to entities whose overwhelming mission is religious. You do not have to be opposed to religious entities having that kind of control. In our decision today, we have to believe that children are better supported by the public schools with public money. If you choose to do otherwise, then let it be with private money. Thank you.

The SPEAKER: The Chair recognizes the Representative from Biddeford, Representative Sullivan.

Representative **SULLIVAN**: Mr. Speaker, Men and Women of the House. It seems nothing is new under the sun. We have debated this issue since I have been here. I am sure to those prior.

First of all, I want to address some things that were said by the Representative from Arundel, Representative Daigle. Indeed they do have a right for children there going to high school to go to Thornton Academy, a system in which I work, Biddeford, a system in which I live, and Kennebunk, Kennebunkport. However, they also provide transportation. Are we going to provide transportation to Chevrus? That is a right also, transportation to schools.

We also have a school program within each community that we represent that depends on enrollment as part of the way they figure what you have coming to you from GPA. Everybody puts into a fire department. We all hope we never have to use that fire department in the municipality. You can put in sprinklers in your building and in your own home if you want, but you have the right to the fire department. That is part of what community in government provides. Public school is what is provided. If we are going to start looking at this, we are going to say that once you have your aged children out of school, then you no longer have to provide tax money to your education system. It doesn't work that way. Communities provide for both ends of the spectrum. Communities have an educational center.

We have forgotten about America. We have agreed to uphold the Constitution, a separation of church and state. To send to religious schools at taxpayers' expense takes away that very principle. I also question the $6,000. The school systems are reimbursed at what the average rate of school is. Thornton Academy is a semi-private school and they are actually allowed to charge 10 percent more. Having had good friends who live

D000027

LEGISLATIVE RECORD - House, May 13, 2003

in Arundel, they have often wondered why Arundel continues to offer Thornton Academy as a choice. They pay extra money than if you go to Biddeford or Kennebunk, public schools. Private schools or semi-private schools are allowed to charge 10 percent more than the average tuition. This is about dollars and cents and it is about the very fabric of the community that you represent, your public schools.

Public schools are what have made the cornerstone of this country. Education, free to all children, to age 18 and in some cases longer. We need to honor that. We need to set policy and say that we support our public schools with taxpayer's money. We don't support private schools, parochial private schools. It is not right. I ask you to go with the Majority Ought Not to Pass Report. Thank you.

The SPEAKER:   The Chair recognizes the Representative from Skowhegan, Representative Richardson.

Representative **RICHARDSON**: Mr. Speaker, Ladies and Gentlemen of the House. This debate amazes me. The people want to be able to send their children, when they don't have the opportunity, to get educated. We are not sending these children to the pied piper. We are sending them to a school to get educated. It also amazes me that we are so concerned with the separation of church and state, but every morning we have a minister giving a prayer over this body. I might add it sounds like it is needed.

The SPEAKER:   The Chair recognizes the Representative from Farmington, Representative Mills.

Representative **MILLS**: Mr. Speaker, Women and Men of the House. I rise in response to some of the issues that have been raised in this debate so far. It has been said that we need to provide vouchers for sectarian schools, to change our current law and do so because it is constitutionally required. I strenuously oppose that position and suggest that there is no basis in law to take that position. In fact, our current statute, as pointed out by the Representative from Kennebunk, has not been changed for 22 or 23 years. Our current statute has been upheld in the courts of Maine. I would refer the gentleman to Strout versus Albanese in 1999, US First Circuit Court of Appeals case, dealing with our current system and finding it constitutional, in addition to the Bagley versus Raymond case in 1999, Maine Supreme Judicial Court case, which also found our current system constitutional. It is not constitutionally required that we change our current system. It has been said several times there are a finite number of resources available to us. I think we all know that. We don't have to serve on Appropriations or Education to understand how GPA is being severely curtailed year by year. We unfortunately can only look forward to additional cuts. I don't see how, as a policy matter, it is possible to give non-secular schools or religious based schools dollars without taking those same dollars away from secular schools and public schools.

It has been said that the Zelman case requires us to change our law. That simply is not so. The Zelman case, as has been pointed out by other speakers, dealt with a very narrow fact situation in the Cleveland School System. It was a 5 to 4 decision. It merely said that in the desperate circumstances in which the Cleveland School System found itself, under court order because of the disastrous circumstances of its schools, under federal court order, it needed to find alternatives to the public school system. It found

D000028

JA241

LEGISLATIVE RECORD - House, May 13, 2003

that those narrow alternatives pass constitutional muster weighing in the balance as the court always does - it is a fine line between the Establishment Clause and the Free Exercise Clause - whether or not giving private non-secular education was the establishment of religion or the promoting of religion and whether or not any other system impaired the exercise of religion. In the narrow circumstances of that case, the US Supreme Court found the Cleveland School System passed constitutional muster. It in no way determined or indicated or hinted in the remotest sense that other school systems in other states would be required to change their system to make our system, for instance, similar to that of Cleveland.

Let me just quote you a few facts quoting from the Zelman opinion. It stated and noted and relied upon the fact that "for more than a generation, Cleveland's public schools have been among the worst performing public schools in the nation. In 1995, a federal district court declared a crisis of magnitude and placed the entire Cleveland School District under state control. The Cleveland Public Schools were in the midst of a crisis, perhaps unprecedented in the history of American education. The district court had failed to meet any of the 18 state standards for minimal acceptable performance. More than two-thirds of high school students in Cleveland either dropped out or failed out before graduation. The students who managed to reach their senior year, out of those students, one out of every four failed to graduate. Of those who did graduate, very few could read, write or compute at levels comparable to their counterparts in other cities." Those facts are cited in the Zelman opinion and on which that narrow opinion is based. It is a very, I think, fact based decision. It is a 5 to 4 decision with very strong concurring and dissenting opinions that narrow the focus of the court's opinion even further.

Compared to the Cleveland situation, a desperate one indeed, by any definition, we, in Maine can be very proud of our public education system. In 1999 our system was rated the highest performing K-12 educational system in the nation by the National Education Goals Panel, an independent bipartisan agency. Maine was one of only 11 states to exceed the national average in all subjects measured by the national assessment of education progress. We have the highest rate of school completion graduation in the nation, 95.4 percent, compared to the national average of 86 percent. Our AP classes, 83 percent of public high schools offer AP courses and our students do very well in AP standings and in standardized tests, both statewide and nationwide.

We have a fairly low student teacher ratio. We have a school system over which we can be very proud indeed. We are not about to fall under any federal court order placing us under jurisdiction or custody of the state or some other agency because of poor school performance. I encourage you and urge you to vote Ought Not to Pass on the bill for the reasons stated.

Our system is not constitutionally broke as it currently stands and it is not necessary to fix something that is not broken. Thank you.

The SPEAKER: The Chair recognizes the Representative from Falmouth, Representative Davis.

Representative **DAVIS**: Mr. Speaker, Ladies and Gentlemen of the House. I urge you to vote the majority on LD 182. In the Majority Report there are both Republicans

D000029

JA242

LEGISLATIVE RECORD - House, May 13, 2003

and Democrats on that report. I would urge you in Portland, Maine, alone, if we open this voucher thing up, think down the line. There are Sunni Muslims in the Portland School System and there are Shiite Muslims in the Portland School System. There are Protestants and Catholics and Jewish children. There are Buddhists and Hindus. I had some of them in my own class. If you open this up, be prepared to open it up thoroughly, because some of those groups, I am sure, will be forming their own schools. Thank you very much.

