No. 24-1590

# In the United States Court of Appeals for the First Circuit

CROSSPOINT CHURCH,
Plaintiff-Appellant,

v.

A. PENDER MAKIN, COMMISSIONER OF THE
MAINE DEPARTMENT OF EDUCATION, ET AL.
Defendants-Appellees.

Appeal from the United States District Court
for the District of Maine
(1:23-cv-00146-JAW)

**BRIEF FOR THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS;
THE NATIONAL ASSOCIATION OF EVANGELICALS; THE ETHICS AND
RELIGIOUS LIBERTY COMMISSION OF THE SOUTHERN BAPTIST
CONVENTION; AND THE LUTHERAN CHURCH–MISSOURI SYNOD
AS *AMICI CURIAE* SUPPORTING APPELLANT AND REVERSAL**

R. Shawn Gunnarson
Christopher A. Bates
Jarom M. Harrison
KIRTON | MCCONKIE
36 South State Street
Suite 1900
Salt Lake City, UT 84111
(801) 328-3600
sgunnarson@kmclaw.com

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP 26.1, *amici* affirm that they have no parent corporations and issue no stock.

# TABLE OF CONTENTS

IDENTITY AND INTEREST OF *AMICI CURIAE* ................................... 1

SUMMARY OF ARGUMENT .................................................... 1

ARGUMENT ............................................................... 4

    I.    The First Amendment Prohibits Religious Discrimination ........ 4

        A. The text of the Religion Clauses categorically prohibits religious discrimination ........................................... 4

        B. Founding-era statements show that the Religion Clauses categorically forbid religious discrimination ......................... 5

        C. Pre-Revolutionary experience in England and the Colonies helps explain why the Founding generation rejected religious discrimination ........................................................ 8

        D. Supreme Court decisions affirm a categorical ban on religious discrimination .................................................... 11

            1. *Lukumi* and other decisions hold that the First Amendment prohibits religious discrimination ........ 11

            2. *Carson* and other recent decisions establish that otherwise eligible recipients cannot be denied public benefits because of religion ............................................ 14

    II.    The Challenged Amendments to Maine Law Discriminate Against Crosspoint Church ...................................... 17

        A. The amendments target BCS and other religious schools with similar beliefs and practices ................................. 17

        B. Maine's political leaders admitted that the amendment targets unpopular religious beliefs and practices ................ 24

III. Crosspoint Church's Constitutional Right to Exercise Religion Must Prevail Over Maine Law ................................................... 27

CONCLUSION ......................................................................... 33

CERTIFICATE OF COMPLIANCE ......................................... 34

CERTIFICATE OF SERVICE ................................................. 35

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis,*
  600 U.S. 570 (2023)................................................................30

*Boy Scouts of Am. v. Dale,*
  530 U.S. 640 (2000)...............................................................30

*Brown v. Bd. of Educ.,*
  349 U.S. 294 (1955)...............................................................32

*Brown v. Bd. of Educ. of Topeka,*
  347 U.S. 483 (1954)...............................................................32

*Carson v. Makin,*
  596 U.S. 767 (2022)................................................... *.passim*

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520 (1993)..................................................... *passim*

*Emp't Div., Dep't of Hum. Res. v. Smith,*
  494 U.S. 872 (1990)......................................... 11, 21, 22, 23

*Espinoza v. Mont. Dep't of Revenue,*
  591 U.S. 464 (2020)..................................................... *passim*

*Everson v. Bd. of Educ.,*
  330 U.S. 1 (1947)................................................................4–5

*Fowler v. Rhode Island,*
  345 U.S. 67 (1953)................................................................14

*Fulton v. City of Philadelphia,*
  593 U.S. 522 (2021)................................................... 22, 30

*Griffin v. Cnty. Sch. Bd.*,
377 U.S. 218 (1964) ........................................................ 4, 31–32

*Horne v. Dep't of Agric.*,
576 U.S. 350 (2015) ........................................................ 17

*Hurley v. Irish-American Gay, Lesbian & Bisexual Grp.*,
515 U.S. 557 (1995) ........................................................ 30–31

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022) ........................................................ 21

*Locke v. Davey*,
540 U.S. 712 (2004) ........................................................ 16

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*,
584 U.S. 617 (2018) ................................................ 24, 26, 32

*McDaniel v. Paty*,
435 U.S. 618 (1978) ........................................................ 11, 14

*Moore v. Harper*,
600 U.S. 1 (2023) ........................................................... 28

*Niemotko v. Maryland*,
340 U.S. 268 (1951) ........................................................ 14

*Parker v. Hurley*,
514 F.3d 87 (1st Cir. 2008) ............................................. 23

*Reynolds v. United States*,
98 U.S. (8 Otto) 145 (1878) ............................................ 17

*Sherbert v. Verner*,
374 U.S. 398 (1963) ........................................................ 5, 17

*State ex rel. Swann v. Pack*,
527 S.W.2d 99 (Tenn. 1975) ........................................... 17

v

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    582 U.S. 449 (2017) ............................................ 1, 14, 15, 20

*Wallace v. Jaffree*,
    472 U.S. 38 (1985) ................................................................ 27

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) ............................................................ 21

**Constitutional Provisions**

U.S. CONST. amend. I ................................................ 1, 4, 7, 20

U.S. CONST. art. VI .................................................................. 5, 27

