No. 24-1590

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

---

CROSSPOINT CHURCH,

*Plaintiff-Appellant*,

v.

A. PENDER MAKIN, IN HER OFFICIAL CAPACITY AS COMMISSIONER OF THE MAINE DEPARTMENT OF EDUCATION; JEFFERSON ASHBY, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE MAINE HUMAN RIGHTS COMMISSION; EDWARD DAVID, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE MAINE HUMAN RIGHTS COMMISSION; JULIE ANN O'BRIEN, IN HER OFFICIAL CAPACITY AS COMMISSIONER OF THE MAINE HUMAN RIGHTS COMMISSION; MARK WALKER, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE MAINE HUMAN RIGHTS COMMISSION; THOMAS L. DOUGLAS, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE MAINE HUMAN RIGHTS COMMISSION,

*Defendants-Appellees*.

---

On Appeal from the United States District Court
for the District of Maine (Bangor)
Case No. 1:23-cv-00146
Hon. John A. Woodcock, Jr., District Judge

---

## AMICUS BRIEF OF AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF MAINE, AND AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMATION

---

CAROL GARVAN
ZACHARY L. HEIDEN
ANAHITA SOTOOHI
ACLU of Maine Foundation
P.O. Box 7860
Portland, Maine 04112

ADITI FRUITWALA
*Counsel of Record*
MICHELLE FRALING
DANIEL MACH
HEATHER WEAVER

Tel: (207) 619-8687
cgarvan@aclumaine.org

ALEXANDRA ZARETSKY
Americans United for Separation
  of Church & State
1310 L Street NW, Suite 200,
Washington, DC 20005
Tel: (202) 898-2145
zaretsky@au.org

American Civil Liberties Union
  Foundation
915 15th St NW
Washington, DC 20005
Tel: (202) 457-0800
afruitwala@aclu.org

LOUISE MELLING
American Civil Liberties Union
  Foundation
125 Broad St, 18th Floor
New York, NY 10004
Tel: (212) 549-2637
lmelling@aclu.org

Dated: October 28, 2024            *Counsel for Amici Curiae*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Amici curiae are nonprofit entities operating under § 501(c)(3) of the Internal Revenue Code. Amici are not subsidiaries or affiliates of any publicly owned corporations and do not issue shares of stock. No publicly held corporation has a direct financial interest in the outcome of this litigation due to amici's participation.

# TABLE OF CONTENTS

**Page**

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ...................................... i

TABLE OF AUTHORITIES ...................................................................... iii

INTEREST OF AMICI CURIAE ................................................................ 1

BACKGROUND AND SUMMARY OF ARGUMENT ........................................ 3

ARGUMENT ...................................................................................... 5

  I.   Generally Applicable And Neutral Antidiscrimination Requirements Do Not Violate The Free Exercise Clause. .......................................................... 5

     A.   Maine is Permitted to Impose Generally Applicable and Neutral Eligibility Requirements in Connection with Enrollment in a Public Benefit Program. ........................................................................ 6

     B.   The MHRA Applies Equally to All Elementary and Secondary Schools in Maine That Receive Public Funding and Contains No Discretionary Exemptions. ...................................................................... 8

     C.   Maine Proceeded Neutrally and Without Hostility to Religion in Enacting the Challenged MHRA Provisions. ................................... 11

  II.   The MHRA Regulates Conduct, Not Speech. ............................................... 14

  III.  Even if Strict Scrutiny Applies, it is Satisfied Here. ..................................... 18

  IV.  The Consequences Of Accepting Crosspoint's Argument Could Severely Undermine Educational Equality For Historically Marginalized Groups ..... 21

CONCLUSION .................................................................................. 23

CERTIFICATE OF COMPLIANCE ........................................................... 25

CERTIFICATE OF SERVICE ................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
  600 U.S. 570 (2023) ...................................................................1, 2

*Am. Legion v. Am. Humanist Ass'n*,
  588 U.S. 29 (2019) ............................................................................3

*Billard v. Charlotte Cath. High Sch.*,
  101 F.4th 316 (4th Cir. 2024) ...............................................................1

*Bob Jones Univ. v. United States*,
  461 U.S. 574 (1983) ................................................................... 18, 19

*Burwell v. Hobby Lobby Stores, Inc.*,
  573 U.S. 682 (2014) .....................................................................2, 3

*Carson ex rel. O. C. v. Makin*,
  596 U.S. 767 (2022) ........................................................ 1, 2, 4, 6, 7, 8

*Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*,
  561 U.S. 661 (2010) ............................................... 2, 3, 11, 16, 17, 18

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993) ................................................................ 6, 12, 14

*City Council of L.A. v. Taxpayers for Vincent*,
  466 U. S. 789 (1984) ....................................................................20

*City of Boerne v. Flores*,
  521 U.S. 507 (1997) ...........................................................................6

*Darren Patterson Christian Acad. v. Roy*,
  699 F. Supp. 3d 1163 (D. Colo. 2023) ................................................19

*Does 1-6 v. Mills*,
  16 F.4th 20 (1st Cir. 2021) ...............................................................9

