No. 24-1590

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

CROSSPOINT CHURCH

*Plaintiff-Appellant*,

v.

A. PENDER MAKIN, IN HER OFFICIAL CAPACITY AS COMMISSIONER
OF THE MAINE DEPARTMENT OF EDUCATION; JEFFERSON ASHBY, IN HIS
OFFICIAL CAPACITY AS COMMISSIONER OF THE MAINE HUMAN RIGHTS COMMISSION;
EDWARD DAVID, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE MAINE
HUMAN RIGHTS COMMISSION; JULIE ANN O'BRIEN, IN HER OFFICIAL CAPACITY
AS COMMISSIONER OF THE MAINE HUMAN RIGHTS COMMISSION; MARK WALKER,
IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE MAINE HUMAN RIGHTS
COMMISSION; THOMAS L. DOUGLAS, IN HIS OFFICIAL CAPACITY AS
COMMISSIONER OF THE MAINE HUMAN RIGHTS COMMISSION,

*Defendants-Appellees*.

Appeal from the U.S. District Court for the District of Maine,
Case No. 1:23-cv-00146; Hon. John A. Woodcock, Jr.

**BRIEF OF *AMICI CURIAE* PUBLIC FUNDS PUBLIC SCHOOLS,
NATIONAL EDUCATION ASSOCIATION, NATIONAL SCHOOL
BOARDS ASSOCIATION, AMERICAN FEDERATION OF TEACHERS,
IN THE PUBLIC INTEREST, FREEDOM FROM RELIGION
FOUNDATION, AMERICAN ATHEISTS, COUNCIL OF PARENT
ATTORNEYS AND ADVOCATES, NETWORK FOR PUBLIC
EDUCATION, PASTORS FOR CHILDREN, AND DISABILITY RIGHTS
MAINE, SUPPORTING DEFENDANTS-APPELLEES AND AFFIRMANCE**

ADAM J. HUNT
TAMARA WIESEBRON
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019-9601
Tel.: (212) 468-8000
AdamHunt@mofo.com
TWiesebron@mofo.com

JENNY XIN
JUSTIN KAREEM REZKALLA
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Tel.: (415) 268-7000
JXin@mofo.com
JRezkalla@mofo.com

*Counsel of Record for Amici Curiae*

JESSICA LEVIN
WENDY LECKER
EDUCATION LAW CENTER
60 Park Place, Suite 3000
Newark, NJ 07102
Tel: (203) 536-7567
JLevin@edlawcenter.org
WLecker@edlawcenter.org

*Counsel of Record for Public Funds
Public Schools*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................... ii

CORPORATE DISCLOSURE STATEMENT .................................................... vii

IDENTITY AND INTEREST OF *AMICI CURIAE* ..................................................1

SUMMARY OF ARGUMENT ..............................................................2

ARGUMENT .........................................................................4

    I.    The State's Core Education Goals Can Only Be Met in Nondiscriminatory Schools .................................................4

        A.    In Some Districts, Maine Fulfills its Duty to Provide Education Through Private "Town Tuitioning" Schools, Which Are Subject to Neutral, Generally Applicable Education Standards.................................................6

        B.    Requiring Maine to Fund Discrimination Defeats the Purpose of Maine's Tuitioning Program and Harms Maine's Children.................................................8

    II.    Conditioning Public Funds on Compliance with Nondiscrimination Standards Is Proper. ...........................................19

        A.    The MHRA's Antidiscrimination Provisions Satisfy the Rational Basis Standard Because They Are Neutral and Generally Applicable ...............................................19

        B.    The MHRA's Antidiscrimination Provisions Also Withstand Strict Scrutiny.............................................24

CONCLUSION.......................................................................27

APPENDIX A .......................................................................28

CERTIFICATE OF COMPLIANCE ....................................................33

CERTIFICATE OF SERVICE ..............................................................34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
  600 U.S. 570 (2023)............................................................17

*AID v. Alliance for Open Soc'y Int'l, Inc.*,
  570 U.S. 205 (2013)............................................................22

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
  458 U.S. 592 (1982)............................................................24

*Berea Coll. v. Commonwealth*,
  94 S.W. 623 (Ky. 1906), *aff'd*, 211 U.S. 45 (1908) ....................15, 18

*Bethel Sch. Dist. No. 403 v. Fraser*,
  478 U.S. 675 (1986)..............................................................9

*Blount v. Dep't of Educ. & Cultural Servs.*,
  551 A.2d 1377 (Me. 1988)......................................................25

*Bob Jones Univ. v. United States*,
  461 U.S. 574 (1983)............................................17, 23, 25, 26

*Bowen v. Roy*,
  476 U.S. 693 (1986)............................................................23

*Brown v. Bd. of Educ.*,
  347 U.S. 483 (1954)..........................................................4, 26

*Carson v. Makin*,
  596 U.S. 767 (2022)..........................................................3, 4, 22

*Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*,
  561 U.S. 661 (2010)............................................................10

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993)....................................................19, 23, 24

*City of Boerne v. Flores*,
521 U.S. 507 (1997), *superseded by statute as stated in Ramirez v. Collier*, 595 U.S. 411 (2022) ...............................................................19

*City of Richmond v. J.A. Croson Co.*,
488 U.S. 469 (1989)......................................................................24

*Does 1-6 v. Mills*,
16 F.4th 20 (1st Cir. 2021)............................................................23

*Donahoe v. Richards*,
38 Me. 379 (1854) ....................................................................24, 25

*Emp. Div., Dep.t of Human Res. of Or. v. Smith*,
494 U.S. 872 (1990)......................................................................19

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021)..................................................................21, 23

*Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rights Comm'n*,
584 U.S. 617 (2018)..................................................................16, 17

*Illinois ex rel. McCollum v. Bd. of Ed. of Sch. Dist.*
*No. 71*, 333 U.S. 203 (1948) .......................................................15

*Newman v. Piggie Park Enterprises, Inc.*,
390 U.S. 400 (1968)..................................................................15, 16

*Norwood v. Harrison*,
413 U.S. 455 (1973)......................................................................25

*Prince v. Massachusetts*,
321 U.S. 158 (1944).......................................................................9

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984)......................................................................24

*Runyon v. McCrary*,
427 U.S. 160 (1976)......................................................................17

*Rust v. Sullivan*,
500 U.S. 173 (1991)......................................................................23

*Santa Fe Indep. Sch. Dist. v. Doe*,
    530 U.S. 290 (2000)........................................................................................15

*Thornton Acad. v. Reg'l Sch. Unit 21*,
    2019 ME 115.................................................................................................5

*W. Chester & Phila. R.R. v. Miles*,
    55 Pa. 209 (1867).....................................................................................15, 18

