# United States Court of Appeals
## For the First Circuit

No. 24-1590

CROSSPOINT CHURCH,

Plaintiff, Appellant,

v.

A. PENDER MAKIN, in her official capacity as Commissioner of the
Maine Department of Education; MEGAN SANDERS,* in her official
capacity as Commissioner of the Maine Human Rights Commission;
EDWARD DAVID, in his official capacity as Commissioner of the
Maine Human Rights Commission; JULIE ANN O'BRIEN, in her
official capacity as Commissioner of the Maine Human Rights
Commission; MARK WALKER, in his official capacity as
Commissioner of the Maine Human Rights Commission; THOMAS L.
DOUGLAS, in his official capacity as Commissioner of the Maine
Human Rights Commission,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

---

* Plaintiff originally named as a defendant Jefferson Ashby
in his official capacity as a Commissioner of the Maine Human
Rights Commission. Sometime around February 2024, Megan Sanders
replaced Jefferson Ashby on the Maine Human Rights Commission.
Commissioners, Me. Hum. Rts. Comm'n,
https://www.maine.gov/mhrc/about/commissioners
[https://perma.cc/AQ4H-47JF] (last visited Apr. 28, 2026).
Pursuant to Federal Rule of Appellate Procedure 43(c)(2), we
substitute Sanders for Ashby as a defendant-appellee.

Before

Montecalvo and Kayatta,[**]
Circuit Judges.

———————

Tiffany H. Bates, with whom Patrick Strawbridge, Consovoy McCarthy PLLC, Kelly J. Shackelford, David J. Hacker, Jeremiah G. Dys, Camille P. Varone, and First Liberty Institute were on brief, for appellant.

R. Shawn Gunnarson, Christopher A. Bates, Jarom M. Harrison, and Kirton McConkie on brief for Church of Jesus Christ of Latter-Day Saints, National Association of Evangelicals, Ethics and Religious Liberty Commission of the Southern Baptist Convention, and Lutheran Church-Missouri Synod as amici curiae supporting appellant.

Christopher C. Taub, Chief Deputy Attorney General of Maine, with whom Aaron M. Frey, Attorney General of Maine, and Sarah A. Forster, Assistant Attorney General of Maine, were on brief, for appellees.

Aditi Fruitwala, Michelle Fraling, Daniel Mach, Heather Weaver, Louise Melling, American Civil Liberties Union Foundation, Carol Garvan, Zachary L. Heiden, Anahita Sotoohi, American Civil Liberties Union of Maine Foundation, Alexandra Zaretsky, and Americans United for Separation of Church and State on brief for American Civil Liberties Union, American Civil Liberties Union of Maine, and Americans United for Separation of Church and State as amici curiae supporting appellees.

Adam J. Hunt, Tamara Wiesebron, Jenny Xin, Justin Kareem Rezkalla, Morrison & Foerster LLP, Jessica Levin, Wendy Lecker, and Education Law Center on brief for Public Funds Public Schools, National Education Association, National School Boards Association, American Federation of Teachers, In the Public Interest, Freedom from Religion Foundation, American Atheists, Inc., Council of Parent Attorneys and Advocates, Inc., Network for Public Education, Pastors for Children, and Disability Rights Maine as amici curiae supporting appellees.

———————

July 2, 2026

———————

———————

[**] Judge Selya heard oral argument in this case and participated in the initial semble thereafter. His subsequent death ended his involvement in this case. The remaining two panelists issued this opinion pursuant to 28 U.S.C. § 46(d).

**KAYATTA**, **Circuit Judge**. Crosspoint Church ("Crosspoint") challenges certain provisions of the Maine Human Rights Act ("MHRA") on First Amendment grounds. This opinion, which resolves Crosspoint's appeal of the district court's denial of a permanent injunction, follows on the heels of our opinion in St. Dominic Academy v. Makin, No. 24-1739 (1st Cir. July 2, 2026), deciding an appeal almost -- but not quite -- identical to the appeal in this case. In this opinion, we consider whether any differences between the two cases call for a different outcome on the merits in this case. As we will explain, we find no such outcome-determinative difference. We therefore affirm in part and reverse in part the district court's order denying Crosspoint's motion for a permanent injunction.