The SPEAKER:   The Chair recognizes the Representative from South Portland, Representative Glynn.

Representative **GLYNN**: Mr. Speaker, Men and Women of the House. I believe that the debate has gotten just a tad off topic. I think that if folks weren't looking at the bill in front of them and were listening solely to the debate, then you would believe that we are debating a school voucher program here in the Legislature and that simply is not the case. Maine has a school voucher program right now for school districts which do not have either a high school or a middle school and Maine law allows for use up to $6,000 for these school district to use public funds to send their children to any private school that is non-religious or to a public school. If you are concerned that voting for a bill will siphon governmental funds for the use in private schools, your concerns are misplaced because that is already state statute. The condition that we are speaking to is a very narrow one dealing with a very small handful of school districts. This is the case of a school district, which has no high school or has no middle school currently giving $6,000 in voucher money to a maximum to a set of parents to send their children to any private school or public school of their choice. However, in the State of Maine we have a prohibition on these parents that they cannot send their children to a secular school, be it Catholic, Jewish, Protestant or any of the other religions. That, my friends in the Legislature, is why I believe that we have a discriminatory practice in Maine. The fact that we have a school voucher program is a public policy debate that was decided in a previous day. School vouchers are here in the State of Maine. The fact that we have a law on the books that says that you can send your children to a private school, but if they are going to be taught by a bunch of Catholics, then that is a problem. That is unconstitutional and that is where our law has gone astray. That is why I believe that the lawsuits that are currently pending in our court systems, both in the federal court and in the state court systems by these parents are actually pointing out a clear discriminatory ban that we have in our state. Why would we not want to empower the children and empower the parents so that the parents can choose the most appropriate educational setting for their children to learn in?

I disagree with the points made by previous speakers that support of our public schools and support of these parents and their decision to send the children to a religious school as well as a non-religious private school in some way are mutually exclusive. They are not. We can and we should have it all here in the State of Maine and we should support these parents. I urge you to join with me and defeat the Majority Ought Not to Pass Report. Thank you.

D000030

LEGISLATIVE RECORD - House, May 13, 2003

The SPEAKER:    The Chair recognizes the Representative from Poland, Representative Snowe-Mello.

Representative **SNOWE-MELLO**:   Mr. Speaker, Ladies and Gentlemen of the House.  I represent one of these districts, the Town of Minot, where we have parents who have decided to sue the state.  This came out of where they asked the superintendent to please have their child sent to St. Doms.  They are very unhappy in their beliefs that the school in Poland did not meet their needs.  They are very unhappy with the policies set in certain areas.  They believed with all their heart that St. Doms would be a much more appropriate school for their child to attend.  They went through everything they needed to do, the proper channels.   They went to the superintendent and asked them for a superintendent's agreement, because that is our school choice agreement.   Our superintendent denied the child to go to that school.  I think it was not appropriate at all.

I am very concerned with the statement that was brought up that our private schools cannot do as good a job at teaching our young people as our private schools or religious private schools.  Many of our religious schools do an excellent job as teaching our young people.  I really was appalled by that statement.

The point I need to make is that I had put in a bill to the Judiciary Committee to ask the state to supply an attorney, free of charge, to help the Town of Minot to help pay for that lawsuit.  That is why I think this bill is so incredibly important.  It will cut down on those costs.  It will help to save tax dollars.  It will give aide to our local schools.  I really believe that parents and children have the right to go to the school they feel is going to teach their children in the way they believe is appropriate.  Thank you.

The SPEAKER:  The Chair recognizes the Representative from Saco, Representative O'Neil.

Representative **O'NEIL**:  Mr. Speaker, Colleagues of the House.  I am a little confused and conflicted on this.  I apologize in advance for speaking on a bill that didn't come out of my committee.  I apologize for speaking on a bill that only has two members on the Minority Report.  I will work through this while I am on my feet if I could.  I have a bit of an interesting perspective here.  I have two kids in Catholic School.  I am a product of a Catholic School.  I am pretty proud of that fact and, in fact, when I went to go to college that helped me a whole lot more than anything else I had done.  The fact of the matter is the Representative from Arundel, Representative Daigle, made a couple of points that aroused my interest.

My two kids, Maggie and Max in eighth and fifth grades respectively, are at St. James School in Biddeford.  For nine years I have paid property taxes in Saco and sent my kids over to St. James willingly and knowingly.  Every time a school voucher or school choice or so called choice vote has come before this body, I have opposed it because I oppose that traditional siphoning of public funds off to private, not necessarily religious, but private institutions for the sake of supporting that bedrock of our democracy, which is the public school system.

That said, I also represent the Town of Dayton, which has undertaken a very divisive and contentious debate over what to do with their middle school kids.  They have outgrown their middle school.  You might know that Dayton is Maine's fastest growing

D000031

LEGISLATIVE RECORD - House, May 13, 2003

town in the '90s. They have outgrown their middle school and they have traditionally sent their seventh and eighth graders to the Saco Middle School. They paid tuition. Arundel is in a similar situation in which they currently receive a voucher to send the kids to a number of different schools. Dayton is in negotiations with Thornton Academy, which is currently a high school to provide a junior high or a middle school service for the Town of Dayton for a cost.

There is the background that tells you what has laid my feet into a quandary. I have heard about the traditional argument about taking money away from the public schools and why that is a bad thing. I agree and I continue to agree. I always have. As I understand it, the applicability of this Minority Report is to schools where they now do get a voucher and that the prohibition is simply on schools that have a religious bend to them. I think that is the crux of the matter right there. If we are okay with the vouchers being granted to go to Thornton Academy, Biddeford or Kennebunk High School from Arundel, are we not okay with it going to a religious school. I think that is the nub right there, whether or not religious schools should get the public funds.

Given my constituency, given my background, but especially given my constituency and given the fact that this applies only to municipalities that now get vouchers because they have no public schools, I just need to be convinced, especially given the fact that these religious schools must have to be licensed and accredited, I need to be convinced as to why I shouldn't support the Minority Report. That argument hasn't been clearly made yet. Thank you.

The SPEAKER: The Chair recognizes the Representative from Presque Isle, Representative Fischer.

Representative **FISCHER**: Mr. Speaker, Men and Women of the House. I want to respond to the good Representative from Saco's concerns. I think there are two things that we should remember as we go to vote on this bill. The first one the good Representative from Portland brought to us, it was about entanglement. He said there is no strict firewall between church and state other than the fact it says in the Constitution and that means a lot to me. Entanglement would mean that if we were to give money to private religious schools, we would have a responsibility to them, to make them accountable in some way. How are we going to make private religious schools who teach religion in the classroom accountable to standards in the State of Maine that do not include any sort of religion in them? How do we reconcile that? There is no answer for that. You can't reconcile. Our public schools are not allowed to teach religion. Private religious schools can. You can't get from one to the other. That is the first thing, entanglement.