**Statutes and Rules**

ME. STAT. tit. 5, § 4602(1)(A) (2024) ...................................... 17

ME. STAT. tit. 5, § 4602(5)(C) (2024) ...................................... 17

**Other Authorities**

ANNALS OF CONG. (Joseph Gales ed., 1834) .............................. 7

Brian J. Grim & Melissa E. Grim, *The Socio-economic Contribution of Religion to American Society*, 12 INTERDISC. J. RSCH. ON RELIGION (2016) ............................................................................................ 25

Carl H. Esbeck, *Uses and Abuses of Textualism and Originalism in Establishment Clause Interpretation*, 2011 UTAH L. REV. 489 (2011) .......... 7

COMPLETE BILL OF RIGHTS (Neil H. Cogan ed., 2d ed. 2015) .................... 6

DAVID P. CURRIE, THE CONSTITUTION IN THE SUPREME COURT: THE FIRST HUNDRED YEARS, 1789–1888 (1985) ....................................................... 10

THE DEBATE ON THE CONSTITUTION (Bernard Bailyn ed., 1993) ........... 5–6

ENGLISH HISTORICAL DOCUMENTS 1660–1714 (Andrew Browning ed., 1953) .................................................................................................. 9

John Witte, Jr., *The Essential Rights and Liberties of Religion in the American Constitutional Experiment*, 71 NOTRE DAME L. REV. 371 (1996) .................................................................................................. 7

JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES (reprint ed. 1987) (1833) ............................................... 8

LAWRENCE HENRY GIPSON, THE COMING OF THE REVOLUTION: 1763–1775 (1954) .................................................................................. 9–10

Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 WM. & MARY L. REV. (2003) .................................................................................. 10

RONALD C. WHITE, ON GREAT FIELDS (2023) .......................................... 25

SAMUEL ELIOT MORISON, THE FOUNDING OF HARVARD COLLEGE (1935) .................................................................................................. 25

WILLIAM BLACKSTONE, COMMENTARIES (1769) ......................................... 9

WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA (1825) ......................................................................... 8

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

*Amici* are religious organizations with a shared commitment to defending religious freedom under the Constitution. We have a surpassing interest in the correct interpretation and application of the Religion Clauses of the First Amendment. That interest necessarily includes opposing laws that discriminate on the basis of religion. To that end, *amici* joined briefs supporting the religious claimants in *Carson v. Makin*, 596 U.S. 767 (2022); *Espinoza v. Montana Department of Revenue*, 591 U.S. 464 (2020); and *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017).

## SUMMARY OF ARGUMENT

The First Amendment guarantees all Americans "the free exercise of religion." U.S. CONST. amend. I. Constitutional text and history, as well as controlling Supreme Court precedent interpreting that guarantee, establish that religious discrimination is categorically barred and that such

---

[1] The parties have consented to all amicus briefs in a letter on file with the Clerk of the Court. Pursuant to FRAP 29(a)(4)(E), amici affirm that no counsel for a party authored this brief in whole or in part and that no person other than amici or their counsel have made any monetary contributions to fund the preparation or submission of this brief.

discrimination is no more justified when a State distributes public benefits than when it exercises its regulatory or criminal powers. *See Carson*, 596 U.S. at 778. This case puts that principle to the test.

Bangor Christian Schools (BCS) is an integrated auxiliary of Crosspoint Church, a nonprofit religious organization in Bangor, Maine. *Crosspoint Church v. Makin*, No. 1:23-cv-00146-JAW, 2024 WL 810033, at *2 (D. Me. Feb. 27, 2024) (Feb. Order).[2] This case arose when the State of Maine adopted laws that effectively exclude BCS from a statewide tuition assistance program because of its religious beliefs and practices. The statutory provision contested here represents the second round of efforts by Maine to exclude BCS. A now-defunct statute excluded schools like BCS from the program for being too religious. The Supreme Court declared that statute unconstitutional. *See Carson*, 596 U.S. at 779. Unwilling to correct its programmatic exclusion, Maine amended State law to add gender identity alongside sexual orientation as protected classes

---

[2] This appeal is taken from a later order, but the district court "adopt[ed] and restat[ed] all of the legal conclusions contained in its February 27, 2024 Order ...." *Crosspoint Church v. Makin*, No. 1:23-cv-00146-JAW, 2024 WL 2830931, at *4 (D. Me. June 4, 2024) The district court's February order is therefore the focus of our arguments.

under the educational discrimination title and to limit the related religious exemption to apply only when a school accepts no State funding. Feb. Order at *10. Crosspoint Church commenced a lawsuit contesting that exclusion as contrary to the Free Exercise Clause.

Shutting out BCS from a valuable public benefit program for which it is otherwise entitled, because of its religious exercise, is a form of religious discrimination categorically forbidden by the Free Exercise Clause. In case after case, the Supreme Court has held that States may not single out institutions to bear special burdens because of their religious character or practices. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 559 (1993) (Scalia, J., concurring) (noting the unconstitutionality of laws that "single[] out a religious practice for special burdens"). Going further, the Court has held that "a fundamental nonpersecution principle" shields religious people and institutions from laws targeting them for hardships or punishment because of their religious practices. *Id.* at 523 (majority op.). The challenged provision of Maine law transgresses that principle.