*Emp. Div. v. Smith*,
   494 U.S. 872 (1990) ........................................................................6, 8

*Espinoza v. Mont. Dep't of Revenue*,
   591 U.S. 464 (2020) ................................................... 1, 3, 6, 7, 8

*Fulton v. City of Philadelphia*,
   593 U.S. 522 (2021) ............................................. 1, 6, 8, 9, 11, 19, 20

*Gonzales v. O Centro Espírita Beneficente União de Vegetal*,
   546 U.S. 418 (2006) ..........................................................................19

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
   515 U.S. 557 (1995) ..........................................................................17

*Judkins v. Saint Joseph's Coll. of Me.*,
   483 F. Supp. 2d 60 (D. Me. 2007)....................................................10

*Kennedy v. Bremerton Sch. Dist.*,
   597 U.S. 507 (2022) ............................................................................2

*Masterpiece Cakeshop, Ltd. v. Colo. C. R. Comm'n*,
   584 U.S. 617 (2018) ............................................................ 1, 2, 12, 14

*Norwood v. Harrison*,
   413 U.S. 455 (1973) ..........................................................................19

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
   591 U.S. 732 (2020) .......................................................................2, 3

*R.A.V. v. St. Paul*,
   505 U.S. 377 (1992) ..........................................................................17

*Roberts v. U.S. Jaycees*,
   468 U.S. 609 (1984) ..................................................................... 19, 20

*Rumsfeld v. F. for Acad. & Institutional Rights, Inc.*,
   547 U.S. 47 (2006) ...................................................................... 15, 16

*St. Dominic Acad. v. Makin*,
   No. 23-CV-00246, 2024 WL 3718386 (D. Me. Aug. 8, 2024)..................... 11, 21

*Swartz v. Sylvester*,
  53 F.4th 693 (1st Cir. 2022) ...................................................12

*Town of Greece v. Galloway*,
  572 U.S. 565 (2014) ...............................................................2

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
  582 U.S. 449 (2017) ........................................... 2, 3, 6, 7, 9

*United States v. O'Brien*,
  391 U.S. 367 (1968) ....................................................... 14, 17

*Zelman v. Simmons-Harris*,
  536 U.S. 639 (2002) ...............................................................7


**Statutes**

20 U.S.C. §§ 1681–1689 ............................................................22

29 U.S.C. § 794 ..........................................................................22

42 U.S.C. §§ 2000d–2000d-7 ....................................................22

42 U.S.C. §§ 6101–6107 ............................................................22

Me. Rev. Stat. Ann. tit. 20-A, § 2 (1981) ...................................3

Me. Rev. Stat. Ann. tit. 20-A, § 5203 (1981) .............................3

Me. Rev. Stat. Ann. tit. 20-A, § 5204 (1981) .............................3

Me. Rev. Stat. Ann. tit. 20-A, §§ 11611–11619-A (1989) .......10

Me. Rev. Stat. Ann. tit. 5, § 4552 (1971) ..................................18

Me. Rev. Stat. Ann. tit. 5, § 4553 (1971) ...................... 4, 8, 12

Me. Rev. Stat. Ann. tit. 5, § 4602 (1983) ...................................4

Me. Rev. Stat. Ann. tit. 5, § 4602(5)(C) (effective Oct. 18, 2021) ........................12

P.L. 2005, ch. 10, § 21, 2005 Me. Laws 70 ................................................................4

P.L. 2021, ch. 366, 2021 Me. Laws 761–768 .......................................................2, 4

## Other Authorities

Nat'l Fed'n of State High Sch. Ass'ns, *High School Athletics Participation Survey (2021-22)* (last visited Oct. 28, 2024) ....................................................................22

Aaron Frey, *Statement of Maine Attorney General Aaron Frey on Supreme Court Decision in Carson v. Makin,* Office of the Maine Attorney General (June 21, 2022)....................................................................................................................13

Caroline Mala Corbin, *Expanding the Bob Jones Compromise, in* Legal Responses to Religious Practices in the United States (Austin Sarat ed., 2012) ...................21

Namarta Vahera, *Impact of Title IX on Women's Participation in Sports*, 3 Int'l J. Physiology, Nutrition & Physical Educ. 512 (2018)............................................22

Xavier Fields & Christine Min Wotipka, *Effect of LGBT Antidiscrimination Laws on School Climate and Outcomes for Lesbian, Gay, and Bisexual High School Students*, 19 J. LGBT Youth 321 (2020).............................................................23

## INTEREST OF AMICI CURIAE[1]

The American Civil Liberties Union (ACLU) is a nationwide, nonprofit, nonpartisan organization with nearly two million members and supporters dedicated to the principles of liberty and equality embodied in the Constitution. The ACLU of Maine is the state affiliate of the national ACLU. As organizations that advocate for religious freedom and free speech, as well as equal rights for people of different faiths, genders, sexual orientation, and races, among others, the ACLU and the ACLU of Maine have a strong interest in the application of proper standards when evaluating constitutional challenges to antidiscrimination laws. The ACLU has appeared as direct counsel or amici in many cases nationwide involving religious liberties and equality. *See*, *e.g.*, *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021) (counsel); *Masterpiece Cakeshop, Ltd. v. Colo. C. R. Comm'n*, 584 U.S. 617 (2018) (counsel); *Billard v. Charlotte Cath. High Sch.*, 101 F.4th 316 (4th Cir. 2024) (counsel); *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) (amicus); *Carson ex rel. O. C. v. Makin*, 596 U.S. 767 (2022) (amicus); *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464 (2020) (amicus); *Our Lady of*

---

[1] The parties have issued a blanket consent to the filing of amicus curiae briefs. Amici confirm that no party or counsel for any party authored this brief in whole or in part; that no party or counsel for any party contributed any money to fund the preparation or submission of this brief; and that no person other than amici or their counsel made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E).