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943)......................................................................................9

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972)......................................................................................9

**United States Constitution**

U.S. Const. amend. I .............................................................................................15

**Maine Constitution**

Me. Const. art. VIII (1820) ....................................................................................5

Me. Const. art. VIII, pt. 1, § 1 (2023).............................................................*passim*

**Federal Statutes**

20 U.S.C. § 1400....................................................................................................14

20 U.S.C. §§ 1681–1688........................................................................................20

42 U.S.C. § 2000d..............................................................................................16, 20

**Maine Statutes**

20-A M.R.S. § 2901(2) .......................................................................................6, 20

20-A M.R.S. § 2902................................................................................................6

20-A M.R.S. § 4704................................................................................................6

20-A M.R.S. § 6209................................................................................................6

5 M.R.S. § 4553(2-A) ...........................................................................................8

5 M.R.S. § 4601 .................................................................3, 7, 8, 22

5 M.R.S. § 4602(1)(C) ...................................................................13

5 M.R.S. § 4602(5)(C) ...................................................................26

ME LEGIS 188 (2023), 2023 Me. Legis. Serv. Ch. 188 (H.P. 1165)
(L.D. 1833) (WEST)....................................................................8

ME LEGIS 643 (2022), 2022 Me. Legis. Serv. Ch. 643 (S.P. 237)
(L.D. 598) (WEST)......................................................................8

**Other State Statutes**

La. Stat. Ann. §§ 17:4011, 4013, 4021 ..................................................20

Ohio Rev. Code Ann. §§ 3301.16, 3310, 3313.......................................20

**Maine Public Laws**

P.L. 1873, ch. 124, § 4 ................................................................5, 6

P.L. 1987, ch. 578, § 3 ..................................................................7

P.L. 2021, ch. 366, § 19 ...............................................................21

**Executive Orders**

Exec. Order No. 12250, 45 Fed. Reg. 72995 (Nov. 4, 1980) .................................20

**Federal Publications**

Nat'l Museum of African American History and Culture, "The
Struggle Against Segregated Education,"
https://nmaahc.si.edu/explore/stories/struggle-against-segregated-
education ...........................................................................16

National Center for Education Statistics, U.S. Dep't of Educ., *The
Condition of Education 2024*,
https://nces.ed.gov/programs/coe/pdf/2024/CGG_508c.pdf............................14

Office for Civil Rights, U.S. Dep't of Educ., *Civil Rights Data Collection: 2020-2021 A First Look: Students' Access to Educational Opportunities in U.S. Public Schools*, https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/crdc-educational-opportunities-report.pdf .................................................10

**State Publications**

Me. Dep't of Educ., *LGBTQ+ Resources* (2020), https://bit.ly/3AIyuMI .................................................................7, 11

**Other Authorities**

Jaana Juvonen, et al., *When and How Do Students Benefit From Ethnic Diversity in Middle School?*, Nat'l Library of Medicine: Nat'l Center for Biotech. Info. (Jun. 20, 2017) .................................10

Julia Donheiser, *Choice for most: In nation's largest voucher program, $16 million went to schools with anti-LGBT policies*, Chalkbeat (Aug. 10, 2017) ..........................................................12

Katie Reilly and Madeleine Carlisle, *The Supreme Court Could Let Religious Schools Take Taxpayer Money. LGBTQ Alumni Say That's a Mistake*, Time Magazine (Jan. 3, 2022) ..............................12

Public Religion Research Institute, *Increasing Support for Religiously Based Service Refusals* (Jul. 25, 2019), https://www.prri.org/research/increasing-support-for-religiously-based-service-refusals/ .......................................................19

*Religious private schools most segregated in U.S.*, Harvard Gazette (June 25, 2002) ................................................................11

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), *Amici*

state that they have no parent corporations and do not issue stock.

DATED:    October 30, 2024                    Respectfully submitted,

By: */s/ Adam J. Hunt*
     Adam J. Hunt
     250 West 55th Street
     New York, NY  10019-9601
     Telephone:    212.468.8000
     Facsimile:    212.468.7900
     AdamHunt@mofo.com

     *Counsel of Record for Amici Curiae*

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* Public Funds Public Schools, the National Education Association, the American Federation of Teachers, the National School Boards Association, American Atheists, the Council of Parent Attorneys and Advocates, Disability Rights Maine, the Freedom From Religion Foundation, In the Public Interest, the Network for Public Education, and Pastors for Children are committed to ensuring that public education remains the cornerstone of our nation's social, economic, and political structure, and that children of all backgrounds have the right to a public education that gives them a meaningful opportunity to succeed in school and in life, free from discrimination. Detailed statements of interest for each of the *Amici* are set forth in Appendix A.

All parties have consented to the filing of this brief.

---

[1] No party or its counsel had any role in authoring this brief. No person or entity—other than Amicus Curiae and its counsel—contributed money that was intended to fund preparing or submitting this brief.

## SUMMARY OF ARGUMENT

Appellant is asking this Court to sanction unlawful discrimination by requiring the State to reward it with public funds, even as it denies educational opportunities to children based on their sexual orientation, gender identity, or religion. Maine's Constitution explicitly articulates the State's "duty" to provide children access to a free public education. Me. Const. art. VIII, pt. 1, § 1 (2023). As a natural extension of this duty, public education in Maine—whether provided in public schools or through the "town tuitioning" program—has historically been subject to neutral, generally applicable education standards that further the State's objective of providing quality education for all students, free from inequality or disparate treatment. The Maine Human Rights Act ("MHRA") sets forth one such standard, establishing requirements to ensure that all students have the opportunity to participate in publicly funded educational programs free from discrimination based on sex, sexual orientation, gender identity, religion, disability, or race.

Appellant Crosspoint Church and its affiliated non-denominational Christian school (Bangor Christian School, hereafter "BCS") have brought a pre-enforcement action seeking to be excused from compliance with the MHRA's antidiscriminatory requirements, claiming that these requirements may impact their free exercise of religion, including policies stating they will not serve students of certain sexual orientations, gender identities, and religious beliefs.

The MHRA is vital to preserving the benefits of public education for all Maine children, particularly those in rural areas who only have access to a state-funded education at private institutions approved to receive funds through town tuitioning. Antidiscrimination laws enable the State to remove obstacles—such as bullying, harassment, and unfair discipline—that often prevent the most vulnerable students from accessing their right to education. Moreover, these protections promote democratic values that are a fundamental goal of public education in Maine. Absolving town tuitioning schools from antidiscrimination requirements would gravely harm Maine's students and violate their core education rights under Maine's constitution. Moreover, it would undermine the ability of the State to enforce laws protecting the civil rights of its citizens and would threaten a host of government-funded programs, scores of which contain similar nondiscrimination requirements. If religious entities have an unconditional right to public funds free of any neutral, generally applicable rules the government may impose, many such programs will become untenable.