## I.

We begin by briefly reviewing the statutory framework that Crosspoint challenges, the same framework at issue in St. Dominic. We then detail the facts presented by this particular case.

## A.

As we explained in our St. Dominic opinion, these cases concern the constitutionality of the intersection of two of Maine's statutory regimes. See slip op. at 5-19. First, the State's tuition-assistance program, codified in Title 20-A of the Maine Statutes, allows for children to attend private elementary and

- 3 -

secondary schools at public expense when the school administrative unit in which they reside neither maintains its own public school nor contracts to send children to a neighboring unit's public school or a private school.  Me. Stat. tit. 20-A, §§ 5203(4), 5204(4).  Second, the MHRA, contained in Title 5 of the Maine Statutes, provides Maine children protection against educational discrimination on certain prohibited grounds and applies to all in-state elementary and secondary schools that receive public funding.  Me. Stat. tit. 5, §§ 4553(2-A), 4602.  Thus, a private school that participates in the tuition-assistance program and then violates the MHRA exposes itself to civil suits from both the Maine Human Rights Commission (MHRC) and private alleged victims, with remedies including injunctive relief and monetary damages. Id. §§ 4612(4), 4613(2), 4621.

At issue here are four rules imposed by the MHRA.  First, the "Employment Rule" bars employment discrimination based on "race or color, sex, sexual orientation or gender identity, physical or mental disability, religion, age, ancestry, national origin or familial status," id. § 4572(1), with several exceptions that ensure that a religious organization can discriminate in employment in favor of co-religionists, id. § 4553(4), and can "require that all applicants and employees conform to [its] religious tenets," id. § 4573-A(2).  Second, the "Religious Expression Rule" provides that "to the extent that an educational

- 4 -

institution permits religious expression, it cannot discriminate between religions in so doing." Id. § 4602(5)(D). Third, the "Religious Nondiscrimination Rule" bars covered schools from discriminating in admissions, financial aid, academics, and the like on the basis of religion. Id. § 4602(1).[1] And fourth, the "Sexual Orientation and Gender Identity Nondiscrimination Rule" bars discrimination in all the same activities on the basis of sexual orientation or gender identity but exempts religious schools that do not receive public funding.[2] Id. § 4602(1), (5)(C).[3]

## B.

Crosspoint is an independent Christian church not subject to the authority of any other ecclesiastical authority.

---

[1] In full, section 4602(1) applies to "academic, extracurricular, research, occupational training or other program[s] or activit[ies]," "athletic programs," "admission[s]," "recruitment," and "financial assistance." Me. Stat. tit. 5, § 4602(1).

[2] This exemption is a hat on a hat: As explained above, the MHRA's education provisions as a whole only apply to those schools that accept public funding. Me. Stat. tit. 5, § 4553(2-A).

[3] The Religious Nondiscrimination Rule and the Sexual Orientation and Gender Identity Nondiscrimination Rule are actually part of the same provision, section 4602(1). In full, that provision makes it "unlawful educational discrimination" to act "on the basis of sex, sexual orientation or gender identity, physical or mental disability, ancestry, national origin, race, color or religion." Me. Stat. tit. 5, § 4602(1).

- 5 -

Crosspoint runs Bangor Christian School (BCS), a private K-12 school, as an auxiliary of the church.