The second one is something that I am sure there are members of this body who would be very concerned about. It is about hiring policies. My father, for instance, is a professor. He has his doctorate. He has taught for 40 years now. He cannot get a job at St. Doms Academy. You know why? He is not a Christian. That is fine, but I am telling you if you can discriminate against people on that basis, what does that say. If you receive public money, you are going to be accountable to public laws. I am a Christian. I could get a job at St. Doms. Go figure. The point is you are going to have a firewall

D000032

LEGISLATIVE RECORD - House, May 13, 2003

there, as the good Representative from Portland said. You are suddenly going to have to open yourself up to the laws of the State of Maine if you receive public money. I don't think from the testimony that we received from directors of Christian schools across the State of Maine that that is something that they are willing to accept. They said that they hire based on whether a person's beliefs are the same as ours. That is a direct quote. You ask any member of the Education Committee, even folks on the Minority Report. They will tell you that that is the truth.

How do you explain to my father that he is a professor and he is the most qualified person for a job that you are not going to hire him because he is not a Christian? That is not what we believe in in this state. We had a big discussion yesterday, if you remember, about our terms of employment. Our terms of employment in this state are at will. We are a state that believes and we say every single day when you get a job that we don't discriminate on the basis of, and you put the list right through. That is our state. It is in our Human Rights Act. It is in the US Civil Rights Act. If someone can explain to me how we aren't going to make private religious schools accountable for their hiring practices, then I will vote against this bill too.

I would pose a question to the chair, if someone can answer that question, then I will vote against this bill. Thank you Mr. Speaker.

The SPEAKER: The Representative from Presque Isle, Representative Fischer has posed a question through the Chair to anyone who may care to respond. The Chair recognizes the Representative from Arundel, Representative Daigle.

Representative **DAIGLE**: Mr. Speaker, Ladies and Gentlemen of the House. I have not actually had the research at my fingertips to completely answer your question. I can assure you of one thing I know to be true. There are many teachers at Chevrus High School, which are not members of the Roman Catholic Church. There are many teachers in the Portland Parochial School System, which are not members of the Catholic Church. That is fine. There are a great number of students at Chevrus High Schools and in the Parochial School System of Portland that I am sure of who are not Roman Catholics.

I go on further to respond to the questions about entanglement. I understand the concerns about that. Certainly if a parochial school system is receiving a large amount of funding from public sources, then they probably would be subject to other types of issues, such as hiring practices based upon things supported by public money. I think that is a decision for the school system to make.

I would further add that we talk about accountability, within the parochial school system they all use, without exception, certified teachers. They go through the same credentials as any teacher in the school to include fingerprinting and they follow an accredited program, which is approved by the Department of Education. What they do, because they are so darn clever at it, is provide a better education on every subject that we ask to teach our students and concurrently find a good time to give them a religious understanding and a morality based training of how to become good citizens. For anybody who has had direct contact with that school system, you would clearly understand that to be true.

D000033

LEGISLATIVE RECORD - House, May 13, 2003

The SPEAKER:   The Chair recognizes the Representative from Kennebunk, Representative Murphy.

Representative **MURPHY**:  Mr. Speaker, Men and Women of the House.  Even though many issues come around in various cycles, 99 percent of the time I will stay in the chamber and listen to the debate.  What you begin to hear is issues begin to be shaped.  I think what the Representative from Saco went through on his comments just a couple minutes ago is he worked his way through this bill.  He got beyond some of the rhetoric that has been on this floor.  He identified that it is just a handful of communities.  They don't have the school so parents and students in that community have a choice and their community gives them that money and they can travel in state and out of state and that they have full control of that money, except they are denied the right that they had prior to 1982.  It was important to listen to what he said.  This isn't a voucher bill.  Every community within the state is only limited in its application.  I think as we go though and look at this, there is a feeling in this chamber that it is either or.  If you have looked at both reports, you begin to understand that if we defeat this report and accept the Minority Report, then during this summer and fall while the court is going to make its decision and the pendulum is swinging in such a direction that it will make a decision, I believe, that will invalidate this law.

The SPEAKER:  Would the Representative please defer?  For what reason does the Representative rise?

Representative **FISCHER**:  Point of order.

The SPEAKER:  The Representative may state his point of order.

Representative **FISCHER**:  Thank you Mr. Speaker.  The good Representative from Kennebunk appears to be debating the merits of the Minority Report at this moment.

The SPEAKER:  The Chair does not find that to be the case.  The Representative from Kennebunk may proceed.

Representative **MURPHY**:  Thank you very much Mr. Speaker, the Representative from Saco did make reference to that.  I was responding to the Representative's comments.

Many of us would like to have the opportunity to be able to take the summer and the fall, wait and look at the court decision and be able to get all the parties together, public and private, the municipalities that are involved and begin to discuss this issue.  Basically what we are facing is something put into the law without proper process, without public hearing that got dropped in as a nugget in the dark of the night.  As the times have changed and court decisions have changed, it is still there.  There is nothing wrong with people having an opportunity to discuss an issue and take time and listen to each other.

The SPEAKER:   The Chair recognizes the Representative from Portland, Representative Cummings.

Representative **CUMMINGS**:  Mr. Speaker, Ladies and Gentlemen of the House.  There have been several issues raised that I want to bring back to the attention of those here.  The issue of what is best for children is, in fact, a parent's decision.  From a public policy position, we must believe that a religiously neutral classroom is the best if funded by public dollars.  It is the foundation of our religious agreements to expect diversity in a

D000034

LEGISLATIVE RECORD - House, May 13, 2003

situation. If you are asking the question about money, it is not an insignificant amount, the DOE has said that the number could be as many as 2,000 students eligible for vouchers. That doesn't mean they would all take them, but what if they did. When we make a statement that we want to support our public schools, it is not because we have a knee jerk reaction for supporting those, but a constitutional policy demand that we create a neutral playing surface for all religions. Our purpose here today is as policy makers we provide an opportunity for the people of Maine to continue their religious avocations and their religious pursuits, but not with public money for the many reasons you have heard today. Yes, in fact, there is, of course, discrimination in religious institutions. I defend their right to do so, but not with my dollar.

The SPEAKER: The Chair recognizes the Representative from Saco, Representative O'Neil.

Representative **O'NEIL**: Mr. Speaker, Ladies and Gentlemen of the House. I thank each and every one of you for indulging my queries. I apologize again for pushing into lunchtime, but this really did kind of peak my interest. The good Representative from Presque Isle mentioned entanglement and that is a concept in which I took some interest. I understand that firewall that we have affirmatively decided to place to keep the church and the schools separate. This is in the form of a question that I will put out there. As I understand it if that is the law of the land now, I think it is also the law of the land for us to allow voluntary school prayer. I see that parallel to allowing students to affirmatively choose to take the voucher that we are giving them and go to the school that is accredited of their choice, whether it is religious or it is not.

As to whether we had a philosophical or an ideological divide over whether religion ought to be in the schools, I submit to you that probably the most informative class I took in college was the foundations of western civilization and it had a huge religion component to it.

A friend of mine who has children at the school where my kids go came in as an atheist/agnostic at best and liked the looks of the school. The City of Biddeford helps with finances for transportation and for books at that religious school. She said after the first year that she was pleased with the bonus that she got that her kids got to take this religion course that they had never been exposed to at home. She saw that as a pre-western civilization course with them. She was thrilled with it. The school gave her the option not to take that.