Maine's attempt to shut out BCS from the tuition program despite a favorable Supreme Court judgment is remarkable—and remarkably

troubling considering the duty to respect the High Court as the final interpreter of constitutional law. *See, e.g.*, *Griffin v. Cnty. Sch. Bd.*, 377 U.S. 218, 221–25 (1964). That the challenged amendments aim to thwart a Supreme Court judgment should suffice to condemn them. Maine has disregarded the clear message of *Carson*—a case with the same school, the same public benefit program, and the same basic constitutional issue in dispute. Unless this Court is prepared to accept the dangerous principle that Maine can defeat First Amendment rights through State legislation, Crosspoint Church deserves relief.

For these reasons, we respectfully urge the Court to reverse.

## ARGUMENT

## I. The First Amendment Prohibits Religious Discrimination.

### A. The text of the Religion Clauses categorically prohibits religious discrimination.

The First Amendment's bar on religious discrimination appears in the text itself. Its command is unqualified: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. amend. I. Laws "respecting an establishment of religion" historically included legal measures granting preferences for an established church and imposing civil disabilities on religious minorities.

*See Everson v. Bd. of Educ.*, 330 U.S. 1, 8–10 (1947). Few laws are as effective at "prohibiting the free exercise" of religion as those that single out a person or institution for special burdens because of religious belief or practice. *See Sherbert v. Verner*, 374 U.S. 398, 404 (1963).

**B.  Founding-era statements show that the Religion Clauses categorically forbid religious discrimination.**

Ratification debates and other contemporaneous evidence confirm that a central purpose of the Religion Clauses was to prohibit religious discrimination.

Concern with religious discrimination arose during the debates over the unamended Constitution's prohibition on religious tests for public office. *See* U.S. CONST. art. VI. This sole mention of religion in the original Constitution ignited controversy at State ratifying conventions. *See* Daniel Shute, Statement in the Massachusetts Ratifying Convention, Jan. 31, 1788, *reprinted in* 1 THE DEBATE ON THE CONSTITUTION 920 (Bernard Bailyn ed., 1993) ("[A]ll have an equal claim to the blessings of the government under which they live, and which they support, so none should be excluded from them for being of any particular denomination in religion."); James Iredell, Statement in the North Carolina Ratifying Convention, July 31, 1788, *reprinted in* 2 THE DEBATE ON THE

CONSTITUTION 904 (calling religious tests "a discrimination" and explaining that the Constitution's prohibition on such tests means "no sect here is superior to another"). James Iredell of North Carolina warned that with "the least difference" in legal treatment based on religion, "the door to persecution is opened." *Id.* at 905.

Religious discrimination as an enemy of religious freedom characterized amendments proposed by the State ratifying conventions. Virginia's ratifying convention offered an amendment declaring that "all men have an equal, natural and unalienable right to the free exercise of religion according to the dictates of conscience, and that no particular sect or society ought to be favored or established by Law in preference to others." Va. Ratifying Convention, Proposed Amendments, June 27, 1788, *reprinted in* COMPLETE BILL OF RIGHTS 13 (Neil H. Cogan ed., 2d ed. 2015). A similar clause forbidding religious favoritism appeared in proposals from North Carolina and Rhode Island. *See id.* at 12–13. New York's ratifying convention proposed language declaring that "no Religious Sect or Society ought to be favoured or established by Law in preference of others." N.Y. State Ratification Convention, Proposed Amendments, July 26, 1788, *reprinted in id.* at 12.

These State proposals found their way into early drafts of the First Amendment. Madison had a pamphlet compiling the State proposals as he prepared constitutional amendments for introduction in the First Congress. *See* Carl H. Esbeck, *Uses and Abuses of Textualism and Originalism in Establishment Clause Interpretation*, 2011 UTAH L. REV. 489, 526 (2011). He proposed amendments assuring that "[t]he civil rights of none shall be abridged on account of religious belief or worship" and that "the full and equal rights of conscience" would be secure. *See* 1 ANNALS OF CONG. 451 (Joseph Gales ed., 1834). Out of those guarantees came the First Amendment's twin securities against religious discrimination—an unqualified right to "the free exercise of religion" and a constitutional bar on laws "respecting an establishment of religion." U.S. CONST. amend. I.

Far from being limited to formal religious services, the term *free exercise of religion* "connoted various forms of free public religious action—religious speech, religious worship, religious assembly, religious publication, [and] religious education, among others." John Witte, Jr., *The Essential Rights and Liberties of Religion in the American Constitutional Experiment*, 71 NOTRE DAME L. REV. 371, 395 (1996).

Scholars during the early Republic interpreted the Constitution as prohibiting religious discrimination. One scholar explained that the Nation's commitment under the Constitution to "the equality of all our citizens" precludes "the denial of the smallest civic right" on the ground of "religious intolerance." WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 119 (1825). Justice Story seconded the point, writing that the First Amendment "sought to cut off the means of religious persecution … and the power of subverting the rights of conscience in matters of religion." JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES 701 (reprint ed. 1987) (1833).

### C. Pre-Revolutionary experience in England and the Colonies helps explain why the Founding generation rejected religious discrimination.

The Founders' animosity toward religious discrimination owes its force to the experience of religious minorities before the American Revolution. *See Lukumi*, 508 U.S. at 532 ("[I]t was historical instances of religious persecution and intolerance that gave concern to those who drafted the Free Exercise Clause." (internal quotation marks omitted).