1

*Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020) (amicus)*; Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017) (amicus); *Burwell v. Hobby Lobby Stores, Inc*., 573 U.S. 682 (2014) (amicus); *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. Of Law v. Martinez*, 561 U.S. 661 (2010) (amicus).

The ACLU of Maine testified in support of P.L. 2021, ch. 366, 2021 Me. Laws 761–768—the statute being challenged in this matter—after carefully analyzing it and finding that it represents a workable model for ensuring the general applicability of neutral antidiscrimination laws in a manner that does not interfere with the freedoms of speech, religion, or association guaranteed to all under the First Amendment.

Americans United for Separation of Church and State is a national, nonpartisan organization that, for over seventy-five years, has brought together people of all faiths and the nonreligious who share a deep commitment to religious freedom as a shield to protect, but never a sword to harm, others. Americans United has also appeared as direct counsel or amici in many cases nationwide involving religious liberties and equality. *See*, *e.g*., *Kennedy v. Bremerton Sch. Dist*., 597 U.S. 507 (2022) (counsel);  *Town of Greece v. Galloway*, 572 U.S. 565 (2014) (counsel); *Masterpiece Cakeshop*, 584 U.S. 617 (2018) (amicus); *303 Creative LLC*, 600 U.S. 570 (2023) (amicus); *Carson*, 596 U.S. 767 (2022)

(amicus); *Espinoza*, 591 U.S. 464 (2020) (amicus); *Our Lady*, 591 U.S. 732 (2020) (amicus)*; Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29 (2019) (amicus); *Trinity Lutheran*, 582 U.S. 449 (2017) (amicus); *Burwell*, 573 U.S. 682 (2014) (amicus); *Christian Legal Soc'y*, 561 U.S. 661 (2010) (amicus).

## BACKGROUND AND SUMMARY OF ARGUMENT

It is a foundational principle in civil rights law that the government may require compliance with antidiscrimination provisions in its distribution of public funds. While a private religious school may have sincerely held beliefs that motivate its discrimination, the state need not subsidize and support discriminatory conduct. Indeed, states have long used the power of the purse to protect the right to equal access to education, employment, housing, and public accommodations. In claiming a constitutional right to discriminate with taxpayer funding, Appellant Crosspoint Church seeks to upend these longstanding safeguards and contravene a neutral and generally applicable state law. The right asserted by Appellant has never been recognized by this Court and should not be now.

Maine law provides that all students be afforded a "free public education." Me. Rev. Stat. Ann. tit. 20-A, § 2(2) (1981). In places where no public schools exist, Maine will pay the tuition for students to attend other approved schools that satisfy certain statutory criteria. *Id*. §§ 5203(4) (elementary school), 5204(4) (secondary school); *see* ADD5–6 [hereinafter Maine's School Tuitioning

Program]. The criteria include compliance with the Maine Human Rights Act's (MHRA) antidiscrimination provisions, which prohibit discrimination on the basis of religion, sexual orientation, and gender identity, among other protected characteristics. P.L. 2005, ch. 10, § 21, 2005 Me. Laws 70; P.L. 2021, ch. 366, § 19, 2021 Me. Laws 766–67; Me. Rev. Stat. Ann. tit. 5, § 4602(5)(D) (1983).

Crosspoint operates a Christian school that openly discriminates by denying admission to students on the basis of their faith, sexual orientation, and gender identity. There is no dispute that Crosspoint may continue to operate and implement these discriminatory policies as a matter of Maine law. But, if Crosspoint elects to participate in the voluntary School Tuitioning Program, it must comply with the eligibility requirements of the program, including the antidiscrimination provisions of the MHRA. Me. Rev. Stat. Ann. tit. 5, § 4553(10)(G) (1971).

In arguing to the contrary, Crosspoint seeks far more than what is authorized under the Supreme Court's recent decision in *Carson*, Maine law, or the Constitution. *Carson*, 596 U.S. 767 (2022), established that religious private schools must be eligible for Maine's School Tuitioning Program to the same extent as non-religious private schools. It did not require Maine to accept all schools into the School Tuitioning Program, regardless of whether they comply with the eligibility requirements.

4

Neither the Free Exercise Clause nor the Free Speech Clause prevents Maine from holding Crosspoint to the MHRA's antidiscrimination requirements. The requirements apply equally to all elementary and secondary schools in Maine receiving public funding, both religious and secular, and the requirements are neutral, with no demonstrated hostility to religion. The requirements regulate conduct, not speech, and they do not compel Crosspoint to speak or not speak any particular message, as Crosspoint remains free to teach consistently with its faith. The challenged provisions are, therefore, subject only to rational-basis scrutiny.