Maine's policy conditioning receipt of public tuition funds on compliance with the MHRA's antidiscrimination provisions, set forth in Title 5, section 4601 of the Maine Statutes, is constitutional.[2] The MHRA's antidiscrimination provisions

---

[2] In *Carson v. Makin*, the Supreme Court held that Maine's non-sectarian requirement for its town tuitioning program violated the Free Exercise Clause of the

pass constitutional muster because they are neutral and generally applicable, and therefore subject to rational basis review. But even if this Court applies a strict scrutiny standard, the MHRA's antidiscrimination provisions should be upheld. Maine's interests are compelling because states have a strong interest in eliminating discrimination in public education programs and ensuring that publicly funded institutions do not discriminate. Moreover, the MHRA's antidiscrimination provisions are narrowly tailored, as they are written to solely encompass discriminatory conduct and, critically, do not apply to religious schools that do not accept public funds.

## ARGUMENT

### I. The State's Core Education Goals Can Only Be Met in Nondiscriminatory Schools

Providing education is "perhaps the most important function of state and local governments." *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954). Since its inception, the Maine Constitution has deemed "[the] general diffusion of the advantages of education [to be] essential to the preservation of the rights and liberties of the

---

First Amendment. 596 U.S. 767, 789 (2022). But the Maine Supreme Court has not had an opportunity to interpret the MHRA as it applies to the updated town tuitioning program, with religious schools now. As such, *Amici* argue that the First Circuit cannot rule on these claims without certifying a question to the Maine Supreme Court as to the scope and applicability of the MHRA to private religious schools. *Amici*'s arguments in this brief apply to the extent that this Court considers these claims now.

people," requiring that every town "support and maint[ain] [] public schools" such that every child in Maine may receive the benefits of a public education. Me. Const. art. VIII (1820); Maine Const. art. VIII, pt. 1, § 1 (2023); *see also Thornton Acad. v. Reg'l Sch. Unit 21*, 2019 ME 115, ¶ 6, 212 A.3d 340, 342 ("By constitutional and statutory mandate, every municipality in Maine must provide for a free public education from kindergarten through grade twelve for all children whose parents reside in that municipality.").

Because of its rural nature, Maine has historically met its constitutional obligation to provide education in some areas through its town tuitioning program. In some circumstances, the program allows school-age children who reside in a municipality that does not operate its own schools to attend a public school in another district or a private school, funded with public education dollars. P.L. 1873, ch. 124, § 4 (available at https://bit.ly/2ZnLudY). To ensure that the program achieves its educational ends, Maine requires private schools that receive public tuitioning funds to comply with certain neutral and generally applicable education standards that further Maine's goal of ensuring every student has the opportunity to receive a high-quality education and that public funds are not used to facilitate state-sanctioned discrimination against Maine's students.

Appellant asks to be absolved from MHRA's antidiscrimination requirements so that its schools may both receive public funds and expressly discriminate against

children and families. The Court cannot rule in Appellant's favor without jeopardizing scores of civil rights laws, as well as the basic and undisputed ability for state governments to place neutral and generally applicable conditions on publicly funded programs. If Maine is not permitted to regulate its town tuitioning program by placing neutral and generally applicable conditions on the receipt of public funds, it is questionable whether Maine can continue to operate the program at all.

> **A.** **In Some Districts, Maine Fulfills its Duty to Provide Education Through Private "Town Tuitioning" Schools, Which Are Subject to Neutral, Generally Applicable Education Standards.**

For geographic and historical reasons, many school districts in Maine do not operate their own public schools. Maine launched its town tuitioning program in 1873, pursuant to which School Administrative Units ("SAUs") without a local public school could use public funds to subsidize resident students' tuition at an approved private school of the parent's choice. P.L. 1873, ch. 124, § 4 (available at https://bit.ly/2ZnLudY).

Maine has long required private K-12 schools to comply with neutral and generally applicable requirements in order to receive the public funds made available through town tuitioning. For instance, private schools adhere to health and safety laws, teacher certification requirements, class size limits, curriculum guidelines, and other requirements governing the quality of education. *See* 20-A M.R.S. §§ 2901(2),

2902, 4704, 6209. These requirements do not target religious practices, nor are they motivated by religious animus.

The MHRA's antidiscrimination provisions are no different. Maine's system of public education operates from the core value that "*every* student deserves a safe and equitable school environment."[3] Accordingly, Maine schools have been required to comply with the MHRA since the Act was expanded to prohibit discrimination in education in 1987. P.L. 1987, ch. 578, § 3. Since then, the MHRA has guaranteed students the opportunity to participate in all educational programs without discrimination because of sex, sexual orientation, physical or mental disability, national origin, or race.[4] P.L. ch. 366, Laws of the State of Maine, 130th Legislature, 5 M.R.S. § 4601.[5] In 2021, the Maine Legislature amended the MHRA to add explicit protections for students of different "gender identit[ies]," "ancestr[ies]," "color[s]," and "religions." *Id.*; 5 M.R.S. § 4601. This was not a one-off amendment: Maine regularly updates the MHRA as it becomes aware of

_____

[3] Me. Dep't of Educ., *LGBTQ+ Resources* (2020), https://bit.ly/3AIyuMI (last visited Oct. 29, 2024) (emphasis added).
[4] Though the MHRA amendments on gender identity were codified in 2021, Maine has long been committed to protecting different gender identities. The definition of "sexual orientation" that was added to the MHRA in 2005 included gender identity. See Ord. re: Mot. for Prelim. Inj., ECF No. 41 at 36 (citing P.L. 2005, ch. 10) ("'Sexual orientation' means a person's actual or perceived heterosexuality, bisexuality, homosexuality or gender identity or expression").
[5] Available at https://lldc.mainelegislature.org/Open/Laws/2021/2021_PL_c366.pdf.

specific needs.[6]  Moreover, the MHRA's provisions concerning "educational institution[s]" include "any public school or educational program," including those that are private but are "approved for tuition purposes," whether they are affiliated with a religious organization or not.[7]  5 M.R.S. § 4553(2-A).  Thus, these neutral and generally applicable civil rights requirements apply to *all* Maine K-12 schools that participate in the tuitioning program, ensuring that *all* Maine students can receive a publicly funded education free from discrimination.[8]

## B. Requiring Maine to Fund Discrimination Defeats the Purpose of Maine's Tuitioning Program and Harms Maine's Children

The State's obligation to provide public education is one of its most fundamental responsibilities.  Maine Const. art. VIII, pt. 1, § 1 (2023).  As the U.S.