BCS operates according to Crosspoint's Statement of Faith, which is reproduced in the school's Student/Parent Handbook. The Statement of Faith avows belief in "the one, true God," avers that "Jesus Christ is the Son of God," and asserts that only "those who receive Jesus Christ will go to Heaven." Per Crosspoint, BCS "considers prospective students' spiritual fit in determining admissions." Still, the school will welcome a student of any religious background or belief, provided that the student's family "is willing to support our philosophy of Christian education" and "allow their children to be educated and influenced in an intentionally Christian environment." Applicants must also show that they are "in agreement with school policies." BCS's Student Handbook also states that "[f]inancial aid is awarded to families based on need, without regard to race, sex, color, religion or national origin," though BCS does provide "[c]hurch member discounts" for first-time enrollees.

BCS students must also adhere to the school's code of conduct and dress code, which the parties agree "derive from [BCS's] religious beliefs." The code of conduct prohibits sexual activity outside of marriage, defined as "join[ing] one man and one woman in a single, covenantal union." The code of conduct also bars students from "identifying as a gender other than their

- 6 -

biological sex."  The dress code similarly requires each student to "wear clothing traditionally associated with his or her sex assigned at birth."  Based on these provisions, BCS leaders state that the school would likely refuse to admit an applicant who was "openly gay" or "[p]resenting oneself as a gender other than the one included on his or her birth certificate" and would likely expel a current student who came out as either.  Additionally, a student may face discipline, including expulsion, if the student "persistently and unrepentantly engages in 'counter-witnessing,' that is, advocating beliefs contrary to BCS's statement of faith."

As to its employment practices, BCS requires that all staff members be co-religionists.  Further, all BCS employees "must adhere to biblical standards of conduct, including those relating to sexual behavior."

Crosspoint alleges that each of the above policies violates one or more of the Employment Rule, the Religious Expression Rule, the Religious Nondiscrimination Rule, and/or the Sexual Orientation and Gender Identity Nondiscrimination Rule. BCS, Crosspoint says, meets or is willing to comply with the requirements for the tuition-assistance program and would apply to become approved for tuitioning purposes if not for the challenged rules.

**II.**

At the outset, we consider whether the distinct procedural posture of Crosspoint's appeal gives us any reason to treat this case differently than St. Dominic.

In St. Dominic, Catholic school St. Dominic Academy and related parties moved for preliminary injunctive relief against the Commissioner of the Maine Department of Education and the five Commissioners of the MHRC (collectively, the "Commissioners"), the district court denied the motion, and the plaintiffs appealed that denial. St. Dominic Acad. v. Makin, 744 F. Supp. 3d 43, 84 (D. Me. 2024). In this case, Crosspoint sought similar preliminary injunctive relief against the same defendants, and the district court similarly denied the motion. Crosspoint Church v. Makin, 719 F. Supp. 3d 99, 126 (D. Me. 2024). Rather than appeal that denial -- as the St. Dominic plaintiffs did in their case -- Crosspoint stipulated to the conversion of the district court's preliminary-injunction denial into a permanent-injunction denial and to the entry of final judgment in favor of the Commissioners -- from which it then appealed. Crosspoint Church v. Makin, No. 23-cv-00146, 2024 WL 2830931, at *4 (D. Me. June 4, 2024). The net result is that, in St. Dominic, we considered an appeal from the denial of a preliminary injunction, while here we work in the realm of permanent injunctive relief.

- 8 -

Although the standard for permanent injunctive relief differs from the standard for preliminary injunctive relief, we do not believe this, alone, requires us to treat the two appeals differently, at least as far as their overlapping issues go.  See Caroline T. v. Hudson Sch. Dist., 915 F.2d 752, 755 (1st Cir. 1990) ("Where a plaintiff seeks permanent injunctive relief, the test is the same [as for preliminary injunctive relief], except that the movant must show actual success on the merits of the claim, rather than a mere likelihood of such success." (citation modified)).  In stipulating to the entry of final judgment, Crosspoint reserved its right to appeal all aspects of the district court's preliminary-injunction order.  At the same time, it agreed that it had no new facts to offer and eschewed any interest in any further hearing.[4]  In particular, it reserved no right to argue that it might be entitled to a permanent injunction even if it was not entitled to a preliminary injunction.  As a result, the different procedural posture of this case does not, by itself, give any reason to depart from our resolution of similar issues in St. Dominic.  We therefore direct the remainder of this opinion to

---

[4]  The parties did include, as part of their stipulated record before the district court, three documents that had not been part of the record on Crosspoint's motion for a preliminary injunction; however, the district court determined that these documents did not alter its analysis.  Crosspoint, 2024 WL 2830931, at *2-3.  We consider these documents as part of the record on appeal.

considering putatively material differences in the facts or substantive arguments presented in this case.