The last point is in trying to get me to support the Majority Report is if this is indeed as many as 2,000 students, why would we object? If we use the Representative from Arundel's math, that is a savings of $6 million. I am still kind of stuck here.

The SPEAKER: The Chair recognizes the Representative from Ellsworth, Representative Crosthwaite.

Representative **CROSTHWAITE**: Mr. Speaker, May I pose a question through the Chair?

The SPEAKER: The Representative may pose his question.

Representative **CROSTHWAITE**: Mr. Speaker, Men and Women of the House. My question is I am looking in the Constitution of the United States and of the State of

D000035

LEGISLATIVE RECORD - House, May 13, 2003

Maine and I am answering anyone who would care to answer where I could find the separation of church and state in either of those Constitutions. Twice I have heard that said this morning that separation of church and state is part of the Constitution. I can't find the article, nor the section. I need some help. Thank you Mr. Speaker.

The SPEAKER: The Representative from Ellsworth, Representative Crosthwaite has posed a question through the Chair to anyone who may care to respond. The Chair recognizes the Representative from Durham, Representative Vaughn.

Representative **VAUGHN**: Mr. Speaker, Ladies and Gentlemen of the House. I would have to concur that I couldn't find the separation of church and state in either the US Constitution or the Maine State Constitution. In fact, the Maine Constitution mentions that we would like to acknowledge with grateful hearts the goodness of the Sovereign Ruler of the universe in affording us an opportunity, so favorable to the design; and, imploring God's aide and direction and its accomplishment, do agree to form ourselves into a free independent state. That is in the preamble, in Section 3 it goes on to talk of the right of religion referring to worship All Mighty God.

I will submit to you that the separation of church and state was a statute introduced in 1954 in the US Congress by a Representative from Texas, which will deny the continuation of tax-free status if they engage in political activity. Thank you Mr. Speaker.

The SPEAKER: The Chair recognizes the Representative from Poland, Representative Snowe-Mello.

Representative **SNOWE-MELLO**: Mr. Speaker, May I pose a question through the Chair?

The SPEAKER: The Representative may pose her question.

Representative **SNOWE-MELLO**: Mr. Speaker, Ladies and Gentlemen of the House. Representative Murphy alluded to the fact that Maine in 1981 law was not passed by the usual process of a bill in the Legislature. Could someone inform me or explain to me how this prohibition came into being?

The SPEAKER: The Representative from Poland, Representative Snowe-Mello has posed a question through the Chair to anyone who may care to respond. The Chair recognizes the Representative from Kennebunk, Representative Murphy.

Representative **MURPHY**: Mr. Speaker, Men and Women of the House. If during the time that you served during the Legislature you haven't had the good fortune to go through a recodification, you should. As it is restructured and the language is redone, it is purposely set up that no meanings or laws change. Usually a recodification is to put it into more modern language or if after two or three decades things appear with five other titles, then you bring them together or you cross reference them. You try to get rid of the hodge podge. Whenever you go through a recodification there are always reassurances that nothing is being done here other than technical. In that particular case, in the recodification as a committee member of education, we were told repeatedly that there are no changes. They are only technical. It is a clean recodification. After the fact, after it appeared, it was clear that someone had slipped that issue in, which was a policy issue without a hearing and without a vote of the Legislature. It is there as law now.

D000036

LEGISLATIVE RECORD - House, May 13, 2003

The SPEAKER:   The Chair recognizes the Representative from Buckfield, Representative Gagne-Friel.

Representative **GAGNE-FRIEL**: Mr. Speaker, Ladies and Gentlemen of the House. I urge you to support the Ought Not to Pass report. Irrespective and irregardless of all of the discussion that you have about private or religious schools, it will open up the voucher system, regardless of what this bill says, to others to challenge it. We can't afford it. The bottom line is, what are we going to do here? We have so much GPA money and we are going to have to pass it out somewhere. The schools are in existence. We take in the children. If you want to send your child to a different kind of school, then you are going to have to take it upon yourself to pay for it. You have to. We can't afford to do that, 2,000 or 22,000. Part of that is because the schools are open. The operating costs do not change. Hiring teachers, running the buses, opening up the building, all of that has to be paid for and it comes from your GPA money, it comes from the taxes that you pay within your town.

Yes, it would be nice if all of us had vouchers. We could send our kid wherever we wanted them to go, but we can't afford it. That is what the bottom line is. That is why we always vote the way we do and we will have to do it again. Thank you Mr. Speaker.

The SPEAKER:   The Chair recognizes the Representative from Waterford, Representative Millett.

Representative **MILLETT**: Mr. Speaker, Ladies and Gentlemen of the House. I would like to respond to the question initially posed by the Representative from Poland and further amplified on by the Representative from Kennebunk. The opinion that was the source of the language in Title 20A came about as a result of an Attorney General opinion requested by then Howard Petrosky of Bangor in the early part of the 1980 session. He had queried the Attorney General as to whether it was appropriate for local dollars, supplemented by state aide in the towns of Veazie and Glenburn to support the payment of tuition payments to John Bapts High School, which was then a sectarian high school. The opinion of the Attorney General was that it was definitely unconstitutional. This caused a change in both the school tuition formula and subsequently in 1981 a change in the recodification of Title 20A. I happened to work on that process. I can assure the good Representative from Kennebunk that it was done in strict concurrence with the Attorney General's recommendations.

I believe that subsequent to that opinion and the recodification several of the sectarian secondary schools changed their constitution and bylaws so as to permit their continued receipt of public monies. I would concur with the Representative from Farmington that the current state of the law in Maine has been upheld over the years and I see no reason to change the law. I would urge your support of the Majority Report. Thank you.

(ROLL CALL 96 - 89 Y, 56 N)

(Majority Ought Not to Pass Report accepted)

D000037

JA250

LEGISLATIVE RECORD - House, May 13, 2003

This is to certify that this is a true and accurate copy of the House Legislative Record dated May 13, 2003.

*Millicent M. MacFarland*

Millicent M. MacFarland
Clerk of the House
May 15, 2003

D000038

JA251

Transcription for the Senate Record of May 14, 2003 on remarks made on H.P. 141  L.D. 182:


### Divided Report

The Majority of the Committee on EDUCATION AND CULTURAL AFFAIRS on Bill "An Act to Eliminate Discrimination Against Parents Who Want to Send Their Children to Religious Private Schools"

H.P. 141  L.D. 182

Reported that the same **Ought Not to Pass.**

Signed:

Senators:
    DOUGLASS of Androscoggin
    BRENNAN of Cumberland
    MITCHELL of Penobscot

Representatives:
    CUMMINGS of Portland
    GAGNE-FRIEL of Buckfield
    FINCH of Fairfield
    LEDWIN of Holden
    NORTON of Bangor
    THOMAS of Orono
    FISCHER of Presque Isle
    DAVIS of Falmouth

The Minority of the same Committee on the same subject reported that the same **Ought To Pass as Amended by Committee Amendment "A" (H-324).**

Signed:

Representatives:
    MURPHY of Kennebunk
    ANDREWS of York


Comes from the House with the Majority **OUGHT NOT TO PASS** Report **READ** and **ACCEPTED.**


Reports **READ.**

D000039

Senator **GAGNON** of Kennebec moved the Senate **ACCEPT** the Majority **OUGHT NOT TO PASS** Report, in concurrence.