English law at the time of American colonization imposed numerous civil disabilities on nonconformists, those who did not belong to the

Church of England. Failure to take an oath renouncing certain Catholic doctrines meant a person could not hold public office, sit in Parliament, or bring a lawsuit. *See, e.g.*, Second Test Act 1678, § III, 30 Car. II, stat. 2, cap. 1, *reprinted in* ENGLISH HISTORICAL DOCUMENTS 1660–1714, at 393 (Andrew Browning ed., 1953). Military and civic officials—including schoolteachers—had to take communion in the Anglican church or lose their positions. *See* Corporation Act 1661, § IX, 13 Car. II, stat. 2, cap. 1, *reprinted in id.* at 376.

Blackstone described the hardships imposed on English Catholics: "They can hold no office or employment; they must not keep arms in their houses, but the same may be seized by the justices of the peace; they may not come within ten miles of London." 4 WILLIAM BLACKSTONE, COMMENTARIES *55 (1769). Other restrictions meant that Catholics could "bring no action at law, or suit in equity," or "travel above five miles from home" without a license at the risk of "forfeiting all their goods." *Id.*

Religious minorities faced civil disabilities in the colonies too. "Roman Catholics as well as non-Christians, including Jews, were denied the franchise and other rights of citizenship even in Rhode Island." LAWRENCE HENRY GIPSON, THE COMING OF THE REVOLUTION: 1763–1775,

at 13 (1954). In Maryland, "a harsh code directed toward the complete suppression of [Catholicism] remained on the statute books," while in Connecticut, religious dissenters were fined or imprisoned for the crime of "separatism." *Id.* As late as 1768, Baptist preachers in Virginia were imprisoned "as disturbers of the peace." *Id.*

One scholar noted that "[t]he bulk of complaints about infringement of religious liberty during the preconstitutional period apparently concerned outright discrimination against dissenters from the dominant sect." DAVID P. CURRIE, THE CONSTITUTION IN THE SUPREME COURT: THE FIRST HUNDRED YEARS, 1789–1888, at 440 (1985). Religious discrimination was a key feature of an established church in England and America. *See* Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 WM. & MARY L. REV. 2105, 2176–81 (2003) (describing restrictions on holding public office and voting based on religious affiliation). Experience, both personal and historical, led the Founders to reject religious discrimination and embrace religious freedom when formulating and adopting the First Amendment.

**D. Supreme Court decisions affirm a categorical ban on religious discrimination.**

**1.** *Lukumi* **and other decisions hold that the First Amendment prohibits religious discrimination.**

Laws engaging in religious discrimination fall outside the usual rule sustaining neutral and generally applicable laws that incidentally burden religious practice. *See Emp't Div., Dep't of Hum. Res. v. Smith*, 494 U.S. 872 (1990). *Smith* concedes that "[t]he government may not … impose special disabilities on the basis of religious views or religious status." *Id.* at 877 (citations omitted). To the contrary, "[t]he Free Exercise Clause categorically prohibits government from regulating, prohibiting, or rewarding religious beliefs as such." *McDaniel v. Paty*, 435 U.S. 618, 626 (1978) (plurality op.). Or as the Supreme Court held elsewhere, "a law targeting religious beliefs as such is never permissible." *Lukumi*, 508 U.S. at 522. That categorical rule encompasses any law that "discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Id.* at 532.

Consider how "[t]his fundamental nonpersecution principle of the First Amendment" applied in *Lukumi*. *Id.* at 523. There, city ordinances

made animal sacrifice (an important element of Santeria religious practice) a crime, but exempted animal slaughter by kosher butchers and for nonreligious purposes. *Id* at 527–28. Although the ordinances did not discriminate against religion on their face, "mere compliance with the requirement of facial neutrality" did not suffice. *Id.* at 534. So potent is the Constitution's ban on religious discrimination that "[o]fficial action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality." *Id.* at 534.

A closer look revealed that the ordinances "singled out" the religious practices of Santeria adherents "for discriminatory treatment." *Id.* at 538. "[A]lmost the only conduct subject to" the ordinances was Santeria members' religious exercise; the city's asserted reasons for the ordinances could be achieved by less restrictive means that did not prohibit those practices; and the ordinances were enacted "in direct response to the opening" of a Santeria church in the community. *Id.* at 535–40. From these facts it was unmistakable that the ordinances "had as their object the suppression of religion." *Id.* at 540.

Although *Lukumi* invoked strict scrutiny, *id.* at 546, a close reading of the decision shows that the Court actually applied a categorical rule

against religious discrimination. Notice that the rule against religious discrimination appears in both the first and last paragraphs of the Court's opinion. *See id.* at 523 ("The principle that government may not enact laws that suppress religious belief or practice is so well understood that few violations are recorded in our opinions." (citations omitted)); *id.* at 547 ("Legislators may not devise mechanisms, overt or disguised, designed to persecute or oppress a religion or its practices."). Not only that. The structure of the Court's analysis collapses into the categorical rule against religious discrimination. Both the compelling-interest and narrow-tailoring prongs of strict scrutiny were driven by the city's failure to regulate conduct other than animal sacrifice by Santeria adherents. *See id.* at 547 (ordinances were not narrowly tailored because "[t]he proffered objectives are not pursued with respect to analogous non-religious conduct"); *id.* at 546–47 (city's interests were not compelling because the ordinances "restrict[] only conduct protected by the First Amendment"). Read together, these features of *Lukumi*'s majority opinion show that the categorical rule against religious discrimination governed the decision: rank religious discrimination can never pass strict scrutiny, meaning that the categorical bar applies.