But even if the requirements triggered heightened scrutiny, Maine has a compelling interest in declining to subsidize private discriminatory conduct, and the law is narrowly tailored to achieve that purpose. Government funding is a principal driver of antidiscrimination protections, and Maine should be afforded necessary latitude to eradicate discrimination and advance equality with taxpayer dollars in its own state.[2]

## ARGUMENT

### I. Generally Applicable And Neutral Antidiscrimination Requirements Do Not Violate The Free Exercise Clause.

---

[2] The state has represented–and the district court agreed–that School Tuitioning Program § 4573-A(2) exempts Crosspoint, as a religious institution, from § 4572(1)(A)'s prohibition on employment discrimination based on religion. ADD42–43; State's Br. 48–49. Amici therefore do not separately address Crosspoint's employment discrimination claim.

Maine is permitted to impose generally applicable and neutral eligibility requirements as a condition of enrollment in its School Tuitioning Program. *See Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021) (citing *Emp. Div. v. Smith*, 494 U.S. 872, 878–82 (1990)) ("laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable"); *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) (same); *see also City of Boerne v. Flores*, 521 U.S. 507, 514 (1997) (same). The MHRA is generally applicable because it applies to all elementary and secondary schools in Maine that receive public funding; and it is neutral because its purpose is not to impede or constrain religion, and the Legislature did not act with hostility in enacting it.

## A. Maine is Permitted to Impose Generally Applicable and Neutral Eligibility Requirements in Connection with Enrollment in a Public Benefit Program.

The three recent Supreme Court cases addressing funding of religious entities —*Trinity Lutheran*, 582 U.S. 449 (2017), *Espinoza*, 591 U.S. 464 (2020), and *Carson*, 596 U.S. 767 (2022)— held that state public benefit programs may not exclude participants "*solely because of their religious character.*" *Trinity Lutheran*, 582 U.S. at 462 (emphasis added); *see also Carson*, 596 U.S. at 768, 779 (quoting *Espinoza*, 591 U.S. at 487) ("'A State need not subsidize private education. . . [b]ut once a State decides to do so, it cannot disqualify some private

6

schools solely because they are religious.'"). *Carson* held that exclusions based on

religious use, as well as religious status, may in some cases violate free exercise,

596 U.S. at 789, but under either category, it is the distinction *on the basis of*

*religion* that triggers heightened constitutional concern.

These decisions in no way suggest that religious entities are entitled to

*special* treatment under public programs; they simply must be held to the same

standards as nonreligious entities. In *Carson*, the Court noted that "[a]bsent the

'nonsectarian' requirement," the parents would have sought tuition payments

through the state program, *see* 596 U.S. at 776, and that the program improperly

excluded "otherwise eligible schools," *id*. at 789.  In *Espinoza*, the Court reasoned

that the school in question met "the statutory criteria for 'qualified education

providers,'" 591 U.S. at 470–71, and that the decision to exclude the school

"hinged solely on religious status," *id*. at 478. And in *Trinity Lutheran*, the Court

held that the provision in question "discriminate[d] against *otherwise eligible*

recipients" and "Trinity Lutheran was denied a grant simply because of what it

is—a church." 582 U.S. at 462, 464 (emphasis added); *cf. Zelman v. Simmons-*

*Harris*, 536 U.S. 639, 654 (2002) (schools required to comply with

antidiscrimination requirements to be eligible for state voucher program).

These cases make clear that states are permitted to impose generally

applicable eligibility requirements to access public benefit programs; states simply

may not exclude participants "solely because they are religious" or solely because the participants may put the dollars to religious uses. *Carson*, 596 U.S. at 785 (quoting *Espinoza*, 591 U.S. at 487). Crosspoint cannot invert the mandate of *Carson*—that "otherwise eligible" religious institutions be included in funding— into a constitutional requirement that their religious status immunizes them from the generally applicable, neutral eligibility requirements. *Carson,* 596 U.S. at 789.

**B. The MHRA Applies Equally to All Elementary and Secondary Schools in Maine That Receive Public Funding and Contains No Discretionary Exemptions.**

"A law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions,'" *Fulton*, 593 U.S. at 533 (quoting *Smith*, 494 U.S. at 884), or "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," *id.* at 534.

The MHRA does neither. Religious schools are treated the same as non-religious schools. Elementary and secondary schools in Maine receiving support through the School Tuitioning Program are subject to the MHRA, whether they are religious or not. Schools outside Maine and private colleges and universities are *not* subject to the MHRA, whether they are religious or not. Me. Rev. Stat. Ann. tit. 5, § 4553(2-A). Moreover, nothing in the MHRA vests any government body with the power to exempt certain schools but not others. *Cf. Fulton*, 593 U.S. at

537 ("The creation of a formal mechanism for granting exceptions renders a policy not generally applicable"); *Does 1-6 v. Mills*, 16 F.4th 20, 30 (1st Cir. 2021) (upholding vaccination rule for healthcare workers where the rule did "not require the state government to exercise discretion in evaluating individual requests for exemptions"), *cert. denied sub nom. Does 1-3 v. Mills,* 142 S. Ct. 1112 (2022).