---

[6] In 2022, Maine amended the MHRA to clarify that discriminating based on traits associated with particular races, such as hairstyles, constitutes race discrimination under the Act.  ME LEGIS 643 (2022), 2022 Me. Legis. Serv. Ch. 643 (S.P. 237) (L.D. 598) (WEST).  And in 2023, Maine altered its definition of "educational institution" to include single-sex private schools approved for tuition purposes.  See ME LEGIS 188 (2023), 2023 Me. Legis. Serv. Ch. 188 (H.P. 1165) (L.D. 1833) (WEST).

[7] Prior to 2021, religious schools received an exemption from antidiscrimination requirements pertaining to sexual orientation.  The 2021 amendment to the MHRA revoked this exemption for schools receiving public funding.  P.L. ch. 366, available at https://lldc.mainelegislature.org/Open/Laws/2021/2021_PL_c366.pdf;  Ord. re: Mot. for Prelim. Inj., ECF No. 41 at 35-36.

[8] The MHRA provisions are generally applicable even if they do not apply to schools outside Maine or to private in-state postsecondary schools.  As Appellees argue in their brief, Maine has no jurisdiction to regulate conduct outside of its borders, and post-secondary education is not similarly situated to primary and secondary schools.  Appellees' Br. at 23-24, 43-44.  More importantly, the MHRA applies equally to religious and non-religious schools.  *Id.*

Supreme Court has acknowledged, education is the gateway to participating fully in our democracy. *See Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972) ("Providing public schools ranks at the very apex of the function of a State."); *Prince v. Massachusetts*, 321 U.S. 158, 168 (1944) ("A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens, with all that implies."). The U.S. Supreme Court has also long affirmed the value in keeping schools free from discrimination, writing that "[f]ree public education, if faithful to the ideal of secular instruction and political neutrality, will not be partisan or enemy of any class, creed, party, or faction." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943). Eliminating discrimination in publicly funded education both instills fundamental democratic values in all students and protects students from discriminatory practices—including bullying, harassment, exclusion from school, unfair discipline, or unequal treatment—that are antithetical to those democratic values.

Adopting antidiscrimination laws also promotes diverse student bodies conducive to the communal educational experience. Diversity helps instill those "fundamental values . . . essential to a democratic society . . . includ[ing] tolerance of divergent political and religious views. . . ." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 681 (1986). The Supreme Court has acknowledged that when schools adopt and enforce antidiscrimination policies, they allow all students to participate,

in turn promoting the goals of education for all students. *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 688 (2010). Research bears this out and has shown that ethnic diversity in school makes students of color feel safer and less lonely, increases perceptions that teachers are treating students fairly and equally, and reduces the degree to which students prefer their own ethnic group relative to other groups.[9] There is no way for the State to further these goals if it grants broad exemptions to the perpetrators of discrimination, regardless of the grounds they cite to justify that discrimination.

By contrast, permitting state-sponsored discrimination directly undermines the goals of public education, requiring the State to pay for a message that certain students and their families are not entitled to the same rights and respects as others. Public education is particularly vital to students of color, students with disabilities, and LGBTQ+ students, who depend on publicly funded schools at higher rates than their peers.[10] Antidiscrimination protections for these vulnerable groups are crucial for student safety and educational achievement. Yet the logic Appellant advances in its effort to force Maine to provide public funding to schools that explicitly

---

[9] Jaana Juvonen, et al., *When and How Do Students Benefit From Ethnic Diversity in Middle School?*, Nat'l Library of Medicine: Nat'l Center for Biotech. Info. (Jun. 20, 2017), *available at* https://pubmed.ncbi.nlm.nih.gov/28631304/.

[10] *See* Office for Civil Rights, U.S. Dep't of Educ., *Civil Rights Data Collection: 2020-2021 A First Look: Students' Access to Educational Opportunities in U.S. Public Schools*, https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/crdc-educational-opportunities-report.pdf (last visited Oct. 30, 2024).

discriminate threatens a slippery slope of publicly funded discrimination against LGBTQ+ students, as well as other vulnerable and protected classes of students, such as students with disabilities, religious students, and students of color. Forcing Maine to issue wholesale exemptions from the MHRA's neutral and generally applicable requirements to any religious school that objects to these requirements will lead to increased bullying and harassment of marginalized students, as well as subject them to discriminatory school admissions and disciplinary policies funded by the State. This is fundamentally inconsistent with Maine's constitution and laws.

### 1. LGBTQ+ students

LGBTQ+ students in particular are more likely to be bullied or harassed and report more anxiety and depression than students who do not identify as LGBTQ+.[11] That bullying and harassment is directly related to pervasive cultural stigma and negative stereotypes about their identity.[12] Private schools, including those in Maine, routinely use policies like dress codes to exclude students based on gender and gender identity.[13] Such discrimination is especially prevalent in religious

---

[11] *See supra*, *Me. Dep't of Educ., LGBTQ+ Resources* at *Maine's LGBTQ+ Youth Make Up A Significant Percentage of Students*, https://bit.ly/3AIyuMI (finding that 37% of Maine LGBTQ+ students were bullied and/or harassed on school property in 2019, compared to 21% of all students).

[12] *Id.*

[13] *See, e.g.*, *Religious private schools most segregated in U.S.*, Harvard Gazette (June 25, 2002), https://bit.ly/3pGQGEW; Lisbon Falls Christian Academy, *Student Handbook* at 10 (updated Aug. 3, 2017), https://bit.ly/3mp4Jg3 (stating that the

private schools.[14] As one notable example, LGBTQ+ students at BCS, the very school at issue here, have reported instances of targeted harassment and bullying from administrators and teachers, including being threatened with expulsion unless they promised to hide their sexuality, offered conversion therapy, and told that they could not be both Christian and gay.[15]

_____

school "supports the emphasis of the Christian home in matters of modesty of dress, hair styles, and good grooming."); Hartland Christian Academy, 2021-2022 *School Handbook* at 19, https://bit.ly/3molPKY.