**III.**

We move on, then, to Crosspoint's arguments for enjoining the Employment Rule, the Religious Expression Rule, the Religious Nondiscrimination Rule, and the Sexual Orientation and Gender Identity Nondiscrimination Rule.

Our analysis in St. Dominic resolves Crosspoint's challenge to the Employment Rule. See slip op. at 24-30. As in that opinion, we hold that no case or controversy exists with respect to the Employment Rule because the rule's carveouts already provide the relief that Crosspoint claims to seek.

Our St. Dominic opinion also takes care of Crosspoint's claims against the Religious Expression Rule. Following that opinion's lead, we hold that the Religious Expression Rule unconstitutionally violates Crosspoint's free-exercise rights, and so we remand for the district court to enjoin that rule as applied to Crosspoint. Id. at 30-43.

We turn, then, to the Religious Nondiscrimination Rule. In St. Dominic, we concluded that the Religious Nondiscrimination Rule does not proscribe St. Dominic's mission-oriented admissions practices. Id. at 45-50. That conclusion applies equally to BCS's policies requiring students' families to "support [BCS's] philosophy of Christian education" and "allow their children to be

- 10 -

educated and influenced in an intentionally Christian environment." Moreover, if Crosspoint fears the MHRA may require it to allow students to "advocat[e] beliefs contrary to BCS's statement of faith," the MHRC may not enforce the Religious Nondiscrimination Rule in a way that, in practice, recreates the Religious Expression Rule. We also found in St. Dominic that the Religious Nondiscrimination Rule's bar on St. Dominic's preference for Catholic students in admissions and financial aid does not violate St. Dominic's constitutional rights. Id. at 51-90. To the extent that certain of BCS's policies -- such as its "[c]hurch member discounts" and consideration of "prospective students' spiritual fit" -- similarly entail some discrimination based on students' religious beliefs, we adopt the reasoning of our St. Dominic opinion in finding no constitutional violation in the Religious Nondiscrimination Rule's application to those policies. Id.

Similarly, we conclude the Sexual Orientation and Gender Identity Nondiscrimination Rule works no constitutional violation for substantially the reasons given in our St. Dominic opinion. See id. at 90-107.

In light of the foregoing, we address here only two arguments raised by Crosspoint but not by St. Dominic. The first, a free-exercise argument, takes aim at the Religious Nondiscrimination Rule and the Sexual Orientation and Gender

- 11 -

Identity Nondiscrimination Rule together.  The other, under a free-speech framing, targets the Sexual Orientation and Gender Identity Nondiscrimination Rule specifically.  Neither changes the ultimate outcome.

**A.**

Crosspoint's first unique argument maintains that a set of recent amendments to the MHRA specifically targets BCS, in violation of the Free Exercise Clause.  In this dispute's precursor litigation -- which culminated in the Supreme Court's decision in Carson v. Makin, 596 U.S. 767 (2022) -- two of the plaintiffs (David and Amy Carson) sought funding to send their daughter to BCS.  Id. at 775-76.  In June 2021, before the Supreme Court acted on the Carson certiorari petition, the State amended various provisions of the MHRA.  An Act to Improve Consistency in Terminology and within the Maine Human Rights Act, Me. Pub. L. 2021, ch. 366, 2021 Me. Laws 761 (codified as amended in scattered sections of Me. Stat. tit. 5) [hereinafter the "2021 Amendments"].