On further motion by same Senator, **TABLED** until Later in Today's Session, pending the motion by same Senator to **ACCEPT** the Majority **OUGHT NOT TO PASS** Report, in concurrence.

---

Intervening action

---

The Chair laid before the Senate the following Tabled and Later Today Assigned matter:

HOUSE REPORTS - from the Committee on EDUCATION AND CULTURAL AFFAIRS on Bill "An Act to Eliminate Discrimination Against Parents Who Want to Send Their Children to Religious Private Schools"

                                                              H.P. 141  L.D. 182

Majority - **Ought Not to Pass** (11 members)

Minority - **Ought To Pass as Amended by Committee Amendment "A" (H-324)** (2 members)

Tabled - May 14, 2003, by Senator **GAGNON** of Kennebec

Pending - motion by same Senator to **ACCEPT** the Majority **OUGHT NOT TO PASS** Report, in concurrence

(In House, May 13, 2003, the Majority **OUGHT NOT TO PASS** Report **READ** and **ACCEPTED.**)

(In Senate, May 14, 2003, Reports **READ**.)

**THE PRESIDENT**:  The Chair recognizes the Senator from Aroostook, Senator Martin.

Senator **MARTIN**:  Thank you, Madame President, members of the Senate.  I rise today in opposition to L.D. 182, 'An Act to Eliminate Discrimination Among Parents Who Want to Send Their Children to Religious Private Schools'.  While the title of the bill sounds appealing, its' effects, whether intended or unintended, will have dire consequences for the citizens of the State of Maine.

D000040

I submit that there are a number of reasons that this bill should be rejected. These reasons are compelling and have as their roots the sovereign prerogatives of the people of Maine regarding how and in what manner public funds can and should be used in supporting public education for the children of Maine.

At the outset, it is important to clarify the meaning of the recent Supreme Court decision which the proponents of the bill have been relying upon. The case of Zelman v. Simmons-Harris decided what a state may do regarding public funding of religious schools. It did not decide what Maine must do.

In no way did that decision limit the sovereign powers of the people of the State of Maine, through their duly elected representatives, to decide whether to fund religious schools. Publicly funding the education of our children is the most important and vital function of our state, and as a representative of the people of this state, I do not intend to abandon my responsibility to decide what is best for our children.

The Supreme Court case did not take that responsibility away from this body and we should carefully exercise the sovereign discretion over our educational system.

Because we retain a responsibility of a publicly funded education, we must look carefully at what we believe is an appropriate form of education for our children. I submit that our publicly funded education system works best when the education is one of diversity and assimilation. An educational system that promotes tolerance and assimilation by educating all of our children together, without regard to religious affiliation and without promoting religious view points, is preferred. Non-religious publicly funded education has been the norm in Maine and elsewhere in our country, and the 'melting pot' effect of this, on our children is what makes this state and this country great. Religious neutrality in the classroom is best.

Bringing all of our children together, no matter what their religious affiliation or background, promotes democracy, tolerance, and what is best in all of us.

The alternative offered by this bill, I submit, is contrary to that preferred approach. The bill could create and promote 'separate and sectarian' educational systems.

Fifty years ago, the Supreme Court rejected as unconstitutional publicly funded 'separate but equal schools,' where the education system funded separate schools based on race. The bill would have us fund 'separate and sectarian' schools where the educational system funds separate schools based on religion.

While citizens most certainly have the right to attend those schools, I do not believe that we should spend our tax dollars to fund the schools. Rather, we should use our limited dollars for schools, whether the public or private under our tuition programs, that are non-religious and that are neutral on religion.

Not only is this bill bad public policy, it is bad governmental policy. Government and religion should be separate. Separation of church and state is firmly established in this state and country. It is appropriate and necessary for the Department of Education and local education officials to ensure that what is being taught at publicly funded elementary and secondary schools is in keeping with the appropriate cultural morals and values of America. That can be done at public schools and private non-religious schools that receive public funding.

The proponents of the bill would demand public funds for private religious schools because, under the tuition program, public funds can be used for private non-religious schools. But the non-religious schools are just like public schools in that they are

D000041

religiously neutral and can be held accountable. Government officials can review what is being taught in private non-religious schools to make sure what is taught is appropriate and not anti-American. Government officials cannot, and should not, review the religious teachings of religious schools, but that is exactly what we will be funding, religious teachings. The public funds could be used to teach intolerant religious views, but we could not review those without approving or disapproving of a religion. The government does not approve or disapprove of religious teachings, and everyone must agree that we should not fund anti-American teaching in the classroom. Since we cannot hold religious schools accountable for what they teach, we should not fund them. That is why I am for the majority ought not to pass report. Thank you, Madame President.

**THE PRESIDENT**: The Chair recognizes the Senator from Oxford, Senator Bennett.

Senator **BENNETT**: Thank you, Madame President, and fellow members of the Senate. I rise to support the pending motion, but I want to be clear that I do not do so in complete agreement with the intent as put forward by the previous speaker, the Senator from Aroostook, Senator Martin. I suspect that several of us in the Senate, who will be voting against this bill and voting for the majority ought not to pass report, may actually believe that the intention of the underlying bill has validity.

The problem that I see is that the committee has put it before us with two reports, the ought not to pass report is before us. If that were to fail, the report that would likely come to us as the ought to pass as amended report, which just puts off for further study something which is being debated elsewhere.

So, for those reasons, I will be voting for the majority ought not to pass report. Thank you.

On motion by Senator **GAGNON** of Kennebec, the Majority **OUGHT NOT TO PASS** Report **ACCEPTED**, in concurrence.

D000042

# Exhibit 9

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| DAVID and AMY CARSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 18-cv-00327 DBH |
| | ) | |
| ROBERT G. HASSON, JR., in his | ) | |
| official capacity as Commissioner of | ) | |
| the Maine Department of Education, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT ROBERT G. HASSON, JR.'S RESPONSES TO
PLAINTIFFS' FIRST SET OF INTERROGATORIES**

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant Robert G.

Hasson, Jr., in his official capacity as Commissioner of the Maine Department of Education

("Defendant"), responds as follows to the Plaintiffs' First Set of Interrogatories dated November

5, 2018.

1.      Please describe how you determine whether a private school that applies to be

approved for tuition purposes is determined to be nonsectarian for purposes of Me. Stat. tit. 20-

A, § 2951(2).

**ANSWER:** A private school seeking to be approved for tuition purposes submits the

private school approval form to the Department of Education. A copy of the current form is

enclosed herewith. Department staff review the form to determine whether a school seeking

approval for tuition purposes has complied with all applicable statutory requirements including

Section 2951(2). Further responding, Defendant refers to his Answer to Interrogatory No. 7.

1

JA257

2.    Please identify any documents that guide or control your determination of whether a private school that applies to be approved for tuition purposes is nonsectarian for purposes of Me. Stat. tit. 20-A, § 2951(2).

**ANSWER:** No responsive documents exist.

3.    Please identify every private school that is approved for tuition purposes for the 2018-2019 school year pursuant to Me. Stat. tit. 20-A, § 2951, including private schools located outside of Maine's borders.