Other Supreme Court decisions are equally unsparing in their condemnation of religious discrimination. *See, e.g., McDaniel*, 435 U.S. at 620 (invalidating a Tennessee statute precluding ministers from serving as delegates to the State constitutional convention); *id.* at 639 (Brennan, J., concurring) ("[G]overnment may not use religion as a basis of classification for the imposition of duties, penalties, privileges, or benefits."); *Fowler v. Rhode Island*, 345 U.S. 67, 69 (1953) (reversing the conviction of a Jehovah's Witness minister convicted under a city ordinance prohibiting religious meetings in a public park, where the conviction amounted to "a discrimination … barred by the First and Fourteenth Amendments"); *Niemotko v. Maryland*, 340 U.S. 268, 272 (1951) (reversing charges of disorderly conduct for unlicensed preaching in a public park where the permit denial was "clearly an unwarranted discrimination").

2. ***Carson* and other recent decisions establish that otherwise eligible recipients cannot be denied public benefits because of religion.**

Religious discrimination is equally unconstitutional when the government distributes public benefits. *See Carson*, 596 U.S. at 767; *Espinoza*, 591 U.S. at 464; *Trinity Lutheran*, 582 U.S. at 449. *Carson* deserves particular attention because of its relevance for this case.

*Carson* involved the same Maine tuition assistance program involved in this case. 596 U.S. at 773–74. At issue there was a Maine law disqualifying any private school the State deemed "sectarian." *Id.* at 774. Two families challenged that provision under the Free Exercise Clause when the State denied their request for tuition assistance because their chosen schools were "sectarian." *Id.* at 775–76. One of those schools was BCS—a ministry of the plaintiff-appellant in this case. *Id.*

By the Supreme Court's reckoning, disqualifying BCS violated the bedrock principle that "a State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Id.* at 778–79. Prior decisions explained that "the Free Exercise Clause did not permit" States to "expressly discriminate[] against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character." *Id.* at 779 (quoting *Trinity Lutheran*, 582 U.S. at 462). That precise form of discrimination appeared on the Maine statute's face: "[t]he State pays tuition for certain students at private schools—so long as the schools are not religious." *Id.* at 781. "Such discrimination," the Court said, "was 'odious to our Constitution' and could not stand." *Id.* (quoting *Trinity Lutheran*, 582 U.S. at 467).

Maine's asserted "interest in separating church and state" offered no defense. *Id.* at 781. Letting BCS and similar schools participate in the tuition assistance program on the same terms as other qualified private institutions would not "offend the Establishment Clause" because the flow of tax dollars to such schools would result from parents' "independent choices." *Id.* at 781. What's more, the Establishment Clause does not excuse what the Free Exercise Clause forbids. "A State's antiestablishment interest does not justify enactments that exclude some members of the community from an otherwise generally available public benefit because of their religious exercise." *Id.*

*Locke v. Davey*, 540 U.S. 712 (2004), made no difference either. *Locke* sustained a Washington law barring the use of public scholarship funds for clerical training. *Id.* at 721. But *Carson* explained that "*Locke* cannot be read beyond its narrow focus on vocational religious degrees to generally authorize the State to exclude religious persons from the enjoyment of public benefits on the basis of their anticipated religious use of the benefits." 596 U.S. at 789. Maine's tuition assistance program did not involve anything resembling such ministerial training. *See id.* at 788–89.

Lacking any viable defense, Maine's exclusion of "sectarian" schools was found to violate the First Amendment. *See id.* at 779.[3]

## II. The Challenged Amendments to Maine Law Discriminate Against Crosspoint Church.

### A. The amendments target BCS and other religious schools with similar beliefs and practices.

Two provisions of Maine law are at issue. One prohibits "unlawful educational discrimination" in an "academic … program or activity" based on "sexual orientation or gender identity." ME. STAT. tit. 5, § 4602(1)(A) (2024). The other exempts "a religious corporation, association or society" from the nondiscrimination mandate "as it relates to sexual orientation or gender identity," but only if the religious institution "does not receive public funding." *Id.* § 4602(5)(C). Together, these provisions

---

[3] A categorical rule against religious discrimination does not preclude the government from adopting health and safety regulations. *See Sherbert*, 374 U.S. at 403. Laws prohibiting human sacrifice and the handling of poisonous snakes, for instance, are valid even when they punish religious activities. *See Reynolds v. United States*, 98 U.S. (8 Otto) 145, 166 (1878); *State ex rel. Swann v. Pack*, 527 S.W.2d 99 (Tenn. 1975), *cert. denied*, 424 U.S. 595 (1976). But avoiding religious discrimination requires government officials to adjust *how* they address threats to public health and safety. *See Horne v. Dep't of Agric.*, 576 U.S. 350, 362 (2015) ("The Constitution … is concerned with means as well as ends.").

disqualify a school with traditional religious beliefs like BCS from receiving funds under Maine's tuition assistance program.

BCS operates under a Statement of Faith that expresses the school's biblical approach to matters of sexuality and gender: "(1) the term marriage has only one legitimate meaning—a covenantal union between one man and one woman; and (2) all sexual activity, identity or expression that lies outside this definition of marriage [is] sinful … and contradictory to God's natural design and … will not be accepted." Feb. Order at *10 (internal quotation marks omitted). BCS's admission policy "adheres to and supports the historical truth claims and moral foundations of Christianity." *Id.* "This includes, but is not limited to, the biblical definition of marriage, sexuality and moral conduct, and the clear biblical teaching that gender is both sacred and established by God's design." *Id.* at 10–11. The district court explained that "[t]he gravamen of Crosspoint's suit is that" the challenged laws "impermissibly burden[] religious exercise by forcing Crosspoint to compromise its religious beliefs to participate in the tuitioning program." *Id.* at 28.