Crosspoint's claim that provisions of the MHRA are not generally applicable because out-of-state schools and private colleges and universities are exempt, Crosspoint's Br. 18, is wanting. Maine is treating like cases alike. There is no evidence here of "unequal treatment" of Crosspoint or the imposition of any "special disabilities on the basis of religious. . . status." *Trinity Lutheran*, 582 U.S. at 458–61. In fact, Maine plainly permits religious schools to participate in its School Tuitioning Program—Maine approved the application of Cheverus High School, a religious high school in Portland, on September 16, 2022. JA56 ¶¶10–12; *see* State's Brief 15. And Crosspoint itself has stipulated in this case that no religious school has applied for and been denied participation in the School Tuitioning Program. JA56-57; *see also* State's Br. 6.

Moreover, the application of the MHRA to in-state but not out-of-state schools, and to public but not private post-secondary schools, does not render it underinclusive under *Fulton*. As to out-of-state schools, Maine has made clear it has no jurisdiction to impose its laws over schools in other states. There is a

presumption that the MHRA (like all Maine laws) cannot be applied extraterritorially to conduct outside the state. This presumption against extraterritorial application does not mean the MHRA is not "generally applicable," any more than the fact that the MHRA does not apply in foreign countries would mean that it is not generally applicable. *See, e.g., Judkins v. Saint Joseph's Coll. of Me.*, 483 F. Supp. 2d 60, 65 (D. Me. 2007) (explaining that "[t]here is a well-established presumption against the extraterritorial application of a state's statutes" and finding MHRA does not apply extraterritorially to a nonresident working outside the state). Any effort to enforce the law out of state could raise serious conflict-of-law issues.

Comparison to Maine's rules as to post-secondary schools is even more inapt. Maine's funding for post-secondary schools (e.g., colleges and universities) is a grant program based on need that pays a maximum of $2,500 a year. Me. Rev. Stat. Ann. tit. 20-A, §§ 11611–11619-A. It bears no relationship to the School Tuitioning Program, *for compulsory elementary and secondary education*, for students who have no public schools in their region.

That Crosspoint's compliance with the MHRA would violate Crosspoint's religious beliefs does not mean the law targets religion. To the contrary, the MHRA is indifferent as to why an institution discriminates based on any protected

characteristic. Indeed, there may well be secular private schools that would prefer not to comply with the requirements, yet all schools alike must do so to participate.

Crosspoint's argument would turn the Free Exercise Clause on its head, transforming a constitutional guarantee against a government's unfavorable or discriminatory treatment of religious institutions into something that carves out special terms for religious schools that participate in Maine's opt-in subsidy programs. In short, Crosspoint "seeks preferential, not equal, treatment" and "therefore cannot moor its request for accommodation to the Free Exercise Clause." *Christian Legal Soc'y*, 561 U.S. at 697 n.27.[3]

### C. Maine Proceeded Neutrally and Without Hostility to Religion in Enacting the Challenged MHRA Provisions.

The "[g]overnment fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 593 U.S. at 533. "If the policy's objective is to impede or constrain religion, the policy is not neutral." *Swartz v. Sylvester*, 53 F.4th 693, 700

---

[3] The lower court in this case concluded that the MHRA is generally applicable. ADD34. The court in *St. Dominic* found that the MHRA is not generally applicable, but nevertheless passes constitutional scrutiny as being narrowly tailored to advance a compelling interest in eradicating discrimination in education. *St. Dominic Acad. v. Makin*, No. 23-CV-00246, 2024 WL 3718386, at *28 (D. Me. Aug. 8, 2024)*. Amici assert that the MHRA is generally applicable, for the reasons detailed *supra*, and that, in any case, satisfies strict scrutiny, as explained in Section III.

(1st Cir. 2022) (citing *Lukumi*, 508 U.S. at 533); *Masterpiece,* 584 U.S.at 639

(citing *Lukumi,* 508 U.S. at 540).

For decades, the MHRA's educational antidiscrimination provisions have applied to "any" educational institution that receives public funding, including both public schools and private schools receiving funding through Maine's School Tuitioning Program. Me. Rev. Stat. Ann. tit. 5, § 4553(2-A). Before *Carson*, there was no need for the MHRA to distinguish between "religious schools" and "religious schools that do not receive public funding" because no religious elementary or secondary school received public funding. Anticipating a gap in the antidiscrimination law, the Maine State Legislature in 2021 amended the MHRA to narrow the exemption for religious organizations to any religious organization "that does not receive public funding," ensuring that it remained the case that all schools receiving public funds could not discriminate. Me. Rev. Stat. Ann. tit. 5, § 4602(5)(C) (effective Oct. 18, 2021) [hereinafter the Amendment].

Crosspoint points to three reasons why, in its view, the 2021 Amendment to the MHRA was hostile to religion: the timing of the Amendment, Attorney General Frey's press release, and Speaker Fecteau's tweet. But none of the "evidence" offered by Crosspoint demonstrates that the MHRA or the Amendment were enacted out of hostility toward religion or to target religious institutions or people of faith.