[14] *See* Julia Donheiser, *Choice for most: In nation's largest voucher program, $16 million went to schools with anti-LGBT policies*, Chalkbeat (Aug. 10, 2017), available at https://www.chalkbeat.org/2017/8/10/21107318/choice-for-most-in-nation-s-largest-voucher-program-16-million-went-to-schools-with-anti-lgbt-polici/ (finding that one in 10 of Indiana's voucher schools, receiving over $16 million in public funds in 2016, publicly shared a policy suggesting or declaring that LGBT students are not welcome); Lisbon Falls Christian Academy, *supra*, at 5; *see also* Greater Houlton Christian Academy, *GHCA Family Handbook* 2024-2025, https://www.ghca.com/images/forms_docs/2024-2025GHCAFamilyHandbook.pdf ("We also believe that any form of homosexuality, lesbianism, bisexuality, bestiality, incest, fornication, adultery and pornography are sinful perversions of God's gift of sex. . . ."); Pine Tree Academy, Handbook at 8-9 (Sept. 10, 2021), https://bit.ly/3EuPoB4 (stating that the school "does not admit individuals who engage in sexual misconduct, which includes . . . homosexual conduct"); Open Door Christian Academy, *2024-2025 Student Handbook* at 7 (2020), https://odbc-school.com/wp-content/uploads/2022/04/2024-2025-Student-Handbook-EDIT-1.pdf ("We believe that God disapproves of and forbids any attempt to alter one's gender by surgery or appearance."); Greater Portland Christian School, Greater Portland Christian School Catalog at 47, https://tinyurl.com/9dckj3tc (last visited Oct. 29, 2024) (stating that the school does not accept "children with current major learning difficulties (i.e., children who have been involved in special education programs) . . . . [or] major emotional problems").

[15] Katie Reilly and Madeleine Carlisle, *The Supreme Court Could Let Religious Schools Take Taxpayer Money. LGBTQ Alumni Say That's a Mistake*, Time Magazine (Jan. 3, 2022), available at https://time.com/6129283/bangor-christian-schools-lgbtq-carson-makin/.

## 2. Pregnant students

Some private religious schools have also threatened to suspend or expel pregnant students protected under the MHRA for religious reasons. For example, one religious school in Maine states that "[p]ossible consequences" for student pregnancy include "suspension," "expulsion," or a requirement to complete all education from home, in which case the student must forfeit all leadership positions.[16] That policy not only violates the MHRA's antidiscrimination requirements, which prohibit the "exclu[sion] [of] any person from any program or activity because of pregnancy or related conditions," 5 M.R.S. § 4602(1)(C), but also undermines Maine's constitutionally mandated duty to "make suitable provision . . . for the support and maintenance of public schools" for all children in the state. Maine Const. art. VIII, pt. 1, § 1.

## 3. Students with disabilities

Granting town tuitioning schools exemptions to the MHRA such that they may discriminate against children and families on the basis of sexual orientation or gender identity also threatens to excuse—and even condone—publicly funded discrimination against and segregation of students with disabilities. The State is required to guarantee students with disabilities the opportunity to participate in all

---

[16] Greater Houlton Christian Academy, *supra*, *GHCA Family Handbook* 2024-2025 at 28.

educational programs without discrimination.[17]  Yet many private religious schools

have a track record of overt discrimination against students with disabilities.  *See,*

*e.g.*, Greater Portland Christian School, Greater Portland Christian School Catalog

at 47 (stating that the school does not accept "children with current major learning

difficulties (i.e., children who have been involved in special education programs) . .

. . [or] major emotional problems"); Sanford Christian Academy, 2020-2021 Parent-

Student Handbook at 3 (2020), *available at* https://bit.ly/3jMb7fL (last visited Oct.

29, 2024) ("The academic programs at SCA are designed for average and above

average students.  No provisions are available for mentally handicapped children or

children with severe learning or behavioral [*sic*] (IEP) disabilities").

4.    **Religious students**

The  MHRA's  antidiscrimination  provisions  aim  to  eradicate  a  form  of

discrimination even Appellant acknowledges has no place in publicly funded school

systems—religious discrimination.  Public education has long been a protected right

for  students  of  all  religious  backgrounds.   While  the  U.S.  Constitution's  Free

Exercise Clause protects the ability of religious schools to educate in accordance

---

[17] Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400.  Maine
is one of three states with the highest percentage of students receiving IDEA services
of all 50 states in the 2022-23 school year.  *See* National Center for Education
Statistics,  U.S.  Dep't  of  Educ.,  *The  Condition  of  Education  2024*,
https://nces.ed.gov/programs/coe/pdf/2024/CGG_508c.pdf  (last  visited  Oct.  29,
2024) (noting that 21% of public-school students in Maine receive services under
the IDEA, the highest percentage in all 50 states).

with their faith, the Establishment Clause prohibits public schools from discriminating against students based on their religion. *See* U.S. Const. amend. I; *Illinois ex rel. McCollum v. Bd. of Ed. of Sch. Dist. No. 71*, 333 U.S. 203, 232 (1948) (invalidating practice of having religious instructors from different denominations enter public schools to offer religious lessons during the school day to students whose parents requested them); *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 312 (2000) (finding student-led, student-initiated prayer at football games violates the Establishment Clause). Exempting certain religious schools from the MHRA thus paves the way for publicly funded discrimination against students of other religions.

### 5. Racially diverse students

The exemption Appellant seeks from the MHRA for publicly funded religious schools also threatens to open the door to a long-rejected history of religiously motivated racial discrimination. One can imagine schools singling out students for scrutiny and disparate treatment simply because they are of a different race or ethnic background.[18] The U.S. Supreme Court has categorically forbidden such conduct, *see, e.g.*, *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 n.5 (1968)

_____

[18] *See, e.g., Berea Coll. v. Commonwealth*, 94 S.W. 623, 626 (Ky. 1906), *aff'd*, 211 U.S. 45 (1908) (upholding a law prohibiting integrated schools because "separation of the human family into races, distinguished . . . by color . . . is as certain as anything in nature" and is "divinely ordered"); *see also W. Chester & Phila. R.R. v. Miles*, 55 Pa. 209, 209, 213 (1867) (justifying segregation on railroads because "the Creator" made two distinct races and "He intends that they shall not overstep the natural boundaries He has assigned to them").

(per curiam), and backsliding on these principles must be diligently avoided. There is no denying this nation's sordid history of racial discrimination in education.[19] Since *Brown v. Board of Education*, the United States has instituted broad legal protections against racial discrimination in schools, including Title VI of the Civil Rights Act, under which not only public schools but also *private schools* that accept federal funds are prohibited from discriminating on the basis of race, color, or national origin. 42 U.S.C. § 2000d *et seq.*

The U.S. Supreme Court has likewise rejected arguments that religious rights trump the government's interest in preventing racial discrimination. *See Newman*, 390 U.S. at 402 n.5 (rejecting business owner's constitutional challenge to the Civil Rights Act's bar on racial discrimination in public accommodations based on his view that racial integration "contraven[ed] the will of God"); *see also Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rights Comm'n*, 584 U.S. 617, 631 (2018) (citing *Newman*, 390 U.S. at 402 n. 5) (recognizing that "while . . . religious and philosophical objections are protected, it is a general rule that such objections do not allow [actors] in society to deny protected persons equal access to goods and services

---

[19] *See, e.g.*, Nat'l Museum of African American History and Culture, "The Struggle Against Segregated Education," https://nmaahc.si.edu/explore/stories/struggle-against-segregated-education (last visited Aug. 7, 2024).

under a neutral and generally applicable public accommodations law").[20]

In the education context, the Court has stated unambiguously that even assuming "parents have a right to send their children to schools that promote the belief that racial segregation is desirable, and that the children have a right to attend such schools, *it does not follow that the Practice of excluding racial minorities from such schools is also protected by the same principle*." *Runyon v. McCrary*, 427 U.S. 160, 161 (1976) (emphasis added); *see also Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983) (rejecting private, federally funded university's challenge to the denial of tax-exempt status for violating prohibition on racial discrimination based on the university's religious conviction that the Scriptures forbid interracial dating and marriage).