The 2021 Amendments touched many parts of the MHRA, but Crosspoint points to two allegedly targeted changes.  First, the amendments added "religion" -- along with color and ancestry -- as prohibited grounds for discrimination in education, effectively creating the Religious Nondiscrimination Rule.  2021 Amendments sec. 19 (codified at Me. Stat. tit. 5, § 4602(1)).  This aligned

the MHRA's education protections with its employment and housing provisions, which already forbade discrimination on the basis of religion.  Me. Stat. tit. 5, §§ 4571, 4581 (2018).  Second, the amendments narrowed a carveout to the Sexual Orientation and Gender Identity Nondiscrimination Rule:  Previously, the MHRA exempted all religious schools from the Sexual Orientation and Gender Identity Nondiscrimination Rule, Me. Stat. tit. 5, § 4602(4) (2018), but the amendments revised that exemption to apply only to those religious schools that do not receive public funding, 2021 Amendments sec. 19 (codified at Me. Stat. tit. 5, § 4602(5)(C)).  This also matched the MHRA's employment and housing provisions, which similarly exempted from their bars on sexual-orientation and gender-identity discrimination only those religious organizations that did not receive public funding.  Me. Stat. tit. 5, § 4553(10)(G) (2018).[5]

In St. Dominic, we rejected the contention that the 2021 Amendments were intended to exclude religious schools generally from the tuition-assistance program.  See slip op. at 61-68, 99-101.  Here, Crosspoint makes a more pointed argument that the narrowing of the rule's exemption for religious schools was

---

[5] The 2021 Amendments also added the Religious Expression Rule, which Crosspoint likewise includes in its targeting argument.  2021 Amendments sec. 19 (codified at Me. Stat. tit. 5, § 4602(5)(D)).  We already enjoin the Religious Expression Rule, but, in any event, its inclusion in the above list of changes would not alter our analysis.

motivated in particular by hostility toward BCS as the school at the center of Carson.  This argument proceeds under the framework established in Employment Division v. Smith, 494 U.S. 872 (1990): "A law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 546 (1993).  Specifically, Crosspoint's targeting claim sounds in the Smith neutrality inquiry.  See Fulton v. City of Philadelphia, 593 U.S. 522, 533 (2021) ("Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature."); Masterpiece Cakeshop v. Colo. C.R. Comm'n, 584 U.S. 617, 638 (2018) ("[T]he government . . . cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices.").

In support of this argument, Crosspoint alleges that three extrinsic sources postdating passage of the 2021 Amendments evince anti-BCS animus: (1) Attorney General Aaron Frey's press release the day the Supreme Court decided Carson, in which he described "[t]he education provided by the schools at issue here" as "inimical to a public education" and stated his intention to "explore" "statutory amendments to address the Court's decision and ensure that public money is not used to promote discrimination,

intolerance, and bigotry"; (2) Maine House Speaker Ryan Fecteau's post-Carson tweet approving of the statement that "Maine just changed the [MHRA's] guidelines to exclude schools that discriminate against LGBTQ+ students" and calling Carson a "ludicrous decision from the far-right [Supreme Court]"; and (3) Professor Aaron Tang's June 2022 opinion piece in The New York Times, entitled "There's a Way to Outmaneuver the Supreme Court, and Maine Has Found It," which extols the 2021 Amendments.