**ANSWER:** A list of schools approved for tuition purposes pursuant to Me. Stat. tit. 20-A, § 2951, including privates schools located outside of Maine's borders for the 2017-18 school year, the last year for which a complete list is available, is enclosed herewith.

4.    Please identify any private school that had its approval to receive tuition pursuant to Me. Stat. tit. 20-A, § 2951 revoked or denied since June 2002, including private schools located outside of Maine's borders, because it was sectarian for purposes of Me. Stat. tit. 20-A, § 2951(2).

**ANSWER:** Documents relating to two private schools that had their request for approval to receive tuition pursuant to Me. Stat. tit. 20-A, § 2951 denied since June 2002 because they were sectarian for purposes of Me. Stat. tit. 20-A, § 2951(2) are enclosed herewith. In addition, Defendant has enclosed documents relating to a private school that had its request for approval granted after consideration of whether it was sectarian pursuant to Section 2951(2).

5.    Please identify and describe each and every government interest you contend is advanced by Me. Stat. tit. 20-A, § 2951(2), which requires that a private school be "nonsectarian" in order to "be approved."

2

**ANSWER:** Defendant refers to the interests identified by the Maine Legislature in rejecting L.D. 182, a bill entitled "An Act to Eliminate Discrimination Against Parents Who Want to Send Their Children to Religious Private Schools" in 2003. That bill sought to eliminate Section 2951(2). It was defeated. Legislative documents relating to L.D. 182 are enclosed herewith.

Further responding, Defendant states that the State has a sovereign interest in the development and maintenance of a system of public education that ensures all Maine students have access to K-12 education at public expense, including students who reside in school administrative units which do not operate schools. To the extent that students in school administrative units which do not operate schools attend private schools, the State has an interest in ensuring that the education they receive at such schools is roughly equivalent to the education they would receive in public schools. The State has an interest in maintaining a religiously neutral public education system in which religious preference is not a factor. The State has an interest in ensuring that public funds are not used to maintain or support sectarian/religious instruction, including, in particular, instruction that promotes or advances a particular religion. The State has an interest in avoiding the religious fractionalization of its publicly-funded education system. The State has an interest in preventing public funds from being used to support institutions which, unlike public and nonsectarian private schools, are legally permitted to engage in discriminatory practices.

6.     Please identify and describe any harm to the public that you contend would arise in the absence of Me. Stat. tit. 20-A, § 2951(2).

**ANSWER:** Defendant incorporates his response to Interrogatory No. 5 above. Further responding, Defendant states that the public is harmed by the use of public dollars to

fractionalize its public education system, or to support institutions that are exclusionary, as opposed to inclusionary. Additionally, the public is harmed by the use of scarce public dollars to fund sectarian/religious instruction.

7.     Please describe how you interpret the language "nonsectarian school" contained in Me. Stat. tit. 20-A, § 2951(2).

**ANSWER:** In making its determination whether a particular school is in compliance with Section 2951, the Department considers a sectarian school to be one that is associated with a particular faith or belief system and which, in addition to teaching academic subjects, promotes the faith or belief system with which it is associated and/or presents the material taught through the lens of this faith. While affiliation or association with a church or religious institution is one potential indicator of a sectarian school, it is not dispositive. The Department's focus is on what the school teaches through its curriculum and related activities, and how the material is presented.

8.     For each interrogatory, identify every person that participated in answering (and/or provided information in order to answer) that specific interrogatory.

**ANSWER:** Acting Deputy Commissioner Joanne Allen, Paula Gravelle, and Pamela-Ford Taylor participated in the answers to Interrogatories 1, 4, 5, 6, and 7. Charlotte Ellis provided the data for Interrogatories 3, 12 and 15.

9.     If your response to Request for Admission No. 1 is anything other than an unqualified admission, explain the denial and identify any facts supporting that denial.

**ANSWER:** N/A

10.    If your response to Request for Admission No. 2 is anything other than an unqualified admission, explain the denial and identify any facts supporting that denial.

4

**ANSWER:** N/A

11.    If your response to Request for Admission No. 3 is anything other than an unqualified admission, explain the denial and identify any facts supporting that denial.

**ANSWER:** N/A

12.    Please identify how many students have received funding from the State of Maine for tuition at non-public secondary schools in the current academic year.

**ANSWER:** A chart showing how many students have received funding from the State of Maine for tuition at non-public secondary schools for the 2017-18 school year, the last year for which a complete list is available, is enclosed herewith.

13.    Please identify which administrative units have provided funding for tuition at non-public secondary schools in the current academic year.

**ANSWER:** See Defendant's Answer to Interrogatory No. 12.

14.    Please identify which non-public secondary schools are approved to receive tuition pursuant to Me. Stat. tit. 20-A, § 2951 in the current academic year.

**ANSWER:** See Defendant's Answer to Interrogatory No. 3.

15.    Please identify how many students are attending secondary schools, both public and non-public, at public expense in the current academic year.

**ANSWER:** A chart showing how many students are attending secondary schools, both public and non-public, at public expense for the 2017-18 school year, the last year for which a complete list is available, is enclosed herewith.

5

Dated: December 4, 2018

Joanne Allen, Acting Deputy Commissioner
Maine Department of Education

Subscribed and sworn before me, this 4 day of December, 2018.

Notary Public   Evelyn L. Poplawski
f/k/a Evelyn L. Fitzgerald
My Commission Expires: January 13, 2019

EVELYN L. FITZGERALD
Notary Public Maine
My Commission Expires January 13 2019

As to Objections:

___N/A_____
Sarah A. Forster
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
Tel. (207) 626-8866
sarah.forster@maine.gov

6

JA262

**CERTIFICATE OF SERVICE**

I hereby certify that on this, the 4th day of December, 2018, I caused the original of this

document to be served by electronic mail and first class mail upon lead counsel for the Plaintiffs:

> Timothy D. Keller, Esq.
> Institute for Justice
> 398 S. Mill Avenue
> Suite 301
> Tempe, AZ 85281
> tkeller@ij.org

All other counsel of record will receive this document by electronic mail:

| | |
|---|---|
| Jeffrey T. Edwards, Esq.<br>Preti, Flaherty, Beliveau, & Pachios, LLP<br>One City Center<br>P.O. Box 9546<br>Portland, Maine 04112-9546<br>jedwards@preti.com | Arif Panju, Esq.<br>Institute for Justice<br>816 Congress Avenue<br>Suite 960<br>Austin, TX 78701<br>apanju@ij.org |
| Lea Patterson, Esq.<br>First Liberty Institute<br>2001 W. Plano Parkway<br>Suite 1600<br>Plano, TX 75075<br>lepatterson@firstliberty.org | Michael K. Whitehead, Esq.<br>Jonathan R. Whitehead, Esq.<br>Law Office of Jonathan R. Whitehead<br>229 SE Douglas Street #210<br>Lees Summit, MO 64063<br>mike@thewhiteheadfirm.com<br>jon@whiteheadlawllc.com |

Dated: December 4, 2018

/s/ Sarah A. Forster
SARAH A. FORSTER
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
Tel. (207) 626-8866
sarah.forster@maine.gov

7

JA263

# Exhibit 10

**Gravelle, Paula B**

| | |
|---|---|
| **From:** | Forster, Sarah |
| **Sent:** | Monday, November 16, 2015 10:35 AM |
| **To:** | Gravelle, Paula B |
| **Subject:** | RE: State approval for an independent school |

I think you can approve them.