The challenged legislative amendment creates a conflict between Maine law and Crosspoint's exercise of religion by requiring BCS to comply with State nondiscrimination requirements at odds with the school's Statement of Faith or forgo participation in the State's tuition assistance program for which BCS is otherwise qualified.

Maine's religious discrimination becomes evident from the fact that the challenged provision targets religious organizations like Crosspoint Church and religious schools like BCS for special burdens. Non-religious schools can participate in Maine's tuition assistance program. So can religious schools without biblically rooted religious beliefs and conduct standards. But a religious school (or its sponsoring church) with sincere beliefs and practices regarding sexual orientation or gender identity that clash with the State's approved viewpoint cannot. Acting on unpopular religious beliefs is exactly what the challenged laws target. Effectively, Maine has issued an ultimatum: give up your religious practices or else lose public financial support.

*Carson* forcefully establishes that imposing such a choice is unconstitutional. That *Carson* involves the same school, the same government

program, and the same essential constitutional question makes it indistinguishable. *See* 596 U.S. at 779 (distilling from precedent the principle that States may not "expressly discriminate against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character"). *Espinoza* rested on the same rule against religious discrimination. 591 U.S. at 487 ("A State need not subsidize private education. But once a State decides to do so, it cannot disqualify some private schools solely because they are religious."). So did *Trinity Lutheran*. 582 U.S. at 462 ("The Department's policy expressly discriminates against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character.").

Nor can Maine justify its exclusion of Crosspoint Church and BCS on the specious ground that they are entitled to believe what they like, but the State is entitled to withhold public benefits because of their conduct. The First Amendment secures "the free *exercise* of religion"—not merely the free belief in religion. U.S. CONST. amend. I (emphasis added). "The Clause protects not only the right to harbor religious beliefs inwardly and secretly. It does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out

their faiths in daily life through 'the performance of (or abstention from) physical acts.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022) (quoting *Smith*, 494 U.S. at 877). In fact, "there are areas of conduct protected by the Free Exercise Clause of the First Amendment and thus beyond the power of the State to control." *Wisconsin v. Yoder*, 406 U.S. 205, 219–20 (1972) (citations omitted).

Because the First Amendment shields religious conduct, the Constitution's categorical bar on religious discrimination applies with full force when the government's object is to suppress or discourage such conduct. *See Lukumi*, 508 U.S. at 532 ("Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality."). That is the foundational principle behind the Supreme Court's recent public benefits cases—including *Carson*. There, Maine's policy of limiting State tuition assistance to "nonsectarian" schools meant that "[t]he State pays tuition for certain students at private schools—so long as the schools are not religious." 596 U.S. at 781. The Court readily concluded that "[t]hat is discrimination against religion." *Id. Carson* further stressed that the State's interest in separating church and state "does not justify enactments that exclude

some members of the community from an otherwise generally available public benefit *because of their religious exercise.*" *Id.* (emphasis added).

BCS exercises its religion by the actions it takes, no less than by the beliefs it professes. Making employment and admissions decisions guided by BCS's Statement of Faith with respect to marriage, sexuality, and gender, *see* Feb. Order at *10–11, is no less an exercise of religion than the foster-care certifications at issue in *Fulton v. City of Philadelphia*, 593 U.S. 522, 526–27 (2021), or the religious rituals at issue in *Lukumi*, 508 U.S. at 524–25. Religion, after all, consists in belief *and* conduct. That truth is witnessed in the lives of millions of religious Americans whose faith is expressed not only in words but in the wearing of religious clothing and symbols, adherence to religious dietary standards, service to the poor and needy, and voluntary compliance with religious standards of sexual conduct and gender presentation. All these come under the First Amendment's broad aegis.

Yet the district court approved Maine's amendments, perhaps misguided by the inapposite rule from *Smith* that "a law that is neutral and of general applicability need not be justified by a compelling governmen-

tal interest even if the law has the incidental effect of burdening a particular religious practice." Feb. Order at *33 (quoting *Parker v. Hurley*, 514 F.3d 87, 95 (1st Cir. 2008)). But *Smith*'s deferential rule does not apply when a State "impose[s] special disabilities on the basis of religious views or religious status." *Smith*, 494 U.S. at 877. Or as *Lukumi* stressed, "a law targeting religious beliefs as such is never permissible." 508 U.S. at 533.

Maine officials changed State law, they might say, to advance LGBT equality. Even so, States are not free to disregard constitutional limits. In their determination to pursue State priorities, Maine officials forgot that the Free Exercise Clause bars any law from "exclud[ing] religious observers from otherwise available public benefits." *Carson*, 596 U.S. at 778. As in *Espinoza*, "the prohibition before us today burdens not only religious schools but also the families whose children attend or hope to attend them." 591 U.S. at 486. Parents have a constitutional right to send their children to private religious schools. Maine's policy "penalizes that decision by cutting families off from otherwise available benefits if they choose a religious private school rather than a secular one, and for

no other reason." *Id.* By discriminating against BCS and similar institutions because of their religious beliefs, the challenged amendment is void under the First Amendment.