12

First, Crosspoint argues that the timing of the Amendment suggests a goal of preventing Crosspoint's participation in the program. But far from an elaborate underhanded scheme to thwart Crosspoint's participation in the program, the truth is more straightforward: The Amendment confirmed that the MHRA's antidiscrimination provisions applied to publicly funded educational institutions, including those that participate in the School Tuitioning Program, as it always had.

The narrow application of the Amendment to only those religious organizations receiving public funding demonstrates the opposite of what Crosspoint argues—not that the Legislature sought to single out religious institutions for disfavored treatment, but that it was cognizant of First Amendment concerns and carefully placed neutral and generally applicable limitations on private institutions (whether religious or not) voluntarily seeking public money.

Second, Attorney General Frey's press release was issued *one year after* the Amendment passed. *See* Aaron Frey, *Statement of Maine Attorney General Aaron Frey on Supreme Court Decision in Carson v. Makin,* Office of the Maine Attorney General (June 21, 2022), https://perma.cc/544J-DAFN. He did not testify supporting the bill, and there is no evidence that he was involved in its introduction or passage. ADD38. It thus has no bearing on an assessment as to the neutrality of the Amendment. Nor has the Attorney General been involved in any decision as to Crosspoint—as there has been none—thus rendering inapt any comparison to

13

*Masterpiece*, in which a commissioner's disparaging comments "cast doubt on the fairness and impartiality of [his own] adjudication", 584 U.S. at 636.

Finally, Speaker Fecteau's tweet about the legislative response anticipating *Carson* did not disparage Crosspoint, Christianity, or even religion. *See* JA280. In any event, a single tweet from one legislator cannot be used "to ascribe motivations to the entire legislative body." *United States v. O'Brien*, 391 U.S. 367, 383–84 (1968) ("Inquiries into congressional motives or purposes are a hazardous matter" and courts should not rely on statements made by individual legislators since "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it"); *see also Lukumi*, 508 U.S. at 558 (Scalia, J., concurring) (subjective motivation of lawmakers is irrelevant when conducting analysis under the First Amendment, and "it is virtually impossible to determine the singular 'motive' of a collective legislative body").

## II.  The MHRA Regulates Conduct, Not Speech.

At the outset, it is important to clarify what the MHRA does and does not prohibit. Crosspoint claims that the requirement to comply with the MHRA compels it to "stop educating its students from a religious perspective." Crosspoint's Br. 31. Not so.

The MHRA is a standard antidiscrimination statute, not an educational law dictating curriculum for schools participating in the School Tuitioning Program.

14

The MHRA prohibits discriminatory *conduct*—the *act* of discrimination, but does not regulate speech, even if that speech is discriminatory. Under the MHRA, Crosspoint is entitled to educate students in the church's religious faith and even communicate anti-LGBTQIA+ messages. As the state concedes, "Crosspoint is free to teach students as it currently does, regardless of whether it accepts public funds. It may continue to teach from a biblical perspective and instill its religious values." State's Br. 50. The District Court agreed: "[The law] does not, on its face, appear to directly limit the content of Crosspoint's religious expression or teaching—e.g., Crosspoint could not reject applicants for being homosexual, but it could still teach that homosexuality is a sin." ADD30; *see also* State's Br. 24 ("In other words, Crosspoint would be free to teach, for example, that marriage can only mean one sanctioned by God joining one man and one woman, Complaint, ¶ 28(d) (JA20), but it could not refuse admission to a gay child."). The issue here is not whether the government is required to fund speech with which it disagrees. Contrary to Crosspoint's assertions, this is not a case about speech.

In that respect, this case is similar to *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47 (2006) [hereinafter FAIR], in which the Supreme Court held that a law denying certain federal funds to law schools that prohibited military recruiters did not violate the First Amendment because it "neither limits what law schools may say nor requires them to say anything" and

15

the "schools remain free under the statute to express whatever views they may have on the military's congressionally mandated employment policy, all the while retaining eligibility for federal funds." *Id.* at 51, 60, 70; *see also Christian Legal Soc'y*, 561 U.S. at 696 (policies that prohibit discriminatory conduct in schools are permissible and do not violate the Free Speech Clause). The MHRA similarly "affects what the [] schools must *do* . . . not what they may or may not *say*." *FAIR*, 547 U.S. at 60.

The fact that Crosspoint's discriminatory *conduct* reflects its religious beliefs does not convert the MHRA into an impermissible regulation of speech any more than a law prohibiting trespass becomes an impermissible regulation of speech whenever protesters want to violate it to protest the existence of private property. *Christian Legal Society* presented an analogous circumstance in which a religious student organization sought an exception from compliance with a law school's antidiscrimination policy. The Supreme Court concluded that the policy "is justified without reference to the content or viewpoint of the regulated speech," and that the organization's "conduct—not its Christian perspective—is, from [the law school's] vantage point, what stands between the group and [registered student organization] status." 561 U.S. at 696 (citations omitted). Even if a regulation has a differential impact on groups wishing to enforce exclusionary membership policies, '[w]here the [State] does not target conduct on the basis of its expressive

16

content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy.'" *Id.* (*quoting R.A.V. v. St. Paul*, 505 U.S. 377, 390 (1992)).