In *Masterpiece Cakeshop*, the Court understood that broad exceptions to antidiscrimination laws would result "in a community-wide stigma inconsistent with the history and dynamics of civil rights laws that ensure equal access to goods, services, and public accommodations." 584 U.S. at 632. The same principle applies here: adopting Appellant's reasoning threatens to thrust society back into a

---

[20] Unlike the situation in *303 Creative LLC v. Elenis*, here, Appellant is not being compelled to speak or promote views inconsistent with their religious commitments. 600 U.S. 570, 595 (2023). In this instance, there is no arrangement between private parties. Instead, Maine is the purchaser of an essential service (e.g., public education) that it is constitutionally obligated to provide for its citizens. Maine not only can, but must be able to, set reasonable limits on the types of education it will pay for to fulfill this constitutional duty.

long-rejected era of racial discrimination in schools justified by religion. *See Berea Coll.*, 94 S.W. at 626 (upholding a law prohibiting integrated schools because "separation of the human family into races, distinguished . . . by color . . . is as certain as anything in nature" and is "divinely ordered"); *see also W. Chester & Phila. R.R.*, 55 Pa. at 213 (justifying segregation on railroads because "the Creator" made two distinct races and "He intends that they shall not overstep the natural boundaries He has assigned to them").

\*       \*       \*

Permitting Maine's town tuitioning schools to discriminate against children and families on the basis of sexual orientation or gender identity is not only abhorrent in and of itself, it is also just the tip of the iceberg; the logic used to excuse it threatens a slippery slope of publicly funded discrimination and segregation against other vulnerable groups of students. The MHRA's prohibitions against discrimination are engineered to prevent this precise backsliding and to ensure the protection of all students receiving a publicly funded education. Critically, no school is obligated to participate in the tuitioning program. But if a school does desire to participate, it must comply with the program's nondiscrimination requirements. To permit anything else would defeat the very purpose of the tuitioning program, which is to provide a publicly funded education to Maine students that allows each of them to participate fully in school and prepares them to participate fully in society. The

danger of allowing the exemptions requested here is particularly apparent given the increasingly visible demands by some religious organizations not to treat certain individuals with the rights and respect that the State otherwise requires them to receive.[21]

## II. Conditioning Public Funds on Compliance with Nondiscrimination Standards Is Proper.

### A. The MHRA's Antidiscrimination Provisions Satisfy the Rational Basis Standard Because They Are Neutral and Generally Applicable

It is well established that states have the power to condition public funding on compliance with neutral, generally applicable nondiscrimination requirements. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) (citing *Emp. Div., Dep.t of Human Res. of Or. v. Smith*, 494 U.S. 872 (1990), *superseded by statute as stated in Ramirez v. Collier*, 595 U.S. 411, 424 (2022)); *City of Boerne v. Flores*, 521 U.S. 507, 514 (1997) ("[N]eutral, generally applicable laws may be applied to religious practices even when not supported by a compelling governmental interest."), *superseded by statute as stated in Ramirez v. Collier*, 595 U.S. at 424. These neutral and generally applicable nondiscrimination requirements are particularly appropriate where the government makes public funds available to

---

[21] *See, e.g.*, Public Religion Research Institute, *Increasing Support for Religiously Based Service Refusals* (Jul. 25, 2019), https://www.prri.org/research/increasing-support-for-religiously-based-service-refusals/.

provide a core government function, such as K-12 education.

Just as a state may constitutionally condition tuition assistance on a private institution meeting curriculum standards, as Maine and other states do,[22] it may also require compliance with neutral, generally applicable nondiscrimination requirements. Indeed, the federal government and the states have long required that publicly funded programs not discriminate on the basis of race, color, national origin, sex, religion, disability, age, and in many cases, sexual orientation and identity. *See, e.g.*, 42 U.S.C. § 2000d (Title VI, § 601 of the Civil Rights Act of 1964, prohibiting discrimination on the basis of race, color, and national origin in programs and activities receiving federal financial assistance); 20 U.S.C. §§ 1681– 1688 (Title IX, prohibiting sex-based discrimination in any school or any education program that receives federal funds); Exec. Order No. 12250, 45 Fed. Reg. 72995 (Nov. 4, 1980) (providing for the consistent and effective implementation of various laws prohibiting discriminatory practices on the basis of race, color, national origin, sex, disability, or religion in programs and activities receiving federal financial assistance); Appellant's Opening Brief, 17 (discussing Maine's prohibition on public funding of private schools that discriminate on the basis of sexual orientation in hiring).

---

[22] *See* 20-A M.R.S. §§ 2901(2), 2902, 4704, 6209; *see also, e.g.*, Ohio Rev. Code Ann. §§ 3301.16, 3310, 3313; La. Stat. Ann. §§ 17:4011, 4013, 4021.

States cannot apply nondiscrimination conditions unevenly, such as allowing exceptions for secular but not religious reasons. *See Fulton v. City of Philadelphia,* 593 U.S. 522, 542 (2021). But governments are not required to compromise their "weighty" interest in ensuring that the benefits of public funds are available on an equal basis. *See id.*

The MHRA's antidiscrimination provisions are facially neutral. They do not target religious practice, nor are they motivated by religious animus. Moreover, the provisions are generally applicable. They apply to all schools that receive public funding from the State, without exception.[23] *Every* K-12 school that receives public funds—whether public or private, religious or not—is prohibited from discriminating on the basis of sex, sexual orientation or gender identity, physical or mental disability, ancestry, national origin, race, color, or religion. *See* P.L. 2021, ch. 366, § 19. Simply put, a religious school that discriminates would receive the *same* treatment as a secular private school that discriminates. Accordingly, Appellant's suggestion that the MHRA's antidiscrimination provisions cannot be neutral are directly controverted by the law's plain language. Although Appellant suggests the MHRA *perpetuates* religious discrimination, Appellant's Br. at 29, its provisions in fact explicitly *prohibit* discrimination based on religion. *See* 5 M.R.S.