Even if we assume that these statements concerned BCS specifically, we reject Crosspoint's reliance on them for much the same reasons that we rejected the St. Dominic plaintiffs' reliance on them.  See slip op. at 64-68.  Maine law assigned Attorney General Frey and Professor Tang no roles in the adoption of the 2021 Amendments.[6]  Speaker Fecteau did play a legislative role in their adoption, but "[w]hat motivates one legislator to [tweet] about a statute is not necessarily what motivates scores of others," so courts must "eschew guesswork" about legislative

---

[6] Crosspoint insists that, even if Frey had no formal role in the enactment, his statement goes to "the context in which [the state] legislated."  However, Frey issued the press release in question roughly one year after passage of the 2021 Amendments. We fail to see how Frey's forward-looking intent to explore statutory amendments in June 2022 could be part of the legislative context when the amendments were passed in June 2021.  Cf. Alexander v. Sandoval, 532 U.S. 275, 313-14 (2001) (Stevens, J., dissenting) (referring to "the contemporary context" of legislative enactments); Thompson v. Thompson, 484 U.S. 174, 180 (1988) (looking to "the context" "[a]t the time Congress passed" the legislation in question).

motive based on the one-off statements of individual legislators. United States v. O'Brien, 391 U.S. 367, 384 (1968).  And even if the tweet did evidence legislative intent, we do not see any anti-BCS animus in a tweet criticizing a Supreme Court decision and describing the 2021 Amendments as "exclud[ing] [from the tuition-assistance program] schools that discriminate against LGBTQ+ students."  That a legislator criticizes a practice and a religious group engages in that practice does not mean that legislator was motivated by religious animus.  Cf. Lukumi, 508 U.S. at 540 (finding ordinances nonneutral on ground that they "were enacted 'because of,' not merely 'in spite of,' their suppression of Santeria religious practice" (citation modified)).

Crosspoint also contends that while the 2021 Amendments "ha[ve] ramifications for many religious schools, [their] timing and structure show that [their] purpose was to preemptively exclude BCS and other schools with similar beliefs from [the tuition-assistance program] to moot Carson."  The State likely adopted the 2021 Amendments at least partially in response to the Carson litigation.  But we will not infer something as sinister as an "express[] design[]" to discriminate against a specific religious entity where Maine offers a quite logical and compelling rationale for the amendments' structure and timing:

> If [the State's] Legislature anticipated that the [Carson] litigation might result in [the State] being prohibited from excluding

- 16 -

religious schools from [public funding], it would have been entirely appropriate to then make the same distinction in education as the Legislature did [years earlier] for employment and housing and require religious organizations that accept public funds to comply with [all antidiscrimination rules].

Thus, just as we concluded in St. Dominic that the plaintiffs there had not shown that general antireligious animus likely motivated the 2021 Amendments, slip op. at 61-68, 99-101, so too do we hold here that Crosspoint has not shown that specific anti-BCS animus motivated the same amendments. And for that reason and the other reasons expressed in St. Dominic, we conclude Crosspoint has not succeeded on its free-exercise claims against the Religious Nondiscrimination Rule or the Sexual Orientation and Gender Identity Nondiscrimination Rule.

**B.**

Crosspoint also insists that the Sexual Orientation and Gender Identity Nondiscrimination Rule acts as a content- and viewpoint-based regulation of speech in violation of the Free Speech Clause.[7] Under the Free Speech Clause, "'[c]ontent-based

---

[7] Much of Crosspoint's free-speech claim homes in on the Religious Expression Rule, which we need not consider here given that we already enjoin that rule under Crosspoint's free-exercise claim. Separately, we do not understand Crosspoint to assert any free-speech argument against the Religious Nondiscrimination Rule. As to section 4602(1), the provision containing both the Religious Nondiscrimination Rule and the Sexual Orientation and Gender Identity Nondiscrimination Rule, Crosspoint's free-speech arguments focus exclusively on students' sexual orientation and gender identity. To the extent this claim does apply to the

laws -- those that target speech based on its communicative content -- are presumptively unconstitutional and may be justified only if' they satisfy strict scrutiny." Free Speech Coal., Inc. v. Paxton, 606 U.S. 461, 471 (2025) (quoting Reed v. Town of Gilbert, 576 U.S. 155, 163 (2015)). Viewpoint-based laws represent a subset of content-based laws where "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction," and, as a result, "the violation of the First Amendment is all the more blatant." Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 829 (1995).