**From:** Gravelle, Paula B
**Sent:** Monday, November 16, 2015 10:32 AM
**To:** Forster, Sarah
**Subject:** FW: State approval for an independent school

Please see response below regarding additional clarification about what takes place during Chapel and why it is held in the Chapel.

*Paula Gravelle*
School Finance Coordinator
Maine Department of Education
Phone (207) 624-6792
http://www.maine.gov/doe/
Subscribe to the Commissioner's Update

> **From:** James Fenn [mailto:jfenn@cardigan.org]
> **Sent:** Friday, November 13, 2015 2:25 PM
> **To:** Gravelle, Paula B
> **Cc:** David Perfield
> **Subject:** Re: State approval for an independent school

Paula,

At Cardigan we have three areas where the entire student body can assemble. They are our dining hall, our theater, and our Chapel building. We meet in our Chapel buildings for our Thursday afternoon activity as it is a long standing tradition at Cardigan dating back to when the Chapel was the only building that could house the entire student body. Chapel activities are where the students participate in activities that help them learn and practice the moral and spiritual values they are being taught in school. Cardigan is a close-knit community that prepares middle school boys in mind, body, and spirit for responsible meaningful lives in a global society. It's a school where universal moral and spiritual values are taught both in and out of the classroom. In Chapel, the students work on better understanding the core values of Cardigan, Compassion , Honesty, Respect, Integrity and Fairness. For more details on the Cardigan Mountain Mission statement and Core Values follow the link below.

https://www.cardigan.org/aboutcms/MissionCoreValues

The following link will take you to videos of several recent chapel sessions so that you can see first hand what takes place.

https://www.cardigan.org/StudentLife/NewsDetail?nid=1135

Please let me know if you need further information.

1

D000012

On Fri, Nov 13, 2015 at 12:15 PM, Gravelle, Paula B <u>Paula.B.Gravelle@maine.gov</u>> wrote:

Jim,


I do have some clarifying questions about your chapel. I understand that chapel is mandatory but that it is for something "other than religious purposes". What are those other purposes and why are they held in the chapel?


Thanks,


*Paula Gravelle*

School Finance Coordinator

Maine Department of Education

Phone (207) 624-6792

http://www.maine.gov/doe/

Subscribe to the Commissioner's Update


> **From:** James Fenn [mailto:jfenn@cardigan.org]
> **Sent:** Friday, November 13, 2015 8:49 AM
> **To:** Gravelle, Paula B
> **Cc:** David Perfield
> **Subject:** Re: State approval for an independent school


> Paula,

> Please find attached a copy of the required Year-End report for Cardigan Mountain School for June 30, 2015 and a copy of a letter from Head of School McCusker in reference to our Chapel program. Please let me know if you need any further information so that we can complete this process.

> Thank you for your help.

> Jim Fenn

D000013

On Tue, Nov 3, 2015 at 10:23 AM, Gravelle, Paula B <PaulaB.Gravelle@maine.gov> wrote:

Good morning James,

Here is the link to the instructions and excel form to fill out and return for consideration of approval to receive public funds: http://www.maine.gov/education/forms/misteam/efm240/efm240menu.htm

The only issue at this time is the requirement that all students must attend the weekly Chapel meetings. In order to be approved, a student must be able to opt-out of attending Chapel. This is not to say they would not be able to attend Chapel, but they must have the option of not attending if they so choose. According to your email (see attached) dated July 16, 2015, that is not an option.

If things have changed please let me know in writing.

Sincerely,

*Paula Gravelle*

School Finance Coordinator

Maine Department of Education

Phone (207) 624-6792

http://www.maine.gov/doe/

Subscribe to the Commissioner's Update

**From:** James Fenn [mailto:jfenn@cardigan.org]
**Sent:** Tuesday, November 03, 2015 9:46 AM
**To:** Gravelle, Paula B
**Cc:** David Perfield
**Subject:** State approval for an independent school

Paula,

Cardigan Mountain School has been working with Hugh Parker, from West Bath, ME, on reviewing the requirements for State of Maine Department of Education for Cardigan Mountain School to become an approved independent school. Mr. Parker has been working with Emily Thompson on how the local District will handle tuition payments to

3

D000014

an independent school in New Hampshire. At this point Cardigan needs to begin the process to be approved by your department. Please send me the link to your forms and process instructions so that I can begin this process.

Thank you for your help.

Jim Fenn

--

James Fenn

*Director of Business Operations*

Cardigan Mountain School

62 Alumni Drive

Canaan, NH  03741

(603) 523-3518

jfenn@cardigan.org

www.cardigan.org

---------- Forwarded message ----------
From: James Fenn <jfenn@cardigan.org>
To: "Gravelle, Paula B" <Paula.B.Gravelle@maine.gov>
Cc: Sandra Kinne <skinne@cardigan.org>
Date: Thu, 16 Jul 2015 09:54:49 -0400
Subject: Re: Cardigan Mountain school

Paula,

All students must participate in "Chapel". It is a non-sectarian program as we have students that practice, Muslim, Jewish, and Buddhist religions as well as various Christian religions on campus attending this program. Chapel programs are truly focused on being responsible for meaningful lives in a global society and our Global Community Initiative.. Please see the link attached for a discussion by our former chaplain on the program he ran. ( https://www.cardigan.org/studentlife/SpiritualLife )

Jim Fenn

On Thu, Jul 16, 2015 at 8:47 AM, Gravelle, Paula B <Paula.B.Gravelle@maine.gov> wrote:

4

D000015

Hello James,

I know that there is a weekly chapel time on the schedule for students who attend Cardigan Mountain School.  Is it possible for a child to "opt out" of attending those chapel meetings?


*Paula Gravelle*

School Finance Coordinator

Maine Department of Education

Phone (207) 624-6792

http://www.maine.gov/doe/

Subscribe to the Commissioner's Update


**From:** Hugh Parker [mailto:hughparker@outlook.com]
**Sent:** Wednesday, July 15, 2015 5:24 PM
**To:** Gravelle, Paula B; 'James Fenn'
**Cc:** 'James Fenn'; 'Sandra Kinne'
**Subject:** Cardigan Mountain school


Paula:  I have copied James Fenn on this message as he is the contact person at Cardigan Mountain School that will be supporting our "School Choice" application for Christopher.


I know when we discussed on the phone last week that the current status of the program was not quite up to date and that it would take you another week or so to get it caught up.


James will be the person as I understand it that will be able to work with you on the Cardigan application and if you could both support us on this it would clearly be an important milestone for us.


James, Paula believes that we may be able to get Cardigan on the list but she wanted to work with you to help make the application be successful.

5

D000016

Thank you both for your support on this.