### B. Maine's political leaders admitted that the amendment targets unpopular religious beliefs and practices.

Religious discrimination follows from the text and operation of the statute. That is enough to invalidate the law. *See Lukumi*, 508 U.S. at 559 (Scalia, J., concurring) ("Nor, in my view, does it matter that a legislature consists entirely of the pure-hearted, if the law it enacts in fact singles out a religious practice for special burdens."). But religious discrimination is evident, as well, in statements by Maine's political leaders. *See Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 634 (2018) (pointing to evidence by State officials of "a clear and impermissible hostility" toward religion). They cited BCS's religious beliefs and practices as *justification* for religious discrimination.

Attorney General Frey issued a remarkable statement the same day that *Carson v. Makin* was decided. That statement unashamedly declared his hostility toward BCS and its religious beliefs.

Frey insisted that religious schools like BCS do not "provide the equivalent of a public education" because they "promote[] religion." Joint

Stipulated Facts Ex. 12 ("Frey Statement"). By that logic, colonial Harvard was not a genuine place of learning. *But see* SAMUEL ELIOT MORISON, THE FOUNDING OF HARVARD COLLEGE 8 (1935) (concluding that "but for the passionately sincere religion of these puritans, there would have been no Harvard"). Neither, for that matter, was Bowdoin College under the leadership of Joshua Chamberlain. *But see* RONALD C. WHITE, ON GREAT FIELDS 282 (2023) ("As the new president he believed his challenge was to maintain the college's Christian identity, but at the same time to broaden its appeal to prospective students and donors."). But the logic is flawed. Major educational institutions throughout the country strive to integrate faith and reason. *See* Brian J. Grim & Melissa E. Grim, *The Socio-economic Contribution of Religion to American Society*, 12 INTERDISC. J. RSCH. ON RELIGION 2, 5 (2016) (reporting that two million students attend faith-based colleges and universities). BCS's educational approach is firmly within that long and honorable tradition.

Attorney General Frey then "expressed his disappointment" at *Carson*'s holding "striking down a Maine law prohibiting religious schools from receiving public funds." Frey Statement. He depicted BCS and comparable schools in derogatory terms:

> The education provided by the schools at issue here is inimical to a public education. They promote a single religion to the exclusion of all others, refuse to admit gay and transgender children, and openly discriminate in hiring teachers and staff. One school teaches children that the husband is to be the leader of the household.

*Id.* To this, the Attorney General added that the education at BCS and like-minded schools "promote[s] discrimination, intolerance, and bigotry." *Id.* Not content to deride BCS, the Attorney General announced his intention to work with the Governor and legislature to adopt "statutory amendments to address the Court's decision." *Id.* Then-Speaker Fecteau echoed Frey's sentiment by admitting that the amendments were intended to evade *Carson.* Joint Stipulated Facts Ex. 13.

This naked display of religious animus by public officials is a shocking departure from "the State's duty under the First Amendment not to base laws or regulations on hostility to a religion or religious viewpoint." *Masterpiece Cakeshop*, 584 U.S. at 625. Official attacks on BCS and its religious convictions offend the First Amendment, under which "the government, if it is to respect the Constitution's guarantee of free exercise, cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Id.* at 638.

Religious discrimination is thus an animating purpose of the challenged law. It targets BCS and other religious schools (and their sponsoring churches) for discriminatory treatment. Under the First Amendment, excluding BCS from Maine's tuition assistance program is invalid.

## III. Crosspoint Church's Constitutional Right to Exercise Religion Must Prevail Over Maine Law.

The district court's preliminary injunction order contains a striking confession: "Despite the plaintiffs' hard-fought and significant victory at the United States Supreme Court in *Carson*, the Maine Legislature and the Maine Attorney General have largely deprived Crosspoint and similar religious schools of the fruit of their victory." Feb. Order at *46. That result, the lower court said, "comes when the Maine Legislature's view of the categories of people meriting protected status conflicts with sincerely held beliefs of members of religious communities." *Id.* After all, the court noted, "the Maine Legislature has the authority to define protected classes under its antidiscrimination laws." *Id.*

Maine certainly can amend its own civil rights laws—but only within the limits set by the Constitution. *See Wallace v. Jaffree*, 472 U.S. 38, 49 (1985). The supremacy of federal rights over State law is among the ABCs of Madisonian federalism. *See* U.S. CONST. art. VI.

State fidelity to the Constitution is vital to our federal system. The Supreme Court has expressed the "concern that state courts might read state law in such a manner as to circumvent federal constitutional provisions." *Moore v. Harper*, 600 U.S. 1, 35 (2023). That concern is equally urgent when, as here, State lawmakers try to circumvent the Constitution by amending State law. Either way, federal courts have the solemn "duty to safeguard limits imposed by the Federal Constitution." *Id.*

Consider how the Supreme Court policed such limits under comparable circumstances in *Espinoza*. There, the Montana Legislature created a tuition assistance program to subsidize K-12 education at private schools. But when parents challenged the validity of a State administrative rule prohibiting the use of such assistance at religious schools, the Montana Supreme Court terminated the entire program as inconsistent with a provision of the Montana Constitution prohibiting public aid to religious schools. *See* 591 U.S. at 470–72. The Supreme Court readily discerned that the decision to scrap the program rested on a bald violation of the Free Exercise Clause. In its view, the Montana court shut down the tuition assistance program "to make absolutely sure that religious schools received no aid"—a tactical retreat affecting religious and secular

schools alike. *Id.* at 487. But the retreat was ineffective because terminating the program rested on "the Montana Supreme Court's failure to follow the dictates of federal law." *Id.* at 488. As the Court explained, "[w]hen the Court was called upon to apply a state law no-aid provision to exclude religious schools from the program, it was obligated by the Federal Constitution to reject the invitation." *Id.* at 487–88. Failure to shoulder that obligation made the Montana decision unconstitutional.