Finally, Crosspoint's reliance on *Hurley*, Crosspoint's Br. 34–35, is misplaced. *Hurley* did not call into question the enforcement of antidiscrimination laws in general, or even of the state's antidiscrimination laws in other applications. Rather, *Hurley* invalidated the "peculiar application" of the law as applied to a private parade, "a form of expression" used to make a "collective point, not just to each other but to bystanders along the way." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 558, 568 (1995). This case concerns publicly funded schooling, which is not a form of expressive conduct.[4]

---

[4] Even if the MHRA regulates conduct in such a way that it has an incidental effect on speech, the governing *O'Brien* test is easily satisfied. The *O'Brien* test asks whether the government regulation "furthers an important or substantial governmental interest," whether that interest is "unrelated to the suppression" of expression or belief, and whether the "incidental restriction" on First Amendment freedom is "no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. at 377 (applying standard in context of First Amendment free speech claim). The MHRA easily satisfies these criteria. The regulation is neutral for the reasons discussed *supra* and promotes a substantial government interest in eradicating educational discrimination that is no greater than necessary to achieve the purposes of the law, as discussed in Section III.

### III.  Even if Strict Scrutiny Applies, it is Satisfied Here.

Maine has a compelling interest in declining to subsidize discriminatory conduct in publicly funded education and the MHRA is narrowly tailored to achieve that interest. Because of the central role that access to education plays in personal and professional development, eliminating discrimination in education has long been recognized as a government interest of the utmost importance. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983) ("[T]he Government has a fundamental, overriding interest in eradicating racial discrimination in education.").

Here, Maine's interest in preventing and remedying discrimination in education is expressly stated in the law itself: The Legislature sought not only to "prevent discrimination in . . . education" but to remedy Maine's long history of education discrimination. Me. Rev. Stat. Ann. tit. 5, § 4552 (1971). The State's interest is even stronger here, where it seeks to avoid government funds—taxpayer dollars—being used to discriminate. Allowing Crosspoint to participate in the School Tuitioning Program while denying admission to LGBTQIA+ students would create the untenable situation where certain taxpayers are denied services that *they* funded because of their child's protected characteristic. *Cf. Christian Legal Soc'y,* 561 U.S. at 688 (university non-discrimination rule "ensures that no Hastings student is forced to fund a group that would reject her as a member"). As

18

the Supreme Court explained in *Bob Jones*, governments are entitled to consider whether public funds would be used in violation of public policy in making eligibility determinations for their funding programs, recognizing that such use would amount to using taxpayer funds to violate public policy. *See* 461 U.S. at 591. This is true even where the discrimination happens to be motivated by religious beliefs. *See, e.g., id.* at 604; *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623, 625 (1984). "That the Constitution may compel toleration of private discrimination in some circumstances does not mean that it requires state support for such discrimination." *Norwood v. Harrison*, 413 U.S. 455, 463 (1973).

Crosspoint argues that the State cannot rely on "broadly formulated interests" in "eliminating discrimination" but must establish a compelling interest in denying an exception to Crosspoint, Crosspoint's Br. 23–24, citing the Supreme Court's decision in *Fulton*, 593 U.S. 522 (2021), and the Colorado district court's application of *Fulton* in *Darren Patterson Christian Acad. v. Roy*, 699 F. Supp. 3d 1163, 1186 (D. Colo. 2023). Even assuming this is the correct standard, this standard is readily satisfied here.

In *Fulton*, the Court explained that in the First Amendment context, "courts must 'scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants.'" 593 U.S. at 541 (quoting *Gonzales v. O Centro Espírita Beneficente União de Vegetal*, 546 U.S. 418, 431 (2006)). The Supreme Court

19

concluded that "the interest of the City in the equal treatment of prospective foster parents and foster children" was not sufficiently compelling because the "creation of a system of exceptions," made at the sole discretion of the Commissioner, in the challenged policy "undermines the City's contention that its non-discrimination policies can brook no departures." *Id.* at 542. Maine has no such system of individualized exemptions. To the contrary, Maine brooks no exception to the rule that in-state schools that participate in the School Tuitioning Program may not discriminate. The state has a compelling reason not to grant Crosspoint an exemption, thereby exposing certain taxpayers to a denial of services that *they* funded in their own state merely because of their child's protected characteristics.

The MHRA is narrowly tailored to further Maine's interest in preventing the use of public funds to engage in discrimination, because the MHRA "'responds precisely to the substantive problem which legitimately concerns' the State and abridges no more speech . . . than is necessary to accomplish that purpose." *Jaycees,* 468 U.S. at 629 (quoting *City Council of L.A. v. Taxpayers for Vincent*, 466 U. S. 789, 810 (1984)).  The program requirements are limited to Maine schools that choose to participate in the School Tuitioning Program and, in exchange, receive state funds, leaving unregulated schools that elect not to contract with the State. Even as to those schools that elect to participate in the State program, the rules leave participants with wide latitude to make admission

decisions; they simply may not make admission decisions based on protected characteristics.