---

[23] As discussed, the MHRA provisions are generally applicable even if they do not apply to schools outside Maine or to private in-state postsecondary schools. *See supra* n.6; Appellees' Br. at 23-24, 43-44.

§ 4601. Moreover, given the posture of this case, a pre-enforcement challenge to the application of nondiscrimination requirements that Appellant fears may someday prevent it from an unspecified exercise of religious faith, the ruling Appellant seeks would effectively create a blanket exemption from the MHRA for any school for any religious purpose.

Appellant's attempts to liken this case to *Carson v. Makin* are inapposite. In *Carson*, the Supreme Court held that "there is nothing neutral about" wholly barring religious schools from the receipt of publicly funded tuition payments. 596 U.S. at 781. In so holding, the Court emphasized that "the Free Exercise Clause forbids discrimination on the basis of religious status." *Id.* at 787. But here, unlike in *Carson*, religious schools can receive *and are receiving* public funds from the State for the purpose of providing religious education for students. BCS's religious identity or practice is not what prevents it from receiving public funds; it is BCS's insistence on both receiving public funds *and* discriminating that precludes it from participating in the program. Indeed, if a school "objects to a condition on the receipt of federal funding, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the [school's] exercise of its First Amendment rights." *AID v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013).

The MHRA does not burden, even incidentally, Crosspoint's religious

practices in violation of the Free Exercise Clause.[24] Even if it did, Appellant's suggestion that incidental effects on its exercise of religion render the MHRA's antidiscrimination provisions unconstitutional is contrary to binding precedent. "When a religiously neutral and generally applicable law incidentally burdens free exercise rights, [this Circuit] will sustain the law against constitutional challenge if it is rationally related to a legitimate governmental interest." *Does 1-6 v. Mills*, 16 F.4th 20, 29 (1st Cir. 2021) (citing *Fulton*, 141 S. Ct. at 1876); *see also Church of Lukumi Babalu Aye, Inc.*, 508 U.S. at 531. Importantly, a burden on religious expression (incidental or not) is not in and of itself cause to render a law unconstitutional. *See, e.g.*, *Bowen v. Roy*, 476 U.S. 693, 702 (1986); *Bob Jones Univ.*, 461 U.S. at 603.

While private schools are entitled to hold values inconsistent with a state's antidiscrimination laws, they are not entitled to the government's financial assistance in discrimination. *See Rust v. Sullivan*, 500 U.S. 173, 193 (1991) ("[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right." (alteration in original and citation omitted)). The public funds that support the tuitioning program are collected from all citizens, without regard to

---

[24] As Appellees make clear, Crosspoint is still free to teach however it likes, including by instilling its religious beliefs in its students. Appellant's argument that the presence of a child who is gay, transgender, or who otherwise does not share its religious beliefs would burden its religious exercise strains credulity.

race, national origin, religion, sex, disability, sexual orientation, or gender identity. Maine has a legitimate interest in ensuring those funds are made available to constituents free from discrimination. *See Church of Lukumi Babalu Aye, Inc.*, 508 U.S. at 535. And the State has more than a legitimate interest in fulfilling the state constitutional duty of providing education that is open and accessible to all. *See supra* Section I; Me. Const. art. VIII, pt. 1, § 1; *Donahoe v. Richards,* 38 Me. 379, 390 (1854). In short, Maine properly exercises its powers when it restricts the receipt of public funding for education to those schools that comply with the MHRA.

**B.     The MHRA's Antidiscrimination Provisions Also Withstand Strict Scrutiny.**

Even if this Court finds that the MHRA is not neutral or generally applicable, the law should still be upheld because it passes strict scrutiny.

Maine's interest in eliminating discrimination within publicly funded institutions is compelling. As demonstrated above, *supra* Section II.A, there can be no dispute that states have a compelling interest in eliminating discrimination. *See also Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 609 (1982) (finding states have a "substantial interest" in protecting their citizens from "the political, social, and moral damage of discrimination"); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984) (eliminating discrimination "plainly services compelling state interests of the highest order"). Indeed, states have an even greater interest in ensuring that publicly funded institutions do not discriminate. *See City of Richmond v. J.A.*

*Croson Co.*, 488 U.S. 469, 492 (1989) ("It is beyond dispute that any public entity, state or federal, has a compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice."); *Norwood v. Harrison*, 413 U.S. 455, 463 (1973) ("That the Constitution may compel toleration of private discrimination in some circumstances does not mean that it requires state support for such discrimination.").

Moreover, Maine has a compelling interest, under the education clause of the state constitution, Me. Const. art. VIII, pt. 1, §1, in ensuring that all children receive an adequate education. *Blount v. Dep't of Educ. & Cultural Servs.*, 551 A.2d 1377, 1382 (Me. 1988). An essential component of the State's affirmative constitutional duty is the guarantee that the education options it provides are open to all children. *Donahoe*, 38 Me. at 390 ("[U]nder our constitution, every child has a right to receive instruction at the public schools; . . . every parent has a right to have his child there taught."). Thus, the nondiscrimination requirements in the MHRA further Maine's compelling interest to provide publicly funded education to all students.[25]

The Supreme Court's decision in *Bob Jones University* is instructive. There,

---

[25] If Appellant succeeds, some students, including students of certain identities, will have few to no public education options, particularly if they live in rural areas where they might only have access to public education at private institutions approved to receive state funds through Maine's "town tuitioning" program. As outlined above, forcing students of certain identities to be subject to discriminatory practices in order to access education will cause irreparable harm to those students. *See supra* Section I.B.

private religious universities challenged an IRS policy that made private schools with racially discriminatory admissions policies ineligible for tax-exempt status. In so doing, the universities argued that their racially discriminatory policies qualified as protected free exercise based on sincerely held religious beliefs, not unlike the Petitioner in this case. *See* 461 U.S. at 579-585, 602-03. But the Supreme Court rejected the religious college's challenge, finding that the government had a "compelling," "fundamental," and "overriding" interest in eliminating racial discrimination in education. *Id.* at 604.[26]

The MHRA is also narrowly tailored. Its antidiscrimination provisions do not apply to religious schools that do not accept public funds. 5 M.R.S. § 4602(5)(C). And, as noted above, private religious schools are not barred from the tuitioning program due to religious status nor prohibited from engaging in religious activity. They are only ineligible for the program if they insist on discriminating against students in violation of the MHRA. *See id.* Simply put, the antidiscrimination provisions are narrowly tailored because they are written to encompass discriminatory conduct within the confines of participation in state funded programs, and nothing more. *See Bob Jones Univ.*, 461 U.S. at 604 (finding "no less restrictive means are available" to eradicate discrimination in education than denying tax

---

[26] Because *Bob Jones University* was decided before *Brown*, the Court applied strict scrutiny. Today, the IRS ruling would likely be upheld as a neutral law of general applicability.

benefits (internal citation omitted)).