The Sexual Orientation and Gender Identity Nondiscrimination Rule, Crosspoint contends, regulates speech because it would "require BCS to affirm a student's gender identity and sexual orientation," even though it would "violate[] BCS's statement of faith to admit a student or allow a student to remain

---

Religious Nondiscrimination Rule, we reject that challenge for substantially the same reasons given with respect to the Sexual Orientation and Gender Identity Nondiscrimination Rule below. Specifically, on its face, the rule's prohibition on discrimination against students on the basis of religion regulates conduct, not speech. On this record, we do not read the Religious Nondiscrimination Rule as prohibiting religious instruction. The rule would not prevent BCS from teaching, for example, that there is only "one, true God" and that "Jesus Christ is the Son of God." And because we have enjoined the Religious Expression Rule, BCS would also be able to curtail religious expression that contradicts that teaching.

enrolled who violates BCS's statement of faith by presenting as a gender not consistent with his or her biological sex."[8]

But the text of the rule contains no such requirement.[9] Rather, as the district court observed, "the plain text of the

---

[8] Unlike the plaintiffs in St. Dominic, Crosspoint makes no expressive-association claim under the First Amendment. See Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez, 561 U.S. 661, 678–83 (2010) (recognizing distinction between free-speech and expressive-association claims). Although Crosspoint's opening brief does reference "the school's 'expressive association'" in its free-speech discussion, Crosspoint made no expressive-association argument below, and in its reply brief to this court, stated, "Crosspoint is not . . . attempting to make a right to association argument." In light of this express waiver, we limit ourselves here to free-speech doctrine and decline to consider any impact the MHRA might separately have on Crosspoint's associational rights. See United States v. Concepcion-Guliam, 62 F.4th 26, 31 (1st Cir. 2023) ("A party who identifies an issue, and then explicitly withdraws it, has waived that issue." (citation modified)).

[9] We add an important caveat here:  In St. Dominic, the plaintiffs challenged on several grounds the potential application to St. Dominic of a 2016 memorandum from the MHRC that interpreted the Sexual Orientation and Gender Identity Nondiscrimination Rule to require a school to "use [a] student's preferred name and pronouns consistent with their gender identity" and instruct its employees and students "to address the student by the student's chosen name and use pronouns consistent with the student's gender identity." Memorandum from Barbara Archer Hirsch, Comm'n Couns., Me. Hum. Rts. Comm'n, to Amy Sneirson, Exec. Dir., Me. Hum. Rts. Comm'n, 3–4 (Jan. 13, 2016), https://www.maine.gov/mhrc/sites/maine.gov.mhrc/files/inline-files/20160113_g.pdf [https://perma.cc/594V-BCS7] [hereinafter "2016 MHRC Memorandum"]; see also St. Dominic, slip op. at 91–92. Crosspoint, unlike the St. Dominic plaintiffs, makes no mention of the 2016 MHRC Memorandum in its briefs.  Instead, Crosspoint focuses its analysis on a single concern: whether the Sexual Orientation and Gender Identity Nondiscrimination Rule prevents them from refusing to admit or expelling a student based on that student's sexual orientation or gender identity.  While other applications of the Sexual Orientation and Gender Nondiscrimination Rule are possible, as suggested by the 2016 MHRC

- 19 -

challenged provisions of the MHRA regulate conduct, not speech." Crosspoint, 719 F. Supp. 3d at 124. Facially, the Sexual Orientation and Gender Identity Nondiscrimination Rule simply prohibits educational discrimination on the basis of sexual orientation or gender identity. As the Commissioners concede, BCS "is free to impart whatever religious education it likes." This includes the message that marriage should be between "one man and one woman in a single, covenantal union" or that one's gender cannot be distinguished from one's biological sex.