Regards,

Hugh Parker

--

James Fenn

Director of Business Operations

Cardigan Mountain School

(603) 523-3518

--

James Fenn

*Director of Business Operations*

Cardigan Mountain School

62 Alumni Drive

Canaan, NH  03741

(603) 523-3518

jfenn@cardigan.org

www.cardigan.org

--
James Fenn
*Director of Business Operations*
Cardigan Mountain School
62 Alumni Drive
Canaan, NH  03741

6

D000017

(603) 523-9508
jfenn@cardigan.org
www.cardigan.org

D000018

Case 1:13-cv-00321-JAW   Document 01-2   Filed 03/12/18   Page 14 of 53   PageID #: 112



David J. McCusker, Jr. '80, P'09, '10
*Head of School*

November 11, 2015

Ms. Paula Gravelle
School Finance Coordinator
Maine Department of Education
23 State House Station
Augusta, ME  04333-0023

Dear Paula,

Thank you for working with Jim Fenn, Cardigan's director of business operations, on the School Choice application for 2015-2016. I understand this consideration may help a current Cardigan family with immediate financial assistance. It's my hope that other families from Maine, who choose to send their middle-school aged boy to Cardigan Mountain School, will benefit from similar funding in the near and distant future.

I write this formal letter in response to your question about the Chapel program we offer to our students and faculty. Simply stated, students and faculty are required to attend weekly Chapel meetings; however, the Chapel program is not compulsory for religious purposes.

Please feel free to contact me directly if you have any questions regarding this letter or any details related to the program offered to middle-school aged boys who attend Cardigan Mountain School.

Sincerely,

David J. McCusker, Jr. '80, P'09, '10
*Head of School*

62 ALUMNI DRIVE · CANAAN, NEW HAMPSHIRE 03741 · PHONE: 603.523.3512 · FAX: 603.523.7227 · DMCCUSKER@CARDIGAN.ORG
D000019

Exhibit 11

Office of the Maine Attorney General

# Statement of Maine Attorney General Aaron Frey on Supreme Court Decision in Carson v. Makin

June 21, 2022

**FOR IMMEDIATE RELEASE**

Contact: Danna Hayes
Danna.hayes@maine.gov

Statement of Maine Attorney General Aaron Frey on
Supreme Court Decision in *Carson v. Makin*

AUGUSTA – Maine Attorney General Aaron Frey expressed his disappointment today with a United States Supreme Court decision, issued this morning, striking down a Maine law prohibiting religious schools from receiving public funds. Approximately 5,000 Maine children live in districts that neither have a public school nor contract with a school in a nearby district. To ensure that these children have access to a free public education, they are permitted to attend at public expense a public or private school of their choice. Public funds cannot be used to attend a private school that promotes religion because such schools, by definition, do not provide the equivalent of a public education.

Several families who wanted to send their children to religious schools at taxpayer expense challenged the law, arguing that it violated their constitutional rights, including their First Amendment right to the free exercise of religion. Both the federal court in Maine and a unanimous panel of the First Circuit Court of Appeals rejected the challenge and upheld the law. In today's decision, a divided Supreme Court struck down the law, rejecting Maine's argument that the purpose of the tuition program was to provide a public education for students who would otherwise be without, and concluding that Maine had created a school choice program that allowed a group of parents to select the secondary school of their choice. As a result, the Court held that their recent precedent dictates that excluding religious schools violates the Free Exercise Clause. Justices Stephen Breyer, Sonia Sotomayor, and Elena Kagan dissented, noting that the Court had effectively eliminated the notion of their being any play in the joints between the Establishment Clause and the Free Exercise Clause and expressing concern that this decision would open the door to claims that states must fund the religious equivalent of other public programs.

JA274

"I am terribly disappointed and disheartened by today's decision," said AG Frey. "Public education should expose children to a variety of viewpoints, promote tolerance and understanding, and prepare children for life in a diverse society.   The education provided by the schools at issue here is inimical to a public education.  They promote a single religion to the exclusion of all others, refuse to admit gay and transgender children, and openly discriminate in hiring teachers and staff.  One school teaches children that the husband is to be the leader of the household.   While parents have the right to send their children to such schools, it is disturbing that the Supreme Court found that parents also have the right to force the public to pay for an education that is fundamentally at odds with values we hold dear.  I intend to explore with Governor Mills' administration and members of the Legislature statutory amendments to address the Court's decision and ensure that public money is not used to promote discrimination, intolerance, and bigotry."

While the Court's decision paves the way for religious schools to apply to receive public funds, it is not clear whether any religious schools will do so.   Educational facilities that accept public funds must comply with anti-discrimination provisions of the Maine Human Rights Act, and this would require some religious schools to eliminate their current discriminatory practices.

###

## Credits

Copyright © 2014
All rights reserved.

# Exhibit 12

Office of the Maine Attorney General | News & Reports

Office of the Maine Attorney General

Home > News & Reports

# Statement from Attorney General Frey on Carson v. Makin oral argument

December 8, 2021

AUGUSTA - Today, the United States Supreme Court held oral arguments in *Carson v. Makin*, a case which considers whether it is constitutional for Maine to refuse to allow religious schools to receive taxpayer funds for the education of Maine's children. Chief Deputy Attorney General Christopher Taub and Assistant Attorney General Sarah Forster argued the case in defense of Maines public education system.

Following today's oral arguments, Maine Attorney General Aaron M. Frey issued the following statement:

"All Maine children, regardless of where they live, are entitled to a free public education. Maine law requires that children are provided a free public education, and that public education by its very nature must be inclusive of all students, regardless of the differences in their diverse backgrounds. A small number of children live in districts that do not operate a secondary school or contract with a school to provide an appropriate education. Those districts can satisfy their obligation to provide a public education by paying for the childrens tuition at a public or approved private school. Schools that require students to undergo religious instruction are excluded because the education they provide is not equivalent to a public education. Maines program has survived legal challenge on prior occasions by the Maine Law Court, the Federal District Court of Maine, and the Federal First Circuit Court of Appeals."

"Schools receiving taxpayer funds are appropriately subject to the Maine Human Rights Act (MHRA), which prohibits discrimination against individuals on the basis of several protected classes. The two religious schools that the parents in this case want to send their children to have made it clear that they are not interested in complying with the MHRA and, therefore, these schools have not even applied to the Maine Department of Education to be eligible to participate in Maines tuition program. Put differently, these schools want to continue to discriminate against individuals based on their status in a protected class and that is inconsistent with the protections afforded to all Mainers under the MHRA."

"Attorneys from my office argued strongly today that *Carson v. Makin* is different from other cases the Supreme Court has considered recently; and made a compelling case for the constitutionality of Maines system of public education, and for how it benefits all Mainers. It would be inappropriate if Maine taxpayers were forced to fund schools which exclude and discriminate against other Mainers, as that would erode the foundational principles of a public education that is diverse and accessible to all."

\#

JA277

## Credits

Copyright © 2014
All rights reserved.

JA278

Exhibit 13



**Santiago Mayer** @santiagomayer_ · Jun 25
You know how SCOTUS said Maine couldn't exclude religious schools from their voucher program?

Maine just changed the guidelines to exclude schools that discriminate against LGBTQ+ students.

💬 1,411        ⟲ 18K        ♡ 124.9K        ⬆

**Ryan Fecteau** 🏳️‍🌈 ✓
@SpeakerFecteau

Replying to @santiagomayer_

Sure did. Anticipated the ludicrous  decision from the far-right SCOTUS.

7:51 AM · Jun 26, 2022 from Biddeford, ME · Twitter for iPhone

## CERTIFICATE OF SERVICE

I filed this Joint Appendix on the Court's electronic filing system, which will email everyone requiring notice.

Dated: September 3, 2024                    _/s/ Patrick Strawbridge_____