So too, here. The district court evidently overlooked the fact that Maine's legislative alterations to its tuition assistance scheme could have no more effect on the permissibility of excluding BCS than the Montana Supreme Court's judicial termination of Montana's tuition assistance program. In both instances, the crucial error lay in the application of State law "to exclude religious schools from the program" when the State "was obligated by the Federal Constitution to reject the invitation." *Id.* at 488. Under the Free Exercise Clause, the Maine Legislature was free to discontinue its tuition assistance program, but it was not free to gerrymander State law "to make absolutely sure that religious schools received no aid." *Id.* at 487. The challenged amendments to Maine law entrench the State's determination to "exclud[e] religious observers from otherwise

available public benefits." *Carson*, 596 U.S. at 778 (citation omitted). As in *Espinoza*, Maine's blatant violation of the Free Exercise Clause "cannot be defended as a neutral policy decision, or as resting on adequate and independent state law grounds." 591 U.S. at 488 (footnote omitted).

It is a truism that no State law can diminish a right under the federal Constitution. *See id.* at 485 ("Our federal system prizes state experimentation, but not 'state experimentation in the suppression of free speech,' and the same goes for the free exercise of religion.") (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660 (2000)). State laws promoting LGBT equality are no exception. Case after case holds that constitutional rights are undiminished even when they collide with state and local civil rights laws. *See Fulton*, 593 U.S. at 542 (concluding that Philadelphia's exclusion of Catholic Social Services as a foster care provider "cannot survive strict scrutiny, and violates the First Amendment"); *303 Creative LLC v. Elenis*, 600 U.S. 570, 592 (2023) (sustaining a web designer's First Amendment challenge to Colorado's public accommodations law because "no public accommodations law is immune from the demands of the Constitution"); *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 579 (1995) (reversing on First Amendment grounds State court

decisions holding that parade organizers violated Massachusetts public accommodations statute by excluding an LGBT group from Boston's St. Patrick's Day parade).

*Carson* announced a constitutional principle—not a fact-bound ruling. The Supreme Court explained that "[r]egardless of how the benefit and restriction are described, the program operates to identify and exclude otherwise eligible schools on the basis of their religious exercise." 596 U.S. at 789. Guided by that principle, there is no meaningful difference between a State law that excludes BCS because it is too religious and one that excludes BCS because its religion is deemed "discriminatory." Yet State officials here preferred to amend Maine law rather than comply with *Carson*'s unmistakable principle of constitutional right.

A Supreme Court judgment demands compliance—not evasion. That was the stern lesson of *Griffin*, 377 U.S. at 218. There, a Virginia county challenged the validity of a district court order "enjoin[ing] county officials from paying county tuition grants or giving tax exemptions" to private schools "and from processing applications for state tuition grants so long as the county's public schools remained closed." *Id.* at 232. The Court sustained the injunction as "appropriate and necessary since those

grants and tax credits have been essential parts of the county's program … to deprive [African-American] petitioners of the same advantages of a public school education enjoyed by children in every other part of Virginia." *Id.* at 233. Behind that conclusion was the landmark ruling that racial segregation in public schools violates the Constitution. *Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483, 495 (1954). *Griffin* reminded the country of that principle, adding that "it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them." 377 U.S. at 231 n.12 (quoting *Brown v. Bd. of Educ.*, 349 U.S. 294, 300 (1955) (*Brown II*)).

Any "rub" in this case comes not because of conflicts between religious beliefs and Maine's desire to protect certain "categories of people," Feb. Order at *46, but because the lower court declined to vindicate the First Amendment rights of BCS and Crosspoint Church. That their beliefs and practices are unpopular is immaterial. "Popular religious views are easy enough to defend. It is in protecting unpopular religious beliefs that we prove this country's commitment to serving as a refuge for religious freedom." *Masterpiece Cakeshop*, 584 U.S. at 649 (Gorsuch, J., concurring).

# CONCLUSION

We urge the Court to reverse and to enter the relief sought by Crosspoint Church.

September 10, 2024      Respectfully submitted,

<div style="margin-left:40%">

*/s/ R. Shawn Gunnarson*
R. Shawn Gunnarson
Christopher A. Bates
Jarom M. Harrison
Kɪʀᴛᴏɴ | McCᴏɴᴋɪᴇ
36 South State Street
Suite 1900
Salt Lake City, UT 84111
(801) 328-3600
sgunnarson@kmclaw.com

*Counsel for Amici Curiae*

</div>

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of FRAP 29(a)(5) and FRAP 32(a)(7)(B) because, excluding the parts of the document exempted by FRAP 32(f), this document contains 6,394 words.

This document complies with the typeface requirements of FRAP 29(a)(4)(A), FRAP 32(a)(5), and FRAP 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

Dated: September 10, 2024        */s/ R. Shawn Gunnarson*
R. Shawn Gunnarson

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system on September 10, 2024.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: September 10, 2024          */s/ R. Shawn Gunnarson*
                                   R. Shawn Gunnarson

                                   *Counsel for Amici Curiae*