Any incidental burden the rules impose on speech is no greater than necessary to vindicate the State's interest in preventing state funds from being used to engage in discrimination. As the court in *St. Dominic* noted, the school is still "free to conduct morning prayers however it wants, teach from a Catholic perspective, and promote Catholicism." *St. Dominic*, 2024 WL 3718386, at *28 (citation omitted). The law is "written to encompass discriminatory conduct, and nothing more." *Id.*

## IV. The Consequences Of Accepting Crosspoint's Argument Could Severely Undermine Educational Equality For Historically Marginalized Groups.

When the government provides funding to institutions that discriminate, it "support[s] and endorse[s] them, both by helping them financially and by condoning conduct[.]" Caroline Mala Corbin, *Expanding the Bob Jones Compromise, in* Legal Responses to Religious Practices in the United States 123, 157 (Austin Sarat ed., 2012). In the educational context, it leads to rank inequality among historically marginalized groups.

Accepting Crosspoint's arguments could undermine decades of antidiscrimination laws tied to government funding, which have helped reduce significant and harmful gaps in educational equality and equity. Since at least the

1960s, Congress has addressed discrimination in education by tying financial assistance to compliance with federal antidiscrimination protections. Title VI of the Civil Rights Act of 1964 prohibits discrimination based on race, color, and national origin. 42 U.S.C. §§ 2000d–2000d-7. Title IX of the Education Amendments of 1972 prohibits educational institutions from discriminating based on sex. 20 U.S.C. §§ 1681–1689. Section 504 of the Rehabilitation Act of 1973 prohibits disability discrimination. 29 U.S.C. § 794. The Age Discrimination Act of 1975 prohibits age discrimination. 42 U.S.C. §§ 6101–6107.

These landmark civil rights laws have meaningfully increased participation in American schools for members of historically marginalized groups. Title IX, for example, revolutionized girls' participation in sports by prohibiting gender-based discrimination in school athletic programs. Prior to Title IX, just seven percent of high school athletes were girls. Namarta Vahera, *Impact of Title IX on Women's Participation in Sports*, 3 Int'l J. Physiology, Nutrition & Physical Educ. 512, 517 (2018), https://perma.cc/J926-SAC6. From 2021 to 2022, girls made up 43% of high school athletes. Nat'l Fed'n of State High Sch. Ass'ns, *High School Athletics Participation Survey (2021-22)*, 56, https://perma.cc/64Z8-D9P3 (last visited Oct. 28, 2024).

As another example, lesbian, gay and bisexual students in states with antidiscrimination protections report more safety in schools and better academic

outcomes than in states without antidiscrimination protections. Xavier Fields & Christine Min Wotipka, *Effect of LGBT Antidiscrimination Laws on School Climate and Outcomes for Lesbian, Gay, and Bisexual High School Students*, 19 J. LGBT Youth 321, 323 (2020).

Accepting Crosspoint's arguments could reach far beyond faith, sexual orientation, and gender identity, authorizing discrimination against students based on race, national origin, disability, and other protected characteristics, and dismantling hard-won antidiscrimination protections across the country.

## CONCLUSION

Crosspoint's demands in this case are extraordinary and would upend much of our nation's progress toward educational equality in the last half century. It is critical that Maine retains the latitude to use its financial power to prohibit discrimination and advance equality in its state. For these reasons, we urge this Court to affirm the order denying Crosspoint's preliminary injunction.

Dated: October 28, 2024                    Respectfully submitted,

/s/ Aditi Fruitwala
ADITI FRUITWALA
MICHELLE FRALING
DANIEL MACH
HEATHER WEAVER
American Civil Liberties Union
  Foundation
915 15th St NW
Washington, DC 20005

23

Tel: (202) 457-0800
afruitwala@aclu.org

LOUISE MELLING
American Civil Liberties Union
  Foundation
125 Broad St, 18th Floor
New York, NY 10004
Tel: (212) 549-2637
lmelling@aclu.org

CAROL GARVAN
ZACHARY L. HEIDEN
ANAHITA SOTOOHI
ACLU of Maine Foundation
P.O. Box 7860
Portland, Maine 04112
Tel: (207) 619-8687
cgarvan@aclumaine.org

ALEXANDRA ZARETSKY
Americans United for Separation of
  Church & State
1310 L Street NW, Suite 200,
Washington, DC 20005
Tel: (202) 898-2145
zaretsky@au.org

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because, excluding parts of the brief exempted by Fed. R. App. P. 32(f), this brief contains 5,287 words. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Times New Roman 14-point type.

Dated: October 28, 2024       Respectfully submitted,

/s/ Aditi Fruitwala
ADITI FRUITWALA

*Counsel of Record for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2024, I electronically filed this Amici Curiae Brief with the Clerk of Court using the CM/ECF system, which will send notifications of such filings to all counsel of record.

Dated: October 28, 2024       Respectfully submitted,

/s/ Aditi Fruitwala
ADITI FRUITWALA

*Counsel of Record for Amici Curiae*