Accordingly, even if this Court does not consider the MHRA neutral or generally applicable, this Court should still uphold the MHRA under a strict scrutiny standard.

## CONCLUSION

For the foregoing reasons, the District Court's judgment should be affirmed.

DATED:  October 30, 2024                    Respectfully submitted,


By: */s/ Adam J. Hunt*
     Adam J. Hunt
     250 West 55th Street
     New York, NY  10019-9601
     Telephone:    212.468.8000
     Facsimile:    212.468.7900
     AdamHunt@mofo.com

     *Counsel of Record for Amici Curiae*

**Public Funds Public Schools** ("PFPS") is a national campaign to ensure that public funds for education are used to maintain, support, and strengthen public schools. PFPS opposes all forms of private school vouchers and other diversions of public funds to private education. PFPS is a partnership between Education Law Center ("ELC") and the Southern Poverty Law Center ("SPLC"). ELC, based in Newark, New Jersey, is a nonprofit organization founded in 1973 that pursues justice and equity for public school students by enforcing their right to a high-quality education in safe, equitable, non-discriminatory, integrated, and well-funded learning environments. SPLC, based in Montgomery, Alabama, is a nonprofit civil rights organization founded in 1971 that serves as a catalyst for racial justice in the South and beyond, working to advance human rights. PFPS has participated as *amicus curiae* before numerous state and federal courts in matters involving issues similar to those presented in this case.

**The National Education Association** ("NEA") is the largest union in the country, which represents three million educators who serve our nation's students in public schools, colleges, and universities. Since its founding over a century and a half ago, NEA has worked to create, expand and strengthen the quality of public education available to all children. NEA is committed to ensuring a strong public education system as the foundation of our vibrant, multiracial democracy.

Consistent with NEA's commitment that public schools prepare every student to succeed in a diverse and interdependent world, NEA frequently appears as amicus in support of the rights of all students to fair treatment.

**The American Federation of Teachers** ("AFT"), an affiliate of the AFL-CIO, was founded in 1916 and today represents 1.8 million members in more than 3,500 local affiliates nationwide. Since its founding, the AFT has been a major force for America's democracy and for preserving and strengthening America's commitment to public education and to educational opportunity for all. AFT's K-12 members are committed to providing their students with the highest quality public education consistent with the standards set by the local, state, and federal government. AFT frequently submits amicus briefs in cases that directly impact public school education.

**The National School Boards Association** ("NSBA"), founded in 1940, is a nonprofit organization ensuring that each student everywhere has access to excellent and equitable public education governed by high-performing school board leaders and supported by the community. NSBA regularly represents its members' interests before Congress and federal courts and has participated as amicus curiae in numerous cases addressing public schools.

**American Atheists** is a national civil rights organization dedicated to equality for atheists and other nonreligious people. We protect the rights of

atheists, advance social inclusion, and empower nonreligious people through advocacy, education, and community building.  American Atheists defends the right of every student to receive a secular public education and seeks to end discrimination and stigma against nonreligious students.

      **The Council of Parent Attorneys and Advocates** ("COPAA") is a nonprofit organization for parents of children with disabilities, their attorneys, and their advocates.  COPAA believes that effective educational programs for children with disabilities can be developed and implemented only with collaboration between parents and educators.  To make this happen, COPAA provides resources, training, and information to help parents, advocates, and attorneys get the free appropriate public education to which the law guarantees children with disabilities.

      **Disability Rights Maine** ("DRM") is the agency designated by the Governor of Maine under federal law to protect and advocate for the rights of individuals with disabilities in the State of Maine.  DRM represents many students each year to enforce their rights to equal educational opportunity.  As such, the population we represent has a direct interest in what is at stake in this case—a request by a school receiving federal funding to be exempt from laws prohibiting discrimination, including discrimination based on disability.

      **The Freedom From Religion Foundation** ("FFRF") is a nationally recognized 501(c)(3) nonprofit with the purposes to educate the public about

nontheism and to preserve the constitutional principle of separation between religion and government. FFRF has about 40,000 U.S. members, including more than 200 members in Maine and a Maine chapter. As a secular organization that promotes freedom of conscience for those who do not practice religion, FFRF opposes the erosion of our secular public education systems and preferential treatment of religious organizations by the government.

**In the Public Interest** ("ITPI"), founded in 2010, is a project of PowerSwitch Action (a 501(C)(3) nonprofit organization) that focuses on strengthening, protecting and expanding access to broad array of public goods. ITPI conducts research and develops policy ideas to ensure public control over important public goods and services. ITPI also advocates for creating high quality, equitable, public education system that is available for every child in the country and that is an essential bedrock of a healthy democracy. ITPI has produced a wide-ranging series of studies, briefs and fact sheets on how school vouchers create obstacles to achieving those goals.

**The Network for Public Education** ("NPE") is a nonprofit advocacy group whose mission is to preserve, promote, improve and strengthen public schools for both current and future generations of students. We have 350,000 members and coordinate more than 200 Grassroots groups. We resist the expansion of publicly-funded alternatives that divert funding and students from our public schools;

believe all publicly funded schools must include all students; and strongly oppose all discrimination in school entry requirements, regardless of rationale.

**Pastors for Children** is a nationwide network of faith leaders and community partners dedicated to school service and fair and equitable public school funding. Pastors for Children believes that that God desires a quality education for every child. Pastors for Children also believes we must keep government out of our fine private and church schools.

# CERTIFICATE OF COMPLIANCE

I certify that his brief complies with the type-volume limitation of Rule 29(a)(5) and 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 6355 words, excluding the parts of the brief exempted by Rule 32(f). I further certify that this brief complies with the typeface requirements of Rule 32(a)(5)(A) and the type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word Version 16.88 in 14-point Times New Roman font, a proportionally spaced typeface.

DATED:     October 30, 2024

*/s/ Adam J. Hunt*

Adam J. Hunt
250 West 55th Street
New York, NY 10019-9601
Telephone:     212.468.8000
Facsimile:     212.468.7900
AdamHunt@mofo.com

*Counsel of Record for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system on October 30, 2024.

I hereby certify that all participants in the case are registered CM/ECF users and that services will be accomplished by the appellate CM/ECF system.

DATED:    October 30, 2024

*/s/ Adam J. Hunt*
Adam J. Hunt
250 West 55th Street
New York, NY 10019-9601
Telephone: 212.468.8000
Facsimile: 212.468.7900
AdamHunt@mofo.com

*Counsel of Record for Amicus Curiae*