The Supreme Court has repeatedly cited similar antidiscrimination laws as examples of regulations targeted at conduct that permissibly curb speech. In R.A.V. v. City of St. Paul, for instance, the Court described Title VII, the federal prohibition on sex discrimination in employment, as a "law[] directed not against speech but against conduct." 505 U.S. 377, 389 (1992). Similarly, in Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, the Court noted that the state

---

Memorandum, Crosspoint has not raised -- much less developed -- any argument about these other applications, which likely require a different, more precise legal analysis. See, e.g., Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Bos., 515 U.S. 559, 561 (1995) (distinguishing between complete exclusion of a protected group and other alleged violations of a state civil rights law). As such, we limit our decision here to the plain text of the Sexual Orientation and Gender Identity Nondiscrimination Rule. Nothing in this opinion precludes Crosspoint from later bringing a challenge to the 2016 MHRC Memorandum if the MHRC or a private litigant seeks to enforce the memorandum's policies against BCS.

- 20 -

antidiscrimination law at issue did "not, on its face, target speech or discriminate on the basis of its content" since "the focal point of its prohibition" was "on the act of discriminating against individuals."  515 U.S. 557, 572 (1995).  So too, here, the text of the Sexual Orientation and Gender Identity Nondiscrimination Rule proscribes discriminatory conduct, not speech.

Of course, the Supreme Court has, on occasion, found an antidiscrimination law to infringe a party's free-speech rights. In Hurley, the Court ultimately found the state antidiscrimination law at issue unconstitutional as applied to the extent it forced private parade organizers "to include among the marchers a group imparting a message the organizers d[id] not wish to convey," to wit, the excluded group's "pride in their Irish heritage as openly gay, lesbian, and bisexual individuals."  Id. at 557, 559, 561. And in 303 Creative LLC v. Elenis, the Court struck down the application of a state antidiscrimination law that would compel a web designer to create wedding websites for same-sex couples.  600 U.S. 570, 602-03 (2023); see id. at 592 (recognizing that "public accommodations statutes can sweep too broadly when deployed to compel speech").  However, both cases concerned not discrimination based on status but discrimination based on message.  In Hurley, the parade organizers allowed openly gay, lesbian, and bisexual individuals to march; the organizers just objected to a particular

- 21 -

group marching "as its own parade unit carrying its own banner." 515 U.S. at 572. Likewise, 303 Creative concerned only the plaintiff's refusal to create a specific message, and the Court expressly disclaimed any "right to refuse to serve members of a protected class." 600 U.S. at 597-98 (citation modified); see also Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC, 103 F.4th 765, 778-79 (11th Cir. 2024) (discussing R.A.V., Hurley, and 303 Creative as cases where the Supreme Court "recognize[d] and enforce[d] the critical distinction between advocating . . . discrimination and practicing it"). In contrast, here, Crosspoint seeks to refuse admission to (and expel) any student who is gay or transgender, irrespective of that student's speech. Although such refusal may express Crosspoint's views regarding sexual orientation and gender identity, and the Sexual Orientation and Gender Identity Nondiscrimination Rule would interfere with that expression, that does not transform the rule into a speech regulation.

Crosspoint has failed to convince us that the Sexual Orientation and Gender Identity Nondiscrimination Rule should receive strict scrutiny as a content- or viewpoint-based regulation of speech. That being so, the rule is subject to only rational basis review, which it survives, as explained in our St. Dominic opinion. See slip op. at 106-07.

- 22 -

**IV.**

For the foregoing reasons -- along with those we provided in St. Dominic -- we affirm in part and reverse in part the district court's order denying Crosspoint's motion for a permanent injunction.  Specifically, we affirm the order insofar as it determined that no case or controversy exists with respect to the Employment Rule and rejected Crosspoint's arguments against the Religious Nondiscrimination Rule and the Sexual Orientation and Gender Identity Nondiscrimination Rule.  And we reverse the order insofar as it rejected Crosspoint's arguments against the Religious Expression Rule.  We thus remand the case for further proceedings consistent with this opinion, including the timely entry of a permanent injunction against the Religious Expression Rule as applied to Crosspoint.  No costs are allocated.